UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x   22 Cr. 188 (JSR)
UNITED STATES OF AMERICA,

     - against -

SINA MOAYEDI,

               Defendant.
-----------------------------------------------------------x


### SENTENCING MEMORANDUM OF SINA MOAYEDI


FREDERICK L. SOSINSKY, ESQ.
45 Broadway, Suite 3010
New York, NY 10006
Phone: (212) 285-2270

SARA KROPF, ESQ.
Kropf Moseley PLLC
1100 H Street, NW, Suite 1220
Washington, D.C. 20005
Phone: (202) 627-6900

*Attorneys for Defendant Sina Moayedi*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iv

TABLE OF EXHIBITS ....................................................................................................x

TABLE OF ABBREVIATIONS .......................................................................................xi

PRELIMINARY STATEMENT .......................................................................................1

ARGUMENT ....................................................................................................................4

I.    The History and Characteristics of Sina Moayedi ..................................................4

    A.  Sina's Life History ..........................................................................................5

    B.  Sina Through the Eyes of Those Who Know Him .........................................14

    C.  Sina's Letter to the Court ...............................................................................26

II.    The Advisory Sentencing Guidelines' Calculations ...............................................28

    A.  Our Objections to the PSR .............................................................................28

    B.  The Guidelines Term of Imprisonment Here is Terribly Irrational and Unjust.............30

III.    Discussion of Relevant Offense Conduct................................................................35

    A.  The Nature and Circumstances of the Government Contracts Conspiracy Offense (Count 1) .......................................................................................................35

        1.  Relevant Federal Procurement Law .......................................................35

        2.  Montage's Work for the Federal Government ........................................44

            a.  Overview of Montage's Work ........................................................44

            b.  Contracts Forming the Offense Conduct ........................................46

            c.  Montage Performed the Work .........................................................48

        3.  Mr. Moayedi's Relevant Misrepresentations .........................................51

            a.  Misrepresentations Regarding 8(a) and WOSB Status.................51

            b.  Misrepresentations Regarding Employee Education and Experience .........51

            c.  Misrepresentations Regarding Montage's Prior Experience .....................52

        4.  Contested Facts That Should Not be Considered for the Purposes of Imposing a Sentence on Mr. Moayedi .......................................................52

            a.  The Government's Newly Identified 37 "Construction Related Issues"......53

            b.  Requests for Equitable Adjustment .................................................53

            c.  No Evidence of National Security Risk ...........................................54

            d.  Submission of Resumes ...................................................................55

            e.  Architect Stamp on "As Built" Drawings .......................................55

            f.  Resubmittals with Architect Stamp .................................................58

B. The Nature and Circumstances of Offense Conduct Related to Bank and Bonding Company (Count 1)................................................................59

C. The Nature and Circumstances of the Bribery Conspiracy Offense (Count 2) ............60

D. The Nature and Circumstances of Aggravated Identity Theft Count (Count 3)............61

IV. Remaining Factors Under 18 U.S.C. § 3553 ......................................................63

A. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense ..............................................63

B. The Need to Afford Adequate Deterrence to Criminal Conduct ...................................63

C. The Need to Protect the Public From Further Crimes of the Defendant .......................65

D. The Need to Avoid Sentencing Disparities..................................................................68

    1. The Court's Harshest Sentences Have Been Reserved For Heartless Scammers.....68

    2. Use of Phony Websites, Email Accounts, Stolen Identities and Fictitious Persona.71

    3. Forged or Altered Documents..................................................................76

    4. Repeat Fraudsters..................................................................................77

    5. Obstruction............................................................................................78

E. The Bureau of Prisons Cannot Be Counted On To Address Sina Moayedi's Medical Issues ........................................................................................................79

F. The Conditions of Confinement at the MDC Where Sina Has Mostly Been Held Have Been Grueling and Intolerable, Further Justifying a More Modest Sentence................81

G. Despite the Terrible Conditions at the MDC, Sina Moayedi Has Been a Model Inmate Who Participated in Every Program Possible and Aided Countless Other Inmates.......85

CONCLUSION................................................................................................85

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Pages</u>

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*
    518 U.S. 668, 691 (1996) (dissent) .............................................................35

*Appeal of Chugach Fed. Sols., Inc.,*
    ASBCA No. 63399 (June 8, 2023) ...................................................41, 54

*Corel Corp. v. United States,*
    165 F. Supp. 2d 12 (D.D.C. 2001).................................................................35

*Dubin v. United States,*
    143 S. Ct. 1557 (2023)...................................................................61, 62

*Flores-Figueroa v. United States,*
    556 U.S. 646 (2009)......................................................................62, 63

*Gall v. United State*s,
    52 U.S. 38 (2007)...............................................................................30

*Kan. v. Umbehr*,
    518 U.S. 668 (1996)...........................................................................35

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y 2006)....................................................1, 31, 63

*United States v. Akhaven & Weigand,*
    20 Cr. 188 (JSR) (S.D.N.Y 6/21/21)............................................................72

*United States v. Asante,*
    12 Cr. 88 (JSR) (S.D.N.Y 5/18/22).............................................................70

*United States v. Bershan*,
    17 Cr. 638 (JSR) (S.D.N.Y 11/22/19)..........................................................69

*United States v. Booth*,
    21 Cr. 652 (JSR) (S.D.N.Y 8/11/22)...........................................................70

*United States v. Borker*,
    22 Cr. 273 (JSR) (S.D.N.Y 4/28/23)...........................................................78

*United States v. Brissett,*
    19 Cr. 153 (KMW)  (S.D.N.Y. 9/11/21).......................................................84

iv

*United States v. Butters,*
    588 F. App'x 12 (2d Cir. 2014) ...........................................................69

*United States v. Casperson,*
    16 Cr. 414 (JSR) (S.D.N.Y. 11/4/16) ..............................................3, 75

*United States v. Crummy,*
    249 F. Supp. 3d 475 (D.D.C. 2017) ...................................................32

*United States v. Days,*
    19 Cr. 619 (CM) (S.D.N.Y. 4/29/21) ..................................................82

*United States v. Gata-Aura,*
    18 Cr. 179 (JSR) (S.D.N.Y 7/28/20) ...................................................74

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ..............................................1, 30

*United States v. Harris,*
    821 F.3d 589 (5th Cir. 2016) .........................................................32, 33

*United States v. Jackson,*
    16 Cr. 750 (JSR) (S.D.N.Y 9/12/17) ...................................................75

*United States v. Johnson,*
    17 Cr. 482 (JSR) (S.D.N.Y 8/12/18) ...................................................76

*United States v. Kaitz,*
    14 Cr. 845 (JSR) (S.D.N.Y 9/9/15) ....................................................77

*United States v. Kozerksi,*
    395 F. Supp.3d 919 (N.D. Ohio 2019) ................................................33

*United States v. Lockhart,*
    2020 WL 4333010 (E.D.N.Y. July 27, 2020) .......................................82

*United States v. Marmolejos,*
    19 Cr. 626 (PAE) (S.D.N.Y. 11/24/20) ...............................................84

*United States v. Mishoe,*
    241 F.3d 214 (2d Cir. 2001) .............................................................68

*United States v. Morgan,*
    19 Cr. 109 (RMB) (S.D.N.Y. 5/5/20) ..................................................82

*United States v. Munshani,*
    22 Cr. 215 (JSR) (S.D.N.Y 4/7/23) ....................................................72

*United States v. Nagle,*
    803 F.3d 167 (3d Cir. 2015)................................................................32, 33

*United States v. Naranjo,*
    13 Cr. 351 (JSR) (S.D.N.Y. 4/9/14)...........................................................77

*United States v. O'Connor,*
    21 Cr. 536 (JSR) (S.D.N.Y  6/23/23)..........................................................74

*United States v. Padron,*
    21 Cr. 00124 (XR) (W.D. Tex. 1/18/23)......................................................33

*United States v. Phillibert,*
    15 Cr. 647 (PAE) (S.D.N.Y. 8/27/21)..........................................................84

*United States v. Prestes Junior,*
    20 Cr. 416 (JSR) (Sept. 27, 2021)........................................................73, 83

*United States v. Ralston,*
    19 Cr. 774 (JSR) (S.D.N.Y 2/7/23)............................................................76

*United States v. Robles,*
    08 Cr. 1114 (PAE) (S.D.N.Y. 8/10/21)........................................................84

*United States v. Rodriguez,*
    492 F. Supp. 3d 306 (S.D.N.Y. Sept. 30, 2020) .........................................83

*United States v. Salehi,*
    21 Cr.5 77 (JSR) (S.D.N.Y. 4/8/22).......................................................61, 78

*United States v. Salemo,*
    11 Cr. 065 (JSR) (S.D.N.Y. 10/19/11).........................................................71

*United States v. Sayoc,*
    388 F. Supp.3d 300 (S.D.N.Y. 2019)......................................................81, 82

*United States v. Servider,*
    17 Cr. 160 (JSR) (S.D.N.Y. 7/27/17)..........................................................74

*United States v. Smith,*
    20 Cr. 074 (AJT) (E.D.V.A. 5/5/22)...........................................................33

*United States v. Sternquist,*
    22 Cr. 473 (DLI) (E.D.N.Y. 10/10/22) ........................................................80

*United States v. Zangari,*
    677 F.3d 86 (2d Cir. 2012)...................................................................................48, 49


**Statutes and Regulations**

18 U.S.C. § 1028A ..........................................................................................................75

18 U.S.C. § 3553 ....................................................................................................3, 79, 85

13 C.F.R. § 124.101 .......................................................................................................37

48 C.F.R. § 2.101 ......................................................................................................36, 38

48 C.F.R. § 9.103 ...........................................................................................................39

48 C.F.R. § 9.406-2 .................................................................................................44, 67

48 C.F.R. § 16.500 ........................................................................................................46

48 C.F.R. § 42.1501 ......................................................................................................40

48 C.F.R. § 42.1503(f) ...................................................................................................40

48 C.F.R. § 43.103(a)(1) ................................................................................................40

48 C.F.R. § 46.104(a) ....................................................................................................41

48 C.F.R. § 46.407 ........................................................................................................43

48 C.F.R. § 49.402-1 ................................................................................................43, 49

48 C.F.R. § 52.225-19(h) ..........................................................................................43, 52

48 C.F.R. § 52.246-21 ...................................................................................................43

48 C.F.R. § 552.211-70 .................................................................................................48

**Sentencing Guidelines**

USSG §2B1.1(a)(2) .................................................................................30

USSG §2B1.1(b)(1)(K) ...........................................................................30

USSG §2B1.1(b)(2)(A)(i) ........................................................................31

USSG §2B1.1(b)(10)(C) ..........................................................................31

USSG §2B1.1(b)(11)(A) ..........................................................................31

USSG §2B1.1(b)(17)(A) ..........................................................................31

USSG §3B1.1(a) ......................................................................................31

USSG §3C1.1 ..........................................................................................38

USSG §3E1.1(a), (b) ...............................................................................31

**Other Authorities**

Congressional Research Service, SBA's "8(a) Program": Overview, History, and Current Issues (July 2022) ........................................................................37, 38

Cullen, Francis T. et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 *Prison J.* 48S (2011) .........................................................64, 66

Green, Donald P. & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism Among Drug Offenders*, 48 Criminology 357 (2010) ...............................................................................66

Gabbay, Zvi, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421 (2007) ...........................64

GAO, *8(a) Program: Fourteen Ineligible Firms Received $325 Million in Sole-Source and Set-Aside Contracts*, No. GAO-10-425 (April 2010) ........................................38

Jacobs, Brian, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021) ...........................64

State Department Foreign Affairs Handbook 14-2, § 220 ....................................36

Tonry, Michael, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28 (2006) ...............................................................................64

U.S. Department of Justice, National Institute of Justice, *Five Things About Deterrence*, (June 2016) ................................................................................64

U.S. Department of Justice, Office Inspector Gen., *Audit of the Federal Bureau of Prison Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School* (March 2022) ....................................................................................81

U.S. Department of Justice, Office of Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (March 2016) ..................................................80

U. S. Department of Justice, Office of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016) ................................80

U. S. Sentencing Commission, *Older Offenders in the Federal System,* July 2022 ...............67

U.S. Sentencing Commission*, The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017) ....................................................................................................67

Von Hisch, Andrew et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) ....................................................................................................64

Weisburg, David et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 *Criminology* 587 (1995)................................................................65

## <u>TABLE OF EXHIBITS</u>

| Exhibit | Description |
|---|---|
| **A** | Mitigation Report by Consulting Project (includes letters as Attachments 1a-1bbb) |
| **B** | State Department proposal for Indefinite Delivery Indefinite Quantity (IDIQ) contract |
| **C** | State Department *OBO Guide to Excellence in Diplomatic Facilities* |
| **D** | State Department Office of Inspector General, *Audit of the Bureau of Overseas Buildings Operations Process for Reviewing Invoices for the Construction of the U.S. Embassy in Islamabad, Pakistan* |
| **E** | List of all federal contracts awarded to Montage |
| **F** | List of all federal contracts awarded to Viking Contractors |
| **G** | Notices of Substantial Completion for Ecuador and Hong Kong projects |
| **H** | Ecuador Project, Division 1 General Requirements |
| **I** | Deposition of State Department Chief, Architectural Engineering Contracting Branch David Vivian |
| **J** | Sina Moayedi's Letter to the Court |

## TABLE OF ABBREVIATIONS

| Acronym | Description |
|---------|-------------|
| COR | Contracting Officer Representative |
| CPARS | Contractor Performance Assessment Reporting System |
| CQC | Construction Quality Control |
| DOR | Designer of Record |
| DOSAR | Department of State Acquisition Regulation |
| FAH | Department of States Foreign Affairs Handbook |
| FAR | Federal Acquisition Regulation |
| IDIQ | Indefinite Delivery Indefinite Quantity |
| IGE | Independent Government Estimate |
| OBO | State Department Bureau of Overseas Building Operations |
| REA | Request for Equitable Adjustment |
| SAM | System for Award Management |
| SDVOSB | Service Disabled Veteran Owned Small Business |
| TIA | Time Impact Analysis |
| WOSB | Women Owned Small Business |

## PRELIMINARY STATEMENT

Sina Moayedi respectfully submits this memorandum to assist the Court in exercising its "formidable responsibility" of "[i]mposing a sentence on a fellow human being." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).  Sina, who recently turned 68 years old, has pled guilty to three offenses and accepts full responsibility for his commission of those crimes and other related misconduct. He wholly acknowledges the wrongfulness of his actions and has spent the entirety of his difficult time in custody, almost two years in total, coming to terms with the harm that his actions caused.  But as we hope the Court will see, Sina Moayedi is, and has always been, far more than simply the immoral offender that the government portrays him to be.

His life story is that of an immigrant who by dint of hard work, a good education, and a love for this country, started and grew a small business over the course of three decades. That small business provided a good living for his family and for those who worked with him.  Those who know Sina best attest that he is a genuinely good man who is extremely caring and interested in them, generous with his time, his ear, his heart, and his money.  They also make plain that Sina is a loving, attentive, and very involved father to his three young daughters, a devoted husband, and a giving brother to his four siblings.  As this Court has put it, "if ever a man is to receive credit for the good that he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006).

Within the realm of what is referred to as white collar crime, the offenses for which Your Honor typically has been called upon to impose sentence fall into certain well-worn categories: those where the defendants scammed unsuspecting victims—often the elderly and retired but sometimes close friends, colleagues, partners, even family members—out of their hard-earned

1

money by false promises or pretenses; those where the defendants outright stole from their clients, their employer, or the government; those where a defendant insider betrayed his or her duties and passed along non-public information to others who traded and profited on the data, causing harm upon the "market"; those where a corporate executive of a publicly-traded entity lies to regulators or to the public regarding relevant financial information in an effort to paint a more favorable picture of the company's finances; or those where business owners lie to lenders about the actual state of affairs in an effort to gain or maintain necessary financing.

The case of Sina Moayedi and the company he built, Montage Inc. ("Montage") represents, we submit, somewhat of an outlier as compared to these types of matters. Not because the misrepresentations that were made over the years—and there were quite a few—were any closer to the truth than the false claims made by defendants in the above cases. But what we hope the Court will recognize as substantially mitigating Sina Moayedi's misconduct is that it was all in service of being awarded, and then fulfilling, what he and Montage had contracted to fulfill – government contracts where Montage designed and built buildings or completed complex renovations subjected to multiple inspections by the federal agency overseeing the projects.

Unlike the defendants who have stood before this Court having schemed to take the last dollar of as many victims as they were able to get their hands on, usually with complete impunity, or those whose entire operations were fraud factories, Sina Moayedi's crimes were motivated by a desire to actually do the hard work, to provide the design and build services required to complete overseas government construction projects.

Though most every defendant involved in white collar crimes acts in order to get money through unlawful means, only a certain class of offender actually provides goods or services to their victims commensurate with what the offender received. Here, Sina Moayedi will be

sentenced, he will be punished, principally for misrepresentations and in one instance the payment of a bribe which allowed his company to bid on and be awarded certain contracts for which Montage was not eligible.  He will be punished because without misrepresentations made to United Bank, Montage would not likely have received the eventual $3 million line of credit needed to operate the company.  But the line of credit was fully secured by real properties throughout the lending period and the loan was paid in full. He will be punished because without misrepresentations made to the bonding companies, Montage likely would not have been issued the performance and payment bonds required to win government contracts. But the amount of loss attributed to the bonding companies for Guidelines "loss/gain" purposes, $1 million, was a byproduct of a common construction dispute between prime contractors and subcontractors.

We ask that the Court impose a meaningful sentence of no more than four years in jail. The government's call for a maximal sentence here – twelve years in prison – is driven, we submit, by an irrational bloodthirst, a push to punish, to inflict extreme retribution. Their request is inconsistent with the proper role of sentencing courts to impose a sentence that is "sufficient but not greater than necessary" to address each of the goals of sentencing as set forth in 18 U.S.C. § 3553(a).  Indeed, as this Court observed in *United States v. Casperson,* 16 Cr. 414 (JSR) (S.D.N.Y. 11/4/16), Doc. 37, at 80-81:

> [A] sentence more than anything else is a moral judgment.... By decreeing that the Court shall impose a sentence sufficient, but not greater than necessary, to comply with these various purposes, that's an expression of a moral judgment, too.  That's an expression of the notion that even in this cruel world where people commit, as the defendant has here, terrible offenses, the punishment of prison is not one that can ever be justified beyond the purposes that Congress has specified.  It can never be an act of revenge, it can never be an act of gratuitous expression of outrage.  Life is too precious to permit that kind of sentence.

