Exhibit D

UNCLASSIFIED



| AUD-MERO-18-46 | Office of Audits | June 2018 |
|---|---|---|

# Audit of the Bureau of Overseas Buildings Operations Process for Reviewing Invoices for the Construction of the U.S. Embassy in Islamabad, Pakistan

MIDDLE EAST REGION OPERATIONS



### AUD-MERO-18-46

UNCLASSIFIED
June 2018
OFFICE OF AUDITS
Middle East Region Operations

**Audit of the Bureau of Overseas Buildings Operations Process for Reviewing Invoices for Construction of the U.S. Embassy in Islamabad, Pakistan**

## What OIG Audited

In September 2010, the Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM), on behalf of the Bureau of Overseas Buildings Operations (OBO), awarded a firm-fixed-price, design-build contract to BL Harbert for the construction of the New Embassy Compound (NEC) and Housing Project in Islamabad, Pakistan. The new construction replaces existing structures on the compound and provides secure housing for embassy personnel. As of April 2018, the cost of the construction project totaled $857 million.

The Office of Inspector General (OIG) conducted this audit to determine the extent to which A/LM/AQM and OBO implemented invoice review and approval procedures that verified the accuracy and completeness of invoiced construction costs and ensured payments were made in accordance with Federal requirements and Department of State (Department) guidance.

## What OIG Recommends

OIG made three recommendations to prompt adherence to the Federal Acquisition Regulation (FAR) and to protect the Department's interests. A/LM/AQM concurred with the recommendation, but OBO did not concur or otherwise indicate a position for the recommendations addressed to it. A synopsis of management's comments to the recommendations follow each recommendation in the Audit Results section of this report. A/LM/AQM's and OBO's response to a draft of this report are reprinted in Appendices C and D, respectively.

## What OIG Found

The invoice review and approval procedures used by OBO generally complied with Federal requirements and Department policy; however, OIG identified areas that could be improved. Specifically, the 26 invoices OIG reviewed for this audit had all the elements of a proper invoice, including supporting documentation. However, the contractually required subcontractor payments certification statement used by BL Harbert to certify that payment was made to subcontractors and suppliers did not comport with the required language in the FAR or the contract. The distinction between the BL Harbert certification and what that required by the FAR affects OBO's ability to confirm that BL Harbert has made *all* payments *due* to its subcontractors and suppliers.

OIG also found that the Contracting Officer's Representative (COR) did not always document his inspection of the contractor's work to attest to the amount which, in his opinion, was due to the contractor for work performed. Although there is no requirement under current policy and guidance to record quality assurance and work progress inspections aligned with a given invoice and to document that determination in the invoice file, such a practice would be helpful for construction projects that take several years to complete. Implementing such a practice would provide more complete historical information through the course of a project, and that information would moreover be directly aligned with invoice payment approval. This level of contextual information would help incoming CORs who rotate to the project by providing details of the project's progression. Related to this finding, OIG found that OBO had not adopted a Standard Operating Procedure (SOP) for reviewing construction invoices associated with the Islamabad project. Implementing such an SOP for reviewing invoices associated with large, multi-million-dollar, multi-year construction projects would provide continuity among the CORs and OBO engineers who periodically rotate throughout the life of the project. In addition, implementing an SOP for reviewing construction invoices would provide for consistent and uniform invoice reviews and facilitate the Contracting Officer's final acceptance of the project.

_____ Office of Inspector General _____
U.S. Department of State • Broadcasting Board of Governors

UNCLASSIFIED

# CONTENTS

OBJECTIVE ........................................................................................................................ 1

BACKGROUND .................................................................................................................. 1

    Contract Management and Oversight Responsibilities ................................................ 2

    Progress Payments and the Approval Process ............................................................ 2

    Quality Assurance and Work Progress Inspections ..................................................... 3

    Federal Regulations and Department Guidance Regarding Invoice Review and Approval .......... 4

AUDIT RESULTS ................................................................................................................ 5

    Finding A: Invoices Included Elements Required by the FAR, the Contract, and OBO Guidance, but the Certification Statement That Subcontractors and Suppliers Were Paid Did Not Comply With the FAR ........... 5

    Finding B: Documenting Pertinent Aspects of Work Progress Inspections That Directly Align With Invoice Payments Will Substantiate the Reasons for Partial Payments Should They Be Challenged ........... 9

RECOMMENDATIONS ................................................................................................... 15

APPENDIX A: PURPOSE, SCOPE, AND METHODOLOGY ................................................ 16

    Prior Reports ............................................................................................................. 16

    Detailed Sampling Methodology .............................................................................. 17

APPENDIX B: EXCERPT OF U.S. ARMY CORPS OF ENGINEERS CONTRACT ADMINISTRATION MANUAL ........... 20

APPENDIX C: BUREAU OF ADMINISTRATION, OFFICE OF LOGISTICS MANAGEMENT, Office of ACQUISITIONS MANAGEMENT RESPONSE ........... 29

APPENDIX D: BUREAU OF OVERSEAS BUILDINGS OPERATIONS RESPONSE ................ 30

ABBREVIATIONS .......................................................................................................... 33

UNCLASSIFIED

## OBJECTIVE

The Office of Inspector General (OIG) conducted this audit to determine the extent to which the Department of State's (Department) Bureau of Overseas Buildings Operations (OBO) and the Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM), implemented invoice review and approval procedures that verified the accuracy and completeness of invoiced construction costs and ensured payments were made in accordance with Federal requirements and Department guidance.

During the audit, OIG found that the contractor had changed the percentages of materials used on the façade of several buildings without the Contracting Officer's (CO) knowledge or approval. In December 2017, OIG issued a Management Assistance Report[1] concerning this issue and the general monitoring of contractor performance in the construction of the New Embassy Compound (NEC) and Housing Project in Islamabad, Pakistan.

## BACKGROUND

In September 2010, the Bureau of Administration, on behalf of OBO, awarded a firm-fixed-price, design-build contract, Contract SAQMMA 10-C0284, to BL Harbert for the construction of the NEC and Housing Project in Islamabad, Pakistan. The new construction was intended to replace the existing structures on the compound and provide secure housing for embassy personnel. As of April 2018, the total cost of the construction project was almost $857 million.

Work under the contract began in 2010 and was to be executed in two phases.[2] In Phase 1, BL Harbert was required to develop the design for the NEC and Housing Project and build a new chancery; a new office annex; a support annex; a warehouse; a utility building; a waste water treatment plant; three compound access controls; a chief of mission residence; and a swing space for interim Marine Security Guard quarters that include a health center, a gymnasium, a commissary, a bank, a barbershop, and consular swing space. Phase 2 required BL Harbert to build a consular annex, a recreation center with an outdoor pool, a parking garage, three SDA buildings, a Marine Security Guard residence, a second waste water treatment plant, and three additional compound access controls. According to BL Harbert, its subcontractors will perform about 20 percent of the work.[3] OBO expects to complete phase 2 of this project in summer 2018.

---

[1] *Management Assistance Report: Lapse in Oversight at Embassy Islamabad, Pakistan, Allowed Design Change to Proceed Without the Contracting Officer's Knowledge* (AUD-MERO-18-01, December 2018).

[2] OBO was in the process of modifying the contract to add an additional phase. Phase 3 will include repurposing of a swing space building and is expected to be completed in March 2019.

[3] BL Harbert officials stated that its subcontractors generally performed services related to concrete work and commissioning.