3

I. <u>**The History and Characteristics of Sina Moayedi**</u>

In every sentencing proceeding involving a white collar offender, defense counsel quite appropriately attempts, as best they are able, to explain to the court why their client engaged in the frauds for which they stand convicted.  Very often, defense counsel works overtime to try to convince the court that simple greed – a desire for financial gain, for even more – played a lesser role than the court might otherwise conclude.  An addiction, whether to substances or gambling, a trauma, a sudden changed life circumstance that may have impacted the offenders' conduct is sometimes urged as an explanation. But the unavoidable truth in almost all cases of financial fraud or theft is that one does not commit these crimes unless that person has consciously made the decision that their opportunity to benefit via deceit or larceny is more important than the honesty required by laws.  Here it is no different.

In the mid-1990s, Sina Moayedi wanted to grow his firm's contracting business and discovered that bending the rules and regulations, which were rarely enforced anyway, would allow him to do so.  Years later, when there was an opportunity to get back in the government contracting game after a few years' hiatus, he again opted to cheat the system to grow his business. There is no question that Sina Moayedi's crimes were motivated by a desire to earn himself a good living while running a successful international business – and that probity far too often took a back seat.  But there were other issues at play, on a somewhat deeper level, which pulled Sina Moayedi in this direction as well.

For many years, Sina had been looked upon by his parents as the most driven and the most successful of the Moayedi children.  Although his two older brothers were well schooled and worked respectable jobs, they had failed when their father had provided them seed money to start up their own small businesses.  And while his two sisters were similarly well educated, hard-

4

working and in the case of one of them, a college professor, they too were regarded by their parents as living pedestrian lives.  His parents, especially his father, a terribly flawed man himself, viewed Sina as especially determined to make something of the family name, even though Sina was the youngest of the five kids.  He became the one that his parents most trusted and depended upon. He was assigned to purchase and renovate a building in Washington, D.C. that would provide his mother a comfortable income.  He was made a trustee and, ultimately, a beneficiary of his father's estate in Iran.  And because of the faith and  confidence put in him, and the high regard to which he was held in his family, Sina felt extraordinary pressure to perform, to produce.  There could be no other way.  He could not stumble, he could not fail, as his brothers earlier had, lest his father think far less of him.  Even after his father's death in 2008, Sina was consumed with demonstrating that he deserved his father's trust in him as the most ambitious, the most "successful" of the offspring. Living up to this standard played a significant role in Sina's decision to cut all sorts of corners, to engage in fraud, and to bring his business greater opportunities and success upon himself.

### A.  Sina's Life History

Sina Moayedi is a 68-year-old American citizen who has proudly lived, worked, paid taxes, and raised a family in this country since coming here from his nation of birth, Iran, as a college student in 1973. He was born in 1955 in Tehran, Iran. Sina is the youngest of five children.

Each of the Moayedi children moved to the United States in the late 1960's and early 1970's. Sina's parents, father Mojstaba Moayedi and mother Mahin Arbabi, came to the United States around the same time.  His mother remained in the United States for most of her life while his father returned to Iran several years after the revolution.  The last time Sina traveled to Iran was fifteen years ago, in 2008, upon the death of his father at age 91. His mother died in 2013.

Growing up, Sina's father was an officer in the Iranian military.  His mother stayed at home to help raise the five children, although it appears that she struggled to do so.  After his dad retired from service, he worked as a commercial farmer and managed his family's inheritance which, by the time of his passing, grew to approximately $5 million.  He did this by investing in and then developing parcels of land in and around Tehran. As discussed below, those properties were later seized by the Iranian government following the revolution and took years of his father's efforts to get them back.

Education and the greater opportunities it could lead to were most important in the Moayedi household.  As was the case with many upper middle class families in Iran, once the Moayedi children had graduated from high school, they were expected to – and did – continue their education in colleges and universities either in the United States or in Europe.  Each of his brothers and sisters left Iran, attended and graduated from an American university.  All have gone on and led honorable, extraordinarily accomplished and successful lives.  So too have their grown children, Sina's nieces and nephews.  Sina and his siblings as well as their children enjoy a very close and loving relationship.  As they all relate to Your Honor in their letters to the Court, they were shocked beyond belief that Sina could have involved himself in fraud.  But without hesitation, each of them offered their homes to secure their brother's appearance bond. Though terribly disappointed, they have been nothing but supportive. As he has expressed to each of them repeatedly since the time of his arrest, Sina is beyond appreciative of his family's support through these trying times.

The eldest of Sina Moayedi's siblings is Siakzar Moayedi, age 76. Siakzar came to the United States on a naval scholarship in 1969.  He attended the University of Utah as a NROTC enrollee and graduated from there with a degree in computer programming in 1974.  The following

year, he earned a master's degree in technology from American University. Siakzar became an American citizen in 1998. For most of his life, Siakzar worked as a consultant to high-end tech companies such as Microsoft and Webwan in Silicon Valley. He also was employed as a government contractor for the Environmental Protection Agency, the Federal Drug Administration, and the Government Publishing Office. After completing his last contract with the GPO, he was hired by them and maintained the software that printed all Congressional bills and resolutions. Siakzar retired from the federal government at age 66. Notably, when Siakzar was a much younger man, following the Iranian revolution of 1978-79, he traveled to Iran to protest the actions of the government. He was twice beaten, arrested, and held in jail by military personnel. Shortly thereafter, Sina's mother was also imprisoned on a visit to Iran when she was overheard talking disparagingly about the government. In retirement, Siakzar has recently moved to Portugal. Nevertheless, Siakzar, like the rest of Sina's family, will be present for Sina's sentencing on August 10.

Mondana Sigaroudi, 74, lives with her husband, Dr. Khosrow Sigaroudi, a prosthodontist in Northern California. Mondana came to the United States in the early 1970s and became a citizen in 1983. She received a master's degree in English Literature from Utah State University. Her work history includes more than ten years as a computer operator at a Milwaukee hospital, many years as a supervisor for enrollment at Health Plan of America, a stint as an aerobics instructor, and another as the owner-operator of two Bay Area cafes. For the past sixteen years, Mondana has taken care of patients following surgeries and has donated all her income to charitable organizations such as Moms Against Poverty, Families Without Borders, Mother Miracle, Operation Smile, and Pledged to Humanity. Together with her husband, she also has sponsored

two university students in Sierra Leone and the Philippines.  As discussed below, Mondana reports that Sina too has generously supported several of these organizations.

A second older sister, Roxana Moayedi, age 73, came to the United States in 1974 to attend graduate school.  She has been a citizen of this country for more than 40 years.  She received a master's and PhD in Sociology from American University in Washington DC in 1985 and was a tenured professor at Trinity University in the District of Columbia for 30 years.  She retired from this position at the close of 2020.  For the past 37 years, Roxana has been married to Dieter Bilitza, a senior scientist at NASA's Goddard Space Flight Center in Greenbelt, Maryland and a Research Professor in the Department of Physics and Astronomy at George Mason University.   The couple have two sons, one who received his PhD in pharmacy at the University of Maryland and works as Director  of Regulatory Affairs for Takeda, a pharmaceutical company in Boston, and a second who received a degree in Political Science from American University and, after running several successful local political campaigns, is currently working for the non-profit Jobs for Justice.

Finally, brother Sourena Moayedi, age 70, resided in the United States since he was 18 years old and became a citizen in 1977.  He attended Westminster College in Utah where in 1977 he earned a degree in Economics and Business Administration.  He then moved to the Washington, DC area and began a career in construction. After working for a number of construction companies, he eventually opened his own. He currently resides in Spain but will be at his brother's sentencing. Sourena's daughter Shadi earned two masters' degrees: Conflict Resolution from George Mason University and Health Science from University of Maryland and is employed as a yoga instructor.

Though from a socioeconomic perspective, Sina and his siblings were raised in a comfortable home, that home was not without trouble.  As Sina and his brothers and sisters have described, throughout much of his childhood, he and his siblings, in particular his brothers, were

subjected to verbal and physical abuse from their father.  Though it was always under the guise of enforcing discipline, it included painful beatings with bare hands and often enough a broom. Sina's mother was not exempt from the violence either.  She was beaten in front of her children on many occasions. Sina's father would also frequently threaten his wife and children with a gun that he kept in his bedroom.  Needless to say, there was no talking back to his father. This unfortunate domestic abuse had a significant impact on Sina.  He lived in fear of his father, who also had a serious drinking problem and smoked opium, the latter customary in Iranian culture. His mother, too, drank too much alcohol and smoked opium.  While she did her best, her children report that their mother was overwhelmed with her responsibilities and frequently absented herself from the household.  But despite this trauma, the family remained a close-knit unit.

Later in life, when it became clear that of all his children, Mojstaba admired and trusted Sina most due to his operation of what appeared to be a successful contracting business, this approbation meant a great deal to Sina. The patriarch, the strong man, the parent who found constant fault with almost everyone, approved of Sina's pathway and the outward appearance of success.

As his sister Mandana had done, Sina attended Utah State University in Logan, Utah from 1974 to 1978, graduating with a degree in geology.  He chose that subject because he had envisioned, upon an eventual return to Iran, working in the big-business oil industry.  This all changed when the bloody revolution there began in early 1978 and continued into 1979.  That four of the five Moayedi children would end up studying in the state of Utah is explained by the fact that the Iranian ambassador to the United States at that time had himself been educated in Utah and encouraged families to send their students there.  While Sina studied there, to support himself, he worked both in a canning factory and cleaned homes.  He recalls that during these years in Utah,

he and many other of the 100 or so Iranian students were subjected to nasty racial epithets and even threats of violence.  Sina was comforted knowing that, at least according to his brothers and sisters, who had by then settled in the Washington, DC area, when he joined them back east following graduation, he would find it a far more accepting environment for Iranians.  But there were problems there too.

Sina moved to the suburban Washington area and took an apartment with older brother Sourena.  He began working for two construction companies that his father had introduced him to.  The work was physical – he served as a laborer for residential developers building low income housing in DC. After about a year of this grinding work, Sina decided that the better course ahead was to pursue graduate studies at the Catholic University in Washington. He was admitted at first to Catholic's urban planning program and then, after a year, the school of architecture, where he focused on spiritual architecture.  Towards the end of his studies, Sina found part-time and then full-time work as a draftsman with an architectural firm in Northern Virginia.  He welcomed this opportunity not only to gain valuable experience but also to earn, for him, a decent amount of money.  This was not due to a high hourly wage – indeed, he made only minimum wage – but because this job allowed him to work long hours. Having jump started what appeared to be a promising career in a field that he loved, Sina eventually left for another day the remaining required coursework to be awarded his master's degree in architecture.  That day would not come until 2016, when he returned to complete the requirements, and proudly earned the degree.

From approximately 1982 until 1991, Sina worked as an architectural designer and then construction design manager for AT&T.  There, he oversaw the building of interior spaces at more than 35 locations throughout the east coast.  He earned a decent living.  During this time, Sina met his first wife, Maria Tukeva.  Well educated and well-connected in the community, Maria was an

educator and the director of a successful not-for-profit organization called the MultiCultural Career Intern Program based in the Mt. Pleasant neighborhood of the District of Columbia. The organization provided opportunities for minority students and young workers to gain hands on experience in the workforce. Indeed, over time, a number of young people from the community interned and then were employed by Montage.

Sina and Maria were married in 1986 and soon moved into a home in Mt. Pleasant that Sina worked to renovate. Encouraged by the work he had done on his own residence, Sina and his brother Sourena soon pooled resources and with additional assistance from their father began to purchase and renovate dilapidated row houses in the same neighborhood. Mostly, they would rent the refurbished apartments in these homes but some of the buildings were sold and the beginnings of a small, successful Maryland-based business – Montage – was born.

Around this time, Sina's father decided to return to Iran to attempt to regain ownership of the properties that he had owned there prior to the Iranian, or as it is sometimes referred to, Islamic, revolution of late 1978-79. The properties had been seized by the new government. Before he left, Mojstaba gave Sina approximately $400,000 and instructed him to use this money to buy a building, renovate it, rent out the units, and provide his mother with the income produced from this property. Mojstaba provided Sina with this money rather than his older sons Siakzar or Sourena because by then, he had already given both Siakzar and Sourena a significant amount of funds for them to start up their own ventures – both of which failed. Mojstaba expressed not only to Sina but to his entire family that he had the most faith in Sina to continue to grow what was then a nascent construction business. Following his father's direction, Sina purchased a property on 16th Street in Washington, DC, renovated the building and turned it into an income producing family-owned asset.

11

After several years back in Iran, Sina's father regained control over his properties there. He sold all but one of them. Further impressed by what was perceived to be the continuing success of Sina's contracting business, Mojstaba told his family that he had designated Sina as having authority over his bank accounts in case anything happened to him.  Many years later, when his father passed away in 2008, rather than receive the proceeds of his father's estate, Sina advised his siblings that they would share, essentially equally, in their father's estate. Sina's brother Siakzar was placed by Sina in charge of receiving and distributing amongst the siblings their inheritance.

At the same time that Montage was involved in residential construction, it began working as a subcontractor for companies with federal, state, and local contracts. When Sina left his position at AT&T in 1991, he focused his efforts on getting prime or general contracting work for Montage. In about two years, Montage began receiving work as a government contractor.  Sina's wife Maria, far more experienced and savvy when it came to operations of an organization, assisted him with preparation of documents and rendered helpful advice to him regarding running the business.

As discussed in greater detail below, since 1993, in addition to a great many projects for state and local agencies as well as private clients, Montage has been awarded contracts and completed more than 380 projects for more than a dozen different federal agencies including the Department of Defense, FBI/DOJ, the Department of the Interior, the Department of Agriculture, NASA, the EEOC, Department of Veterans Affairs, Nuclear Regulatory Agency and Department of State. Since 2014, the majority of Montage's federal government work was on State Department projects at overseas embassies and consulates.

At first, Montage operated out of Sina's and Ms. Tukeva's home in Mt. Pleasant.  Later, the company moved to a small three-room apartment on the ground floor of a nearby apartment building. It remained there until relocating into a traditional office building in 2017.  While the

size of government contracts grew over the years, Montage never had a particularly large office staff.  Depending on the number of jobs being worked on, Montage generally had between 5 and 10 employees.  Overseas, Montage would employ approximately 20 to 30 workers depending on the size of the jobs.

Unfortunately, by 2007, after several years of struggling to make things work, Sina and Maria Tukeva separated.  Fortunately, the following year, while in the Philippines, he met his wife and mother of his three children, Melissa Gonzalez.  Sina's divorce from Ms. Tukeva was finalized in 2009.  Sina has been married to Melissa since 2011.  Melissa became a United States citizen in 2015.  Their three beautiful children are daughters ages 14, 13, and 9.  The girls, all American citizens, attend public schools in Montgomery County, Maryland and until recently had been excellent students.

Following Sina's arrest in early January 2022, Melissa, the girls, and Melissa's mother had to move from the family's home in Potomac, Maryland to a modest two-bedroom rental apartment in Rockville, Maryland.  There, the girls share a single bedroom, although many nights, at least one of them will sleep with their mother in her bedroom where their grandmother also sleeps. After Sina's initial arrest, in order to provide their family with sustenance, Melissa began working as a teacher's aide in a public school.  Today, the family gets by on her very limited income, social security payments, and the help of Sina's brothers and sisters.

Though he was able to earn a good income compared to many, Sina's only real assets prior to his arrest were, as was the case with his father, in real estate:  he owned a home in Maryland and one in Virginia.  With his background and experience in design, construction and architecture, these homes were his life's passions.  He had previously owned, together with his siblings, a house he helped to build in the Bahamas, but he relinquished his share of ownership to his siblings to

13

repay them after they had lost a significant amount of money due to his business' failures.  There were and are no investment accounts, no stocks or bonds, no secret bank accounts.  Nor did Sina live what anyone would consider a fast and fancy lifestyle. He drove his old cars, purchased used, into the ground. Whatever Sina had, other than supporting his family, he put into work on his homes.  Those homes are gone. Both the house in Virginia and the one in Maryland were sold and the proceeds paid to Lexon Insurance Company.

Although Sina started a family later in life, his love and devotion to his wife and three daughters is unmistakable.  We recognize, of course, as Your Honor has observed in scores of sentencing proceedings, that in most every case in which a person commits a serious crime and faces incarceration, his or her family are, in a very real sense, victimized by their loved one's wrongdoing.  After all, it is the offender's choices that placed their family in harm's way.  But there is a stark difference, we would offer, between a defendant who seeks to use his fatherhood to young children as a mitigating factor notwithstanding that he was uninvolved and unsupportive in his children's lives and a defendant who is by every account intimately involved in every aspect of his children's upbringing.  Sina Moayedi surely is the latter.  His continued incarceration, sadly, will have a profound impact on his still impressionable daughters.

### B.  Sina Through the Eyes of Others Who Know Him

Sina's wife Melissa, in her letter to the Court, describes her husband as a "caring, kind hearted, giving and responsible" man.  Her letter, along with many others, is attached to Exhibit A, the mitigation report by Consulting Project, as Attachment 1a. She recounts how Sina over the years has financially assisted her family in the Philippines, contributing towards her nieces' and nephews' education.  Regarding the critical role that Sina occupied with their kids, Melissa reports that Sina "manage(d) the girl's school, [the family's] finances, organization and discipline. Every

14

weekend he is the one who organize and look for an activity to take us as family for educational nurture." With respect to their education, she shares: "He always present to them, he always attended school program, school meeting and walking them to school." Melissa explains – as do others – how, understandably, she and the girls have truly struggled in her husband's absence.

Sina's oldest daughter, age 14, in her letter to Your Honor, tells of her dad's obvious love for her and her sisters. Ex. A (Mitigation Report), Attachment 1b. Writing about some of the tender moments she and her father have shared, she shares how "the less noticeable things really give . . . away" his joy towards his family. She continues "Basically any time I expressed interest in something my dad would express interest in it, too. And a lot of the things I became interested in were because of him. I think I mostly wanted to be like him. I still look up to him a lot." She further talks of her and her father's mutual interest in film, architecture, marine biology and even karaoke as expressions of his love for her. "There's practically nothing he hasn't done to ensure that I have a great future. He has a lot of dreams for me. A lot of the things I do, I do to make my dad proud." His daughter is entering high school where she will be taking a number of AP courses as well as dual enrolling in community college. "My dad wants the best for me…. Without him, I don't really know where me and my sisters would be."