UNCLASSIFIED

## Contract Management and Oversight Responsibilities

A/LM/AQM is responsible for awarding and administering the construction contract for the NEC and Housing Project. The Foreign Affairs Handbook (FAH) states that the CO is the U.S. Government's sole authorized agent with the authority to solicit proposals and negotiate, award, administer, modify, or terminate contracts.[4] The CO is responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interest of the United States in its contractual relationships.[5]

## Progress Payments and the Approval Process

In construction projects such as the NEC and Housing Project that may take years to complete, costs incurred are invoiced and paid on the basis of progress made. Progress payments[6] under firm-fixed-price contracts differ from invoice payments under cost-reimbursement contracts. Under firm-fixed-price contracts, the contractor receives a percentage of incurred costs as construction progresses; under a cost-reimbursement contract, the contractor is paid 100 percent of actual, allowable costs.[7]

Progress payments for fixed-price construction contracts should reflect the value of work completed in each payment period (usually 1 month) provided that the work conforms to the specifications of the contract.[8] The contractor is responsible for tracking work completed each period and submitting a request for payment. To calculate the value of work completed, the contractor creates and uses a budget and planning document called the cost-loaded project execution schedule. The cost-loaded project execution schedule assigns a dollar value for each activity to reflect the time, labor, and materials needed to complete this activity.[9] The contract directs BL Harbert to submit invoices to OBO's Resource Management Office in Arlington, VA, which logs in the invoice and gives it to the Contracting Officer's Representative (COR) for review.

---

[4] 14 FAH-2 H-141, "Roles and Responsibilities in the Contracting Process" ("Responsibilities of the Contracting Officer") (August 24, 2017).

[5] FAR, "Career Development, Contracting Authority, and Responsibilities," Subpart 1.602-2 ("Responsibilities").

[6] Progress payments are "payments based on a percentage or stage of completion." FAR 32.102 (E)(1). "Agency procedures must ensure that payments are commensurate with work accomplished, which meets the quality standards established under the contract." FAR 32.102(E)(2). Progress payments are requested by the contractor and, for purposes of this report, are considered invoices for payment.

[7] FAR 16.301-1, "Cost Reimbursement Contracts – Description."

[8] "The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." FAR 52.232-5(b) "Payments under Fixed-Price Construction."

[9] Costs for non-physical activities, such as administrative tasks, are distributed proportionally among other activities.

UNCLASSIFIED

## Quality Assurance and Work Progress Inspections

The COR reviews the initial invoice and determines if the invoiced costs are commensurate with the progress made and if the work for which BL Harbert is requesting payment has been satisfactorily performed. To monitor the percentage of completion and the status of the NEC and Housing Project, OBO engineers conduct quality assurance inspections. During these inspections, the COR/Project Director (PD), OBO engineers, and the BL Harbert personnel walk through the work site and discuss the project's progress, including any issues with meeting technical specifications and the quality of building materials. The COR then uses the information obtained from quality assurance and work progress inspections to discuss with BL Harbert any concerns or discrepancies identified with the invoice submitted. Once it is agreed that BL Harbert's invoiced costs are commensurate with the work progress described and the work is deemed satisfactory on the basis of quality assurance and work progress inspections, BL Harbert sends the approved invoice back to OBO's Resource Management Office for further processing and payment. Although the COR reviews and approves BL Harbert's regularly submitted invoices, the OBO Construction and Commissioning Guidebook requires the CO to review and approve BL Harbert's first and last invoices. Figure 1 shows the invoice review process for the NEC and Housing Project at Embassy Islamabad.[10]

### Figure 1: OBO Invoice Review Process for NEC and Housing Project at Embassy Islamabad



**Source:** OIG generated from information provided by OBO and BL Harbert officials and the OBO Construction and Commissioning Guidebook.

---

[10] After the completion of fieldwork, OBO informed OIG that the invoice review process had changed. BL Harbert now submits the initial invoice to the PD/COR. The PD/COR then reviews and approves the invoice before BL Harbert submits it to OBO's resource management office for further processing and payment.

UNCLASSIFIED

## Federal Regulations and Department Guidance Regarding Invoice Review and Approval

The FAR, the FAH, contract terms, and the OBO Construction and Commissioning Guidebook provide guidance on the review and approval of invoices for payment. In addition, guidance is provided for properly maintaining the associated contract file.

### *Federal Acquisition Regulation*

The FAR establishes requirements for the elements of a proper payment under fixed-price construction contracts. Specially, FAR 52.232-27(a)(2) states that a proper invoice must include the contractor's name and address, the invoice date and contract number, the description and price of the work or services performed, the taxpayer identification number, delivery and payment terms, banking information, and any other information or documentation required by the contract. If the invoice does not comply with the requirements, the billing office must return it within 7 days of receipt, stating the reasons it is deemed improper.

The FAR also provides the requirements for payments under fixed price construction contracts. According to FAR 52.232-5(b), "the Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the [CO], based on evidence of work accomplished that meets the standards of quality established under the contract." For progress payments, FAR 52.232-27(a)(2)(viii) requires the contractor's request for progress payments to include the following substantiation in accordance with FAR 52.232-5(b)(1):

- An itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested.
- A listing of the amount included for work performed by each subcontractor under the contract.
- A listing of the total amount of each subcontract under the contract.
- A listing of the amounts previously paid to each such subcontractor under the contract.
- Additional supporting data in a form and detail required by the CO.

### *Foreign Affairs Handbook*

According to 4 FAH-3 H-424.1, the "post and bureau/office personnel contracting or purchasing goods and services ... are responsible for determining that invoices or vouchers examined, approved or certified, are correct, just and proper for payment. These officials are also responsible for the establishment of adequate and sufficient checks and controls to prevent improper or duplicate payments." Additionally, 14 FAH-2 H-523(b) states, "the COR is responsible for developing quality assurance procedures, verifying whether the supplies or services conform to contract quality requirements, and maintaining quality assurance records."

*Contract Requirements*

Contract terms contained in the BL Harbert contract require the following documentation to support the invoice package:

- A Payment Application itemizing the amount requested attached to the corresponding activity.
- An Updated Project Execution Schedule allocating the contract value/cost to the corresponding activity.
- A Schedule Narrative Report updating the status of the project.
- A Procurement Log (or inventory billing).
- Gantt (bar) charts showing activities completed, those in progress, and those that will be undertaken in the following month.[11]

*OBO Construction and Commissioning Guidebook*

The OBO Construction and Commissioning Guidebook also provides instructions on the type of documents that should be submitted along with the invoice. The Guidebook requires the PD to prepare a daily log that records details of the construction work and activities for each day during the life of the project.

# AUDIT RESULTS

## Finding A: Invoices Included Elements Required by the FAR, the Contract, and OBO Guidance, but the Certification Statement That Subcontractors and Suppliers Were Paid Did Not Comply With the FAR

The invoice review and approval procedures used by OBO generally complied with Federal requirements and Department policy; however, OIG identified areas that can be improved. Specifically, the 26 invoices OIG reviewed for this audit included all the elements of a proper invoice, including any supporting documentation. However, the contractually required subcontractor payments certification statement used by BL Harbert to certify payment to subcontractors and suppliers did not comport with the required language in the FAR or the contract. The language used by BL Harbert to certify that subcontractors had been paid was based on an outdated FAR certification statement, which was revised in November 2002. Specifically, the certification statement used by BL Harbert did not state that "all" payments "due" to the subcontractors have been made, as the 2002 revision requires.[12] Although the Contracting Officer for the project acknowledged BL Harbert was using an outdated certification statement, he stated that the contractor certification statement was sufficient. OIG, however, concludes that the important distinction between the BL Harbert certification and what is

---

[11] NEC Islamabad Contract, Section 01321, 1.03 D, E.

[12] FAR 52.232-5(c)(2).

required in the FAR would affect OBO's ability to confirm that BL Harbert has made **all** payments due to its subcontractors and suppliers.

### Invoice Contained Required Documentation

Each of the 26 invoices that OIG reviewed contained the contractor's name and address, the invoice date and contract number, the description and price of the work or services performed, a taxpayer identification number, delivery and payment terms, and banking information, as the FAR requires. In addition, the invoices reviewed contained contractually required documents such as the following:

- Payment Application (also required by the OBO Construction and Commissioning Guidebook).
- Updated Project Execution Schedule (also required by the OBO Construction and Commissioning Guidebook).
- Schedule Narrative Report.
- Procurement Log.
- Gantt (bar) charts.

Together, these documents meet the contract requirement that each invoice include the value of labor and materials completed, including a prorated portion of overhead and profit.