Sina's middle child is in middle school in Bethesda. It is obvious that she has taken note of her dad's kind and caring persona. She relates that her dad is "always smil[ing]," the type of person that "would become friends with a stranger in an elevator or taking almost an hour to buy shoes since he's having a conversation with a vendor" Ex. A, Attachment 1c. She writes that when her father returned home after his release on bond, "it was the first time I had ever seen my dad cry." She recalls that during this time, she felt even closer to her father. Together, they would "make diagrams of houses out of paper and glue" and work on poetry. Like her older sister, Sina's

15

middle daughter mentions that she and her dad would often talk about her future and the importance of education.

Echoing what Melissa has recounted, Sina's sister Roxana, who has always lived close by to Sina's family, reports that he "was involved in every aspect of [his children's] learning process, homework, school meetings, extracurricular activities and he help(ed) the school fundraising." Ex. A, Attachment 2a. Sina was, Roxana shares, consumed with providing long term financial security and "a nurturing environment for his daughters." Even while incarcerated, Sina "uses his phone calls to monitor their school progress" and has asked Roxana to advise his eldest daughter to pursue a most challenging academic program as she enters high school. Roxana has seen the difficulty that Sina's wife has gone through in his absence and worries about the lack of structure and discipline in Sina's family's home.

Roxana also knows what a kind and caring man her brother is. She recalls a time when she was a PhD candidate that their father cut her off from further financial assistance because he considered her "too much of a feminist." Struggling to make ends meet, Sina, who worked for AT&T at the time, helped her with her tuition bills so that she could finish her dissertation. Roxana also notes that following their father's death, Sina, who could have remained sole beneficiary of their family's estate – he had full authority over the bank accounts in Iran – not only ensured that their inheritance was split evenly amongst the five children but also insisted that with these funds he and his siblings should help pay for Roxana's and her husband's son's college education.

And Roxana describes that Sina's kindness and thoughtfulness extended to others, even strangers, as well:

> When the ex-wife of my cousin needed extra income after the divorce, Sina hired her and her teenage daughter to teach French and voice weekly to his daughters. . . . The majority of my students were

first generation college students with great financial burden. On several occasions I asked Sina if he could help a number of my advisees who did not have the financial resources to buy text books; Trinity policy disallowed faculty to financially help individual students. He was always happy to help.

[Sina] also provided mentorship to many of his employees, particularly women and men of color. The majority of Sina's employees were women and people of color, many of whom were recent immigrants. Working at Sina's company provided them with valuable work experience, enabling them to pursue better and higher-paying jobs. One good example is Melynda Major. She initially worked for Sina as a grant writer but later relocated to Alabama to support her aging parents. Her experience at Sina's company played a crucial role in securing a job with a construction company that offered a substantial salary.

In her visits and calls with her brother, Roxana has taken note of Sina's shame and regret over his actions. Importantly, she has also observed introspection, growth, and change. Sina has:

acknowledged how his hubris has led to his present situation and how this experience has replaced his pride with humility, reverence, and self-knowledge. He told us that he thought he can overcome his low self-worth by pushing himself to achieve more and more. He thought that high occupational prestige of being a successful architect who could design beautiful homes for his family could enhance his self-esteem. He now realizes that his and his family's happiness were at their peak when he lived a simpler life. He aspires to return to that simplicity and ease with his family…. Being in jail has been an agonizing experience for him but it has become a source of meaning and purpose. He has chosen to deal with by helping other prisoners. Helping others has transformed his pain into growth. He has learned that counseling and teaching are what he enjoys.

Dieter Bilitza, Roxana's husband of 37 years, in his letter to the Court, describes his admiration for his brother-in-law's "easy way with which he can be in contact with people of all walks of life and his great empathy for people who are less well off. He has helped so many over the years.…" Ex. A, Attachment 2e. Dieter cites as an example of Sina's helpful nature a time when Sina encouraged Roxana and Dieter to move to Tokyo to take advantage of a year-long

17

sabbatical with the Japanese Space Agency notwithstanding that Roxana was due to give birth. Though Dieter and Roxana owned a home and worried about how they might make things work, Sina insisted they store a full houseful of belongings at his home and rent out their home to make ends meet. Dieter also recalled school-related help that Sina offered their son when Dieter was away on business.  "I think helping people was a welcomed relieve (sic) for Sina from the pressure and stress of running a company and being responsible for many employees who depended on him for their income."

Sina's kind and caring character is also evidenced in the letter to the Court from Sina's sister Mandana Sigaroudi. Ex. A, Attachment 2b. When Mandana battled breast cancer some years ago, of all her siblings, it was Sina that spent the most time with her, she reports. Sina's graciousness "extended to the nurses as well, as he would bring them pastries and express gratitude for their exceptional care."  Mandana highlights as well several charitable causes that her brother has made significant financial donations to that she knows allowed for the betterment of the lives of young children in West Africa, Iran and the Philippines. *See also* Ex. A, Attachment 6a (letter of Terri Khonsari of Families Without Borders); Ex. A, Attachment 6b (letter of Delfarib Fanaei of Moms Against Poverty). Notably, despite running an international contracting firm, Sina "always remained humble and down to earth, never indulging in expensive brand-new cars, designer clothes or extravagant furniture. Instead, he prioritized a life where the well-being of our family held greater importance than material possessions."

Mandana's husband, Dr. Khosrow Sigaroudi, calls Sina "the most generous, helpful individual to anyone in need, regardless if the person was a family member, friend or even a stranger.…" Ex. A, Attachment 2f. Dr. Sigaroudi, like others, has long-observed Sina's love for his children and his "involve[ment] with their education, working with them every day, and in the

18

evening to make sure they all achieve the best in their studies…"  Since his detention, Sina has regularly expressed to him and his wife his deep appreciation for "emotionally and financially assisting his family in his absence."  So too has Sina expressed to them his "accountability, responsibility and deepest remorse" for his actions.

Siakzar Moayedi is the oldest of the five Moayedi siblings.  Of Sina's loving  relationship with his children, he writes. "He is their pillar of strength and the center of their lives.  The impact on them is immeasurable and their lives have been deeply shaken by his absence." Ex. A, Attachment 2c.

As Siakzar relates, following their father's passing in 2008, Sina could have kept the substantial estate funds to himself.  However, "being a loving and honorable person," Sina shared the inheritance with his siblings.  When their mother died in 2013, Sina assumed the responsibility as what Siakzar termed the family's "love keeper," always finding ways to bring the family together and "ensuring that the bond and love within our family remained strong….."

Sina's nephew, Dr. Sebastian Bilitza, in his letter to Your Honor, considers his professional success a product of his "uncle's mentorship and guidance." Ex. A, Attachment 3a. He writes:

> He has been a guiding light, imparting invaluable lessons on the values of hard work, and following one's heart.  From a young age, he served as a role model and mentor, instilling in me a strong sense of integrity and an unwavering commitment to personal growth and societal well-being.  His influence extended to my college education, where I am forever grateful for his immense generosity in funding my studies under the condition that I pursue a degree or job that allows me to make a positive impact and help others.

Catherine Feng is Sebastian's fiancé.  She too works as a director for a large pharmaceutical company. Catherine recalls the first time she met Sina at a Thanksgiving family gathering at his home.

> From the minute I walked in the door, Sina welcomed me with open arms (literally).   Throughout the night, I observed Sina's unwavering commitment to creating an inclusive and harmonious atmosphere for all.  His infectious laughter and genuine interest in others' well-being created an environment where even the most reserved among us found solace and a sense of belonging.

> Ex. A, Attachment 3b.

Sina's niece Shadi Moayedi in her letter to the Court, writes that "Sina has been a constant presence in my life." Ex. A, Attachment 3d. From hosting extended family gatherings, to taking her hiking, sharing his love and knowledge of nature and more generally, Sina always "created an environment of joy and connection for all of us."  Shadi's husband, Shahyar Darafsheh, in his letter adds that "Sina has consistently exhibited kindness, warmth, and a genuine hospitality towards me and everyone around him."  Ex. A, Attachment 3e.

Charmiane Gonzales, Melissa's niece, who lives in the Philippines, has written a particularly touching letter illustrating Sina's generosity. Ex. A, Attachment 3f. Charmiane reports:

> [Sina] supported me and my three sisters, which is why we are able to study at present.  Because without the care of my uncle Sina, I wouldn't have had decent dental care and hygiene.. . . He also would not have introduced me to his sister, which is why I am currently pursuing my degree.  Uncle Sina has given me the chance to realize my lifelong goal of working as a nurse. . . . Essentially, it was because of my Uncle Sina's passion for education and his love and concern for everyone.

Sina's brother-in-law Darwin Reyes also has written to the Court about the assistance and guidance, professional and financial, that Sina has offered him and his family business in the Philippines. Ex. A, Attachment 4aa.

Erickson Bequillo Lacopia, a teacher in the Philippines and Melissa's cousin, describes what happened when the high school at which she works needed financial support in order to construct a basketball court.  Erickson writes:

> I advised the School Principal, Mrs. Loida Tabernilla, to reach out and request MR. SINA MOAYEDI . . . to ask for financial assistance to accomplish this priority project. Without any doubt and hesitation, MR. SINA MOAYEDI approved the request. He sent budget in a regular basis until the school basketball court was finished last 2017. He also gave the school's basketball team with a complete uniform, basketballs, volleyballs, whistles and other sports materials. . . .The school overwhelmingly appreciated this great contribution of MR. SINA MOAYEDI, that is not only enjoyed its purposes by the teachers and learners but also by the whole community.

In addition to this donation, Erickson details that Sina provided scholarship grants to two students at the school who, as a result of this assistance, went on to graduate from college there. Ex. A, Attachment 6c.

A further example of Sina's caring nature is offered by Sina's first cousin Mehrzad Arbabi, who grew up next door to him in Tehran. Mehrzad recites how, when she and her husband fled to the United States with only their clothes on their back and little command of the English language, Sina hired her husband to work in his office and trained him "patiently and kindly." Sina was the only one to extend this "hand" as they started their new lives here. Ex. A, Attachment 3i. Yet another example of Sina's selflessness comes from Dr. Shapur Ameri, a spine surgeon in Boston who is married to Sina's first cousin Linda Arbabi, herself a dermatologist. Dr. Ameri recounts: "When Linda developed health problems and required in-house healthcare, Sina was the first family member to contact me and volunteer to find a caregiver. He interviewed several individuals and chose the best available option who was willing to travel to Boston to take care of my wife." Ex. A, Attachment 4d.

Marian Shallal has been a friend of Sina's for half a century. She recalls how when she was in high school in Tehran, Sina pushed his older brother to pick up Marian and her sister and drive them to school, sparing them from having to take two public buses to get there. More

recently, Marian relates an instance where her daughter was in the midst of emotional struggles requiring admission to an area hospital.  When Sina learned of this, he insisted that her daughter come and stay with his family on their ranch in Virginia where he had horses which could be therapeutic for her. Ex. A, Attachment 4a.

Another friend of 50 plus years is Mamjeh Marvastian.  Even after Mamjeh's divorce from Sina's oldest brother, Sina "stepped in filling the void with his unconditional support and care for both [her] and [her five-year old] daughter."  To this day, Mamjeh writes, Sina has acted as a trusted and valued advisor in connection with her operation of a nonprofit organization. Ex. A, Attachment 4l.

Gerardo del Cerro, a close friend for some 25 years, operates an extremely successful commercial bakery.  Gerardo, in his letter, like so many others, has experienced firsthand Sina's generosity of spirit.  Ex. A, Attachment 4m. He writes:

> I am eternally grateful to Sina for being there for me like no other when I was on the brink of divorce.  It was one of the most difficult times in my life.  Sina was the most supportive friend who gave me the love, support and the soundest advice that led to a reconciliation with my wife.

William Wernick is a retired college professor and psychologist.  He has known Sina for more than 16 years.  William writes:

> I observed him quietly provide a number of underprivileged students with the funding required to secure costly college textbooks. I was present several times when a student's plight was brought to his attention.  He always agreed to help without hesitation explaining it was an honor to help these young people.... I saw another example of his charitable nature when a local construction worker was on the verge of divorce because he was unable to meet his family's financial needs on his current income.  Sina found him work at a higher rate of pay which helped him become financially stable again.  Sina's actions not only helped preserve this man's marriage, his actions restored this man's dignity.

22

Ex. A, Attachment 4dd.

For a time years ago, while working on a State Department project there, Sina lived on the island nation of Palao.  There he came to know and develop a close friendship with Mari Kishigawa, president of a family-run tourism and dive business. Mari, in her letter to Your Honor, recalls how Sina, noticing a lack of reading and writing skills amongst school-age children in Palao, sponsored an essay contest and provided scholarship awards for the winners. Ex. A, Attachment 4b. Additionally, as Mari shares, Sina's passion for conservation of the island's beauty and resources led him to assist in residents' efforts to head off the development of a project on the beach there by a Chinese company.

A number of former employees of Montage have also written to Your Honor and offered their perspectives on Sina Moayedi.  Hossein Kalantar has known Sina Moayedi and his family for over 40 years.  Throughout his life, he has worked for a number of Fortune 500 companies but for a three-year period he worked as a business development manager for Montage.  Regarding his time working with Sina, Hossein informs: "During my tenor (sic) as business development manager, I found Sina highly dependable, responsible, and hard-working business owner who cared for each employee in the company.  His focus on safety and security of employees, especially the labor force, was exemplary." Ex. A, Attachment 4t.

Another letter comes from Arlene Cuison who worked as office manager on the construction of the U.S. embassy in Palau from 2007-2009.  When Montage was awarded a contract for work on the consulate in Hong Kong, Arlene again worked for Montage from 2016-2017.  She worked as well on the ill-fated project in Madrid, Spain in 2018. Arlene describes Sina as "a person of exceptional character and a person with integrity," "a great mentor and motivator." Sina was "a supportive employer who makes sure that our accommodation abroad is good." She

notes as well that Sina was a down to earth person who does not "love[] fancy stuff." Ex. A, Attachment 5a.

Yash Davoodi started with Montage in 2016.  He relates how Sina paid for his attendance in night classes in construction management so that he could eventually gain certification in the field.  Yash also recounts that, much to his surprise, when he became ill in 2017 and for a time could not work, Sina nonetheless continued to pay him.  Of his time with Montage, Yash writes "Mr. Moayedi was the kindest, most patient, and most caring boss I ever had.  His guidance and wisdom took me from almost no knowledge to now being a valuable and indispensable management professional." Ex. A, Attachment 5c.

Richard Cunningham worked as Montage's project manager on the Hong Kong contract from 2016-2017 and in 2018 on Montage's job in Burkina Faso.  Cunningham reports:

> Working with Sina at Montage was demanding.  I found him to be strong-willed, hardworking, and he had a no-nonsense approach when it came to adhering to timelines and contractual commitments. Government contracts involve an overwhelming amount of paperwork, regulations, specifications, and engineering and construction plans.  When Sina asked a work-related question, he expected an immediate answer, or he was prepared to access file folders himself to find the necessary information in context.

> Ex. A, Attachment 5d.

Analiza Lleses worked for Montage from 2007 through its close in 2021.  Analiza writes:

> Since I started working at Sina's company, I have only seen Sina's kindness to all.  He taught me a lot about construction and cherished every bit of learning that he had shared with me….I was blessed and lucky to have him as a boss. . . . I had never known anybody who turned to Sina Moayedi for help and did not receive it.

> Ex. A, Attachment 5e.

Samantha Garcia, 50 and the mother of three, joined Montage in 2015.  She worked there as a Project Manager until the close of the company.  Of Sina Moayedi, she writes:

I have come to know Sina first as an employer.  He is hardworking, caring, selfless, generous, down to earth, fun and easy to be with, and most of all humble.  During my time as Sina's employee, I enjoyed coming to work because I learned a lot of things about work and life. I remember how Sina always challenged my weakness with public speaking by always having me practice meeting presentations, which I was never excited about.  I believe the challenges molded me to become a better and confident Project Manager.  For that I am grateful because it has helped me become a seasoned professional.

Sina's character is consistent professionally and personally.  I have known him to be a good family man. I had the opportunity to meet and his family – wife, children, siblings and friends.  We developed a close relationship, almost like family, and this relationship extends to my own side of the family and friends.  We would all be invited to each other's family milestone events.

Ex. A, Attachment 5b.

Behrouz Sobarian was introduced to Sina when Montage began work on a project for the Department of the Navy.  He joined the company and served as chief estimator for more than 20 years.  Due to his age and experience, Behrouz saw himself and Sina as having a "father and son" relationship.  Though he could have chosen to work for other companies, he remained at Montage through the years because of what he terms Sina's "character" and "respect" for him and all employees of the company. Ex. A, Attachment 5f. Finally, Mohammed Kamruzzaman, who worked as assistant project director on a number of jobs from 2017-2020 shares a similar view: "Sina Moayedi [was] very cooperative and helpful to all employees.  He used to take care not only of the employees but also always tried to hear about each family. . . ." Ex. A, Attachment 5g.

The Mitigation Report, Exhibit A, also attaches letters from Mondana Flor Moayedi, Sourena Moayedi, Bijan Sigaroudi, Emmanuel Locopia, Manouchehr Arbabi, Mahrokh Boroumand, Mahpari Kordmafi, Connie Chang, Sima Otsuka, Fariba and Iraj Zolnasr, Mary Sadrieh, Mahvash Sigaroudinia, Cathy Carr, Shohreh Porsaid, Terri Khonsari, Dr. Paul Marischen,

25

Marz Attar, Christine Tondari, Astiage Tondari, Nasser Nejad, Andy Shallal, Behzad Touhidi-

Baghini, Sina Afshar, Charles Bessant, Raz Moghbel, Enayat Boroumand, Dr. Kian Kaviani,

Karen Bendinelli, Daniel Gilbert, Dr. Kaz Fottohi, Shakou Fatemi, Ronald Mitchell, Marlene

Cherry, Bahmain Tehrani, Rozita Azizimamini and Kamran Ghalili.

### C.  Sina's Letter to the Court

In his heartfelt letter to the Court, Ex. J, Sina expresses his remorse, his shame, for having

committed his offenses.  As he acknowledges, "I was given opportunities to provide an honest

service and I failed.  Millions of others with similar back grounds and difficulties were given the

same opportunities and the[y] excelled in their execution without breaking the law as I did."  He

then reflects on his time in prison:

> I deserved the harshness of life at MDC it allowed me to feel a
> fraction of the pain and suffering I caused others to feel.  Prison has
> been my awakening, the experience stripped me of my pride and self
> focus. Prison brought me to the lowest point of my life, it broke me
> down, took away all I had and started to rebuild me.  I am in the
> process of seeing my self for who I am and see all my faults,
> insecurities and inefficiencies that I had tried to escape from all my
> life. . . .