### Contractor Certification of Subcontractor Payment

The contract also requires BL Harbert to certify that it has paid its subcontractors and supplies when it submits the invoice:

> [T]he Contractor shall submit with the request for payment a certification that the Contractor has (a) made full payment from the proceeds of prior payments, and (b) that [the contractor] will make timely payment from the proceeds of the progress or final payment for which request is being made, to his subcontractors and suppliers in accordance with the Contractor's contractual arrangements with them.

The contract also incorporated the relevant FAR requirement by reference.[13] Specifically, FAR 52.232-5 requires the contractor to use specific language to certify payment has been made in full to subcontractors and suppliers.

OIG found that, although BL Harbert included a certification statement on each of the 26 invoices reviewed, the statement did not comport with the language required by the contract or by FAR 52.232.-5. The certification statement did not represent that "all" payments "due" to the

---

[13] Section G.1 of the contract states that "payments will be made in accordance with the following partial payment schedule: FAR 52.232-5 – Payments Under Fixed-Price Construction Contracts."

subcontractors had been made. Figure 2 highlights the difference between the language required by the FAR and the language BL Harbert included on the invoices.

**Figure 2: Contractor Certification Statement in the FAR and on BL Harbert Invoices**

| Contractor Certification Required by FAR 52.232-5 | Contractor Certification on BL Harbert Invoices |
|---|---|
| **All** payments **due** to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of Chapter 39 of Title 31, United States Code.[14] | Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of Chapter 39 of Title 31, United States Code. |

### *Current FAR Language Was Developed To Address Shortcomings in Earlier FAR Language*

The current FAR language regarding the specific contractor certification statement was revised in 2002 based on the Government's need to ensure that subcontractors are paid in full and to hold the contractor accountable if they are not.[15] This rationale for including the terms "all" and "due" is expressly set forth in the relevant rulemaking proposal:

> An ambiguity in FAR 52.232-5 surfaced as a result of a decision issued on April 2, 1999, by the United States Court of Appeals for the Sixth Circuit in *United States vs. Gatewood*, 173 F.3d 983 (6th Cir. 1999). The Court concluded that certifying that the prime contractor has made payments to subcontractors and suppliers is not the same as certifying that the prime contractor has made all payments due to subcontractors and suppliers.[16]

As noted, this proposal was prompted by the decision in *Gatewood*, in which the Sixth Circuit vacated a contractor's conviction for submitting false statements. The court concluded that the

---

[14] Chapter 39 of Title 31, United States Code, is also known as the Prompt Payment Act.

[15] The FAR Council is the Government entity responsible for maintaining and updating the FAR. The FAR Council was established to assist in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in accordance with Title 41, Chapter 7, Section 421, of the Office of Federal Procurement Policy Act. As also set forth in the Act, the FAR Council membership consists of the Administrator for Federal Procurement Policy, the Secretary of Defense, the Administrator of National Aeronautics and Space, and the Administrator of General Services.

[16] Federal Acquisition Regulation; Payments Under Fixed-Price Construction Contracts, 66 Fed. Reg. 53,050, 53,050 (October 18, 2001).

prime contractor, who certified that he made payments to subcontractors using a certification statement lacking the words "all" and "due," had not made a false statement even though he only made partial payments to the subcontractors.[17] The court noted that "[i]f the Navy had wanted to be sure that all payments then due the subcontractors had been made, it should have drafted the certification to reflect that desire."[18] The revisions to the FAR were made to address this concern.

During fieldwork, the CO stated that he was aware that the certification statement on the invoices did not use the exact wording required by the FAR or the contract, but he stated that he did not believe that the omission had an effect on the contract or payments made to subcontractors. He further stated that the contractor certification statement currently included on the invoices was sufficient and the omission of the words "all" and "due" would not relieve the contractor from the basic intent and meaning of the certification. After the completion of fieldwork, A/LM/AQM stated that the contracting officer was unaware that the contractor was not using the most current certification statement. Regardless of the conflicting statements, the contracting officer did not have the authority to deem the contractor's certification statement as sufficient, given that the exact language in FAR 52.232-5(c) is a mandatory prerequisite for progress payments to be made. The CO also stated that, to his knowledge, subcontractors have, in fact, been paid "all" sums due, and, because he considered the certification sufficient, he did not withhold any payment to BL Harbert. OIG, however, concludes that the important distinction between the actual contractor certification on the invoices and the FAR requirement could affect OBO's ability to confirm that BL Harbert had made **all** payments due to subcontractors. In addition, not insisting that BL Harbert include the required FAR language when submitting invoices could affect the Government's ability to hold BL Harbert accountable if it did not make all payments due to the subcontractors. Accordingly, OIG makes the following recommendation:

**Recommendation 1:** OIG recommends that the Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM) require BL Harbert to include the contractor certification statement required by Federal Acquisition Regulation 52.232-5, "Payments Under Fixed-Price Construction Contracts," when submitting invoices for payment.

**Management Response**: A/LM/AQM concurred with the recommendation. On May 2, 2018, A/LM/AQM directed BL Harbert to cite FAR clause 52.232-5 on all future invoices. A/LM/AQM requested that OIG close the recommendation.

**OIG Reply**: On the basis of A/LM/AQM's concurrence with the recommendation and stated actions, OIG considers this recommendation resolved, pending further action. This recommendation will be closed when OIG receives and accepts documentation demonstrating that the Department has directed BL Harbert to cite FAR clause 52.232-5 on all invoices and that BL Harbert has agreed to do so.

---

[17] *United States vs. Gatewood*, 173 F.3d 983, 987 (6th Cir 1999).

[18] *Id.*

## Finding B: Documenting Pertinent Aspects of Work Progress Inspections That Directly Align With Invoice Payments Will Substantiate the Reasons for Partial Payments Should They Be Challenged

OIG found that the COR did not always document his inspection of the contractor's work to attest to the amount that, in his opinion, was due to be paid to the contractor for work performed. Documenting this determination is important when making progress payments for a firm-fixed-price contract for which the contractor receives a percentage of incurred costs as construction progresses. OIG acknowledges that there is no requirement under current policy and guidance to record quality assurance and work progress inspections aligned with a given invoice and to document that determination in the invoice file. OIG also concludes, however, that such a practice would be helpful for construction projects that take several years to complete. Implementing such a practice would provide more complete historical information through the course of a project, and that information would moreover be directly aligned with invoice payment approval. This contextual information would help incoming CORs who rotate to the project by providing details of the project's progression. For example, the Islamabad project, which began in 2010, has had four CORs involved as of April 2018. Including the daily record of activities associated with each invoice would have benefited incoming CORs by highlighting areas of contractor performance that may require additional scrutiny. Moreover, when the COR does not approve payment of the full amount invoiced by the contractor, the COR must advise the contractor of the reasons for that decision. Documenting pertinent aspects of the quality assurance and work progress inspections that directly align with the invoice in question could also help substantiate the reasons for the partial payment should that decision ever be challenged.

On a related point, OIG found that OBO had not adopted a Standard Operating Procedure (SOP) for reviewing construction invoices associated with large, multi-million-dollar and multi-year construction projects such as the Islamabad NEC and Housing Project. OIG concludes implementing an SOP for reviewing invoices would provide continuity among the CORs and OBO engineers who periodically rotate over the life of the project. In addition, implementing an SOP for reviewing construction invoices would provide for consistent and uniform reviews and facilitate the Contracting Officer's final acceptance of the project.

### Verification of Completed Work Was Not Documented in Invoice Files

OIG found limited documentation in the 26 invoice files reviewed that supported the COR's determinations on progress payments or work completed for the NEC and Housing Project.

The contract states:

> Following receipt of the Contractor's request for payment, and on the basis of an inspection of the work, the [CO] or COR shall make a determination as to the amount which, in his opinion, is then due. In the event the [CO] or COR does not approve payment of the full amount applied for, less the retainage addressed in

52.232-5 [...], the [CO] or COR shall advise the Contractor of the reasons therefore.