***

> I am not the same man who was arrested on May 28, 2021. While
> prison is a life changing experience and life at MDC is definitely a
> humbling one. I am unable to think of a more humbling experience.
> I am one of over a thousand inmates at MDC, all from different
> walks of life yet we are all the same here.  There is no status and we
> are all equals and we all need to work and maintain our house for
> the welfare of all of us.  It is a challenging life, I have had to learn
> how to protect my self when my life was threatened and my
> belongings stolen, but there has also been times when I have felt the
> strength and the brotherhood of men who come to help an old inmate
> they just met.

***

26

During my two years of incarceration, I have learned a lot about myself. I have spent countless hours reflecting on the past in an effort to map out a better future for my family and me. No longer burdened with the desires of personal wants, I see how lost I had been throughout most of my life.  How I prayed to false idols of success and pride.  I failed myself, my loved ones and society.  . . .

\*\*\*

Prison creates an environment where one must surrender their mind, body, and soul in order to transform to a higher self.  The harshness, pain, and suffering of prison life is an awakening at the charnel house.

\*\*\*

Sina addresses his tremendous worry for his wife and concern for the wellbeing of his dear children:

My wife and three daughters define me.  They are my reason for being, they are my saviors.  I would not have survived these last several years without them.  But without me, Your Honor, they are like a boat without a rudder. …. My wife is full of love, compassion, and empathy- she is pure of heart.  Yet this same naivete and lack of worldly sophistication can be to her detriment in navigating today's fast-paced, complex, and all too often dangerous world.  I fear that there are many who would take advantage of the kindness and lack of social awareness and could place her and my young daughters at risk. …..

Regarding the future, as tough as it is likely to be, Sina has thoughtful plans:

I have no money and I own nothing. I lost my business and my reputation.  At 68 years old, it is very unlikely that I could ever work again in my previous capacity even if I wanted to, which I do not. I look forward to using my knowledge of Architecture and Design and Construction for a non profit organization involved in low income housing.  I would also like to complete my Bachelors degree in Psychology and become a part time social worker and help Prisoners and their families to cope with the separation and help them to see the silver lining of a Prison experience.

27

II.    **The Advisory Sentencing Guidelines' Calculations**

In its Presentence Investigation Report dated July 21, 2023 (the "PSR"), the Probation Department calculates an astronomical total offense level of 37 under the sentencing guidelines. That calculation is arrived at in the very same manner as the guidelines calculations contained in the parties' plea agreement. PSR ¶ 120-137.  The PSR, like the plea agreement, places Sina Moayedi in Criminal History Category I as these are his only criminal convictions.  PSR ¶ 140-141. As set forth in the PSR and the plea agreement, at an offense level of 37 and in CHC I, the applicable advisory guideline range of imprisonment for this first time offender is 210 to 262 months.  However, because the statutory maximum sentences authorized on Counts One and Two are five years each, and on Count Three is 24 months which must run consecutively to the sentences imposed on Counts One and Two, the advisory guideline term of imprisonment here is 144 months or 12 years. PSR ¶ 176-178.  Consistent with the plea agreement, the PSR reports that restitution of $6,588,697.63, PSR ¶ 190-191, and forfeiture of $17,795,098.50 be ordered. PSR ¶ 193-194. Finally, the PSR recommends that no fine be imposed.  PSR ¶ 175.

A.  **Our Objections to the PSR**

Following our receipt of the draft PSR, we communicated our objections to the Probation Department. None of those objections concerned calculations of the advisory guidelines applicable to this matter.  Rather, they concerned objections to purportedly factual or conclusory statements in the draft PSR – all provided by the government to Probation – that we believed were either incorrect, misleading, terribly unfair, or outside the scope of the crimes for which Sina Moayedi had pleaded guilty or conduct to which he had stipulated in the plea agreement.  As to virtually all our objections, the Probation Department declined to amend its report and in its final version of the PSR adopted the government's allegations.  Rather than recite each of these objections here,

28

we refer Your Honor to pages 58-77 of the "Addendum" to the PSR at which Probation sets forth each of our objections, the government's position as to our objections and Probation's response.

We must add, however, that in the PSR, Probation for the very first time, presumably because the government provided it to them, **added a full 5 ½ pages of alleged "construction-related issues [that] have been identified"** at job sites that Montage last worked many years ago. Not only did we not have an opportunity to object as to any or all of the allegations set forth at paragraphs 96-112 of the PSR  – we notified Probation of our procedural objection to these additions in a letter dated August 3, 2023 – but actually addressing competently all of the many "complaints" about construction completed following government inspections and official sign offs all these years ago way beyond the warranty period in every contract would take an extraordinary amount of effort and resources.  We would of course demand that the government provide us with discovery regarding each of the complaints and need to have these complaints reviewed by a construction consultant.  But even more significantly, the very notion that Your Honor should punish Sina Moayedi more harshly because years and years later, the government claims that various construction-related issues have arisen appears to us terribly unjust.  And if a government contractor can be criminally punished for these type of issues years after the work is completed, this result would almost certainly have a chilling effect on federal agencies' ability to find qualified contractors.  Who, after all, would wish to work on such projects and then years and years later, be subject to prosecution for allegedly faulty performance? The government has well-trod and available administrative and civil avenues to bring such claims if indeed they have merit. That the government instead "sneaks them" into the final PSR without even giving the defense an opportunity to properly respond to them speaks volumes as to their approach here.

**B.  The Guidelines Term of Imprisonment Here is Terribly Irrational and Unjust**

While we acknowledge and agree that the Guidelines as calculated are correct, we nevertheless urge that those Guidelines should not play a significant role in the Court's determination of what is a fair and just sentence here.  The Guidelines in matters of fraud and theft are, as Your Honor has expressed repeatedly, patently unreasonable, even absurd.  While as a general matter, a court "may not presume that a Guidelines sentence is reasonable," *Gall v. United State*s, 552 U.S. 38, 50 (2007), in the specific context of sentencing in cases of financial offenses, the Guidelines "reflect an ever more draconian approach to white collar crime, unsupported by any empirical data." *Gupta,* 904 F. Supp. 2d at 351.  As Your Honor observed in *Gupta*, sentencing "requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *Id.* at 350.

A look at the "adding-up" of numbers here demonstrates the irrationality of the fraud Guidelines. As is the case with all convictions for economic crimes, although the guidelines calculations begin with a modest 6 points for engaging in the crimes of wire and mail fraud, USSG §2B1.1(a)(2), they are increased exponentially – by 20 points – based on a total loss or gain figure of between $9,500,000 and $25,000,000. USSG §2B1.1(b)(1)(K). Thus, before even turning to what are termed in the Guidelines as additional "specific offense characteristics," adjustments for role in the offense and obstruction of justice, the Guidelines already suggest a sentence of 63-78 months in prison.  This Court has recognized time and again that no rationale has ever been offered by the Sentencing Commission to explain the fraud Guidelines' "inordinate emphasis" on the

amount of loss as a driving determinant of punishment. *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006).

The Guidelines at bar also add an additional two levels because the offense involved more than 10 victims, USSG §2B1.1(b)(2)(A)(i); two levels because sophisticated means were used, USSG §2B1.1(b)(10)(C); two levels because an "authentication feature" was used in the offense, USSG §2B1.1(b)(11)(A); two levels because more than $1,000,000 in gross receipts from a financial institution was involved, USSG §2B1.1(b)(17)(A); four levels because the defendant was a leader of the criminal activity, USSG §3B1.1(a); and two levels because the defendant obstructed justice, USSG §3C1.1.  Altogether, under the advisory Guidelines, an additional 14 levels are added to the 26 discussed above, taking it to an adjusted offense level of 40.  When three levels are subtracted because of the defendant's acceptance of responsibility, USSG §3E1.1(a), (b), the result is a total offense level of 37, with a suggested sentence of 210-262 months in prison. The statutory maximum caps this number at 144 months.

As is the case with the Guidelines' point structure for loss/gain, "the [Sentencing] Commission has never explained the rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *Adelson,* 441 F. Supp. 2d at 510 (citations omitted).  As in *Adelson*, the addition here of 14 levels represents "the kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Id*.  Indeed, the additional points result in almost *a four-fold increase* in the suggested sentence for Mr. Moayedi.

The sheer irrationality of the Guidelines is not somehow diminished here because of their reduction to *only* 144 months due to the statutory maximums applicable to the offenses of

31

conviction.  Even that calculation represents far more than a doubling of the guideline level that would apply before the specific offense characteristics are added.

In any event, the loss amount for Guidelines' purposes – or as was agreed to here, the amount of *gain* by way of profit to Montage as a result of Sina Moayedi's offenses – fails to reflect the economic reality of the crimes committed, proving once again the sheer absurdity of the fraud Guidelines. While it is conceded that Montage was awarded certain contracts that it otherwise would not have been eligible to be awarded, the fact remains that the work, most often the design and build projects, was performed. The government agreed to pay a fixed amount for a project and received the services that they had contracted and paid for. Where this is the case, there is strong support for the argument, even under a Guidelines analysis, that the loss to the government is zero. *See, e.g.*, *United States v. Harris,* 821 F.3d 589 (5th Cir. 2016); *United States v. Nagle*, 803 F.3d 167 (3d Cir. 2015).

In procurement cases, loss should be "the difference between the contract price and the fair market value of services rendered" by the defendant to "reflect[] the contracting agencies' losses under their respective contracts – the difference between what they paid and what they received." *Harris,* 821 F.3d at 606.  Determining the loss amount in this way "properly focuses the loss inquiry on the pecuniary impact on victims." *Id*; *Nagle,* 803 F.3d at 183 (in determining credits against loss in procurement fraud case, the fair market value of services rendered includes "the fair market values of the materials supplied, the fair market value of the labor necessary to assemble the materials, and the fair market value of transporting and storing the materials"); *see also United States v. Crummy*, 249 F. Supp. 3d 475, 484 (D.D.C. 2017) (now-United States Supreme Court Justice Ketanji Brown Jackson) (holding in procurement fraud case that if the government receives the services it bargains for, it would "not necessarily  [be] troubling" to find a loss amount of zero

because the "sole question" is the pecuniary harm to the victim"); *United States v. Padron*, No. SA-21-CR-00124-XR (W.D. Tex. 1/18/23), Doc. 191 (defendant used false certification as service-disabled veteran owned small business (SDVOSB) to win $202 million in federal contracts with profits of about $6.3 million (a 3% profit margin); court determines loss to be zero because government received fair market value for what it paid the company; "[t]here is no evidence in the record to establish that the government did not receive the buildings and facilities it contracted for. There likewise was no evidence presented that valid service-disabled veterans who have presented bids had lower profit margins than the bid presented by Blackhawk."); *United States v. Kozerksi*, 395 F. Supp.3d 919, 922 (N.D. Ohio 2019) ("in cases where government contracts were fraudulently procured but fully performed, as is the case here, the government has suffered no economic loss"), *aff'd* 969 F.3d 310 (6th Cir. 2020); *United States v. Smith*, 20 Cr. 074 (AJT) (E.D.V.A. 5/5/22), Doc. 199, at 43-44, (contractor falsely certified that business was owned by service-disabled veteran in order to win $7 million contract; court finds loss amount to be zero, citing to *Harris* and *Nagle*; because company fully performed under the contract, government received fair market value for the services and suffered no pecuniary harm).

As discussed below, the State Department received fair value for what they paid Montage because Montage did the work under the contracts and always intended to do so.

Moreover, from a real economic loss standpoint, as the government concedes, on most every job that Montage was awarded, they were the low bidder. PSR ¶¶ 20, 68, 79-80. Viewed from this perspective, selecting Montage resulting in cost savings to the government. For example, the Court, from the sentencing of May Salehi (the State Department official who accepted a bribe from Mr. Moayedi), will recall that even after Salehi advised Mr. Moayedi that Montage's bid was the lowest and that he could raise the bid by some $900,000 and remain the low bidder, the price

at which the government awarded Montage the contract was still *significantly below the Government's estimate* of what the job should cost.[1]  Similarly, a project in Hong Kong was awarded to Montage when, even after it was urged to revise upward its bid, Montage remained, by many millions of dollars, the low bidder on the job—and nearly two million dollars below what the government expected the project's costs to be. Montage's final price proposal (that won the award) was $15.5 million and the only bidder's price proposal was $40 million, a difference of nearly $25 million. Thus, though again, we stand by the loss/gain calculation contained in the plea agreement for Guidelines' purposes, we submit that the government did not suffer any economic loss by awarding projects to Montage as the low bidder.

Nor did Montage's submission to United Bank of fraudulent financial information cause loss or harm to the bank.  The bank's loans were secured by valuable real estate owned by Sina Moayedi as well as by his brothers and sisters.  The bank was paid back in full for the financing they provided.  Thus, although for Guidelines' purposes, we have no quarrel with the notion that Sina Moayedi and Montage "gained" from the availability of United Bank's financing, there was no loss to the bank. It is for this reason that there is no restitution owed to United Bank.

Finally, as to the bonding company, while there were two payments of which we are aware (one to a subcontractor on the Prague project and one to the government on the Madrid project) such claims on construction bonds are not at all unusual in the industry.  As to the first bond payment related to a project in Prague, Sina Moayedi, through the sale of his property in Virginia and another property in Maryland, has paid more than $2,249,421.60 of the total outstanding amount, leaving about $950,000 due.  As to the second bond payment related to a project in

---

[1] For this reason, the Court determined that there was no actual loss to the government and declined to award any restitution.

Madrid, he has agreed to make restitution of $4,718,180.50. While this second figure is a significant amount of money, more than half of it is from a liquidated damages calculation which has no rational relationship to the actual harm here.

## III.   Discussion of Relevant Offense Conduct

### A.  The Nature and Circumstances of the Government Contracts Conspiracy Offense (Count 1)

Mr. Moayedi pleaded guilty to one count of conspiracy to defraud the United States (18 U.S.C. § 371) based primarily on misrepresentations in Montage's bids for certain government contracts awarded between 1996 and 2018. The government and the defense agreed that there are 28 contracts procured on the basis of Mr. Moayedi's misrepresentations.

#### 1.  Relevant Federal Procurement Law

The "arcane world of federal procurement law," *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 18 (D.D.C. 2001), baffles lawyers and government contractors alike. To place Mr. Moayedi's relevant illegal conduct into context—and to aid the Court in parsing out the irrelevant portions of the government's narrative—we briefly summarize pertinent provisions of the federal acquisition process.

*Applicable Regulations.* The Federal Acquisition Regulation or FAR (48 C.F.R. Chapter 1) governs all federal contracts and is thousands of pages long.[2] Each agency has specific acquisition regulations, such as the Department of State Acquisition Regulations (DOSAR) and the State Department's Foreign Affairs Handbook.

*Complex One-Sided Contracts.* A government contract is not negotiated like a private contract. Instead, an agency's solicitation for proposals from bidders will function as the primary,

---

[2] *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 691 (1996) (dissent) (noting that FAR is "5,037 pages of fine print").

and largely unnegotiable, contract document. For example, Exhibit B, is the solicitation for one of the primary contacts here. It is 132 pages long, excluding the dozens of attachments. It includes detailed information about pricing; scope of work; inspection protocols; project schedule; deliverables; procedure for invoicing and progress payment; bonding and insurance requirements; and security procedures. Government contracts incorporate by reference various FAR provisions governing the work. The list of applicable FAR provisions in a single contract may stretch to hundreds of citations; this one has north of 150 incorporated FAR and DOSAR provisions.

The solicitation document is not the end of the story. For complex projects like the ones here, the agency issues additional detailed "contract specifications." For example, for one of the construction projects here (Ecuador), the specifications are an additional 243 pages long. Ex. H. Basically, the government leaves nothing to chance and maximizes its authority to oversee the project to ensure compliance.

*Competitive Bidding and Set-Aside Contracts.* Not surprisingly, the bidding process is heavily regulated. There are multiple types of solicitations. Some permit "full and open competition," which "means that all responsible sources are permitted to compete." 48 C.F.R. § 2.101. (The concept of a "responsible" contractor is discussed below.) The State Department, like all agencies, prefers full and open competition. *State Department Foreign Affairs Handbook* 14-2, § 220 ("The Public Contracts Act, 41 U.S.C. 3301, requires, with limited exceptions, that contracting officers promote and provide for full and open competition in soliciting offers and awarding U.S. Government contracts over the simplified acquisition threshold. Maximum

competition is desirable from a public perspective because, if properly administered, it results in timely delivery to the U.S. Government of quality products and services at reasonable cost.").[3]

One exception to competitive bidding is a set-aside contract. For this type of contract, only contractors that meet certain regulatory requirements may bid. Relevant here, federal agencies have set-side programs for small businesses, women-owned small businesses (WOSB), and companies in the Small Business Administration's 8(a) program. A contractor like Montage will register in the System for Award Management (SAM) and certify that it meets one or more set-aside category. If a contract requires bidders to meet set-aside requirements, then the agency will rely on the contractor's SAM certification to permit it to bid on that particular contract.

*The 8(a) Program.* The 8(a) program "provides participating small businesses with training and technical assistance designed to enhance their ability to compete effectively in the private marketplace" and "8(a) firms can receive federal contracting preferences in the form of set-aside and sole-source awards." Congressional Research Service, *SBA's "8(a) Program": Overview, History, and Current Issues* (July 2022) at 1 ("CRS 8(a) Report").[4] Eligibility for the 8(a) program is "generally limited to small businesses which are 'unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States' and demonstrate 'potential for success.'" *Id.* at 1 (citing 13 C.F.R. §124.101). The 8(a) program has a long history of failed government oversight and vendor abuse. A 2018 SBA Office of Inspector General investigation found that an astonishing **80% of the firms** it reviewed "should have been removed from the 8(a) Program" because they

---

[3] https://fam.state.gov/FAM/14FAH02/14FAH020220.html
[4] https://crsreports.congress.gov/product/pdf/R/R44844

were ineligible under the program's requirements. CRS 8(a) Report at 37-38. And this was not a new or isolated problem.[5]

*The Women Owned Small Business (WOSB) Program.* To qualify as a WOSB an entity (1) must be a "small business concern,"[6] (2) "at least 51 percent owned by one or more women; or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women," and (3) its "management and daily business operations … controlled by one or more women." 48 C.F.R. § 2.101.