According to OBO officials, for large OBO construction projects such as the NEC and Housing Project, incurred costs are invoiced and paid on the basis of progress made. To monitor the percentage of completion and the status of the NEC and Housing Project, OBO engineers conduct quality assurance inspections. During these inspections, the COR/PD, OBO engineers, and BL Harbert personnel walk through the work site and discuss the project's progress, including any issues with meeting technical specifications and the quality of building materials. However, OIG found that these activities were frequently not documented in the invoice file. For example, an invoice submitted by BL Harbert in August 2016 requested $14,757,432 in payment for progress made on the project. However, the final invoice approved by the COR was for $14,660,787, an amount that differed by $96,645. The reason for the change was not documented in the COR file. In total, the final approved amount was different than the initial submitted amount on 15 of the 26 invoices OIG reviewed. Therefore, OIG could not confirm that the invoice payments were consistently made in accordance with Federal requirements and Department guidance. In discussing this issue, the COR correctly explained that he is not required to document his verification efforts in the invoice file. Department policy, specifically 4 FAM 424(a), only requires that the COR sign the invoice certifying its accuracy, which the COR did on all the invoices OIG reviewed.[19]

OIG found that some quality assurance and monitoring activities were included in some files, but the information included varied among the invoice files reviewed.[20] For example, OIG found copies of meeting minutes between BL Harbert and the COR in which they discussed such matters as the status of work, schedule slippage, and required contract modifications. However, more than half the invoice files (15 of 26 invoice files, or 58 percent) did not include complete meeting minutes but contained only meeting sign-in sheets or bullets outlining meeting agendas. In addition, several of the invoice files lacked complete daily records of BL Harbert's activities (such as hours worked and activities completed). The COR/PD provided two explanations as to why inspection records were not consistently included in the invoice file. First, the COR/PD stated that the FAR, the contract, and the OBO Construction and Commissioning Guidebook do not require these documents to be reviewed as a part of the invoice review process. Second, the COR/PD is on site on a daily basis monitoring the project, the daily record of activities for each invoice, and other quality assurance and work progress.

OIG again acknowledges that the COR is correct that including the daily record of activities or the quality assurance and monitoring activities associated with a given invoice in the invoice file is not required. OIG concludes, though, that such a practice would be helpful for construction projects that take several years to complete. Specifically, implementing such a practice would provide more complete historical information throughout the course of a project, and that

[19] Language in 4 FAM 424 (a) explains that "this approval shall be in the form of a signature on either the voucher, the invoice, or the documents attached to the voucher."
[20] In addition to the required documentation, some invoice files included additional information, such as meeting minutes and daily records, not required by the FAR, the contract, or Department guidance.

information would moreover be directly aligned with invoice payment approval. In addition, this practice would be helpful for incoming CORs who rotate to the project by providing details of the project's progression that are not currently available. For example, the Islamabad project that began in 2010 has had four CORs (or acting CORs) involved as of April 2018, which is an average of one new COR assigned every 2 years. Including the daily record of activities, quality assurance/control documents, or other monitoring activities associated with each invoice would have benefited the incoming CORs by highlighting areas of contractor performance that may require additional scrutiny. In addition, this documentation could also help to protect the Department's interests in any challenge by a contractor who disputed the COR's decision not to approve the full amount requested for payment.

**Recommendation 2:** OIG recommends that the Bureau of Overseas Buildings Operations require the Contracting Officer's Representative assigned to multi-year construction projects to include documentation in the invoice file that supports the amount requested by the contractor. Documentation should include quality assurance and work progress inspection records, meeting minutes with the contractor, and daily records of the contractor's activities, including hours worked and activities completed.

**Management Response:** OBO neither agreed nor disagreed with the recommendation but stated that the process in place met the intent of the recommendation. OBO stated that "The Contracting Officer's Representative (COR) ensures that all required documentation is received and archived appropriately per the contract and referenced Federal Acquisition Regulation (FAR) clauses. In a firm-fixed price contract, it is the percentage of completion that is verified in the field, not a dollar amount. The required documentation found in the project files verifying contractor performance include daily reports, weekly reports, Quality Control reports, monthly progress cables, and meeting minutes. These documents support the invoice process and the percentage of completion by the contractor." OBO added that it "has provided these documents to the OIG throughout the course of their audit, and requests that the OIG close this recommendation."

**OIG Reply:** Because OBO did not concur with the recommendation or adequately address the underlying cause of the finding that prompted the recommendation, OIG considers this recommendation unresolved.

The intent of this recommendation is to ensure that invoice files contain sufficient information to allow anyone working with that file at any point in time to understand key events and decisions. As noted in this report, OIG found numerous instances in which the final approved invoice amount differed from the initial amount submitted and where that difference was unexplained in the invoice file. Specifically, OIG found that the final approved invoice amount differed from the initial submitted amount on 15 of the 26 invoices reviewed. In one instance, the initial invoice submitted by BL Harbert requested $14,757,432 in payment, but the final invoice approved by the COR was for $14,660,787, a difference of $96,645. The reason for the change was not documented in the COR file.

UNCLASSIFIED

In discussing this issue with the COR, the COR explained that this practice is not required per Department policy (specifically 4 FAM 424(a)) and that only his signature is required on the invoice. OIG acknowledges that there is no requirement to align quality assurance and work progress inspections with a given invoice and to document that determination in the invoice file. Nevertheless, OIG made the recommendation because such a practice would be helpful for construction projects that take several years to complete. Moreover, implementing such a practice would provide information about the progression of a construction project that would be beneficial to incoming CORs who are assigned to a project. CORs rotate frequently on such long-term projects, and, as described above, the Islamabad project began in 2010 and has had four CORs (or acting CORs) involved as of April 2018, which is an average of one new COR assigned every 2 years.

This recommendation will be considered resolved when OBO agrees to implement it or provides an acceptable alternative that meets the intent of the recommendation. This recommendation will be closed when OIG receives and accepts documentation demonstrating that OBO has required CORs to include documentation in the invoice file that supports the amount or percentage of completion requested by the contractor. Documentation should explain the basis for approving invoices and align with quality assurance and work progress inspection records, meeting minutes with the contractor, and daily records of the contractor's activities, including hours worked and activities completed.

### OBO Has Not Adopted a Standard Operating Procedure for Reviewing Construction Invoices

On a related matter, OIG found that OBO had not adopted an SOP for reviewing construction invoices associated with large, multi-million-dollar and multi-year construction projects such as the Islamabad NEC and Housing Project. Specifically, the COR/PD told OIG that the OBO Construction and Commissioning Guidebook does not lay out a process for reviewing invoices for the NEC and Housing Project or other projects because the intent is to provide CORs with flexibility in their review. When OIG asked OBO to clarify the rationale for the lack of an invoice review SOP for construction projects, OBO responded with the following:

> [T]he methods for inspection of the work vary depending on the project's scope, scale, and degree of completion, but in general, compare the quantity and quality of work in place against the Issued for Construction drawings and specifications. Therefore, the appropriate process for verifying invoices may vary as the project progresses. Invoice verification for a project with a limited scope, such as a façade renovation, or with a readily inspect-able scope, such as a perimeter security upgrade, will be less involved than a large New Embassy Compound. This is why an SOP for invoice verification would have limited value in OBO's diverse project context.

Although an OBO official stated that an invoice review SOP would have limited value in OBO's diverse project context, OIG notes that the U.S. Army Corps of Engineers works in a similarly

UNCLASSIFIED

diverse project context and has adopted an SOP for reviewing construction invoices under its purview worldwide. The U.S. Army Corps of Engineers has developed specific criteria[21] for reviewing and processing contractors' progress payment requests. These criteria include specific review steps for determining whether the request constitutes a "proper invoice," timelines for rejecting or processing the estimates, flowcharts, checklists, a list of required supporting documents and certifications, actions to take upon the subcontractor/supplier allegations of prime contractor nonpayment, and the proper inclusion of retainage or liquidated damages. In addition, the SOP is applicable worldwide for both firm-fixed-price and cost-reimbursable construction contracts (see Appendix B for an excerpt of the U.S. Army Corps of Engineers Contract Administration Manual).

OIG concludes that for multi-million-dollar, multi-year construction projects such as the Islamabad NEC and Housing Project, OBO would greatly benefit from adopting an SOP for reviewing construction invoices. Doing so would provide continuity among the CORs and OBO engineers who periodically rotate over the life of the project, while at the same time providing flexibility and a basic checklist of activities. As previously mentioned, four different CORs or acting CORs have been involved with the Islamabad NEC and Housing Project since it began in 2010. In addition, implementing an SOP for reviewing construction invoices would provide for consistent and uniform invoice reviews and facilitate the Contracting Officer's final acceptance of the project.