***Responses to Solicitations.*** Agency solicitations are public documents. Prospective bidders will submit lengthy bids—often hundreds of pages long—in compliance with the bid's specific requirements. The bids will include the contractor's proposed price, experience from other work, identification of key personnel who will work on the project, and so forth. A technical evaluation panel within the agency will evaluate each bidder's proposal on matters other than price such as experience, past performance, and key personnel, and the agency will then compare the proposed prices against the Independent Government Estimate (IGE), which is the agency's estimate for what the project should cost. The agency can and often does ask bidders to revise the price they propose or any other part of their bid. The agency will then select a bidder or decide that no bidders are qualified and try again.

---

[5] In 2010, the Government Accountability Office (GAO) issued a report concluding that the "8(a) Program has inadequate controls to prevent fraud and abuse" and that over a two-year period, there were "$325 million in set-aside and sole-source contracts given to firms not eligible for the 8(a) program." GAO, *8(a) Program: Fourteen Ineligible Firms Received $325 Million in Sole-Source and Set-Aside Contracts*, No. GAO-10-425 (April 2010), at 29. Available at https://www.gao.gov/products/gao-10-425

[6] The SBA has regulations that govern the size of a "small business concern" by the category of work it performs. For example, companies that engage in construction of commercial buildings must have less than an average of $45 million in revenue over the last five years to qualify.

*"Responsible" Contractors.* Under the FAR, "[p]urchases [by agencies] shall be made from, and contracts shall be awarded to, *responsible* prospective contractors only." 48 C.F.R. § 9.103(a) (emphasis added). The agency's contracting officer must "make[] an affirmative determination of responsibility." *Id.* § 9.103(b). A contractor's low bid price cannot overcome the fact that a contractor is not responsible. *Id.* § 9.103(c).[7]

The FAR defines what constitutes a "responsible" contractor. Relevant here, a responsible contractor has "a satisfactory performance record" and "a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104-1. It must have other qualifications as well, including "the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them." *Id.*

*Extensive Evaluations of Contractors.* To help determine responsibility of a contractor, the federal government maintains the Contractor Performance Assessment Reporting System (CPARS). Past performance information from CPARS "is relevant information[] for future source selection purposes" and includes a detailed written evaluation of nearly every aspect of a contractor's work on a specific contract, including:

> (1) Conforming to requirements and to standards of good workmanship;
> (2) Forecasting and controlling costs;
> (3) Adherence to schedules, including the administrative aspects of performance;
> (4) Reasonable and cooperative behavior and commitment to customer satisfaction;
> (5) Complying with the requirements of the small business subcontracting plan;
> (6) Reporting into databases;
> (7) Integrity and business ethics; and

---

[7] 48 C.F.R. § 9.103(c) ("The award of a contract to a supplier based on lowest evaluated price alone can be false economy if there is subsequent default, late deliveries, or other unsatisfactory performance resulting in additional contractual or administrative costs. While it is important that Government purchases be made at the lowest price, this does not require an award to a supplier solely because that supplier submits the lowest offer. A prospective contractor must affirmatively demonstrate its responsibility . . .").

39

(8) Business-like concern for the interest of the customer.

48 C.F.R. § 42.1501. The CPARS are available to agency officials, so they can see how a contractor has performed in the past to determine whether the agency wishes to select that contractor. 48 C.F.R. § 42.1503(f). A contractor cannot change a CPARS. If it performs poorly on a contract, then every agency evaluating its future bids will know about it.

***Firm-Fixed-Price Contracts.*** The contracts at issue in this case are firm-fixed-price contracts. "A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." 48 C.F.R. § 16.202-1. In other words, if a contractor underbids the contract because it thinks the cost of certain supplies or labor will be lower than they turn out to be, then the harm from that error falls on the contractor. No regulation requires the agency to adjust the contract price to compensate the contractor for cost overruns in a firm-fixed-price contract. Indeed, as the FAR succinctly explains, "[t]his contract type places upon the contractor *maximum risk and full responsibility* for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties." *Id.* (emphasis added). The amount of the contract is to cover all costs for the contract: supplies, labor, and hoped-for profit to the contractor.

If a contract unexpectedly costs more than the award amount or takes longer than expected, the contractor can seek a change in the award price or deadline. It can submit a Request for Equitable Adjustment or REA to ask for more money; it can submit a Time Impact Analysis to ask for more time. The agency has complete discretion as to whether it will modify the price or the schedule during contract performance. 48 C.F.R. § 43.103(a)(1). If the contractor disagrees with the agency's decision to deny an REA, however, its only recourse is to seek a civil remedy after

the fact through the administrative or federal court procedure. For example, in a recent case, a contractor (Chugach) was awarded a $330 million contract, with a likely expected profit of about $33 million. The project ran $37 million over the expected cost. The agency denied Chugach's claim for more money and the administrative law judge affirmed the agency's position. That the contractor demonstrated that it had *lost money* performing the contract did not change the ALJ's decision (after years of litigation) that the agency properly denied the claim for additional payments. As the FAR makes plain -- and this case exemplifies --the risk of submitting a too-low bid falls on the contractor and the contractor alone.[8]

**Contract Oversight and Progress Payments.** Montage was not paid a lump-sum amount at the start of each project and then left to its own devices to finish it. Rather, the State Department had full time personnel on job sites and conducted on-site inspections at every stage *before* it made progress payments under the contracts. The contracting officer or contracting officer representative (COR) oversaw every step of these projects. *See* Ex. B (IDIQ contract), § G.5 (contracting office authorizes payments only "on the basis of an inspection of the work"). The State Department contracting officer must inspect the project on an ongoing basis and "[p]erform all actions necessary to verify whether the supplies or services conform to contract quality requirements." 48 C.F.R. § 46.104(a).

The State Department's Bureau of Overseas Building Operations (OBO) oversaw the primary projects at issue here. The OBO designs, builds, and maintains overseas agency properties. "OBO's mandate is to provide secure facilities, and every new embassy [it] build[s] meets very rigorous security and life safety standards." Ex. C, *OBO Guide to Excellence in Diplomatic*

---

[8] *Appeal of Chugach Fed. Sols., Inc.*, ASBCA No. 63399 (June 8, 2023).

*Facilities* ("Excellence Guide"), at 5. To meet this mandate, the OBO assigns an on-site Project Director to handle all matters "during construction up to a completed project's handover to the post." *Id.* at 46. The OBO Project Director "monitors construction to ensure that every aspect is constructed in accordance with the approved and contracted design, scope, and standards of quality. He or she also ensures that all construction is carried out in accordance with the construction security and safety plans." *Id*. OBO requires multiple levels of on-site inspections. *First*, OBO's subject matter experts—such as in fire protection and life safety and security systems—will inspect the project for compliance with State Department standards. *Id*. at 102. *Second*, OBO will engage "a qualified, independent commissioning agent to assign with verifying that the systems are properly designed and that the contractor's performance meets contractual requirements." *Id*. The independent agent visits the site six to twelve months before completion to oversee the process and to "witness a variety of tests on the building systems." *Id*. *Third*, the Bureau of Diplomatic Security must accredit a new facility or a major renovation project like the ones that Montage performed. This process includes "a series of inspections, as well as testing of key systems." *Id*. at 103.

These inspections are completed before payment is made to a contractor like Montage. In a similar embassy construction project in Pakistan by a different contractor, the State Department OIG included an instructive narrative of how the inspection process affects the invoicing process in the real world: The COR first "reviews the initial invoice and determines if the invoiced costs are commensurate with the progress made and if the work for which [the contractor] is requesting payment has been satisfactorily performed." Ex. D (OIG Report), at 3. Then, to "monitor the percentage of completion and the status of the . . . Project, . . . the COR/Project Director (PD), OBO engineers, and the [contractor] personnel walk through the work site and discuss the project's

progress, including any issues with meeting technical specifications and the quality of building materials." *Id*. The COR then "uses the information obtained from quality assurance and work progress inspections to discuss with [the contractor] any concerns or discrepancies identified with the invoice submitted." *Id*. Once the agency is satisfied that the contractor's "invoiced costs are commensurate with the work progress described and the work is deemed satisfactory on the basis of quality assurance and work progress inspections," the agency will pay the invoice. *Id*.

   ***Problems with Contractor's Performance or Personnel***. Given the complexity of federal contracts, the FAR anticipates that there may be problems with the contractor's performance and provides specific procedures to address them. If the agency inspects the work and finds a problem or concludes that personnel on a project are underperforming, then it has multiple avenues of recourse during contract performance and afterwards:

- *Opportunity to cure.* If an inspection reveals a problem during contract performance, then the "contracting officer should reject supplies or services not conforming in all respects to contract requirements." 48 C.F.R. § 46.407(b). But before seeking any sanction against the contractor, the "contracting officer *ordinarily must give the contractor an opportunity to correct or replace nonconforming supplies or services* when this can be accomplished within the required delivery schedule." *Id*. § 46.407(c).

- *Remove personnel.* If any personnel working on the project "fail[s] to comply with or violate[s] applicable requirements of th[e] contract," then the contracting officer has complete "discretion" to "direct" the contractor to remove the personnel from the project. 48 C.F.R. § 52.225-19(h).

- *Terminate for cause.* The agency may terminate the contract for cause if the contractor fails to "perform the services within the time specified in the contract" or to "perform any other provision of the contract." 48 C.F.R. § 49.402-1.

- *Warranty period.* If the government identifies problems after the contract is done, then it can seek recourse but not forever. The government has one year to do so. *See* 48 C.F.R. § 52.246-21 ("[t]his warranty shall continue for a period of 1 year from the date of final acceptance of the work" or 1 year after the government "takes possession of any part of the work before final acceptance").

43

- *Performance bond claim.* The agency can file a claim with the contractor's performance bond company. A performance bond secures the contractor's performance; a bonding company provides a bond in return for a premium payment by the contractor.

***Suspension and Debarment***. The suspension and debarment process, the most serious administrative sanction available, "protects the federal government from fraud, waste and abuse by using a number of tools to avoid doing business with non-responsible contractors."[9] If an agency suspends or disbars a contractor under the FAR, the contractor may not bid on, or be awarded, any federal contract. An agency may debar a contractor where there is a "willful failure to perform" a contract or where there is "a history of failure to perform, or of unsatisfactory performance" of a contract. *See* 48 C.F.R. § 9.406-2 (b)(1)(i).

## 2. Montage's Work for the Federal Government

While Mr. Moayedi pleaded guilty to specific wrongdoing associated with a series of government contracts, the full picture of his three decade career in government contracting—rather than a narrow slice of it—reveals a very different perspective.

### a. *Overview of Montage's Work.*

Mr. Moayedi formed Montage in 1986. Its work at the start was mostly state and local contracts, as well as projects for private clients. Montage won its first federal government contract in 1993. Since then, Montage has been awarded 387 government contracts with a value of about $195 million. Ex. E (list of all Montage contracts). Over the last three decades, Montage won bids for construction projects for the Department of Justice, the Department of Homeland Security, the Department of Defense, the Department of the Interior, the Department of Labor, the Department

---

[9]  GSA Frequently Asked Questions, available at https://www.gsa.gov/policy-regulations/policy/acquisition-policy/office-of-acquisition-policy/gsa-acq-policy-integrity-workforce/suspension-debarment-and-agency-protests/suspension-debarment-faq.

of Transportation, the Equal Employment Opportunity Commission, the General Services Administration, NASA, and the Nuclear Regulatory Commission.

Mr. Moayedi was also involved in another company called Viking Contractors Inc. that he founded with a Montage employee named Marianela Lugo. The federal government awarded Viking 44 contracts between 2003 and 2011 with a value of $15.8 million. Ex. F (list of all Viking contracts). Viking won bids for construction projects for the Department of Defense, Department of Treasury, the GSA, the Department of Veterans Affairs, and the Department of Agriculture.

As explained above, each time an agency decided to award a contract to Montage, it concluded that it was a "responsible" contractor after reviewing its past performance on federal contracts in the CPARS system. Had Montage not performed satisfactorily as a contractor, then federal agencies would not have awarded it new contracts, or it would have been suspended or disbarred from federal contracting altogether. The record is the opposite. Year after year, Montage performed work for the federal government and year after year, the federal government awarded it new work.

The State Department alone awarded Montage over 70 contracts from 1999 to 2018. For example, Montage worked on a $4.1 million contract in Hungary in 2003 for the State Department. This Hungary project is not part of the offense conduct here. After working with Montage on that project, the State Department awarded Montage many additional contracts over the years. Other agencies followed suit: NASA awarded Montage a $3.8 million contract for work at the Goddard Space Center in 1996 (worth about $9 million in today's dollars); the Marine Corps/DOD awarded Montage a $3.9 million for work at Quantico 2003; and the Department of Justice awarded Montage a $3.9 million contract for work on the FBI headquarters in 2018.

45

   b.   *Contracts Forming the Offense Conduct.*

There are 28 contracts for which Mr. Moayedi agreed that he made misrepresentations in the bidding process.  For Guideline's purposes, the parties have agreed that these contracts resulted in about $13.6 million in "gain" or profits. They fall into two categories. *First* are seventeen contracts won by Montage or Viking when Mr. Moayedi certified in SAM that these companies met the requirements of the 8(a) program. *Second* are eleven contracts awarded by the State Department to Montage for construction work on overseas State Department embassies and consulates.

**The 8(a) Contracts (17 Contracts).** Most of the contracts to which Mr. Moayedi pleaded guilty (17 of 28) were procured by fraud because Mr. Moayedi certified in the SAM system that Montage or Viking  met the requirements of the 8(a) program. While it was true that individuals who met the program's requirement to be part of a "disadvantaged" group had a majority interest in these companies (Mr. Moayedi's first wife and Ms. Lugo), Mr. Moayedi ran their day to day operations and therefore "controlled" both of these businesses. Although not an excuse for knowingly making false representations, Montage was far from alone in not following the 8(a) program's technical rules, given the State Department's OIG finding, *supra* at 37-38, that in 2018 that 80% of companies that won bids under the 8(a) program did not meet its requirements.

**State Department Contracts (11 Contracts).** In January 2014, the State Department solicited bids for design-build work under the Indefinite Delivery Indefinite Quantity (IDIQ) Contracts for Worldwide Design-Build Construction and Construction Projects. An IDIQ contract provides for an indefinite quantity of services for a fixed time but without a predetermined deadline. *See* 48 C.F.R. § 16.500 *et seq.* Prospective contractors bid to be a qualified vendor within the IDIQ project. The agency selects the IDIQ contractors but they are not given any specific

projects at that point. When the agency has a specific need, it asks the pre-qualified vendors to bid on a "task order" for the work. Only the pre-qualified vendors may bid on these task orders. A task order is treated the same as a contract under the FAR. Montage submitted its bid for the IDIQ as a woman owned small business, as a small business, and to bid on "full and open" competition task orders as well.

Four of the IDIQ task orders awarded to Montage are part of this case. The State Department also awarded seven other contracts to Montage between 2008 and 2017 that were not part of the IDIQ contract. These 11 construction projects were complex in nature, performed overseas, and included project in dangerous and unpredictable locations such as Sudan, Nigeria, and Burkina Faso—locations where Al Qaeda operated, where political corruption abounded, and where civil unrest was commonplace.

A table of the relevant contracts is below:

| Award Year | Project Name | Initial Award Amount | Amount with Modifications | Type of Award |
|---|---|---|---|---|
| 2008 | Lagos, Nigeria | $26,104,185.00 | $28,293,677.00 | Full and open competition |
| 2014 | Guayaquil, Ecuador | $17,039,611.00 | $17,574,565.00 | Full and open competition |
| 2014 | Abu Dhabi, UAE | $1,321,299.00 | $1,321,299.00 | IDIQ |
| 2014 | Copenhagen, Denmark | $5,606,810.00 | $4,764,373.98 | IDIQ (woman owned business set aside) |
| 2015 | Hong Kong | $15,492,075.00 | $16,789,114.91 | Full and open competition |
| 2016 | Prague, Czech Republic | $20,282,303.68 | $21,278,637.54 | Full and open competition |
| 2016 | Burkina Faso | $2,295,000.00 | $2,597,957.00 | IDIQ (woman owned business set aside) |
| 2016 | Hamilton, Bermuda | $6,296,735.79 | $6,296,735.79 | IDIQ |
| 2016 | Tokyo, Japan | $5,532,685.00 | $1,344,127.30 | Full and open competition |
| 2016 | Madrid, Spain | $15,453,200.00 | $2,922,335.00 | Full and open competition |
| 2017 | Khartoum, Sudan | $16,348,642.00 | $18,647,717.36 | Full and open competition |

47

>    *c.   Montage Performed the Work.*

This case differs from most fraud prosecutions because Montage always intended to—and then actually did—perform the work and thus provided fair value for the amounts it received from government agencies. Affirmatively proving that Montage did the work on 28 complex, overseas construction contracts presents a logistical challenge in a sentencing memo. However, there are multiple objective indicators that Montage indeed did the work, that the government contemporaneously accepted the work as completed, and that the government did not suffer the type of harm that would be expected if Montage did not perform.

**First**, the government issued "substantial completion" notices for projects. *See, e.g.*, Ex. G (Hong Kong and Ecuador notices). Under federal regulations, "work shall be deemed 'substantially complete' if and only if the Contractor has completed the work and related contract obligations in accordance with the contract documents." 48 C.F.R. § 552.211-70.

**Second**, the government has agreed that Mr. Moayedi's conduct did not cause the State Department tens of millions of dollars in pecuniary harm to redo or repair Montage's work. The agreed-upon restitution amount owed to the State Department on all 28 contracts is $923,989.50.[10] Restitution, of course, "must be tied to the victim's actual, provable loss." *United States v. Zangari*,

---

[10] The total restitution amount in the plea agreement is $6,588,679.63. According to documents provided by the government and in a footnote to the plea agreement, the amount owed to the bonding company for the Prague contract is $946,509.63 and the amount owed to the bonding company for the Madrid project is $4,718,180.50. This leaves $923,989.50 as the amount owed to the State Department. This amount is from two sources. First, the government had to pay $24,500 to a neighbor who claimed damage to property from Montage's work in Bermuda. Second, the remaining portion reflects the increased award amount to Montage on the Bermuda project related to Mr. Moayedi's bribe to May Salehi. Your Honor has already determined that this increased cost did not result in a loss to the government, as discussed in more detail *infra* at 60-61. Nonetheless, for purposes of resolving this matter, Mr. Moayedi has agreed to include this amount as restitution.

677 F.3d 86, 91 (2d Cir. 2012). Here, the "actual, provable loss" to the State Department is just under $1 million or less than 1% of the total payments to Montage.