**Recommendation 3:** OIG recommends that the Bureau of Overseas Buildings Operations develop and implement a Standard Operating Procedure similar to those promulgated by the U.S. Army Corps of Engineers for reviewing invoices for multi-year, multi-million-dollar construction projects.

**Management Response:** OBO neither agreed nor disagreed with the recommendation but stated that the process in place met the intent of the recommendation. OBO stated that it uses the contract requirements and the FAR clauses as guidance for invoice reviews and the requirements for progress payments. Specifically, OBO stated that the contract (Section G, Division 1, Section 01101) allows for the contractor's Project Manager and OBO's PD to agree on a final invoice. OBO stated that "disputes related to retainage or payments held may arise due to quality defects. However, in those instances, supporting documentation is required because the Contracting Officer will not allow retainage or payments to be held without supporting information." OBO further added, "the methods for inspection of work vary depending on a project's scope, scale, and degree of completion. The appropriate process for verifying invoices may vary as a project progresses. For example, an invoice verification for a project with a limited scope or with a readily inspectable scope may be less involved than a large New Embassy Compound. Therefore, a Standard Operating Procedure for invoice verification would have limited value in OBO's diverse project context."

---

[21] U.S. Army Corps of Engineers, "Engineering Pamphlet 415-1-260," March 2016. Chapter 7: "Contract Administration"; U.S. Army Corps of Engineers South Atlantic Division, "Contract Administration Manual," June 2012. Chapter 4: "Contractor Progress Payments."

**OIG Reply:** Because OBO did not concur with the recommendation or adequately address the underlying cause of the finding that prompted the recommendation, OIG considers this recommendation unresolved.

Notwithstanding OBO's statement that the current process in place to review invoices for the New Embassy Compound meets the intent of this recommendation, the report itself describes ways that the process could be improved. More fundamentally, though, OBO suggests that the variety of its projects—including the "scope, scale, and degree of completion"—weighs against adopting a standard procedure. As discussed previously, though, the U.S. Army Corps of Engineers has adopted an SOP for reviewing construction invoices under its purview worldwide. Even though it also has a wide variety of projects, the U.S. Army Corps of Engineers has developed specific criteria for reviewing and processing contractors' progress payment requests. These criteria include specific review steps for determining whether the request constitutes a "proper invoice," timelines for rejecting or processing the estimates, flowcharts, checklists, a list of required supporting documents and certifications, actions to take upon the subcontractor/supplier allegations of prime contractor nonpayment, and the proper inclusion of retainage or liquidated damages. In addition, the SOP is applicable worldwide for both firm-fixed-price and cost-reimbursable construction contracts. Implementing such an SOP for reviewing invoices associated with large, multi-million-dollar, multi-year construction projects would provide continuity among the CORs and OBO engineers who periodically rotate throughout the life of the project. In addition, implementing an SOP for reviewing construction invoices would provide for consistent and uniform invoice reviews and facilitate the Contracting Officer's final acceptance of the project. Doing so would not, however, prevent appropriate flexibility.

This recommendation will be considered resolved when OBO agrees to implement it or provides an acceptable alternative that meets the intent of the recommendation. This recommendation will be closed when OIG receives and accepts documentation demonstrating that OBO has developed and implemented an SOP similar to that developed by the U.S. Army Corps of Engineers (see Appendix B for an excerpt of the U.S. Army Corps of Engineers Contract Administration Manual) for reviewing invoices for multi-year, multi-million-dollar construction projects.

UNCLASSIFIED

# RECOMMENDATIONS

**Recommendation 1:** OIG recommends that the Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management require BL Harbert to include the contractor certification statement required by Federal Acquisition Regulation 52.232-5, "Payments Under Fixed-Price Construction Contracts," when submitting invoices for payment.

**Recommendation 2:** OIG recommends that the Bureau of Overseas Buildings Operations require the Contracting Officer's Representative assigned to multi-year construction projects to include documentation in the invoice file that supports the amount requested by the contractor. Documentation should include quality assurance and work progress inspection records, meeting minutes with the contractor, and daily records of the contractor's activities, including hours worked and activities completed.

**Recommendation 3:** OIG recommends that the Bureau of Overseas Buildings Operations develop and implement a Standard Operating Procedure similar to those promulgated by the U.S. Army Corps of Engineers for reviewing invoices for multi-year, multi-million-dollar construction projects.

UNCLASSIFIED

# APPENDIX A: PURPOSE, SCOPE, AND METHODOLOGY

The Office of Inspector General (OIG) conducted this audit to determine the extent to which the Department of State's (Department) Bureau of Overseas Buildings Operations (OBO) and the Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM), implemented invoice review and approval procedures that verified the accuracy and completeness of invoiced construction costs and ensured payments were made in accordance with Federal requirements and Department guidance.

OIG conducted fieldwork from October 2017 to March 2018 in Washington, DC, and Islamabad, Pakistan, in accordance with generally accepted government auditing standards. These standards require that OIG plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for its findings and conclusions. OIG maintains that the evidence obtained provides a reasonable basis for its findings and conclusions based on the audit objective. OIG conducted this audit under the authority of the Inspector General Act of 1978, as amended.

To answer the audit objective, OIG reviewed a random sample of 26 invoices that OBO approved between October 2010 and August 2016. OIG reviewed each invoice file to determine if it met the requirements of the Federal Acquisition Regulation (FAR), the OBO Construction and Commissioning Guidebook, and the contract. Specifically, OIG reviewed the invoice that contained an itemized list of expenses, the project execution schedule (and narrative explaining the project execution schedule), applicable Gantt charts showing progress, and inventory billing records. OIG also reviewed documentation relating to quality control and quality assurance when included.

In Washington, DC, OIG interviewed the Division Chief for Policy, the Contracting Officer, and senior officials from OBO's Construction, Facility, and Security Management Division. In Islamabad, Pakistan, OIG interviewed the Contracting Officer's Representative, who was also the Project Director on the project; the Assistant Contracting Officer's Representative; the Deputy Construction Manager; the Facilities Manager; and mechanical and electrical engineers. OIG accompanied OBO engineers on inspections of new staff apartment buildings, the consular building, and the gymnasium and fitness center. OIG received basic training on the Primavera system, which BL Harbert uses to produce the project execution schedule, among other things.

## Prior Reports

In a November 2017 report titled *Management Assistance Report: Lapse in Oversight at Embassy Islamabad, Pakistan, Allowed Design Change to Proceed Without the Contracting Officer's Knowledge"* (AUD-MERO-18-01), OIG reported that the contractor BL Harbert made adjustments or alterations to the final design documents and changed the percentages of materials used without the approval of the CO, as the contract requires. The report concluded that the communication between BL Harbert, OBO, and the CO was generally poor and uncoordinated and moreover was not documented in the contract files as required.

To ensure that the oversight of the NEC and Housing Project in Islamabad, Pakistan, is robust, OIG made five recommendations to the Bureau of Administration, four of which were in coordination with OBO. The Bureau of Administration, in coordination with OBO, concurred with four recommendations and did not concur with one. However, on the basis of actions taken to implement the recommendations (and documentation of such actions), OIG considered all five recommendations closed as of April 2018.

## Detailed Sampling Methodology

The audit universe consisted of 634 general ledger line items for Contract SAQMMA-10-C-0284, valued at $635,949,900. Seventy-seven line items containing zero or negative amounts were removed. As a result, 557 line items worth $637,247,855 million remained. These general ledger line items pertained to 73 invoices defining our sample universe. From this universe, OIG selected a sample of 30 invoices using a partially dollar-weighted stratified sampling design.[1] A sample size of 30 was chosen by OIG to provide sufficient evidence to support the conclusions in this report. The 30 invoices contained 4 duplicate invoice numbers, resulting in a final sample of 26 unique invoices for review. The total payment value for the sample was $249,133,299. Table 1 below shows the sample of invoices and corresponding invoice amounts.