**Third**, with the exception of the Madrid project, the government did not terminate these contracts for cause. Termination for cause is the result when the contractor fails to "perform the services within the time specified in the contract" or to "perform any other provision of the contract." 48 C.F.R. § 49.402-1. Instead, Montage performed the work, the government inspected it, and the government made final payment to Montage based on the work it had performed. Had Montage not performed these contracts, a trail of terminations-for-cause would litter the record. Montage would have been suspended or debarred years ago.

To be fair, the government did terminate Montage for cause on the Madrid project. After Montage completed the design phase of the project, the government sent a "Notice to Proceed" with the construction phase on February 26, 2019. Montage could not begin construction until it received this notice. Yet just two months later the government terminated Montage based on the delays on the project and other claimed problems.[11] The government sought payment from Montage's bonding company and received approximately $4.7 million in return.

The delays on the Madrid project—and minor increases in project costs for other Montage contracts—pale in comparison with other projects overseen by the State Department. Consider a $196 million contract awarded by the State Department in 2014 to Caddell Construction Co. for

---

[11] The government also terminated the Tokyo contact "for convenience" (not for cause) because the government had erred in issuing it. The Tokyo contract was to replace the exterior doors and windows at the ambassador's residence, as well as to renovate the kitchen. After the project began, however, the State Department realized that its specifications for the new windows did not comply with certain historic designation requirements imposed by the city. Montage received about $1.3 million from the $5.5 million award for the work it had already completed at the time the government shut down the project.

49

work on an embassy in Turkmenistan. The project was to be completed in 4 years. As of today, however, the project is estimated to take 12 years and cost at least $327 million.  According to the State Department OIG, the project includes years of construction errors.[12] The Department of Justice has not brought criminal charges against the company. While Mr. Moayedi admitted his guilt with respect to misrepresentations related to these contracts, not one of his projects caused cost increases or delays anywhere close to the State Department's Turkmenistan project.

*Fourth*, the government did not file a claim with Montage's performance bond company within the one year warranty period, apart from the Madrid project discussed above. Had Montage walked away from these projects without doing the work, or pocketed millions of dollars for substandard or truly unsafe work, the government would have raised those claims long before now. This is not a situation like the matter recently resolved by the Department of Justice against Bradken, Inc.[13] There, the company produced and sold substandard steel components to the U.S. Navy to be used on vessels. The Director of Metallurgy at the Bradken lab knowingly falsified test results to conceal the fact that the components did not meet the Navy's specifications. The Department of Justice allowed Bradken to enter into a deferred prosecution agreement and pay a civil settlement of $10,896,924 to resolve the matter. In that agreement, Bradken agreed that its fraud "required the Navy to undertake substantial testing and monitoring measures, which have imposed considerable economic costs and operational limitations on the Navy."

*Fifth*, the government paid Montage only after inspecting the work onsite to ensure that it complied with the contracts. Ex. D (OIG Report), at 3 (contracting officer "reviews the initial

---

[12] Available at https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/Ashgabat%20Embassy_Factsheet_0 9.08.2022.pdf.
[13] Available at https://www.justice.gov/usao-wdwa/pr/bradken-inc-pays-108-million-settle-false-claims-act-allegations-and-enters-deferred.

invoice and determines if the invoiced costs are commensurate with the progress made and if the work for which [the contractor] is requesting payment has been satisfactorily performed."); Ex. B (IDIQ contract), §G.5 (contracting office authorizes payments only "on the basis of an inspection of the work"). If Montage did not complete the work, then the State Department would not have made progress payments on the contracts.

That the State Department received fair value for its payments to Montage does not excuse Mr. Moayedi's misrepresentations or any other misconduct. But certainly Your Honor should take into account that Mr. Moayedi worked hard to fulfill these contracts and always planned to do so.

### 3. Mr. Moayedi's Relevant Misrepresentations

There are three categories of Mr. Moayedi's misrepresentations that we submit should appropriately play a role in the Court's sentencing decision here.

#### a. Misrepresentations Regarding 8(a) and WOSB Status

Mr. Moayedi misrepresented that Montage qualified as a woman owned small business. Although a woman and an African-American man owned a majority of the shares of the company and later another woman owned 100% of the company, it was Sina Moayedi who was in charge of running the company. Sina Moayedi "controlled" the company. Two of the 28 contracts were set asides for women owned small businesses. Likewise, although a member of a disadvantaged group owned 51% of Viking on paper, Mr. Moayedi was in control of it. Fifteen of the 28 contracts were set asides for 8(a) companies. That said, based on the Inspector General's report, *supra* at 37-38, it is not known whether the other bidders for these 8(a) contracts were qualified either.

#### b. Misrepresentations Regarding Employee Education and Experience

Montage submitted resumes of certain key personnel that reflected that the persons met specific requirements (educational and experience) when they did not. Mr. Moayedi admits that

51

he submitted resumes that exaggerated a few staff members' educational backgrounds. For example, one person had attended, but had not graduated from, a specific college and he submitted a resume saying that he had graduated from that college. Some individuals' experience was inflated. Mr. Moayedi accepts responsibility for these misrepresentations. Although these individuals did not meet the contract specifications, they did the work adequately and the government never asked Montage to remove them from the projects, as it had the authority to do. 48 C.F.R. § 52.225-19(h). Moreover, several of the individuals that the government points to as unqualified in fact had State Department construction experience and went on to work at a number of additional State Department projects, some to this day.

### c.  Misrepresenting Montage's Prior Experience

Mr. Moayedi inflated or fabricated certain prior experience to include with Montage's bids. For example, Montage had performed about $3.5 million in work for a District of Columbia monastery but listed that work as close to $20 million on Montage's bids. He also created domain names and fake websites to support these claims. Though there was no question that at the time he did so, Montage had for many years completed major government contracts, including for the State Department, the timing and size of these contracts would not have permitted Montage to bid on the larger contracts at issue.  Mr. Moayedi acknowledges this fraudulent  conduct.

### 4.  Contested Facts That Should Not be Considered for the Purposes of Imposing a Sentence on Mr. Moayedi

The government, in the information it provided probation for the PSR and what we expect it will similarly submit to this Court, takes what can charitably be described as a "kitchen sink" approach—alleging many things that are unproven or irrelevant here. For example, the PSR includes the "facts" that there was a murder of an employee of the U.S. Agency for International Development at one embassy where Montage performed the work and a dynamite explosion at

another. PSR ¶ 93. Even if these acts of violence occurred (they are not assigned a date and no citation or evidence is provided), there is simply no link between them and Mr. Moayedi's conduct. Mr. Moayedi, of course, disputes that his misrepresentations played any role whatsoever in these unconscionable acts.

Under Fed. R. Crim. Proc. 32(i)(3)(B), because these "facts" are disputed, the Court may resolve the dispute or "determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Mr. Moayedi requests that the Court determine that a ruling on these issues and the matters below are unnecessary because they "will not affect sentencing" or because the Court "will not consider" them in sentencing Mr. Moayedi.

### a. The Government's Newly Identified 37 "Construction Related Issues"

For the first time in the final PSR dated July 21, 2023, the defense learned of the government's claim regarding what it calls specific "construction-related issues" on five of the contracts. The final PSR includes 37 bullet points regarding these issues (and five additional "quality of personnel" issues). The defense was denied any opportunity to object to any of this information before Probation issued the final PSR, in violation of Rule 32. On August 3, 2023, the defense sent a letter to Probation objecting to the lack of notice for this new information and lack of opportunity to respond. Because Mr. Moayedi was denied the opportunity to respond to these allegations, the Court should disregard them.

### b. Requests for Equitable Adjustment

The government claims that Montage somehow engaged in fraud by bidding a low price to win an award and then planning to submit REAs in the future to increase its profit margins. When a contractor submits a bid lower than a competitor for a fixed fee contract, however, this is no way

53

is tantamount to fraud. As discussed above, submitting a low bid is at the contractor's peril; the government makes no promises that it will pay any submitted REA and only promises to pay the awarded fee amount and no more. A contractor who loses a claim for additional payment may erase all its profit on the contract—and then some—as demonstrated by the *Chugach* decision discussed above. Additionally, the government always calculates its Independent Government Estimate (IGE) of what the project should cost before it evaluates the bids by contractors. A contractor bidding well below the IGE would almost always be contacted by the agency to revise its bid upwards out of concern for underestimated costs.

Beyond the legal infirmity of the government's novel theory, the evidence shows that this is not what happened. For nearly two-thirds of the contracts (18 of the 28 contracts), Montage ultimately received either exactly the awarded contact amount or *less* than the award amount. In other words, the agency did not increase the initial contract amount through any REAs. For the remaining contracts for which Montage received additional payments, it is unknown whether the increase resulted from Montage's submission of REAs or change orders initiated by the government to alter the scope of work and cost. Either way, for the remaining 10 contracts, the State Department independently determined that Montage deserved more money for the work it had performed.

### c.  No Evidence of National Security Risks

The government has accused (but not charged) Mr. Moayedi of creating national security risks. Mr. Moayedi denies that there was any breach of national security interests related to these contracts and the government has not offered any evidence of damage to national security here. Some of the government's allegations in this regard seem to be thinly-veiled attacks based on Mr. Moayedi's national origin. During this case, the Department of Justice has repeatedly emphasized

that Mr. Moayedi is from Iran. The PSR repeats this fact as though it is somehow relevant to the Court's sentencing decision. *See* PSR ¶ 95 (accusing Mr. Moayedi of having "enduring connections to a country that is hostile to the United States"). Mr. Moayedi was indeed born in Iran. He has been a proud citizen of the United States since 1986. He did travel to Iran for his father's funeral. This trip was fifteen years ago.

        *d. Submission of Resumes.*

The government has also argued that Mr. Moayedi engaged in "corporate espionage" when he submitted in connection with bidding documents resumes of individuals who were not employees of Montage. Mr. Moayedi has responded to this allegation in his objections to the PSR. PSR at 69 (defense objection to paragraph 60). Even if these allegations are true, these were not resumes for key personnel that could possibly have influenced the agency's award of the contract.

        *e. Architect Stamp on "As-Built" Drawings.*

During a design-build project, Montage would first work with an approved architecture firm to design the buildings or renovations. The architect, known as the Designer of Record, would date and sign the drawings when they were submitted to the State Department for approval. If approved, then the government would issue a Notice to Proceed, which allowed Montage to begin the second phase of the project, the construction phase. As in any construction project, changes to the work would need to be made along the way and Montage would make those changes on a "red lined" version of the drawings, called the "as-built" drawings. The point of the as-built drawings was to have a final version of what work was actually completed for future reference. For example, if a pipe needed to be moved 6 inches to the left to accommodate the size pipe required, then Montage would mark on the as-built drawings (in red) where the pipe had ultimately been placed. Montage would make these changes on the drawings, not the Designer of Record, since the DOR

was in charge of design and not construction and thus was not on-site throughout construction to know what changes were being made to the drawings.

The government claims that part of the fraud here occurred when Mr. Moayedi "forged" the architect's stamp on the as-built drawings when he submitted them to the agency on the Ecuador project to suggest that the DOR had signed off on the changes themselves. But this is not the case.

First, neither the Ecuador contract nor any other contract required the DOR to sign off on the as-built drawings. The contract provides that "[t]he Contractor shall store, consolidate, contain, ship, clear, install, inspect, performance test, and revise As-Built and As-Installed drawings." Ex. H (Ecuador General Requirements), § 3.03(c)(7). Also, the contract mandates who must sign the as-built drawings, the Construction Quality Control Manager (at Montage)—not the Designer of Record: "All design changes shall be submitted to and accepted by the Government. A complete set of drawings used in the As-Built (red line) process will be controlled on site by the CQC Manager. All red line changes to the design shall be accepted by the Government. Red line changes shall be initiated by the CQC Manager and the Project Director/COR [a State Department employee] or his designated representative." *Id.* § 3.01(A)(11).  Thus, as it had done with respect to previous projects, when it provided its "as-built" drawings to the agency, Montage was indicating the changes (red-lined) to the original, approved, design that had been made, not representing that there had been an inspection of the jobsite signing off on these modifications by the DOR. It never asked the DOR to sign them nor was this work within the DOR's contract with Montage.

The government states that when Montage submitted the as-built or red-lined drawings for the Ecuador project to the State Department at the close of the project in December 2017 the

drawings had the stamp and signature of the Designer of Record on them indicating, the government alleges, that the DOR had inspected the job site and signed off on the "as-builts." However, the 323-pages of as-built drawings submitted by Montage at the close of the project contained the stamped signature of the DOR from December 2015 and April 2016 for all pages except four. The DOR did review and stamp the drawings in 2015 and 2016 near the beginning of the project and during its design phase. This is the contractual role of the DOR.

Below is a screenshot of the signatures from December 2015 and April 2016, which are used on nearly every page.




There was no reason for Mr. Moayedi to forge the DOR's stamp during the construction phase because the contract did not require the DOR to inspect the property and sign off on the as-built drawings as accurately reflecting the final work. And the evidence shows that he did not misrepresent anything to the government. The red-lined drawings were made right on top of the DOR-approved drawings and Montage left the DOR's original (2015/2016) stamp on them to show that it was using the approved drawings for the basis of the red-lined ones.

<i>f. Resubmittals with Architect's Stamp</i>

The government also claims that part of Mr. Moayedi's fraud was when Montage sent "resubmittals" to the State Department that contained the architect's signature on the Ecuador project. "Submittals" are  documents asking for approval of certain manufactured products to be used at the jobsite. Montage had sent these submittals for approval during the design phase with the architect's signature and stamp and the agency approved them. Then, Montage resubmitted them during the construction phase, applying the architect's stamp to the already-approved submittals. Mr. Moayedi disclosed this matter at the time, explaining that Montage had improperly used a shortcut to apply the architect's stamp to the resubmittals, thinking it was not a problem since the original submittals had already been approved. The contracting officer representative ultimately approved the resubmittals but there was, admittedly, a back-and-forth where the COR expressed concern about what Montage had done.

However, in connection with affirmative litigation brought by Montage seeking additional payment for work on the Ecuador contract, senior State Department contracting official David Vivian was deposed in late 2019 about Montage's use of the architect's stamped signature on these resubmittals. Ex. I (Vivian deposition transcript). Mr. Vivian had worked in State Department procurement for nearly 20 years. Vivian testified: "[w]hen I spoke to Montage about [the

submittals], they told me that there was an issue with the person in the designer of record, that she had an accident or something and she was in the hospital. And there was some issue with people not stamping the documents as was agreed in their original contract. And I spoke to other people in OBO about it and legal counsel. And we basically agreed that there was no harm or intent to defraud the government or to falsify documentation. They were using the staff to further the project by stamping the documentation and submitting it as they would have done. It was all correctly submitted. They weren't trying to get away with anything." *Id*. at 285.  Mr. Vivian was then asked, "that was ultimately resolved, correct?" He responded: "Yes. There were a set number of documents that I understand were incorrectly or falsely stamped. And we worked through those number of documents and that was the end of the issue." *Id*.[14]

While there may well have been a difference of opinion about whether the stamped signatures were fraudulent versus a shortcut for convenience that was not intended to deceive anyone, the evidence shows that the matter was resolved at the time. No breach of the contract was claimed.  The items on the resubmittals were approved by another OBO approved architectural firm, Page Architects, and Montage finished the Ecuador job. The government has no credible evidence that this issue led to any cost overruns, safety issues, or any other harm to the government.

### B.  Nature and Circumstances of Offense Conduct Related to Bank and Bonding Company (Count 1)

Included in Mr. Moayedi's plea to Count 1 of the Information charging conspiracy to commit wire fraud are his misrepresentations made to United Bank. Mr. Moayedi has acknowledged in his plea of guilty that as part of his operation of Montage, he conspired with

---

[14] Mr. Vivian also testified that he had personally worked with Montage on two projects and that Montage was a "reasonable contractor" that was "able to do the job." Ex. I at 14-15.

others to knowingly submit to United Bank certain false and/or fraudulent information and documentation so that Montage could maintain a revolving line of credit of up to $3 million with the bank.  At all times while the line of credit was in place, properties owned by Mr. Moayedi and/or certain of his family members were used as collateral to secure repayment of this financing. United Bank's loan was paid in full, it sustained no loss as a result of issuing the loan to Montage, and no restitution is owed to the bank.

Mr. Moayedi accepted responsibility as well for conspiring with others to knowingly submit to Lexon Insurance Company certain false and/or fraudulent information and documentation so that Lexon would issue Montage payment and performance bonds required to bid on government contracts.  One payment was made by Lexon pursuant to a claim against the payment bond by a subcontractor on the Prague project.  Lexon has been paid back  approximately $2.2 million; there is an outstanding balance of $946,509.63 owed to Lexon. A second payment in the approximate amount of $4,718,180.50 was made by Lexon to the U.S. Government in connection with the Madrid project discussed above.

### C.  The Nature and Circumstances of the Bribery Conspiracy Offense (Count 2)

As acknowledged in his guilty plea to Count 2 of the Information, Mr. Moayedi accepted responsibility for having paid May Salehi, at her request, a total of $60,000 for her provision to Montage of confidential information which allowed Montage to raise its bid on a State Department contract in Hamilton, Bermuda yet remain low bidder and be awarded this project.  Mr. Moayedi acknowledges that on an earlier occasion, Salehi had provided him with a copy of the technical portion of another larger and well-established company's bid on a job that had already been awarded (and completed) so that Montage might present future bids to the State Department in a far more "professional" and organized fashion than it had been doing. Moayedi paid Salehi

approximately $6,000 for this document. Mr. Moayedi denies any allegations that Salehi ever provided him with confidential bidding information with respect to any job that Montage bid on, other than the Bermuda project.

With regard to the Bermuda contract, as the Court has previously determined, Montage's increased bid following its receipt of confidential information did not cause financial harm to the government because not only did Montage remain the lowest bidder but the price at which Montage agreed to perform the project – and did so – was still substantially below what the government had estimated the cost of the project to be. ("No restitution will be imposed because the Court adopts the defense's argument in that regard…" *United States v. Salehi*, 21 Cr. 577 (JSR) (S.D.N.Y. 4/8/22), Doc. 32 at 62.

### D.  The Nature and Circumstances of Aggravated Identity Theft Offense (Count 3)

Finally, Mr. Moayedi pleaded guilty to one count of aggravated identity theft under 18 U.S.C. § 1028A in Count 3 of the Information.  Violation of this statute occurs when the "misuse of another person's means of identification is at the crux of what makes the underlying offense criminal.  *Dubin v. United States*, 143 S. Ct. 1557, 1563 (2023).  In reversing defendant's conviction for aggravated identify theft in *Dubin*, the Supreme Court found that the "crux" of the defendant's crime was inflating the value of medical services and the use of a patient's identification to fraudulently bill for such services was merely an "ancillary part" of the process.