---

[1] A partially dollar-weighted sampling design selects samples randomly with an emphasis on larger dollar invoices.

UNCLASSIFIED

## Table 1: Invoices and Dollar Amounts

| Month | Invoice ID | Invoice Amount |
|---|---|---|
| **2011** | | |
| June | ISB-009 | $3,879,966 |
| August | ISB-011 | $7,135,053 |
| **2012** | | |
| January | ISB-016 | $5,878,215 |
| August | ISB-023 | $8,908,417 |
| September | ISB-024 | $11,310,406 |
| December | ISB-027 | $14,902,437 |
| **2013** | | |
| February | ISB-029 | $20,206,753 |
| July | ISB-034 | $18,464,667 |
| August | ISB-035 | $11,433,237 |
| September | ISB-036 | $9,257,370 |
| November | ISB-038 | $7,250,781 |
| December | ISB-039 | $10,525,690 |
| **2014** | | |
| January | ISB-040 | $5,903,885 |
| February | ISB-041 | $6,206,147 |
| April | ISB-043 | $6,780,435 |
| June | ISB-045 | $5,484,807 |
| **2015** | | |
| February | ISB-053 | $4,200,575 |
| March | ISB-054 | $3,650,361 |
| June | ISB-057 | $3,827,676 |
| October | ISB-061 | $8,350,227 |
| November | ISB-062 | $8,498,015 |
| **2016** | | |
| January | ISB-064 | $7,949,787 |
| February | ISB-065 | $9,709,406 |
| March | ISB-066 | $8,823,314 |
| May | ISB-068 | $25,934,885 |
| August | ISB-071 | $14,660,787 |
| **Total** | | **$249,133,299** |

**Source:** OIG generated from invoice files provided by OBO and selected for this audit.

## Use of Computer-Processed Data

OIG used computer-processed data in its selection of invoices. OIG relied on the invoice data from the Department's accounting system, the Global Financial Management System (GFMS), to select a sample. The accuracy and completeness of the universe of invoice data were verified by reconciliation of the dollar total from a status report provided by OBO. The audit team

determined that no data were missing and that it had a complete list of all invoices submitted and approved within the timeframe being reviewed. On the basis of these conclusions, the audit team determined that the invoice data from GFMS were sufficiently reliable for the purposes of the audit.

## Work Related to Internal Controls

OIG performed steps to assess the adequacy of internal controls related to the areas audited. This included determining whether checklists prepared for each invoice reviewed were completed. OIG also assessed whether the COR was reviewing documentation that would verify that the invoiced services had met contractual requirements prior to payment approval. OIG's findings related to internal controls involving OBO invoice review and approval procedures are presented in the Audit Results section of this report.

## APPENDIX B: EXCERPT OF U.S. ARMY CORPS OF ENGINEERS CONTRACT ADMINISTRATION MANUAL

June 2012                                          SADDM 1110-1-1

# CONTRACT ADMINISTRATION MANUAL
### FOR CONSTRUCTION CONTRACTS

# SOUTH ATLANTIC DIVISION



## US Army Corps of Engineers®

UNCLASSIFIED

## CHAPTER 4 - CONTRACTOR PROGRESS PAYMENTS

**4.1  Introduction.** This chapter is intended to familiarize personnel with the Prompt Payment Act Amendments of 1988 and guide government personnel in processing the contractor's progress payments (ENG Form 93) and supporting fiscal matters. Processing is shown on the flow diagram in Exhibit 4A. It is limited to the actual payment estimate preparation and matters pertaining thereto.

**4.2  References**
    a. FAR Subpart 32.9, Prompt Payment.
    b. Public Law 100-496, Prompt Payment Act Amendments of 1988.
    c. 5 CFR 1315: Prompt Payment; Formerly OMB Circular A-125.
    d. QMS ES - 04010 MILCON Project Closeout
    e. QMS ES - 08035 Construction Payment Estimates

**4.3  Prompt Payment Act Amendments of 1988.** The Prompt Payment Act (PPA) Amendments of 1988 significantly changed the bill paying practices of the Federal Government for contracts awarded, renewed, and options exercised after 31 March 1989. The Act established standards for invoice payments; clarified the definitions of invoice receipt dates and dates of government acceptance of goods or services; eliminated grace  periods for late government payments; made interest penalties automatically payable; provided an additional penalty for interest owed but not paid; and extended PPA requirements to partial payments, construction progress payments and release of retained percentage, and construction subcontracts. The PPA Amendments of 1988 do not apply to contracts awarded before 1 April 1989.

**4.4  PPA Procedures for Construction Contracts.** The following operating procedures will insure that the Government promptly processes contractor payments. For complete guidance on the Prompt Payment Act Amendments of 1988, see contract clauses, Payments Under Fixed-Price Construction Contracts, FAR 52.232-5, and Prompt Payment for Construction Contracts, FAR 52.232-27.

    **a. Preliminary Review of Invoice.** Before a proper invoice is submitted, a preliminary review of the NAS schedule, or an alternate schedule, by government and contractor personnel will insure:

      • that each payment item is related to the various elements of work required by the contract;

    **e. Improper Invoice**. An improper invoice is one that does not meet the conditions established by the PPA contract clause. Take special notice in the clause of the requirement for the prompt payment certification. The contractor attests to the amounts requested for performance, attests that timely payments were made to subcontractors and suppliers, and does not withhold or retain any amounts from a subcontractor or suppliers in contravention of the terms and conditions of the subcontract. If the Prompt Payment Certification and Supporting Data for Contractor Payment Invoice, Form 93 and 93a, Contractor Invoice, summary Tables or Supporting Data is not submitted, reject the invoice. An invoice is also improper when it incorporates a modification to the contract that has not been finalized or does not include the Consent of Surety, when applicable. When an invoice is found by the Resident Engineer to be improper or defective, the following actions must occur:

(1) Notify the contractor of the defective invoice within seven days after the invoice is received, initially by telephone, and then confirmed, in writing. If it takes more than seven days to notify the contractor, then the due date for beginning interest accrual on the corrected invoice will be adjusted by subtracting the excess number of days for notification. For example, if the contractor is notified of defective invoice 10 days after receipt, the interest accrual date will start 11 days after receipt of the corrected invoice (14 day prompt payment period minus the 3 excess days in notification). Attach the corrected notification documentation to the applicable payment estimate.

(2) The designated government representative will cross out the date stamp on the invoice and certificate, initial, and date the same date of notification to the contractor of improper or defective invoice. The "clock" is effectively stopped upon notification.

(3) The whole process starts over with the resubmission of the corrected invoice and certification, date stamped, etc.

(4) Disagreement between the Government and the contractor over the payment amount, issues of contract compliance, or retainage does not form the basis for finding the invoice defective and requiring resubmission. However, since the PPA Clause states that interest penalties are not required on payment delays due to disagreement, it is imperative that written evidence be submitted with the payment estimate. The Prompt Payment Certification and Supporting Data for the contractor payment invoice will be annotated to document the delay and to alert the designated payment office not to pay interest during the delay period. The ideal position is to avoid this situation by substantiating and documenting agreements prior to the contractor submitting the invoice, as indicated in paragraph 4.4.

*This printed copy is for "Information Only." The controlled version resides on the SAD Contract Administration Website.*

**UNCLASSIFIED**

• that the work requested was performed (refer to work sheets, cross sections, etc.);
• how the percentage or amount paid was determined;
• why retainage was held or not held;
• why liquidated damages were assessed or not assessed;
• that there is agreement between both parties.

The RE should substantiate the preliminary review, in writing, and place the documentation in the applicable file retained in the field office. Use PE Checklist as shown in Exhibit 4B.