Mr. Moayedi agreed to this plea before *Dubin* was decided and does not seek to withdraw his plea because of this recent decision. He has agreed that he engaged in aggravated identity theft when listing the names of Beverly Johnson, Maria Quevedo and Marianela Lugo as the owners of Montage, Viking, and Ponce in order to bid on government contracts. But there can be little doubt that this case is outside the heartland of typical identity theft cases – those in which the defendant

uses without permission or steals someone's personal identifying information to commit a financial crime. *Dubin*, 143 S. Ct. at 1568 (citing Black's Law Dictionary definition of "identity theft" as the "ordinary meaning" of the offense: "[t]he unlawful taking and use of another person's identifying information for fraudulent purposes; specif[ically] a crime in which someone steals personal information about and belonging to another, such as a bank-account number or driver's-license number, and uses the information to deceive others."); *Flores-Figueroa v. United States*, 556 U.S. 646, 656 (2009) (describing "examples" of "classic identity theft" as when "a defendant has used another person's identification information to get access to that person's bank account" or "when the defendant has gone through someone else's trash to find discarded credit card and bank statements, or pretends to be from the victim's bank and requests personal identifying information").

Here, in contrast to those scenarios, all three individuals knew that Mr. Moayedi "used" their names or identities for the purpose of allowing for bidding on government contracts. Indeed, the government has described at least one of them as a coconspirator in a mutually advantageous arrangement. PSR ¶ 30. And equally importantly, there was no financial harm caused to any of the people whose identities Mr. Moayedi utilized.

The government has also claimed that Mr. Moayedi engaged in aggravated identity theft in other respects. They point to Mr. Moayedi's listing as a reference regarding prior work a "person" with the name of Edward Gonzalez. But there is no basis for the assertion that Edward Gonzalez is a real person. Thus, this cannot form the basis of an identity theft charge. *Flores-Figueroa*, 556 U.S. at 657. They reference Mr. Moayedi's use of a notary stamp in the name Gloria Linda Martinez, but fail to report that, like Edward Gonzalez, this was a fictitious persona. They point to the use by one employee for a period of time of Mr. Moayedi's wife's name but fail to

explain how that was intended to or did in fact harm anyone.  Nor could inclusion of his wife's name on a website caused harm to anyone. And where Mr. Moayedi created websites using the names of companies or universities as part of his wrongdoing, the use of those names cannot possibly form the basis of an identity theft charge since they are not "persons" under the statute's plain language. *Id.*

## IV.   Remaining Factors Under 18 U.S.C. § 3553

### A.  The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense

Sina Moayedi well recognizes that the contracting fraud and bribery offenses he engaged in, as well as his related misdeeds, are serious matters necessitating punishment.  It would be difficult to fail to appreciate this when one's residence for the last twenty months (and prior to that for three months) has been a federal jail, mostly the Metropolitan Detention Center.  The question then is how much additional time in prison is "necessary," but not more than "necessary," to reflect the serious nature of the misconduct.  We submit that a sentence of 4 years in prison adequately addresses these retributive concerns.

### B.  The Need to Afford Adequate Deterrence to Criminal Conduct

As far as general deterrence is concerned, this Court has stressed numerous times over the years that in cases of white collar crimes, it is especially important that the Court's sentence send a clear message to those who would consider commission of such an offense that if caught, they will go to jail.  But although the certainty of a prison sentence in such cases serves to discourage others from engaging in these crimes, there is no empirical support for the argument that a *longer* prison sentence is necessary to deter similar misconduct.  Indeed, "there is [] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp.2d at 514.

To achieve the aim of general deterrence, "social science conclusively finds that certainty matters more than severity." Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021). "[T]he vast majority of people who are committing crime are not particularly forward-looking.  So adding on five or ten years to an already long prison sentence simply doesn't have much of an effect on their behavior today." *Id*. A 2016 bulletin by the National Institute for Justice, a division of the U.S. Department of Justice, made this plain: "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (June 2016). Additionally, the NIJ report provided: "[P]rison sentences, (particularly long sentences) are unlikely to deter future crime" and that "increasing the severity of punishment does little to deter crime . . .." *Id*.  *See also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence"); Andrew von Hisch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Francis T. Cullen, et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity");

David Weisburg *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

Thus, while the government urges that more than a decade in prison is required here in large measure to dissuade others from violating the law, in reality, what they are arguing for is a "greater than necessary" punishment. There is no sound reason to believe that a sentence of four years in prison for a 68-year-old, first-time, non-violent offender, a significant sentence by any reasonable metric, would somehow be seen by a would-be offender as worth the risk. What such an offender would be worried about was going to jail, period.

### C.  The Need to Protect the Public From Further Crimes of the Defendant

Sina Moayedi is 68 years old and has been in jail now a total of about two years.  In that time, which has included much of the pandemic, between all of the lockdowns, he has taken advantage of every positive opportunity that is available to inmates not only to better himself but to better others.  He has worked at the jail in several capacities.  He has been a unit orderly which is considered a position earned by trust.  He has participated in a good number of drug and alcohol addiction programs so as to learn more about and deal far better with his history of substance abuse.  He has acted as a tutor, a teacher to inmates, helping them to learn poetry and achieve their GEDs. He has enrolled in a college program studying psychology to help him better understand himself and others.  And, most notably, he has volunteered as a suicide prevention observer, helping to ensure that inmates thought to be in danger of self-harm or worse, are watched, talked to and befriended.  In fact, because many times, other such volunteers or even staff are not available on overnight shifts, Sina is called upon to serve as an observer on these grueling shifts.

He has done all this because it is in his nature to help, to inquire, to learn, to improve.

Sina Moayedi poses effectively zero risk of reoffending.  He has lost everything he once had, with the exception of his family and some close friends and former colleagues.  He has lost his business, a business that he and others loved. He has lost whatever assets, whatever properties he once possessed.  He has no family home.  His family now pays rent to his sister to live in her rental unit.  He has no credit and owes millions of dollars in restitution and forfeiture.  It goes without saying he will never again work as a government contractor.  And given his age and his criminal record, it will not be easy for him to find work at all when he is released.  Whatever work there may be will be as an employee of someone else, a humbling experience for someone like Sina.

Despite all this, the government contends that a twelve year sentence is required here because otherwise, Sina is likely to again commit crimes.  But there is no data driven, no empirical support for the contention that a longer sentence will have any impact at all on the chance that an offender will recidivate.  And Sina's advanced age makes a return to crime far less likely.

According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011).  Studies have also demonstrated that, except for the incapacitative effect of incarceration, there is little apparent correlation between recidivism and imprisonment.   Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism Among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their

counterparts who received prison time were re-arrested at similar rates over a four year time frame").

As importantly, because Sina Moayedi is 68 years old, well-educated, and has no previous criminal history, he is in the category of offender that is *least likely* to return to crime. In a 2017 report of the U.S. Sentencing Commission entitled *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), the Commission concluded older offenders are substantially less likely than younger offenders to recidivate. Over an eight year period, among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released at age 65 or older. For offenders in Criminal History Category I, the re-arrest rate for those younger than 30 when released was 53.0 percent compared to 11.3 percent for offenders released after the age of 60. The Commission also found education correlated with recidivism in those released when they were older than 60: for those with a college degree, the rate was 11.6 percent compared with 17.2 for those who did not complete high school. *See also* U. S. Sentencing Commission Report, *Older Offenders in the Federal System,* July 2022 (reaching same conclusions).

We anticipate the government to argue that Sina's commission of fraud even when he was in his 60's shows that he is, even now, likely to continue to commit crimes if he is released. This contention, however, ignores the reality that his crimes were committed in furtherance of operating his business, Montage, and that business, for which he worked for more than 30 years, is no more. As a person convicted of these offenses, he would be debarred from federal contracting anyway. *See* 48 C.F.R. § 9.406-2(a) ("The debarring official may debar—(a) A contractor for a conviction of or civil judgment for—(1) Commission of fraud or a criminal offense in connection with—(i) Obtaining; (ii) Attempting to obtain; or (iii) Performing a public contract.").

The same is true for the government's argument that Sina's September 2021 deletion of the internet domains shows that he would, unless sentenced to twelve years, engage in similar obstruction in the future. Having been remanded to a prison with objectively awful conditions (even for a prison), accepted responsibility for this misdeed and now been punished at least in part for doing so, there is no longer any reason for Sina Moayedi to be concerned with potential evidence against him.  Regardless, as shown above, a longer sentence does not increase the odds that a person will or will not commit another crime.

It is also the case, we submit, that where a person such as Sina is convicted of a non-violent, white collar offense, and has never before been incarcerated, there should be far less concern that by the end of a significant term of imprisonment, they would not have been sufficiently deterred from future commission of criminal acts.  In *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001), the Second Circuit suggested the validity of this argument in addressing concerns associated with the career offender guideline. There, the Court found that the tremendous disparity between the prior sentences imposed upon Mishoe and the proposed sentence as a career offender was greater than necessary to achieve individual deterrence: "[T]o achieve a deterrent effect that ... prior punishments failed to achieve . . .  requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses.... [I]f a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect." *Id.* at 220. The Court observed that a sentencing court could, in its "individualized consideration" of a defendant's criminal history, consider the relationship between the career offender range and the previous sentences.  "In some circumstances, a large disparity in that relationship might indicate that the career offender sentence provides a deterrent effect so in excess of what is required in light

68

of the prior sentences and especially the time served on those sentences as to [authorize a downward departure]." *See also United States v. Butters*, 588 F. App'x 12 (2d Cir. 2014) (discussing *Mishoe* and finding increased sentence reasonable).

### D.  The Need to Avoid Sentencing Disparities

While we recognize that every case involving fraud and every defendant present unique circumstances and factors, this Court's sentencing jurisprudence demonstrates just how unreasonable the government's sentencing request is. While the government contends that Mr. Moayedi's transgressions are worthy of well more than a decade in prison, a look at the sentences imposed by Your Honor in cases of white collar crime involving conduct, objectively, far more egregious than this one shows how misplaced that contention is. Each of the defendants in these cases was a leader of the criminal activity charged.

### 1.  This Court's Harshest Sentences Have Been Reserved For Heartless Scammers

One of the longest white-collar sentences Your Honor has handed down came in the matter of *United States v. Bershan*, 17 Cr. 638 (JSR) (S.D.N.Y. 11/22/19), Doc. No. 229, at 96-98. Bershan and her co-conspirators had engaged, over the course of four years, in two separate fraudulent investment schemes whereby more than 50 individual investors lost almost $3 million. Bershan also used the stolen identity of three individuals – an IRS agent, attorney, and an employee of a well-known company which she claimed hers was in merger talks with - to commit one of the schemes, illegally received a firearm and conspired to distribute cocaine.  Moreover, Bershan committed acts of similar fraud before and after pleading guilty pursuant to a cooperation agreement. Observing the "immense pain and suffering" caused to the victims of her fraud who "took their life savings in many cases and invested them in a lie, a lie the defendant knew from day 1 was a total lie", and that "[e]very day people get robo-called from fraudsters who, under the

guise of anonymity, are trying to trick them into giving up their life savings, and sometimes they do," the Court sentenced Bershan to a total of seven years, five for her frauds and other crimes and a mandatory two years consecutive for aggravated identity theft.

In *United States v. Booth*, 21 Cr. 652 (JSR) (S.D.N.Y. 8/11/22), Doc. No. 123, at 24, the defendant was sentenced upon his conviction of running a years-long international boiler room investment fraud scheme in which more than 18 individual victim investors were induced through false promises and high-pressure tactics to provide between $2 and $8 million dollars in funds to defendant and his cohorts for securities that they never received.  The Defendant created a fictitious persona, fake brokerage websites, phony corporate email accounts and non-existent contracts to create the appearance that the victims were getting what they had been promised.   In reality, they got nothing at all.   Noting "it is hard to escape the great and heart-wrenching evils that he brought about through the scheme that he and others perpetrated," the Court imposed a non-guidelines sentence of ten years on Booth.

Your Honor imposed a nine-year sentence in the recent matter of *United States v. Asante*, 12 Cr. 88 (JSR) (S.D.N.Y. 5/18/22).  In that matter, Asante, who had in his not-too-distant past been convicted and sentenced to more than seven years in federal prison, was the top U.S.-based money launderer for a criminal enterprise based in West Africa which defrauded American businesses, individuals and the federal government through business email compromises, romance scams and COVID-19 relief programs.  Over the course of five years, Asante, through false representations, opened some nineteen bank accounts at ten different institutions, most in names of shell companies he controlled.  Some $36.4 million in what he knew to be fraudulent proceeds flowed through these accounts, including funds from at least 80 identified victims.

Finally, in *United States v. Salemo*, 11 Cr. 065 (JSR) (S.D.N.Y. 10/19/11), Your Honor sentenced the defendant to 13 ½ years in prison.  Salemo was convicted for having attempted to (a) obtain $1 million in loans from investors based on his assignment of a government grant award that did not exist but for which he had forged purported documentation and (b) purchase some six Manhattan buildings for some $22 million using a fake identity, forged checks, and phony bank statements to complete the transaction. Salemo had *ten prior criminal convictions*, almost all for financial frauds, had served lengthy prison terms and committed his eleventh felony while on federal supervision and then while imprisoned.

In contrast to these cases where the defendants, including repeat offenders, attempted to or successfully fooled their often vulnerable victims into parting with their money and, by design, received nothing in return, here, Mr. Moayedi and Montage performed the construction projects that they were awarded.  As discussed above, Mr. Moayedi's crimes were committed in order to gain and complete these jobs.  Any comparison of his offense conduct to individuals who set out to scam unsuspecting investors out of their hard-earned money, even their life savings, is entirely off the mark.

### 2. Use of Phony Websites, Email Accounts, Stolen Identities and Fictitious Personas

The government makes much of the fact that Sina created domain names and websites in order to back up Montage's statement on bid applications that it had previously completed projects of a certain size.  Additionally, the government stresses that Sina used the name of a fictitious individual as the contact for one of these jobs and was prepared to pretend to be this person if a background check call was made to this "individual."  While we do not dispute that he did these

things, we submit that they are, unfortunately, quite common in 21st century fraud schemes and not terribly meaningful in assessing Sina Moayedi's misconduct.

Indeed, Your Honor is all too familiar with the use of websites and other technology, as well as fictional personas, in furtherance of modern fraudulent schemes. For example, in the recent case of *United States v. Akhaven & Weigand,* 20 Cr. 188 (JSR) (S.D.N.Y. 6/21/21), to facilitate a $150 million fraud upon U.S. banks and credit unions by disguising credit and debit card purchases of marijuana deliveries as purchases of other goods, the defendants used shell companies to open offshore phony merchant and banking accounts. Significantly, the defendants also created phony merchant webpages purporting to be purveyors of drinks, creams, dog products and diving gear and created phony internet traffic to the websites to lend them further legitimacy. The defendants cleverly went so far as to utilize online tracking pixels to be sure that customers who had paid for marijuana deliveries but who were billed on their statements for legitimate goods purportedly sold by these online websites would be redirected to the actual website for the marijuana delivery company if they searched for the billing URL, but that any other user was not so redirected to the actual website. Your Honor sentenced the defendants there to 30 months and 15 months in prison respectively. While the very existence of Akhaven's and Weigand's company depended upon the seamless, everyday operation of these bogus websites, Mr. Moayedi created these websites to provide some backup in the event that someone was to check his references – which apparently never occurred.

In *United States v. Munshani,* 22 Cr. 215 (JSR) (S.D.N.Y. 4/7/23), the defendant, the CEO of a data security services company, stole over $10 million from his employer over an eight-year period via fraudulent payments to fictitious vendors controlled by him, to a consulting company secretly half-owned by him and by payment of a non-existent federal tax obligation – to himself.

Of note, in order to accomplish these thefts, Munshani and his brother registered a shell company using the identity of their deceased uncle, created email accounts in their dead uncles' name, and then used those email accounts to send the company more than 50 emails negotiating (on both ends) the terms of supposed contracts and supplying bogus invoices for services never provided. The invoices falsely included charges for marketing services provided by an individual who had no idea his identity was being used.  Munshani was permitted to plead guilty to a dual-object conspiracy with a five-year maximum sentence and was sentenced by this Court to 42 months in prison.

Another instructive sentence by this Court in a case involving fictitious personas and use of internet websites to further a massive fraud was the one imposed in *United States v. Prestes Junior*, 20 Cr. 416 (JSR) (S.D.N.Y. 9/27/21).  In *Prestes Junior*, the defendant and his codefendants were convicted of defrauding Brazilian businesses of approximately $15 million through an international advance fee scheme.  The defendants falsely represented that the victims would receive large loans after making advance payments of fees to entities that, although not disclosed, the defendants controlled.  The defendants created a number of shell companies and corresponding websites to make it appear that the entities that would receive the advance fees were legitimate third parties administering the loan payouts.  They even opened offices in New York and Miami to create a veneer of legitimacy and to meet with unsuspecting borrowers.  Junior used an alias because he had previously had criminal trouble in his native Brazil.  No loans were ever made, and no refunds were issued.  The Court sentenced Prestes Junior to four years in prison and to make restitution to his victims of $15 million.

While the business that Pretes Junior ran was a fraud factory – and nothing else –– here there is no question that Montage was a respected government contractor who completed scores

of projects for federal, state and local agencies, as well as private clients.  *See also United States v. Servider*, 17 Cr. 160 (JSR) (S.D.N.Y. 7/27/17) (where this Court imposed a sentence of 18 months upon defendant who defrauded approximately 100 individual investors out of approximately $2.4 million by falsely representing in cold calls over the course of three years that the firm bearing his name would use investor funds to engage in foreign currency exchange transactions on the clients' behalf; instead, almost none of such funds were used for such purposes; ***defendant created and maintained a website which falsely claimed historic gross return rates for the firm and its predecessor when in fact there were no returns at all***).

Yet another case featuring defendants' use of a completely false identity to run what the Court described as a "big-time Ponzi scheme" in which 800 victims were fleeced of more than $40 million was *United States v. Gata-Aura*, 18 Cr. 179  (JSR) (S.D.N.Y. 7/28/20), Doc No. 127, at 29-30.  In that case, in order to lure investors, the defendant oversaw a sales team which knowingly made false and fraudulent representations regarding the management, projected profitability and planned operations of a co-working space company.  Gata-Aura and his co-conspirators invented a fictitious persona for the company's CEO to hide the fact that the CEO had recently been sanctioned and sued by British regulators for operating unrelated fraudulent investment schemes.  Your Honor noted that "many victims were left destitute, others deprived of money that was important to them," and imposed a "substantial sentence" of 40 months incarceration.