**b. Proper Invoice.** An invoice is the contractor's bill or written request for payment for work performed under the contract. In accordance with the PPA, a 'proper' invoice must include:

(1) Name and address of the contractor.
(2) Invoice date.
(3) Contract number or other authorization (including order number and contract line item number).
(4) Description of work or services performed.
(5) Delivery and payment terms (e.g., prompt payment discount terms).
(6) Name and address of contractor official, or as otherwise directed by the contractor, in writing, to whom payment is to be sent (must be the same as that in the contract or in a proper notice of assignment).
(7) Name (where practicable), title, and telephone number of person to be notified in event of a defective invoice.
(8) Substantiation of the amounts requested (determined under preliminary review) and certification in accordance with the requirements of the Payments Under Fixed-Price Construction Contracts Clause.
(9) Total dollar amount reflected in each agreement between the contractor and subcontractor; amount included in current payment for each subcontractor; and total payments already made to each subcontractor.
(10) Any other information or documentation required by the contract. For example, the contractor's electronic payment request (updated NAS Schedule) which is required by the Project Schedule and/or Quality Control System (RMS-QCS Module) specification sections.

i.   **Subcontractors/Suppliers.**

(1) The contractor, in accordance with the PPA, will include a payment clause and interest penalty clause in each subcontract, and a clause requiring each subcontractor to include the same clauses in each of its subcontracts.

(2) PPA Amendments obligates the contractor to pay subcontractor(s) for satisfactory performance under its subcontract not later than seven days after payment of such amounts is received by the contractor under the contract, or interest will be paid at the same rate the Government pays interest for late payment. Prime contractors must follow the "pay-when-paid" principle in dealing with subcontractors.

(3) The prime contractor's progress payment request must list the total amount reflected in each agreement between the contractor and subcontractor; the amount included in the current payment for each subcontractor; and total payments already made to each subcontractor. The contractor will submit this information, among other data needed for a proper invoice on Prompt Payment Certification and Supporting Data for Contractor Payment Invoice. Do not process payment estimates if the certification is not included.

(4) Contractors may withhold or retain all or part of payments due subcontractors for good cause, including work that is in dispute, third-party claims, or alleged damages. The contractor may also retain a specified percentage of subcontract payments pending final completion of subcontract work, if allowed in his or her subcontract agreement, or withhold payment for Miller Act violations. If the contractor elects to deduct subcontractor earnings, follow the indicated procedures:

(a) The contractor will report full progress and earnings, including subcontractor work, in NAS or by alternate means.

(b) The contractor will request deductions for subcontractor work by using Prompt Payment Certification and Supporting Data for Contractor Payment Invoice.

(c) "Subcontractor Deductions by Prime Contractor" will be backed out in an added item to ENG Form 93.

(d) "Total Earnings to Date" on ENG Form 93 will only reflect earnings for which the contractor wishes payment, less normal retainages and deductions.

*This printed copy is for "Information Only." The controlled version resides on the SAD Contract Administration Website.*

**UNCLASSIFIED**

## 4.10 Retained Percentage (Prime Contractor).

a. If satisfactory progress is achieved during any period for which a progress payment is to be made, payment may be made in full. If satisfactory progress is not achieved, the Contracting Officer's Representative may (if consistent with the COR's letter of appointment) retain a maximum of 10 percent of the payment amount until satisfactory progress is achieved. Whenever the work is substantially complete, the Contracting Officer's Representative may (if consistent with the COR's letter of appointment) retain from previously withheld funds and future progress payments that amount he/she considers adequate for the Government's protection and will release all the remaining withheld funds. On completion and acceptance of each separate building or other division of the contract on which the price is stated separately in the contract, payment will be made for the completed work without retention of a percentage.

PAYMENT ESTIMATE FLOW DIAGRAM



LEGEND
1. REO - RESIDENT ENGINEER OFFICE
2. DBO - DESIGNATED BILLING OFFICE
3. DPO - DESIGNATED PAYMENT OFFICE

June 2012      **Exhibit 4A – Payment Processing (Flow Diagram)**
This printed copy is for "Information Only." The controlled version resides on the SAD Contract Administration Website.

**CD CHECKLIST**
**FOR PROGRESS/FINAL PAYMENTS**

**CONTRACT NO:**                      **PAY ESTIMATE NO**
**PO/DELIVERY ORDER NO:**         **PERIOD COVERED**

**CONTRACT STATUS CODE** _____      **PRIMARY DELAY CODE** _____
**ACTUAL BOD DATE** _____      **INTERIM 1354 DATE** _____

**STATUS/ISSUES**        **SCHEDULED % COMPLETE** _____   **ACTUAL % COMPLETE** _____

| | YES | NO | N/A | | | | |
|---|---|---|---|---|---|---|---|
| Outstanding RFI's | ___ | ___ | ___ | | **FINAL PAY ESTIMATE** | | |
| Outstanding Correspondence | ___ | ___ | ___ | | YES | NO | N/A |
| Submittal Register Current | ___ | ___ | ___ | O & M Manuals | ___ | ___ | ___ |
| Payrolls Current | ___ | ___ | ___ | Submittal Register Complete | ___ | ___ | ___ |
| Safety Meeting Held/Doc | ___ | ___ | ___ | Punch List Complete | ___ | ___ | ___ |
| Satisfactory Safety Conditions | ___ | ___ | ___ | DD Form 1354 | ___ | ___ | ___ |
| QC Required Test Performed | ___ | ___ | ___ | Final Completion Statement | ___ | ___ | ___ |
| Stored Materials Verified | ___ | ___ | ___ | Final Inspection Date | ___ | ___ | ___ |
| Progress Bar Chart/NAS | ___ | ___ | ___ | Final Salvage Report | ___ | ___ | ___ |
| Payment Certification | ___ | ___ | ___ | Contractor Evaluation | ___ | ___ | ___ |
| Bond/Escrow (CD-LA) | _____ | | | AE Evaluation | ___ | ___ | ___ |
| Liquidated Damages | _____ | | | Gov't Furnish Property | ___ | ___ | ___ |
| Other Deductions | _____ | | | Release of Claims | ___ | ___ | ___ |
| Retainage (Hold/Refund) | _____ | | | As-Built Drawings | ___ | ___ | ___ |
| Recommended Payment | _____ | | | Payroll Cards (Eng 3180) | ___ | ___ | ___ |
| Insurance | _____ | | | Environmental Permits | _____ | | |
| As-Built Drawings | _____ | | | Other | _____ | | |
| Any Work-in-Place Rejected (identify below) | | | | Other | _____ | | |

_____
_____      PREPARED BY:   DATE: _____

June 2012           **Exhibit 4B. Pay Estimate Checklist**
*This printed copy is for "Information Only." The controlled version resides on the SAD Contract Administration Website.*

## Prompt Payment Certification And Supporting Data For Contractor Payment Invoice

Page 1 of 3 pages

| (1) Contract No.: DACA09-03-C-0020 NA | (2) Location and Description of Work: Nellis Air Force Base, Nevada Repair Community Support Center FY2003 | (3) Estimate No.: 14 |
|---|---|---|
| | | (4) Invoice Date: 04/10/2006 |

| (5) Contractor Official (name and address) to whom payment is to be sent: Innovative Technical Solutions, Inc. 2730 Shadelands Dr., Suite 100 Walnut Creek, CA 94588 Contra Costa | (6) Discount Terms: 0 Days 0 Percent |
|---|---|

| (7) If Notice of Assignment has been filed, enter name of Assignee to whom payment is to be sent: | (8) Name, Title, phone number, and mailing address of person to be notified in event of a defective invoice: |
|---|---|

| (9) Subcontractor Name | (10) Total Amount Subcontracted | (11) Previous Subcontractor Payments (Excluding Deductions) | (12) Subcontractor Amount included in this Payment Estimate (Excluding Deductions) | (13) ** Subcontractor Earnings Deducted by Contractor (Total to Date) |
|---|---|---|---|---|
| Allied Forces Temporary Services | $0.00 | $0.00 | $0.00 | $0.00 |
| Automatic ElectricLLC | $0.00 | $0.00 | $0.00 | $0.00 |
| B. Witt Concrete Cutting, Inc. | $0.00 | $0.00 | $0.00 | $0.00 |
| C & W Enterprises Inc. | $15,000.00 | $0.00 | $12,000.00 | $1,000.00 |
| C&W Enterprises | $0.00 | $0.00 | $0.00 | $0.00 |
| CST Environmental | $0.00 | $0.00 | $0.00 | $0.00 |
| CTE-Construction Testing | $0.00 | $0.00 | $0.00 | $0.00 |
| Done Right Plumbing | $0.00 | $0.00 | $0.00 | $0.00 |
| Eberhard Southwest Roofing | $0.00 | $0.00 | $0.00 | $0.00 |
| Energy Mechanical Insulation | $0.00 | $0.00 | $0.00 | $0.00 |
| Forensic Analytical | $0.00 | $0.00 | $0.00 | $0.00 |
| F-Rodgers | $0.00 | $0.00 | $0.00 | $0.00 |
| Hardy Painting & Drywall | $0.00 | $0.00 | $0.00 | $0.00 |
| Harmony Fire | $0.00 | $0.00 | $0.00 | $0.00 |
| Helix Electric | $10,000.00 | $0.00 | $0.00 | $0.00 |