In *United States v. O'Connor*, 21 Cr. 536 (JSR) (S.D.N.Y. 6/23/23), 21 Cr. 225 (JSR) (S.D.N.Y. 6/23/23), the defendant was the leader of an international cybercrime conspiracy which, over the course of two years, hacked into a NYC company's accounts, stole cryptocurrency valued at $1.3 million from clients' accounts, impersonated company executives in internal communications, hacked into and stole cryptocurrency from three other individuals, hacked into

130 Twitter accounts and posted messages, purportedly from the actual account holders, seeking funds from followers, hacked into a TikTok account and threatened to release nude images of the account holder, hacked into another individual's TikTok account and threatened and tried to extort the account holder, and, finally, engaged in a months'-long campaign of cyberthreats, harassment and swatting attacks against an underage girl and her family.  Although charged with aggravated identity theft based on numerous stolen identities, O'Connor did not plead guilty to this crime.  Your Honor sentenced him to sixty months imprisonment.

And in *United States v. Casperson*, 16 Cr. 414 (JSR) (S.D.N.Y. 11/4/16), Doc. No. 37, at 80, the defendant was convicted of committing an "egregious" $27 million Ponzi-like investment fraud, victimizing in the process family, friends, colleagues, charities and trusting financial managers.  Casperson stole the identity of two people, one of them a friend he had already defrauded, and used that person's driver's license in an effort to raise another $50 million from investors.  He also created a fake internet web domain, email address, set up a telephone number for this person and impersonated him on calls. Further, when an investor demanded to speak with someone else at defendant's company, he instructed an employee to lie to the caller and report that a redemption of the investor's securities was underway.  Your Honor sentenced the defendant, fairly we submit, to 48 months in prison.  *See also United States v. Jackson*, 16 Cr. 750 (JSR) (S.D.N.Y. 9/12/17) (defendant, who had numerous prior convictions for theft and who committed similar crimes while on pretrial release, was "the most prolific" member of a retail theft ring responsible for almost $2 million in losses to Macy's and Bloomingdales; the offense involved obtaining the personal identification number of employees and using it to steal; Your Honor imposed a total sentence of 34 months - two years for a violation of 18 U.S.C. 1028A and ten additional months for the underlying wire fraud offense).

### 3.  Forged or Altered Documents

The government claims that Sina was a "master forger." They point to his company's submission of altered bank statements and other financial documents as evidence of his "skills" in this regard.  But even if this was true, and it is not, this aspect of Mr. Moayedi's crimes does  not support the harsh sentence sought by the government. Your Honor has presided over many prosecutions where systematic creation of false, forged or fraudulent documentation was involved. Just sentences have abounded.

One case concluded just months ago before this Court in which *both* the use of websites to run the fraud and large-scale forgeries of phony instruments were front and center is *United States v. Ralston*, 19 Cr. 774 (JSR) (S.D.N.Y. 2/7/23), Doc. No. 230, at 42 In *Ralston*, over a seven year period, the defendant, the CEO of a publicly traded company, and his co-conspirators were involved in a boiler room telemarketing scheme which bilked over 1000, mostly elderly and retired, victims of almost $16 million, through false representations regarding investment opportunities.   Notably, the defendants created thousands of phony certificates and other documents directing the victims  to fake websites in the names of the shell investment vehicles where they  could purportedly "check on" their investments. Your Honor remarked (at the sentencing of codefendant Hooper): "Here we have elderly people, trusting people, vulnerable people, and the defendants, well knowing that vulnerability, preyed on it to enrich themselves in very substantial amounts, and leave some of the victims virtually destitute; even in the case of one of the victims who wrote to the Court on the verge of suicide."  The Court sentenced Ralston to five years in prison.

In *United States v. Johnson,* 17 Cr. 482 (JSR) (S.D.N.Y. 8/12/18), the founder, president and chief executive officer of a closely-held, family-owned cocoa commodities business, oversaw

76

the company's years'-long sophisticated falsification of regularly recurring certified financial reports submitted to a syndicate of banks making it appear that the company had far more collateral than it actually had. After the fraud was uncovered, the company filed for bankruptcy owing its lenders a staggering approximately $360 million. Your Honor sentenced Johnson to a term of imprisonment of 36 months.

In *United States v. Kaitz*, 14 Cr. 845 (JSR) (S.D.N.Y. 9/9/15), the Court sentenced Steven Kaitz, one of the owners of a company that provided in store display for retailers, to 40 months in prison for his role in a scheme to defraud the company's lenders and customers out of millions of dollars. Over the course of three years, to maintain the company's financing, Kaitz created phony purchase orders, invoices and bills of lading, fake email accounts of purported customers to "verify" the false information provided to the banks and separately tricked customers into paying markedly inflated invoices. When the fraud was discovered, lenders suffered an actual loss of $18.6 million; *see also United States v. Naranjo*, 13 Cr. 351 (JSR) (S.D.N.Y. 4/9/14) (sentencing defendant to seventy two months in prison where he evaded paying prevailing wages to employees; defendant submitted fraudulent certified payrolls, forged time sheets and altered paychecks, tampered with witnesses and used others' identities in filings with agencies).

### 4. Repeat Fraudsters

As discussed above, there is no question that Mr. Moayedi's transgressions took place over an extended period of time. And we understand and appreciate that the Court will consider this factor, among many others, in settling on what it determines to be a fair sentence in this matter. The government, we expect, will argue that this aspect of the offense conduct is one of the most important considerations for the Court. We do not believe it should be seen as such a damning factor. Clearly, if Mr. Moayedi had been the subject of prior OIG or other investigations, or worse,

had been prosecuted for fraudulent conduct, his continued misrepresentations over the course of years would be a compelling aggravating factor. But even where this has been demonstrated, this Court, when weighing all of the 3553(a) factors, has imposed a sentence no greater than was necessary.

In *United States v. Borker*, 22 Cr. 273 (JSR) (S.D.N.Y. 4/28/23), the defendant was before Your Honor for sentencing following his *third federal conviction* arising out of his operation of an online eyewear business which defrauded hundreds of customers through a series of false representations. In order to conceal his role in operating the web-based company, Borker used the identities of two other individuals, his mother and another person, to open banking and business accounts. In addition, while on supervised release and committing his third federal fraud scheme, he lied to probation and claimed that he was uninvolved in the fraudulent business. Borker had previously served two separate terms of imprisonment of four years each time, for his operation of similar fraudulent web-based eyewear businesses. Nonetheless, the Court sentenced Borker to 30 months incarceration.

### 5. Obstruction

While Sina Moayedi does not dispute that he engaged in the acts which the government contends constitute obstruction of justice, acts such as these are often enough engaged in – and discovered – but do not necessarily lead to significantly enhanced sentences. Indeed, in connection with the sentencing of May Salehi, the Court was made aware that immediately after a search warrant was executed at her home in May 2021, Salehi called a coconspirator and told him that if anyone inquired about whether they had worked together, he should deny having done so – which was untrue. *United States v. Salehi*, 21 Cr. 577 (JSR) (S.D.N.Y. 4/1/22), Doc. 20 at 15. Here, Mr. Moayedi's obstructive statements to Beverly Johnson regarding the operation of Ponce – a

company which, in any event, was awarded not a single federal contract – were no worse than Salehi's.

Nor should Sina's September 2021 nonrenewal of internet website domains that served to back up the references Montage listed on its bid applications support an increase in the sentence imposed here. When all else is considered here, this action, though costing Sina Moayedi his freedom, is not worthy of further punishment. Finally, the false statements by Sina Moayedi at two depositions in 2019 about being the company's then-vice president versus its president are hardly the stuff that should push the sentence higher here.   They are the same misrepresentations that form the basis of Mr. Moayedi's plea and there is no indication that they caused any independent harm to any victim.

### E.   The Bureau of Prisons Cannot Be Counted On To Address Sina Moayedi's Medical Issues

Section 3553(a)(2)(D) requires a sentencing court to consider in imposing a sentence how to provide the offender with necessary medical care or other treatment "in the most effective manner."   Where, as here, as an aging inmate, Sina Moayedi is unlikely to receive adequate but necessary medical attention for a variety of ailments, the Court should weigh this factor heavily in imposing a shorter sentence.

During his time at the MDC, Sina Moayedi has requested on countless occasions to be seen by doctors in connection with a host of medical issues.   In particular, he has had to deal with ███████████████████████████████████████████████████████████████████.

The poor medical care that he has received at the MDC is, sadly, systematic within the federal Bureau of Prisons. It has been recognized by the Department of Justice's own Inspector General. Judges have for years expressed their alarm and outrage over the failure to provide proper medical

care at the MDC.  In *United States v. Sternquist*, Magistrate Lois Bloom noted that "it should[n't] be a death sentence to be put into MDC's care and that people having to go to the hospital doesn't surprise anyone." 22 Cr. 473 (DLI) (E.D.N.Y. Oct. 19, 2022), Tr. 16:19-21 (referencing the lawsuit that has been pending against the jail for "several years" as a result of the appalling conditions there).  She further remarked: "[I]t's gotten to the point where we [magistrate judges] are all afraid of the medical care that people are being given at MDC." *Id.* at 23:9-11.

Once sentenced, Mr. Moayedi will be transferred to a different BOP facility.  This, however, does not mean he will finally receive adequate medical care.  In 2016, the Department of Justice Inspector General issued an alarming report on conditions within the BOP for older, infirm individuals.  The report provides substantial detail on many conditions and aspects of BOP custody that would have a direct impact on Sina Moayedi. U. S. Department of Justice, Office of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016).  The DOJ Inspector General concluded that "BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population." *Id.* at ii.  These staffing issues cause acute problems when it comes to inmate medical care.

As the DOJ Inspector General described in a related report, "staffing shortage limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." U.S. Dep't of Justice, Office of Inspector Gen., *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, at i (March 2016). The BOP's inability to fully staff medical positions is widespread and deep.  *Id.* "Understaffed health services units limit access to medical care and contribute to delays for aging inmates." *Id.*  While aging inmates "have an increased need for health services. . . BOP officials,

staff, and inmates, institutions lack adequate health services staff to address these needs." *Id*. "As a result, aging inmates experience delays receiving medical care." *Id*. at ii.

Another recent report on the BOP's contracts for outside medical services confirmed that "BOP did not have a reliable, consistent process in place either to evaluate the timeliness of inmate healthcare or the quality of that care." U.S. Dep't of Justice, Office Inspector Gen., *Audit of the Federal Bureau of Prison Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School*, at ii (March 2022). Even in Federal Medical Centers, where high-needs inmates are housed for medical care, specialty positions were often unfilled. *Id*. at 13.

Overcrowding within BOP facilities also has a direct impact on inmate health because it prevents inmates from being housed in the appropriate institutions. As the DOJ Inspector General determined, "[o]vercrowding also limits the BOP's ability to move aging inmates to the institutions that best address their medical needs." *Id.* at 25.

### F. The Conditions of Confinement at the MDC Where Sina Has Mostly Been Held Have Been Grueling and Intolerable, Further Justifying a More Modest Sentence

Sina Moayedi was originally arrested in connection with this prosecution on May 28, 2021. After being granted bail (over the government's objection), he spent three months at MDC Brooklyn before being released. On January 4, 2022, he was rearrested for violating the conditions of his release and he has been in federal custody ever since. He has been incarcerated at MDC since April 2022. All told, as we approach his sentencing, Sina Moayedi has been in jail for more than 22 months. For a slight, 68 year-old man with an assortment of medical issues, under even the best of circumstances, being held at a facility like the MDC poses its own difficulties. As this Court has remarked, even in "normal" times, "it is no small thing to deprive a person of his or her freedom" because "[p]rison is a harsh environment, in which fear and misery are never far from

the surface, boredom is endemic, and privacy is nil." *United States v. Sayoc*, 388 F. Supp.3d 300, 301 (S.D.N.Y. 2019).   With recurring issues such as overcrowding, understaffing, mismanagement, lack of hygiene and necessary medical care, failures of electricity or heat and, more generally, simply horrible living conditions, courts in this district have railed against the state of things at the MDC: As Judge Berman has remarked, the MDC is "dirty," "infested with drugs," and there is a "prevalence of violence." *United States v. Morgan*, 19 Cr. 109 (RMB) (S.D.N.Y. 5/5/20), Doc. 90 at 12-15, 37. Judge McMahon has gone a bit further describing conditions at these facilities as being "disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y. 4/29/21), Doc. 35 at 19; *see also* Letter to Federal Bureau of Prisons Regarding Conditions at MDC Brooklyn from members of New York delegation of U.S. Congress dated 8/16/22 (decrying inhumane conditions at the jail).

Mr. Moayedi's experience at the MDC – putting aside the frequent lockdowns due to the pandemic or otherwise – has been quite trying.   He has on numerous occasions been threatened and had valuable personal items stolen from his cell. He has to daily contend with open drug usage in his units.  He has had to remain in a cell where the toilet does not flush, where he sleeps feet away from feces accumulating in what should be a functioning toilet for weeks on end.  Where he shares his cell with medium size rats.

And, of course, the onset of the pandemic has made Sina Moayedi's time in jail a far more difficult, far more harsh and restrictive time, than under "normal conditions."   Fear inside these detention facilities was far more pronounced than outside. And for very good reason. The risk of infection among inmates was significantly higher than that of the rest of us. *See United States v. Lockhart*, 2020 WL 4333010, at *4 (E.D.N.Y. July 27, 2020) (Johnson, D.J.) (explaining that "the

rate of infection in the Bureau of Prisons is almost six times higher than the national average"). The jails, including MDC, could not employ even the most basic CDC recommendations for preventing the spread of the coronavirus. Maintaining six feet of distance from other detainees is quite literally impossible in a setting in which most individuals share a "bunk-bed," toilet and sink and shower in common with approximately 18 other people. During a large portion of his time at the MDC, there have been unrelenting lockdowns where for one reason or another, Mr. Moayedi, like others there, was forced to remain in his cell for 24 hours a day. These lockdowns continued at times for weeks on end and never with any announcement or other information about when the lockdown was likely to end. Then, when an extended period of lockdown might end and a few days would pass where he was able to gain some measure of escape from a small cell for one or two hours under what MDC termed "modified operations", another lockdown would begin. While locked down, not only was Mr. Moayedi unable to communicate with his family but he was unable even to take a shower or to wash his clothes.

This Court and others in this district as well as the Eastern District have taken note that detention and imprisonment during the pandemic has been far more punishing and restrictive than under regular circumstances. For example, in *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (JSR) (S.D.N.Y. 9/30/20), the Court recognized that incarceration during the pandemic has been "harsher and more punitive than would otherwise [be] the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus [...] have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal."

In *United States v. Prestes Junior*, 20 Cr. 416 (JSR) (S.D.N.Y. 9/27/21), Doc. 32 at 21, Your Honor reduced the five-year sentence it was prepared to impose to a four year term on this basis. The Court explained:

> And the main reason, not the only reason, but the main reason I'm reducing it is the terrible conditions that the defendant suffered while incarcerated in the local jail. This is not the first case -- and I regret to say that I suspect it won't be the last -- where there has been brought to the Court's attention just how terrible conditions in both the MDC and, for that matter, the MCC, have become; and that's even without the additions of the pandemic, that's even without the additions of the electrical failures and the heat failures and things like that that occurred while this defendant was incarcerated. We must never forget that while defendants have committed crimes that they all deserve to be punished for, they, like us, are human beings and still require to be treated in a civilized manner. And I think that was less than true in this defendant's case and, I'm afraid, in others. I view the incarceration that he's already suffered as entitled to greater weight because it was, in effect, worse than anything the Court would have contemplated.

In *United States v. Philibert,* 15 Cr. 647 (PAE) (S.D.N.Y. 8/27/21), Doc. 65 at 8-9, Judge Engelmayer found that "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *See also United States v. Brissett,* 19 Cr. 153 (KMW)  (S.D.N.Y. 9/22/21), Doc. 56 at 26 (giving 31 months extra time-served credit for every day "spent in deplorably brutal conditions" during COVID); *United States v. Robles*, 08 Cr. 1114 (PAE) (S.D.N.Y. 8/10/21), Doc. 100 at 16 (observing the "unforeseen grueling conditions of confinement presented by COVID-19 and the additional punishment suffered as a result"); *United States v. Marmolejos*, No. 19 Cr. 0626 (PAE) (S.D.N.Y. 11/24/20), Doc. 25 at 33 (granting a sentence "farther below the guidelines sentence it otherwise would have been on account of the conditions in which [the defendant had] been held –due to COVID-19," where "a day spent in terrible conditions [created as a result of the pandemic] . . . exacts more punishment for an incarcerated defendant than a day in ordinary conditions").

84

We ask that Your Honor account for the extraordinary isolation and punitive nature of incarceration at the MDC during the pandemic and reduce the sentence that it otherwise might have imposed.

### G. Despite the Terrible Conditions at the MDC, Sina Moayedi Has Been a Model Inmate Who Has Participated in Every Program Possible and Aided Countless Other Inmates

Despite the grueling conditions that have plagued the MDC during most of Mr. Moayedi's time behind bars, he has committed to making the very best of his time in custody. He has participated in nearly every program available, he has helped numerous other inmates to learn, he has worked as an orderly and in the food services program, and, most importantly, as a suicide prevention volunteer. He has enrolled in a university program working towards another degree. In short, he has demonstrated that he is fully capable and committed of making amends.

### CONCLUSION

Sina Moayedi must be punished for his wrongdoing. We submit that when all of the factors relevant to sentencing are considered, a meaningful sentence of four years in prison is more than sufficient, but not greater than necessary, to accomplish the goals of sentencing as set forth in 18 U.S.C. § 3553(a). We ask Your Honor to impose this sentence.

Dated:  August 3, 2023
       New York, New York

Respectfully submitted,

/s/ Frederick L. Sosinsky, Esq.
FREDERICK L. SOSINSKY, ESQ.
45 Broadway, Suite 3010
New York, New York 10006
(212) 285-2270
freds@newyork-criminaldefense.com

/s/ Sara E. Kropf, Esq.
SARA KROPF, ESQ.
Kropf Mosely PLLC
1100 H Street, NW, Suite 1220
Washington, D.C. 20005
(202) 627-6900
sara@kmlawfirm.com

*Attorneys for Defendant Sina Moayedi*