** A written notice of any withholding shall be issued to a subcontractor (with a copy to the Contracting Officer) of any such notice issued by the Contractor, specifying (1) the amount to be withheld, (2) the specific causes for the withholding under the terms of the subcontract, and (3) the remedial actions to be taken by the subcontractor in order to receive payment of the amounts withheld. Attach copy of notification to pay estimate. Reference FAR 52.232-27(g).

I herby certify, to the best of my knowledge and belief, that:

(1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made from the proceeds of the payments covered by this certification, in accordance with subcontract agreements and the requirements of Chapter 39 of Title 31, United States. Code; and

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

(4) This certification is not to be construed as final acceptance of a subcontractor's performance.

| Signature | Date |
|---|---|
| Typed Name and Title | |

June 2012                **Exhibit 4C**

Prompt Payment Certification and Supporting Data for Contractor Payment Invoice

*This printed copy is for "Information Only." The controlled version resides on the SAD Contract Administration Website.*

# APPENDIX C: BUREAU OF ADMINISTRATION, OFFICE OF LOGISTICS MANAGEMENT, OFFICE OF ACQUISITIONS MANAGEMENT RESPONSE



United States Department of State

Washington, D.C.   20520

UNCLASSIFIED                                June 11, 2018

**MEMORANDUM**

TO:        OIG/AUD – Norman P. Brown

FROM:      A/LM – Jennifer A. McIntyre

SUBJECT:   Draft Report on *Audit of the Bureau of Overseas Buildings Operations' Process for Reviewing Invoices for Construction of the U.S. Embassy in Islamabad, Pakistan (AUD-MERO-18-XX)*

Thank you for the opportunity to provide our comments on the subject draft OIG Management Assistance Report.

**General Comment:** The Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM) would like to clarify on page 8, paragraph 2 that the Contracting Officer was aware that the contractor must certify their invoice in accordance with FAR 52.232-5, but was unaware that the contractor was not using the most current FAR language.

**Recommendation 1:** OIG recommends that the Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management require BL Harbert to include the contractor certification statement required by Federal Acquisition Regulation 52.232-5, "Payments Under Fixed-Price Construction Contracts," when submitting invoices for payment.

**Management Response to Draft Report (06/11/2018):** The Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM) concurs with the recommendation. A/LM/AQM provided direction to BL Harbert on May 2, 2018 directing the vendor to cite FAR clause 52.232-5 on all future invoices. A/LM/AQM respectfully requests the OIG close this recommendation.

UNCLASSIFIED

# APPENDIX D: BUREAU OF OVERSEAS BUILDINGS OPERATIONS RESPONSE



**United States Department of State**

*Washington, D.C. 20520*

UNCLASSIFIED                                        May 31, 2018

**MEMORANDUM FOR NORMAN BROWN – OIG/AUD**

FROM:        OBO/RM – Jürg Hochuli

SUBJECT:     Draft Report on the *Audit of the Bureau of Overseas Buildings
             Operations' Process for Reviewing Invoices for the Construction of the
             U.S. Embassy in Islamabad, Pakistan*
             AUD-MERO-18-XX, May 2018

As requested, attached is OBO's response to Recommendation numbers two and three of
the subject report.

Attachment:
        As stated.

**UNCLASSIFIED**

UNCLASSIFIED

Office of Inspector General
Draft Report
*Audit of the Bureau of Overseas Buildings Operations' Process for Reviewing Invoices
for the Construction of the U.S. Embassy in Islamabad, Pakistan*
Report No. AUD-MERO-18-XX, May 2018

**OIG Recommendation #2:**  OIG recommends that the Office of Overseas Buildings
Operations require the Contracting Officer's Representative assigned to multi-year
construction projects to include documentation in the invoice file that supports the
amount requested by the contractor. Documentation should include quality assurance and
work progress inspection records, meeting minutes with the contractor, and daily records
of the contractor's activities, including hours worked and activities completed.

**OBO Response, May 2018:  The process in place meets the intent of this
recommendation. The Contracting Officer's Representative (COR) ensures that all
required documentation is received and archived appropriately per the contract and
referenced Federal Acquisition Regulation (FAR) clauses.  In a firm-fixed price
contract, it is the percentage of completion that is verified in the field, not a dollar
amount.  The required documentation found in the project files verifying contractor
performance include daily reports, weekly reports, Quality Control reports,
monthly progress cables, and meeting minutes. These documents support the
invoice process and the percentage of completion by the contractor.**

**OBO has provided these documents to the OIG throughout the course of their audit,
and requests that the OIG close this recommendation.**

**OIG Recommendation #3:**  OIG recommends that the Office of Overseas Buildings
Operations develop and implement a Standard Operating Procedure similar to those
promulgated by the U.S. Army Corps of Engineers for reviewing invoices for multi-year,
multi-million-dollar construction projects.

**OBO Response, May 2018:  The process in place meets the intent of this
recommendation. OBO uses the contract requirements, including the FAR clauses
and general conditions found in Division 1, as guidance for invoice reviews.  The
requirements for progress payments can be found in Contract Section G, Division 1
Section 01101, and also in Division 1 Section 01321.**

**The Division 1 requirements allow for the contractor's Project Manager and OBO's
Project Director to agree on a final invoice. Disputes related to retainage or
payments held may arise due to quality defects. However, in those instances
supporting documentation is required because the Contracting Officer will not
allow retainage or payments to be held without supporting information.**

**Please also note that the methods for inspection of work vary depending on a
project's scope, scale, and degree of completion. The appropriate process for
verifying invoices may vary as a project progresses. For example, an invoice**

UNCLASSIFIED

verification for a project with a limited scope or with a readily inspectable scope
may be less involved than a large New Embassy Compound. Therefore, a Standard
Operating Procedure for invoice verification would have limited value in OBO's
diverse project context.

OBO requests that the OIG close this recommendation.

2

## ABBREVIATIONS

| | |
|---|---|
| A/LM/AQM | Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management |
| CO | Contracting Officer |
| COR | Contracting Officer's Representative |
| FAH | Foreign Affairs Handbook |
| FAR | Federal Acquisition Regulation |
| NEC | New Embassy Compound |
| OBO | Bureau of Overseas Buildings Operations |
| OIG | Office of Inspector General |
| SOP | Standard Operating Procedure |

UNCLASSIFIED

## OIG AUDIT TEAM MEMBERS

Jim Pollard, Division Director
Middle East Region Operations
Office of Audits

Latesha Turner
Audit Manager
Middle East Region Operations
Office of Audits

Suzana Chowdhury
Senior Auditor
Middle East Region Operations
Office of Audits

Taylor Westfall
Management Analyst
Middle East Region Operations
Office of Audits

Hillary Hampton
Presidential Management Fellow
Middle East Region Operations
Office of Audits

UNCLASSIFIED

UNCLASSIFIED



# HELP FIGHT

## FRAUD. WASTE. ABUSE.

1-800-409-9926
**stateoig.gov/HOTLINE**
If you fear reprisal, contact the
OIG Whistleblower Ombudsman to learn more about your rights.
**OIGWPEAOmbuds@stateoig.gov**

**stateoig.gov**

Office of Inspector General • U.S. Department of State • P.O. Box 9778 • Arlington, VA 22219

UNCLASSIFIED