Exhibit I



**Planet Depos**®
We Make It *Happen*™

# Transcript of David Vivian

**Date:** November 12, 2019
**Case:** Montage, Inc. -v- U.S. Department of State

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of David Vivian

1 (1 to 4)

Conducted on November 12, 2019

---

**Page 1**

```
1        BEFORE THE UNITED STATES CIVILIAN BOARD OF
                    CONTRACT APPEALS
2
  ----------------------------
3  MONTAGE, INC.,              :
4            Appellant,        :
5      -v-                     :        CBCA Nos.
                               :  6168, 6213 & 6376
6  U.S. DEPARTMENT OF STATE,   :
7          Respondent.         :
8  Contract No. SAQMMA14C0200  :
9  ----------------------------
10
11       DEPOSITION OF DAVID WESLEY VIVIAN
12            Reston, Virginia
13        Tuesday, November 12, 2019
14               9:43 a.m.
15
16
17
18
19
20  Job No.:  269478
21  Pages:  1 - 297
22  Reported by:  Paula Flint
```

---

**Page 2**

```
1        DEPOSITION OF DAVID WESLEY VIVIAN, held at
2  the law offices of:
3
4
5            ODIN FELDMAN & PITTLEMAN, P.C.
6            1775 Wiehle Avenue
7            Suite 400
8            Reston, Virginia 20190
9            (703) 218-2100
10
11
12
13       Pursuant to agreement, before Paula Flint,
14  Notary Public of the Commonwealth of Virginia.
15
16
17
18
19
20
21
22
```

---

**Page 3**

```
1              A P P E A R A N C E S
2  ON BEHALF OF THE APPELLANT:
3      SALLY ANN HOSTETLER, ESQUIRE
4      SHIVA S. HAMIDINIA, ESQUIRE
5      ODIN FELDMAN & PITTLEMAN, P.C.
6      1775 Wiehle Avenue
7      Suite 400
8      Reston, Virginia 20190
9      (703) 218-2100
10
11  ON BEHALF OF THE RESPONDENT:
12      RANDAL W. WAX, ESQUIRE
13      U.S. DEPARTMENT OF STATE
14      OFFICE OF THE LEGAL ADVISER
15      BUILDINGS AND ACQUISITIONS
16      600 19th Street, Northwest
17      Washington, D.C. 20522
18      (202) 616-3226
19
20  ALSO PRESENT:
21      Marianela Lugo
22
```

---

**Page 4**

```
1              C O N T E N T S
2  EXAMINATION OF DAVID WESLEY VIVIAN      PAGE
3    Ms. Hostetler                          10
4
5
6              E X H I B I T S
7        (Attached to transcript.)
8  APPELLANT DEPOSITION EXHIBIT NO.        PAGE
9    1    Previously Marked                 15
10   2    Previously Marked                 90
11   3    Previously Marked                 91
12   4    Previously Marked                 91
13   5    Previously Marked                277
14   27   Previously Marked                 29
15   36   Previously Marked                124
16   46   Previously Marked                 49
17   54   Previously Marked                280
18   55   Previously Marked                262
19   58   Previously Marked                175
20   61   Previously Marked                263
21   62   Previously Marked                200
22   64   Previously Marked                236
```

5

1      E X H I B I T S   C O N T I N U E D
2         (Attached to transcript.)
3   APPELLANT DEPOSITION EXHIBIT NO.        PAGE
4    65   Previously Marked          238
5    66   Previously Marked          238
6    67   Previously Marked          240
7    68   Previously Marked          199
8    69   Previously Marked          241
9    70   Previously Marked          242
10   72   Previously Marked          201
11   73   Previously Marked          208
12   76   Previously Marked          205
13   77   Previously Marked          215
14   80   Previously Marked          167
15   81   Previously Marked          220
16   86   Previously Marked          186
17   97   Email Communication - DOS-GUAYA0012811   21
18   98   Email Communication DOS-GUAYA0121823   23
19   99   Org Chart                   34
20   100  Email Communication - DOS-GUAYA0070476   50
21   101  Email Communication - DOS-GUAYA0069961   57
22        and 0069962

7

1      E X H I B I T S   C O N T I N U E D
2         (Attached to transcript.)
3   APPELLANT DEPOSITION EXHIBIT NO.        PAGE
4    114  Email Communication - DOS-GUAYA0230494  210
5        through 0230496
6    115  Email Communication - DOS-GUAYA0065971  223
7        through 0065984
8    116  Email Communication - DOS-GUAYA0071308  248
9        and 0071309
10   117  Email Communication - DOS-GUAYA0066047  251
11       through 0066081
12   118  Email Communication - DOS-GUAYA0090326  255
13       and 0090327
14   119  Email Communication - DOS-GUAYA0066502  255
15       and 0066503
16   120  Email Communication - DOS-GUAYA0095422  264
17       through 0095430
18   121  Email Communication - DOS-GUAYA0275871  267
19       through 0275878
20   122  Email Communication - DOS-GUAYA0095405  267
21       and 0095406
22

6

1      E X H I B I T S   C O N T I N U E D
2         (Attached to transcript.)
3   APPELLANT DEPOSITION EXHIBIT NO.        PAGE
4    102  6/22/2018 Letter            61
5    103  Email Communication - DOS-GUAYA0373521   71
6    104  Email Communication - DOS-GUAYA0064348   73
7        through 0064351
8    105  Email Communication - DOS-GUAYA0066892   76
9        through 0066896
10   106  Email Communication - DOS-GUAYA0070930   77
11       and 0070934
12   107  Org Chart                   95
13   108  Email Communication - DOS-GUAYA0173262  107
14       through 0172364
15   109  Email Communication - DOS-GUAYA0012008  117
16   110  Screenshot                 119
17   111  Email Communication - DOS-GUAYA0026692  192
18       through 0026696
19   112  5/7/2018 Letter            194
20   113  Email Communication - DOS-GUAYA0115637  203
21       through 0115640
22

8

1      E X H I B I T S   C O N T I N U E D
2         (Attached to transcript.)
3   APPELLANT DEPOSITION EXHIBIT NO.        PAGE
4    123  Email Communication - DOS-GUAYA0095279  267
5        and 0095280
6    124  Email Communication - DOS-GUAYA0095248  267
7        through 0095250
8    125  Email Communication - DOS-GUAYA0066369  267
9        through 0066371
10   126  Email Communication - DOS-GUAYA0094092  286
11   127  Email Communication - DOS-GUAYA0018525  286
12       and 0018525
13   128  Email Communication - DOS-GUAYA0375266  286
14       and 0275267
15   129  2018 Report to Congressional Requesters 293
16
17           *    *    *
18
19
20
21
22

**Page 9**

```
 1        TRANSCRIPT INFORMATION REQUESTS
 2   TRANSCRIPT DOCUMENT/DATA REQUEST      PAGE/LINE
 3   Attachment              52/09
 4   Drafts or Recommendations        53/20
 5   Exhibit 80 Drafts              168/16
 6   Calculations for Daily Rates      227/10
 7
 8              *    *    *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 10**

```
 1   Thereupon,
 2           DAVID WESLEY VIVIAN,
 3   called as a witness, and having been first duly
 4   sworn, was examined and testified as follows:
 5       EXAMINATION BY COUNSEL FOR APPELLANT
 6   BY MS. HOSTETLER:
 7       Q.  Please state your name.
 8       A.  David Wesley Vivian.
 9       Q.  And where do you live?
10       A.  In Woodbridge, 13604 Custis Street.
11       Q.  And you are currently the Chief,
12   Architectural Engineering Contracting Branch,
13   with DOS?
14       A.  Correct.
15       Q.  Have you had your deposition taken
16   before?
17       A.  Yes, I have.
18       Q.  So you know the process, that we're
19   going to try not to talk over each other so the
20   court reporter can take everything down, correct?
21       A.  Correct.
22       Q.  And if at any time you need a break
```

**Page 11**

```
 1   where there's no question pending let us know and
 2   we can take a break.  We have a breakout room for
 3   you as well.
 4       A.  Okay, thanks.
 5       Q.  So how long have you been with the
 6   Department of State?
 7       A.  Been with the Department of State
 8   19 years now, 19 years and four months.
 9       Q.  But who's counting, right?
10       A.  Exactly.
11       Q.  And you are currently the contracting
12   officer on the Guayaquil project that this case
13   is about?
14       A.  Well, I'm the branch chief and
15   contracting officer, senior contracting officer.
16   Donna Neal has her warrant again so she is the
17   contracting officer.
18       Q.  So she's currently the contracting
19   officer again?
20       A.  Correct.
21       Q.  How long was she not the contracting
22   officer?
```

**Page 12**

```
 1       A.  Well, she was always the contract
 2   specialist.  She was not the contracting officer
 3   for about 12 months, I think.
 4       Q.  We'll track that down in a bit.
 5           Can you briefly describe your
 6   educational background?
 7       A.  Yeah.  I completed a Bachelor's degree
 8   in business at -- it's like Lebanon University
 9   in -- near Scott Air Force Base in Illinois.  I
10   did four years there and then retired from the
11   Air Force.
12       Q.  And would you briefly describe your
13   work experience and what you did before you got
14   to the Department of State and your rise within
15   the Department of State?
16       A.  Before I got to the Department of
17   State I was in the United States Air Force for
18   26 years.  I did four years as a jet engine
19   mechanic and then cross trained to contracting.
20   Did 22 years --
21       Q.  Thank you for your service.
22       A.  Oh, yes.  Thank you.
```

Transcript of David Vivian
Conducted on November 12, 2019

---

**13**

1   **Did 22 years as a contract specialist,**
2   **contracting officer with the Air Force and then**
3   **retired from the Air Force in 2000 and been with**
4   **Department of State for 19 years.**
5       Q.   Can you explain for me -- before we
6   get to that, clearly as chief you oversee a lot
7   of projects.  This is just one of many.  Is that
8   accurate?
9       **A.   That's correct.**
10      Q.   And when I refer to this project,
11  we'll understand that we're talking about the
12  Guayaquil project with Montage?
13      **A.   Correct.**
14      Q.   So given your scope of what you do
15  day-to-day, what did you do to prepare yourself
16  and refresh your memory on what happened on this
17  particular project?
18      **A.   I just read a couple of contracting**
19  **officer decisions that I had signed.  While Donna**
20  **didn't have her warrant, I was required to sign**
21  **them.  And that's just about it.**
22      Q.   Prior to the Guayaquil project, did

---

**14**

1   you have any prior experience with Montage?
2       **A.   Yes, I did.**
3       Q.   And that was on the Copenhagen
4   project?
5       **A.   That project as well as some others,**
6   **yes.**
7       Q.   Hong Kong project?
8       **A.   Yes.**
9       Q.   And both of those finished either on
10  time or ahead of schedule by a bit?
11      **A.   I know the Hong Kong project did.  I'm**
12  **not sure about the Copenhagen.**
13      Q.   Any other projects that you can recall
14  working with Montage or being aware of Montage
15  working on projects that were ultimately under
16  your purview?
17      **A.   None in particular, but I've been**
18  **working with them since 2000 when I first joined**
19  **the Department of State.**
20      Q.   Do you find them to be a reasonable
21  contractor?
22      **A.   Yes.**

---

**15**

1       Q.   And able to do the job?
2       **A.   Yes.**
3       Q.   Let me show you what was previously
4   marked as Exhibit 1 to Mr. Skov's deposition.
5   This is what we call a 30(b)(6) notice and I just
6   want to confirm for the record, sir, that you, as
7   part of our deposition today, will cover topics
8   7, 8 and 43.  Will you look at those and make
9   sure that those are things that you're familiar
10  to testify to.  Paragraph 7.
11      **A.   Seven?**
12      Q.   Uh-huh.  Eight.  And 43.
13      **A.   Yes, I am familiar with those.**
14      Q.   And other than reviewing the two
15  contracting officer's decisions which you signed,
16  which are 7 and 8, did you do anything else to
17  prepare to answer questions with regard to those
18  three categories?
19      **A.   No.  I spoke to counsel, but that was**
20  **it.**
21      Q.   So when -- you mentioned that you were
22  the contracting officer for about a year on this

---

**16**

1   project?
2           MR. WAX:  Objection, mischaracterizes
3   testimony.
4       **A.   I assisted Ms. Neal because she didn't**
5   **have a warrant.  So I was required to sign**
6   **documentation in her stead.**
7       Q.   Did you sign that as the contracting
8   officer?
9       **A.   Yes, I did.**
10      Q.   So during what period of time were you
11  filling the role as the contracting officer when
12  Ms. Neal's warrant had expired?
13      **A.   From the time it expired to the time**
14  **she attained that warrant again.**
15      Q.   And can you tell me when that was?
16      **A.   It seems to be September 2017 when she**
17  **lost it.  Maybe '18.  And then she got it back**
18  **just recently.  About four months ago.**
19      Q.   And how was the contractor alerted of
20  that change in who the contracting officer was?
21      **A.   Donna Neal would have told them.**
22      Q.   Would that be in writing or orally?

17

1     A.   I would assume by email.  I'm not
2  sure.
3     Q.   And how was OBO informed?
4     A.   OBO?  Donna would have told them that
5  she couldn't sign documentation if she was asked
6  to sign something and she would have sent it to
7  me or had another contracting officer sign the
8  documentation.
9     Q.   Would there have been an
10 administrative mod that would have changed the
11 contracting officer?
12    A.   No.
13    Q.   Do you know for a fact that the
14 contract -- excuse me, the contractor or OBO
15 were advised that she was no longer acting in the
16 role as a contracting officer on this project in
17 the September 2017 timeframe?
18    A.   I'm not sure.
19    Q.   Do you know why she lost her warrant?
20    A.   She didn't complete some of the
21 training classes that would be required to
22 complete 80 hours of contract-related training.

18

1     Q.   Did she have a limit of warrant of
2  some sort?
3     A.   Yes, she did have a warrant.
4     Q.   Was it a limited warrant?
5     A.   Yes.
6     Q.   And what were the limits of that
7  warrant?  I haven't seen it, so just in general
8  terms.
9     A.   I think the dollar value was about
10 five million for signing as a contracting
11 officer.  But that would be the only limitation.
12 She could sign contract actions up to one
13 million, but she could sign any documentation as
14 a contracting officer other than a contract
15 document.
16    MR. WAX: While a question isn't
17 pending, I would like to know for the record that
18 the -- the way, at least depositions I'm involved
19 in go, is that the witness should not be called
20 to speculate.  Thank you.
21    Q.   When did -- when was Ms. Neal's
22 warrant reinstated, if that's the right phrase,

19

1  for the Guayaquil --
2     A.   I believe it was about four months ago
3  that it was reinstated.
4     Q.   About four months ago.
5        And again, how was OBO or the
6  contractor notified of that?
7        MR. WAX: Objection, calls for
8  speculation.
9     A.   I'm not sure.
10    Q.   Is there a process by which that is
11 normally done within the State Department?
12    A.   No.  If a person has a warrant they
13 would sign as a contracting officer.  If they
14 don't have a warrant, then they would not sign as
15 a contracting officer.
16    Q.   Would it make a difference to the
17 contractor, as far as who were they dealing with,
18 if they were dealing with someone who was no
19 longer the contracting officer on the job?
20    MR. WAX: I'm going to object, calls
21 for speculation.
22    A.   It just depends on what the direction

20

1  or the discussion was about.
2        MS. HOSTETLER: And Mr. Waxman, while
3  there's no question pending too, I would say for
4  the record that speaking objections are not
5  permitted.  You can object to the form of the
6  question and I'll ask you if I can -- how I can
7  clean up the question.  But I would object --
8        MR. WAX: It's not a speaking
9  objection.  But I hear what you're saying and
10 I'll try to accommodate you to the extent I can.
11    MS. HOSTETLER: Thank you, sir.
12 BY MS. HOSTETLER:
13    Q.   Did you ever advise Montage or OBO
14 that Ms. Neal had lost her warrant for a period
15 of time on this project?
16    A.   I'm not sure.
17    Q.   We've been provided with a lot of
18 documentation, both from the Department of State
19 as well as Montage has provided information to
20 the Department of State from their files as well.
21 And I can -- we can go through some of those, but
22 there was -- during that September 2017 time

21

1 period going forward, there were lots of emails
2 to Ms. Neal as the contracting officer. Would
3 that refresh your memory as to whether or not the
4 contractor had ever been told that Ms. Neal was
5 no longer the acting contracting officer?
6    **A.  No, it wouldn't.**
7        MR. WAX:  Are you going to be
8 referring to preexisting exhibits?
9        MS. HOSTETLER:  If I do I will let you
10 know.
11        MR. WAX:  Thanks.  This is a big pile
12 here and the more time you can give me the faster
13 we can go.
14        MS. HOSTETLER:  Okay.
15        (Exhibit 97 marked for identification
16 and attached to the transcript.)
17 BY MS. HOSTETLER:
18    Q.   Mr. Vivian, the court reporter's
19 handed you an email string and you were actually
20 on this email string from March 1, 2018, where
21 it's from Mr. Skov, and Mr. Skov is referring to a
22 teleconference with CO, Donna Neal.  Do you see

22

1 that, sir?
2    **A.  Yes, ma'am.**
3        MR. WAX:  Will you give me a second to
4 read this, please?  (Reviewing.)
5        So before the witness answers let me
6 ask you a question, because I don't know how
7 you-all have been conducting your depos.  When an
8 exhibit references an attachment, do you guys --
9 have you and Jeff been just sort of leaving that
10 aside or do you also attach the attachment?
11        MS. HOSTETLER:  It depends on whether
12 the attachment is relevant to the line of
13 inquiry.  We've done it both ways.  I think Jeff
14 has started the process of not putting
15 attachments when he started using all the claims
16 without all the attachments.
17        MR. WAX:  I see.  Thank you.
18        MS. HOSTETLER:  And my question here
19 doesn't go to the attachment.  But it goes to
20 just the concept of Ms. Neal as being the
21 contracting officer.
22        So can you read my question back to

23

1 the witness?
2        (The Reporter read from the record as
3 follows:  "Q. Mr. Vivian, the court reporter's
4 handed you an email string and you were actually
5 on this email string from March 1, 2018, where
6 it's from Mr. Skov and Mr. Skov is referring to a
7 teleconference with CO, Donna Neal.  Do you see
8 that, sir?")
9    **A.  Yes, I do.**
10    Q.   And when you received this email on
11 around March 1, 2018, did you reach out to either
12 Mr. Skov or anyone at Montage to correct them
13 that at this time Donna Neal was not the
14 contracting officer?
15    **A.  I did not.**
16        (Exhibit 98 marked for identification
17 and attached to the transcript.)
18    Q.   So Mr. --
19        MR. WAX:  Will you give me a second?
20        MS. HOSTETLER:  I'm just going to ask
21 him to look at it.
22    Q.   Mr. Vivian, the court reporter has

24

1 handed you what's been marked as Exhibit 98,
2 which is an email string for which you are not
3 copied on dated May 7, 2018.  And let me know
4 when you're ready to answer questions.
5    **A.  Ready.**
6    Q.   So in the bottom part of this email
7 Donna Neal is sending an email to Fabian Rendon
8 and the subject is CO visit.  Do you see that,
9 sir?
10    **A.  Yes.**
11    Q.   Who is Mr. Rendon?
12    **A.  I don't know.**
13    Q.   And she's making reference to the fact
14 that she is making a trip to Guayaquil in -- on
15 May 13 through May 16.  Do you see that?
16    **A.  Correct.**
17        MR. WAX:  I'm going to object.
18        You already answered.
19    Q.   And was it your understanding that
20 Ms. Neal was going to Guayaquil acting as the CO
21 in May of 2018?
22    **A.  She was going to Guayaquil to attend a**

**25**

1 meeting.  I don't know that there's any CO
2 decisions or CO documentation that needs to be
3 provided during this meeting.
4    Q.    You did not attend this meeting,
5 correct?
6    A.    Correct.
7    Q.    Do you know if the participants in
8 this meeting thought that Donna Neal was the CO?
9    A.    I do not.
10    Q.    Do you recollect -- and we may get to
11 it later if you don't.  Do you recollect that
12 this was a meeting discussing substantial
13 completion of the project in May of 2018?
14    A.    No, I don't.
15    Q.    You testified that Ms. Neal got her
16 warrant back, or is now the CO again for the
17 Guayaquil project, approximately four months ago.
18    A.    Yeah, that's my estimate.
19    Q.    So my math may be wrong, but we're
20 talking like May, April, August 2019.  Can you
21 help me out a little bit with when?
22    A.    No.  It was sometime during the

**26**

1 summer, as I recall, that she got her warrant
2 back.
3    Q.    During the summer, okay.
4        And she's aware that she's currently
5 the CO on the project?
6    A.    Yes, correct.
7    Q.    So at the time, in September of 2019,
8 that Ms. Neal signed the CPARS she was actually
9 acting as the contracting officer, correct?
10        MR. WAX:  I'm going to object to the
11 form of the question.
12    A.    I don't know.
13    Q.    Did you have any involvement with the
14 CPARS that were issued in September of 2019?
15        MR. WAX:  I'm going to object to the
16 form.
17    A.    Not that I recall.
18    Q.    You didn't review the CPARS that were
19 recently issued in -- from Montage?
20    A.    I reviewed them in preparation for
21 this discussion.
22    Q.    But you didn't review them at the time

**27**

1 they were issued?
2    A.    I don't remember.
3    Q.    Would that have been something that
4 would be typical of your responsibilities
5 supervising Ms. Neal as the contracting officer?
6    A.    No.
7        MR. WAX:  I'm going to object to the
8 form.
9        Can you slow down, please?
10        THE WITNESS:  Oh, sorry.
11 BY MS. HOSTETLER:
12    Q.    So it would be fair to say that it is
13 not typical for you to review the CPARS of the
14 contracting officers who work for you?
15    A.    Correct.
16    Q.    And when you said you reviewed them
17 recently for purposes of this deposition, were
18 you aware of any inaccuracies in those CPARS?
19    A.    Not that I recognized.
20    Q.    Did you see the reference with regard
21 to the falsification of documentation?
22    A.    Yes, I did.

**28**

1        MR. WAX:  I'm going to object to the
2 form.
3    Q.    And isn't it true, sir, that the
4 Department of State determined that issue to be a
5 clerical error?
6        MR. WAX:  I'm going to object to the
7 form.
8    A.    Not that I know of.
9        MR. WAX:  Are we talking about one
10 document or plural documents?  Because you're
11 saying CPARS.
12    Q.    Mr. Vivian, what are CPARS?
13    A.    CPARS are performance reports on
14 contractors that are done periodically and then
15 at the end of the project.
16    Q.    And the CPARS that were issued in
17 September of 2019 were the CPARS -- the final
18 CPARS?
19    A.    It seems like the project was complete
20 by then, so it would be the final CPARS.
21    Q.    And so that is -- in answer to your
22 counsel's question, that is one series of

Transcript of David Vivian
Conducted on November 12, 2019

---

29

1  performance evaluation, correct?
2        MR. WAX:  I'm asking -- that wasn't my
3  question.  My question was are we talking about a
4  single document or multiple documents.  Because
5  you're saying CPARS instead of CPAR.
6        MS. HOSTETLER:  Well, I think the
7  witness has answered what CPARS are.
8     Q.   So in the documents that you reviewed
9  in preparation for today, the September 2019
10 CPARS, was that a single document?
11    **A.   I believe it is one single document.**
12       MR. WAX:  So Counsel, that's called a
13 CPAR, not a CPARS.  That's why I asked the
14 question.
15       MS. HOSTETLER:  Okay.
16    Q.   Did you review the interim CPARS from,
17 I think, 2015 or thereabouts on this project?
18    **A.   I reviewed two, yes.**
19       MS. HOSTETLER:  Can you show the
20 witness Exhibit 27?
21    Q.   So you're looking at what was
22 previously marked as Exhibit 27 to these

---

30

1  depositions, which is the September 2019
2  performance --
3        MR. WAX:  Can you repeat that, please?
4        MS. HOSTETLER:  I hadn't finished the
5  question, sir.
6        MR. WAX:  Oh.  Sorry.
7        MS. HOSTETLER:  Let me start again.
8     Q.   The court reporter has shown you what
9  was previously marked as Exhibit 27 to this
10 deposition which is a September 30, 2019
11 contractor performance assessment report,
12 correct?
13    **A.   Correct.**
14    Q.   And this is the document -- one of the
15 documents that you looked at in preparation for
16 today?
17    **A.   Well, not in this form.  It's a**
18 **different format.**
19    Q.   You looked at it, perhaps, online in
20 the system?
21    **A.   Well, I looked at a printout of the**
22 **actual report.**

---

31

1     Q.   Do you -- do you recollect the
2  substance of that printout in Exhibit 27?  I want
3  to make sure we're talking about the same
4  document.  Because there was some issue with
5  Ms. Neal as to whether or not this was the proper
6  document.
7        MR. WAX:  I didn't hear the verb.  Did
8  you say reckon or recognized?
9        THE REPORTER:  Recollect.
10    **A.   It looks pretty much the same.  I**
11 **can't be sure.**
12    Q.   Ms. Neal thought that she had modified
13 the quality section on page three of seven.  Did
14 you see a version different than what is before
15 you now with regard to that quality section?
16    **A.   I can't really say without comparing**
17 **the two.**
18    Q.   She thought that she had added
19 something that this issue had been resolved as a
20 clerical error?
21    **A.   I don't recognize that.**
22       MR. WAX:  Are we looking at the same

---

32

1  document?  You said three of seven?  Oh, I see.
2  Sorry.
3     Q.   Did you discuss these CPARS with
4  Ms. Neal?
5     **A.   Not that I recall.**
6     Q.   Not before they were issued?
7     **A.   No.**
8     Q.   Have you discussed them since?
9     **A.   No.**
10    Q.   Did you discuss with Ms. Neal her --
11 the substance of her deposition last week?
12    **A.   I talked to her on Friday about the**
13 **length of the deposition but not the substance or**
14 **content.**
15    Q.   Bear with me one minute here.  Can you
16 explain for me the people on the Guayaquil
17 project and who reported to whom?
18    **A.   Well, Dave Skov, as I recall was, the**
19 **COR, and some people called him a project**
20 **director, but as contracting goes we call him a**
21 **COR.  And then there were various people**
22 **considered OBO architects, engineers maybe, that**

---

Transcript of David Vivian
Conducted on November 12, 2019

33

1  **are working for him and a construction manager**
2  **reporting to him while they're surveilling the**
3  **postage.**
4      Q.   And then who did Mr. Skov report to?
5  Did he report to Ms. Neal as the contracting
6  officer?
7      **A.   Yeah.  Well, he's in charge of the**
8  **project and trying to get it constructed and in**
9  **charge of the quality assurance team.  But he**
10 **doesn't necessarily report to Ms. Neal.  But**
11 **Ms. Neal is the overall contracting officer and**
12 **then Dave Skov is her representative.**
13     Q.   So explain how that works.  Because
14 there are two divisions.  One is the division
15 that you're the chief of and then there's OBO.
16 Can you explain how that -- how that hierarchy
17 works?
18     **A.   Well, there's OBO, a totally separate**
19 **bureau within the Department of State, who has**
20 **responsibility for maintaining and constructing**
21 **our overseas diplomatic facilities.  They have no**
22 **contracting authority.  So in order for them to**

34

1  **maintain these facilities, they need contracting**
2  **support.  And we are the individuals, AQM,**
3  **acquisition management, are the individuals who**
4  **write the contracts they require to complete**
5  **their mission of maintaining the facilities.**
6      Q.   So there are two divisions with
7  reporting upward but shared responsibilities.  Is
8  that accurate?
9      **A.   No.  Because we have responsibility**
10 **for contracts.  They have responsibility over the**
11 **buildings.**
12     Q.   So they're not shared, they're
13 disparate responsibilities but working together?
14     **A.   Correct.**
15     MS. HOSTETLER:  Can I have -- let's
16 mark this.
17     (Exhibit 99 marked for identification
18 and attached to the transcript.)
19     Q.   So this is a printout that I found.
20 And can you just help me a little bit with where
21 you fall on here, where Ms. Neal falls, where
22 Mr. Skov falls, into which one of these boxes or

35

1  multiple boxes?
2      MR. WAX:  I'm going to object to the
3  form.
4      **A.   We're nowhere on this chart.**
5      Q.   Okay.  So this is all OBO?
6      **A.   Correct.**
7      Q.   And so there's going to be a separate
8  chart like this for your division?
9      MR. WAX:  I'm going to object to the
10 form.
11     Q.   Is that correct?
12     **A.   Correct.**
13     Q.   So where does Mr. Skov fall within
14 this?
15     **A.   He would be off of the Office of**
16 **Construction Management.  He would be a subset of**
17 **that.**
18     Q.   So he would fall under this chain?
19     **A.   No, not under the chain, just a little**
20 **line drawn from construction -- from the Office**
21 **of Construction Management down to him.  Not in**
22 **the chain because it doesn't flow.**

36

1      Q.   So he would be -- so we take that box
2  and we would put Mr. Skov.  And then underneath
3  Mr. Skov would be his construction manager and
4  the people who work for him and they would also
5  fall under that chain under him to that box?
6      **A.   I believe that is a good**
7  **representation.**
8      Q.   All right, thank you.
9      So where does Mr. Powell fall on this?
10 Do you know Mr. Powell?
11     **A.   He's in our chart, not on this one.**
12     Q.   He's on your side?
13     **A.   Correct.**
14     Q.   Maybe we can find that and that will
15 just help me.  I appreciate that.
16     **A.   Uh-huh.**
17     MR. WAX:  Are we coming back to this?
18 Because I don't want to lose order.
19     MS. HOSTETLER:  Probably.  We'll see
20 how it goes.
21     Q.   So prior to the year in which you
22 served as the contracting officer, what was your

37

1  role on the Guayaquil project?
2      A.   Just talking to Ms. Neal, if she
3  needed any assistance.
4      Q.   Did you visit the job site?
5      A.   No, I did not.
6      Q.   Did you receive any reports from the
7  job site as to the progress of the work?
8      A.   Not that I recall.
9      Q.   Did you receive any -- what are called
10 WAR reports?
11     A.   No.
12     Q.   As the CO did you receive any regular
13 or periodic reporting about what was happening on
14 the job site?
15     A.   Just from Ms. Neal, as necessary.
16     Q.   Did you review any of the weekly
17 reports that Montage submitted to Ms. Neal that
18 had photographs and sketches?
19     A.   No.
20     Q.   Were you aware that Montage's weekly
21 reports were on a share drive available to your
22 division?

38

1      A.   They should be on ProjNet, which is a
2  system that is available to contracting
3  personnel.
4      Q.   And if they weren't in ProjNet, that
5  would be of a concern?
6      A.   Yes.
7      Q.   Were you aware that Ms. Neal asked
8  Montage to email her weekly reports pretty much
9  on a regular basis about the status of the
10 project?
11     A.   No.
12     Q.   When you said most of -- as the CO
13 most of your reporting came through Ms. Neal, did
14 she give you regular reports as to what was going
15 on or was it only if an issue arose that needed
16 your attention?
17     A.   Only if an issue arose that needed my
18 attention.
19     Q.   And that was true before you were the
20 CO as well, correct?
21     A.   Correct.
22     Q.   As the contracting officer, did you

39

1  visit the job site at all?
2      A.   No.
3      Q.   How would you describe this project?
4      A.   A construction project for renovation
5  of facilities in Guayaquil.
6      Q.   And how would you describe how the
7  project progressed?
8      A.   Based on the information I have, the
9  project was behind schedule but the work was
10 completed.
11     Q.   As of today, has the project been
12 granted final acceptance?
13     A.   Not that I know of.
14     Q.   Do you know why?
15     A.   Because there was work recently being
16 performed that wasn't completed.
17     Q.   Would you describe this project as
18 troubled?
19     A.   Yes.
20     Q.   Was it a typical sort of construction
21 project for an overseas embassy -- consulate?
22     A.   A bit more problems than normal, but

40

1  it was successful.
2      Q.   When you say a bit more problems than
3  necessary, what were the types of problems that
4  would rise to your level that would need your
5  attention?
6          MR. WAX:  I'm going to object to the
7  form.
8      A.   I believe I said than normal, not
9  necessary.  But there were just issues with the
10 performance of the contractor, where work wasn't
11 being necessarily performed in accordance with
12 the required specifications.
13     Q.   Were there problems with the OBO staff
14 as well?
15     A.   I did hear of some problems, yes.
16     Q.   And in fact both sides wanted the
17 other side's PD or PM kicked off the job,
18 correct?
19     A.   I think I recall that, yes.
20     Q.   Did you look into those issues to see
21 what was happening and what factually --
22     A.   No.  Donna looked into those issues.

Transcript of David Vivian
Conducted on November 12, 2019

---

**41**

1    Q.    Did you she report to you any of her
2  investigations about -- let's start with Mr. Skov
3  and Mr. Wright wanting Montage kicked off this
4  project.
5         MR. WAX: I'm going to object as to
6  the form.
7    **A.    Would you repeat that question?**
8    Q.    I'll just restate it again.
9    **A.    Okay.**
10   Q.    Did Ms. Neal report to you about her
11 investigations when Mr. Skov and Mr. Wright
12 wanted various Montage people kicked off the job
13 site?
14        MR. WAX: I'm going to repeat my
15 objection.
16   **A.    I can't really remember.**
17   Q.    So sitting here today you don't have a
18 recollection of what the facts were that involved
19 that?
20   **A.    No, not that good.**
21   Q.    Did Ms. Neal report to you when
22 Montage sought to have Mr. Skov and Mr. Wright

**42**

1  kicked off this project?
2         MR. WAX: Same objection.
3    **A.    She may have mentioned it but I don't**
4  **remember the substance of it.**
5    Q.    Were those -- those were not the types
6  of issues that would rise up to your level of
7  involvement?
8    **A.    If it was something where -- no, it**
9  **would not.**
10   Q.    You said one of the issues in the
11 project was the contractor not performing to the
12 specs --
13   **A.    Correct.**
14   Q.    -- words to that effect?
15        And what specs are you referring to?
16   **A.    The general specifications and**
17 **drawings that are in the construction contract.**
18   Q.    And you're aware that there are the
19 RFP drawings and the RFP specifications and then
20 the issued for construction drawings and the
21 issued for construction specifications, correct?
22   **A.    Correct.**

**43**

1         MR. WAX: I'm going to object as to
2  the form.
3    Q.    And when you say that they were not
4  performing up to the specs, are you referring to
5  the RFP specs or the issued for construction
6  specs?
7    **A.    The issued for construction specs and**
8  **the RFP specs as well.  I mean they carry**
9  **through.**
10   Q.    Well, some of the RFP specs could not
11 be modified, correct?
12        MR. WAX: I'm going to object to the
13 form.
14   **A.    That's correct.**
15   Q.    None of the division one could be
16 modified, for example, correct?
17   **A.    Correct.**
18   Q.    But other portions of the
19 specifications could be modified through the IDR
20 process, correct?
21        MR. WAX: Object to the form.
22   **A.    I'm not sure.  The regional**

**44**

1  **requirements of the RFP carry through.  So if the**
2  **contractor is -- if it's a design-build contract,**
3  **the contractor still is responsible for**
4  **performing all of the requirements in the**
5  **original RFP documents.**
6    Q.    So then what's the purpose of the
7  issued for construction specifications?
8    **A.    In a design-build contract, the**
9  **contractor is responsible for developing the**
10 **design in accordance with the original RFP specs.**
11 **And that is their responsibility.  The government**
12 **will review the developed specifications or**
13 **drawings that the contractor develops, and if**
14 **there's anything still missing from the original**
15 **RFP specs, the contractor is still required to**
16 **perform that work.**
17   Q.    But aren't the issued for construction
18 specifications approved and accepted by the
19 government?
20   **A.    They're accepted by the government.**
21   Q.    If there's a conflict between the two,
22 what governs?

Transcript of David Vivian
Conducted on November 12, 2019

45

1    **A.    The original --**
2         MR. WAX: I'm going to object.
3    **A.    The original RFP documents.**
4    Q.    The original RFP is based upon a maybe
5 25 or 30 percent design, thereabout?
6    **A.    I don't know.**
7    Q.    Oh, you don't know?
8    **A.    No.**
9    Q.    What's your understanding of the IDR
10 process?  Let me take that back.
11        Have you been involved in an IDR
12 process.
13    **A.    I have.**
14    Q.    So what is that process?
15    **A.    It is the government's quality**
16 **assurance program whereby the government can**
17 **review the contractor's developed design and**
18 **developed specifications and to see if they're**
19 **following the general requirements of the**
20 **original contract.**
21    Q.    Isn't it an iterative process, back
22 and forth between the design and the government,

46

1 as to what's actually going to be built?
2         MR. WAX: I'm going to object to the
3 form.
4    **A.    No.  It is a review of the**
5 **contractor's development of the documentation.**
6    Q.    And by review, you mean the
7 government's just sitting there saying, well,
8 we'll look at anything you give us or is it an
9 interactive process?
10        MR. WAX: I'm going to object to the
11 form.
12    **A.    It's an interactive process.**
13    Q.    And issues with regard to the initial
14 design are worked out during that process?
15    **A.    Well, the initial design isn't fully**
16 **developed.  So the contractor is responsible for**
17 **developing the design to 100-percent completion**
18 **so that work can be performed.**
19    Q.    Is it fair to say that when you take a
20 design from a smaller percentage to 100-percent
21 completion, there's going to be changes and
22 modifications with that design that are going to

47

1 happen?
2    **A.    The design will be developed.  It's**
3 **not changes or modifications.  It's the**
4 **development of the design so that the actual**
5 **design can be constructed.  You've got to do the**
6 **calculations, you've got to do all the**
7 **requirements to get up to the 100-percent design**
8 **for construction.**
9    Q.    Are the RFP specifications
10 project-specific?
11    **A.    Some are, some aren't.**
12    Q.    But the issued for construction
13 specifications are project-specific, correct?
14    **A.    Should be.**
15    Q.    So there would be things in the RFP
16 specifications that are developed for projects
17 all over the world that might not be specific to
18 the Guayaquil project?
19    **A.    Well, not being an architect or an**
20 **engineer, I would have to say that there are many**
21 **requirements in the specifications that are**
22 **generic but they apply to all projects.**

48

1    Q.    Are you aware of any specifications
2 that were enforced against Montage on the
3 Guayaquil project --
4         MR. WAX: I'm going to object to the
5 form.
6         MS. HOSTETLER: Well, can you at
7 least, sir, let me get the question out?
8         MR. WAX: I'm sorry.  There was a
9 pause so I thought it was done.  But I apologize
10 if I interrupted you.
11        MS. HOSTETLER: I lost my train of
12 thought, which I think was the point.  Can you
13 read back the question.
14        MR. WAX: Oh, that's unnecessary.  If
15 you want to have an argument, I'm really capable
16 of that.
17        (The Reporter read from the record as
18 follows: "Q.  Are you aware of any
19 specifications that were enforced against Montage
20 on the Guayaquil project" --)
21 BY MS. HOSTETLER:
22    Q.    Are you aware of any specifications

Transcript of David Vivian
Conducted on November 12, 2019

49

1 that were enforced against Montage that were not
2 in either the RFP specs or the issued for
3 construction specs?
4      MR. WAX:  I'm going to object to the
5 form.
6      **A.    No, I'm not.**
7      Q.   Would that be proper?
8      MR. WAX:  I'm going to object to the
9 form of the question.
10     **A.    Only if it was modified into the**
11 **contract or in some kind of way it was modified.**
12     Q.   Mr. Vivian, the court reporter has
13 handed you what was previously marked as
14 Exhibit 46 to these depositions.  That is a
15 contracting officer's final decision dated
16 October 31, 2018 signed by you.  Is this one of
17 the final decisions that you issued wearing your
18 hat as contracting officer on the Guayaquil
19 project?
20     **A.    Yes.**
21     Q.   And what role, if any, did Ms. Neal
22 play in the preparation of this final decision?

50

1      **A.    I'm not sure.  It was a team effort.**
2 **But I'm not sure what role she actually played.**
3      Q.   I want you to hold on to that because
4 we're going to be walking through that, but I'm
5 going to ask the court reporter to mark this as
6 the next exhibit.
7      (Exhibit 100 marked for identification
8 and attached to the transcript.)
9      MR. WAX:  Just so I can do it so that
10 Jeff doesn't get upset with me, are you guys
11 marking your exhibits by witness or just
12 plaintiff and defendant?
13     MS. HOSTETLER:  Actually, I think it's
14 ending up being government and Montage.  I
15 thought we were going to do it all at the same
16 time, but I think he's going to -- I started with
17 one, he started with one.  And then we're going
18 to continue through.
19     MR. WAX:  Okay.  So it's not by the
20 witness name, it's just the party's name?
21     MS. HOSTETLER:  Right.  Although I do
22 believe that the court reporter lists them as --

51

1      MR. WAX:  The witness?
2      MS. HOSTETLER:  -- just for our ease.
3      MR. WAX:  Gotcha.
4 BY MS. HOSTETLER:
5      Q.   Mr. Vivian, you've been shown what's
6 been marked as Exhibit 100 to these depositions,
7 which is an email string between you and
8 Ms. Neal.
9      **A.    Yes.**
10     Q.   Let me know if you're ready to answer
11 questions?
12     MR. WAX:  Give me a second.
13 (Reviewing.)  Okay, thanks.
14     Q.   So Exhibit 100 is an email from
15 Ms. Neal to you dated June 21, 2018 to which you
16 respond.  Attached to Ms. Neal's email of
17 June 21, 2018, there's a reference to files that
18 are zipped and attached.  Do you see that, sir?
19     **A.    Yes, I do.**
20     Q.   Did Ms. Neal send you -- sorry.
21     Did Ms. Neal send you zipped and
22 attached files regarding the various claims

52

1 submitted by Montage?
2      **A.    I don't recall, but it says so here.**
3 **So perhaps that email is in my group somewhere.**
4      Q.   I do not have those zipped and
5 attached files and they're not in the Rule 4
6 file.  So we would ask, if you can find them,
7 provide them to your counsel and counsel will
8 provide those to us.
9      (Document/data request.)
10     MR. WAX:  Hang on.
11     Q.   Do you have --
12     MR. WAX:  Can you hang on one second?
13 I'm going to make a note so I can do what you
14 ask, okay?  Because this is Jeff's case and not
15 my case.  And I will forget.  You want the
16 attachment to Exhibit 100 from -- the part from
17 Neal to Vivian, right?
18     MS. HOSTETLER:  Yes, sir.
19     Q.   Do you recollect having received or
20 reviewed some draft final decisions or
21 recommendations from Ms. Neal as part of your
22 process?

Transcript of David Vivian
Conducted on November 12, 2019

53

1    A.    No, I don't.

2    Q.    Was Ms. Neal taking the initial cut at

3  preparing the final decision?

4         MR. WAX: I'm going to object to form.

5    A.    It would have been a team effort.

6  Dave Skov, her and working up drafts and sending

7  them for the necessary reviews and clearances.

8         MS. HOSTETLER: And so I would add,

9  Mr. Waxman, because I haven't seen any drafts by

10 Ms. Neal, and she testified that she thought she

11 had some, she wasn't sure.  So to the extent that

12 Ms. Neal prepared drafts of the final decisions,

13 we would like those?

14        MR. WAX: Sure, hang on.  Just so I

15 don't get it wrong, you want drafts to the final

16 decisions from Neal?

17        MS. HOSTETLER: Drafts or

18 recommendations, whatever they were.

19        MR. WAX: Okay.  Thank you.

20        (Document/data request.)

21 BY MS. HOSTETLER:

22    Q.    Ms. Neal's email implies that she has

54

1  completed several -- either final decisions,

2  drafts or recommendations.  It's hard actually

3  for me to understand.  Do you know if those got

4  factored into your final decision?

5         MR. WAX: I'm going to object to the

6  form.

7    A.    I don't recall seeing any other

8  documentation.

9    Q.    When you tell Ms. Neal that you will

10 send her a sample format, what is a sample

11 format?  What were you referring to?

12    A.    I believe a sample format of the

13 contracting officer's final decision.

14    Q.    And is that sample format consistent

15 with what we were looking at in Exhibit 46?

16    A.    Just the first paragraph and the final

17 paragraph.

18    Q.    Because it would be fair to say that

19 in between the first paragraph and the last

20 paragraph it would depend upon what claims are

21 being discussed, correct?

22    A.    Correct, yes.

55

1    Q.    Was this the first time that Ms. Neal

2  was assisting as part of the team with rendering

3  final decisions?

4         MR. WAX: I'm going to object to the

5  form.

6    A.    I don't believe so.

7    Q.    If it wasn't her first time why would

8  it be necessary for you to send her a draft?

9         MR. WAX: I'm going to object to form.

10   Q.    Excuse me.  It wasn't draft, it was

11 sample format.  I apologize.

12   A.    We always shared formats.  They're all

13 on the share drive.

14   Q.    This was in June of 2018.  Do you

15 recall when the claims by Montage were submitted?

16        MR. WAX: Object to the form.

17   A.    I do not.

18   Q.    Do you recall any urgency with trying

19 to get a response out on Montage's claims?

20        MR. WAX: Object to the form.

21   A.    Well, the FAR gives us 60 days to

22 respond to a contractor's claim unless additional

56

1  time is identified before the original 60 days

2  expires.  So there's always some urgency, but I

3  don't recall anything specific.

4    Q.    You mentioned Mr. Skov was on your

5  team working on this as well.  Did Mr. Skov

6  provide recommendations to you?

7    A.    Not to me.  The team was Donna and

8  Mr. Skov and other people that would provide her

9  advice.  But not to myself, no.

10   Q.    So help me understand what just said.

11 You've got a team of Donna -- Donna Neal, David

12 Skov and other people assisting them, correct?

13   A.    Correct.

14   Q.    So let's start with, do you know who

15 those other people are?

16   A.    Well, it would be counsel.  And

17 there's a contracting officer's representative,

18 an alternate contracting officer's --

19 administrative?  It's the ACOR that works in OBO

20 in SA6.  So that person probably would have been

21 assisting Donna as well.

22   Q.    And who is that person?

Transcript of David Vivian
Conducted on November 12, 2019

15 (57 to 60)

---

**Page 57**

1   A.   **I don't recall.**
2   Q.   Who would know who that person is?
3   A.   **Donna should know.**
4        MR. WAX:  Can you let me know when you
5   have a logical break so we can take that?  I have
6   a voice-mail.
7        MS. HOSTETLER:  Okay.
8   Q.   So you have this team of Donna and
9   David -- Donna Neal, David Skov and the people
10  who are assisting them.  Between those two, who
11  reported to you, if either of them did, as far as
12  what the recommendation should be for the
13  contracting officer's final decision?
14  A.   **I believe Donna, but I'm not sure.**
15  Q.   Was that in writing or was it oral?
16  A.   **It would have been the draft.**
17       MS. HOSTETLER:  Sir, we can take a
18  break.
19       MR. WAX:  Oh, thanks.
20       (A recess was taken.)
21       (Exhibit 101 marked for identification
22  and attached to the transcript.)

**Page 58**

1   BY MS. HOSTETLER:
2   Q.   Mr. Vivian, I'll show you what's been
3   marked as Exhibit 101 to your deposition, which
4   is an email string between you and Ms. Neal in
5   July of 2018.  Let me know when you're ready to
6   answer questions.
7        MR. WAX:  And while he's doing that, I
8   would like to ask for you to speak to Jeff about
9   this event.
10       MS. HOSTETLER:  Okay.
11  A.   **I'm ready.**
12  Q.   So who is Mr. Sawyer?
13  A.   **Mr. Sawyer is one of the lawyers**
14  **working, attorneys.**
15       MR. WAX:  So you see the point?  Can
16  we just move on and let you guys work it out?
17       MS. HOSTETLER:  Yes.  But I'll only
18  ask you about that top --
19       MR. WAX:  Well, every one on this is a
20  lawyer.
21       MS. HOSTETLER:  Oh, is that right?
22       MR. WAX:  Yeah.

**Page 59**

1        MS. HOSTETLER:  So Dennis is a lawyer
2   as well as John?
3        MR. WAX:  Right.  I'll answer that.
4   Dennis is the head of LBA.  And John is one of
5   the attorneys.
6        MS. HOSTETLER:  Okay.
7        MR. WAX:  So if we could just move on,
8   I would appreciate it.
9        MS. HOSTETLER:  Okay.  I was thinking
10  this might be the OBO person.
11       MR. WAX:  No, no, I understand that.
12  And I wasn't suggesting otherwise other than I
13  don't know what your arrangement is with Jeff
14  about clawbacks and all that good stuff.
15       (Exhibit 102 marked for identification
16  and attached to the transcript.)
17  Q.   Showing you what's been marked as
18  Exhibit 102 to these depositions, a June 22, 2018
19  letter from Donna Neal to Sina at Montage.  And
20  let me know when you're ready to -- you've seen
21  this document before?
22  A.   **Not that I remember.**

**Page 60**

1   Q.   Let me know when you're ready to
2   answer questions.
3   A.   **I'm ready.**
4   Q.   So this is a letter where the
5   government's telling Montage that they need more
6   time to respond to their claims, correct?
7   A.   **Correct.**
8   Q.   Does this mean that Ms. Neal is
9   responsible for responding to these claims
10  because she's the one asking for more time?
11  A.   **She's the one responsible for drafting**
12  **the decision, working with OBO to work up the**
13  **decision.  She can't sign it.**
14  Q.   Despite the fact that Ms. Neal lost
15  her warrant as CO on this project, did you
16  continue to rely heavily upon her and her
17  knowledge of this project in the preparation of
18  the final decisions?
19  A.   **I did, yes.**
20  Q.   Do you know why the -- why Ms. Neal
21  had not been able to draft responses to those
22  claims that are set forth in Exhibit 102?

Transcript of David Vivian
Conducted on November 12, 2019

61

1         MR. WAX:  I'm going to object to the
2  form.
3      **A.    Other than her other administrative**
4  **workload, no.**
5      Q.    These were -- were these claims that
6  had been submitted to the contracting officer
7  representative during the course of the project
8  and denied?
9      **A.    Not as claims, maybe as requests for**
10 **equitable adjustment.**
11     Q.    Fair enough.  That's a better use of
12 the word.  So let me clean up my question.  Which
13 is, were these requests for equitable adjustments
14 submitted to the contracting officer
15 representative, Mr. Skov, during the course of
16 this project and denied?
17     **A.    I believe they were.**
18         MR. WAX:  If I could just interject so
19 that we don't all get confused.  This says
20 certified claims, which is not a request for an
21 equitable adjustment.
22     Q.    And at the time you prepared your

62

1  response, Exhibit 46, to -- and this one is
2  referring to the 19 claims -- did you have in
3  your possession or at your -- did you have in
4  your possession the denial by the COR of the REA
5  claims?
6         MR. WAX:  I'm going to object to the
7  form.
8      **A.    I did not.**
9      Q.    Did you review those denials as part
10 of your analysis of -- that led to the
11 contracting officer's final decision, Exhibit 46?
12         MR. WAX:  I repeat my objection.
13     **A.    No.  The team would have looked at all**
14 **of the pertinent information and offered the**
15 **final decision to me.**
16     Q.    What was -- what was your process in
17 coming to the final decision that's set forth in
18 Exhibit 46?
19     **A.    To review the final documentation and,**
20 **if it was acceptable, to sign it.**
21     Q.    And when you say review the final
22 documentation, are you referring to a draft of

63

1  the final decision?
2      **A.    No.  I believe this is the final that**
3  **I received, when I signed it.  I don't think I**
4  **sent it back for any adjustments.**
5      Q.    So if I understand, you received what
6  is contained in Exhibit 46 as a draft and signed
7  it as is?
8      **A.    Correct.**
9      Q.    Other than reading the information
10 contained in Exhibit 46, what else did you do to
11 assure yourself that the decision was accurate?
12     **A.    Just any information that Donna and I**
13 **had spoke about prior to my actually receiving**
14 **the document.**
15     Q.    And what information did you and
16 Ms. Neal speak about prior to receiving the draft
17 of what is now Exhibit 46?
18     **A.    Maybe some particles about each one of**
19 **the REAs that are in this sealed decision that is**
20 **marked as Exhibit 46, but I don't recall.**
21     Q.    Is there -- that was an oral
22 conversation?

64

1      **A.    As far as I know, yes.**
2      Q.    Did you take notes?
3      **A.    No.**
4      Q.    Did she have notes with her when she
5  was discussing this with you?
6      **A.    I don't recall.**
7      Q.    Did you have any oral conversations
8  with Mr. Skov?
9      **A.    No, I did not.**
10     Q.    So is it fair to say that other than a
11 conversation with Ms. Neal and reviewing what was
12 presented to you as Exhibit 46 in draft, you did
13 nothing else as part of your analysis in
14 rendering the contracting officer's final
15 decision?
16         MR. WAX:  I'm going to object to the
17 form.
18     **A.    No.  That was Donna's responsibility**
19 **to work with the team and they gave me the final.**
20     Q.    And because there was an objection,
21 let me ask it maybe a little cleaner.
22         Other than reading and reviewing what

Transcript of David Vivian
Conducted on November 12, 2019

65

1  you signed as Exhibit 46, and a conversation with
2  Ms. Neal prior to receipt of that document, did
3  you do anything else as part of your analysis and
4  decision-making as the contracting officer?
5          MR. WAX: Same objection.
6      **A.   Not that I recall.**
7      Q.   How long was your conversation with
8  Ms. Neal?
9      **A.   I don't know.**
10     Q.   Was it a phone conversation or
11 face-to-face conversation?
12     **A.   I don't recall.  We had both.**
13     Q.   Do you recall if this was a lengthy
14 discussion where you went through each one of the
15 individual items listed in Exhibit 46?
16     **A.   I do not recall.**
17     Q.   Do you recall any one of -- which, if
18 any, of the individual claims set forth in
19 Exhibit 46 you spoke with Ms. Neal about before
20 you signed this?
21     **A.   No, I don't.**
22     Q.   Did you review any recommendations on

66

1  a claim-by-claim basis other than -- let me
2  just --
3      **A.   Not that I recall.**
4      Q.   So you've got what's Exhibit 46, had a
5  conversation with Ms. Neal and you signed
6  Exhibit 46.  Is that --
7          MR. WAX: Object to the --
8      Q.   Is that fair?
9          MR. WAX: I'm going to object to the
10 form.
11     **A.   I'm not sure if it was just one**
12 **conversation, but yes, I did sign this document.**
13     Q.   Were your conversations with Ms. Neal
14 just the two of you or were there others involved
15 in those?  And the conversations I'm talking
16 about are conversations leading to Exhibit 46.
17     **A.   Just her and I.**
18     Q.   Did you consult any technical subject
19 matter experts?
20     **A.   That would have been the team that she**
21 **worked with.**
22     Q.   And do you know -- we've mentioned

67

1  Mr. Skov.  Do you know any other names of the
2  team that Ms. Neal worked with that led to your
3  final decision?
4      **A.   Names, no.**
5      Q.   Anything to help identify them, as far
6  as what their --
7      **A.   Like I said, I believe she --**
8      Q.   -- what types of technical --
9          MR. WAX: Let her finish.
10     Q.   -- what types of technical
11 information?
12     **A.   I believe she would have talked to**
13 **ACOR, but I don't know that person's name.**
14     Q.   Anyone else?  Any other positions that
15 you can recall that she would have spoken to?
16     **A.   No.**
17     Q.   So it's fair to say that you did not
18 undertake any individual analysis or independent
19 analysis of these claims other than what's set
20 forth in Exhibit 46?
21         MR. WAX: I'm going to object to the
22 form.

68

1      **A.   Correct.**
2      Q.   Did you personally look at any of the
3  drawings or specifications as they related to
4  these claims?
5      **A.   Not that I recall.**
6      Q.   Is the ACOR that you referenced, is
7  that the construction executive or is that a
8  different position?
9      **A.   A different position.  No, I'm sorry.**
10 **That is correct.  They call it construction**
11 **executive and another term that I forget right**
12 **now.  But that is the same person.**
13     Q.   And you don't recall sitting here
14 today the name of that person?
15     **A.   No, I do not.**
16     Q.   Referring back to Exhibit 46, is it
17 the government's position that none of the
18 19 claims involve work outside of the contract
19 requirements?
20     **A.   And as I -- certainly most of them,**
21 **but I believe some of them are not fully**
22 **supported as well.**

Transcript of David Vivian
Conducted on November 12, 2019

---

69

1    Q.    Explain -- can you explain what you
2  just said?
3    **A.    The documentation that is included in**
4  **the claim that was submitted to the government**
5  **wasn't complete enough to perform a total**
6  **analysis.**
7    Q.    So if I understand you, it's fair to
8  say that a number of these claims the government
9  determined was not extra work, and there were
10 some claims that the government just wasn't able
11 to tell.  Is that what your testimony is?
12   **A.    That's correct.**
13   Q.    So which of the claims did the
14 government determine was -- was just not extra
15 work versus which of the claims they weren't able
16 to determine?
17   **A.    Well, each one has a self -- a little**
18 **description of the reason why it's denied.**
19   Q.    And I'm trying to find out if the
20 government looked at this and said which of these
21 claims -- well, strike that.  Let's just run
22 through each one of them.

---

70

1          Actually, before we get through each
2  one, did you request any additional information
3  from Montage prior to issuing the contracting
4  officer's final decision?
5    **A.    I did not.**
6    Q.    Did you direct Ms. Neal or Mr. Skov to
7  obtain additional information from Montage?
8    **A.    I did not.**
9    Q.    Do you know if they requested
10 additional information?
11   **A.    I don't know.**
12   Q.    If the government wasn't able to
13 determine what the claim was, as you say for some
14 of these, you just weren't able to determine
15 whether there was extra work or not, why didn't
16 the government reach out to Montage and say --
17 and ask them questions?
18        MR. WAX:  I'm going to object to the
19 form.
20   **A.    Because the contractor submitted a**
21 **claim and it's now our responsibility to review**
22 **the submission and either accept it or deny it.**

---

71

1    Q.    Were you ever advised by anyone
2  whether or not there was -- whether any of these
3  claims involved out of scope work?
4        MR. WAX:  I'm going to object, and to
5  the extent -- because we haven't spoken about
6  this.  To the extent that anything in your answer
7  involves discussions with counsel, you're not to
8  disclose those.
9    Q.    Other than communications you may have
10 had with counsel, did Ms. Neal or Mr. Skov or
11 anyone else tell you that some of the claims that
12 were submitted to you for a final decision
13 involved out-of-scope work?
14   **A.    I don't recall.**
15   Q.    Were you aware of any effort by
16 Ms. Neal or Mr. Skov to ensure that the claims --
17 strike that.  That's just a bad question.
18        (Exhibit 103 marked for identification
19 and attached to the transcript.)
20   Q.    Mr. Vivian, I'm handing you what's
21 been marked as Exhibit 103 to these depositions.
22 And as you can see, it's an email that you were

---

72

1  not copied on.  It's between Mr. Wright, with his
2  personal email account, and Mr. Skov.  And I'll
3  let you read it and I just have one or two
4  questions.
5    **A.    (Reviewing.)  Okay.**
6    Q.    Mr. Skov is telling Mr. Wright that
7  Montage might have found a leverage point on an
8  item where scope might be missing.  Are you aware
9  of any issue that was identified to you by
10 Mr. Skov or anyone else that there was some scope
11 missing?
12        MR. WAX:  I'm going to object to the
13 form.
14   **A.    No.**
15   Q.    If you would look back to Exhibit 46,
16 your final decision.  On the second page there's
17 a reference about halfway through that first
18 paragraph that says, "OBO on-site personnel were
19 not warranted contracting officers nor authorized
20 to change the terms of the contract by the
21 contracting officer."
22        Do you see that, sir?

---

Transcript of David Vivian
Conducted on November 12, 2019

---

73

1    A.   Yes, I do.

2    Q.   And was that true of Mr. Skov as well?

3    A.   **As far as I recall, yes.**

4    Q.   Were there issues with Mr. Skov on

5 this project with regard to his authority?

6    A.   **Not that I remember, no.**

7         MR. WAX:  I hope you appreciate that I

8 got up extra early to make it all the way here.

9    Q.   Was there -- weren't issues raised to

10 your attention that Mr. Skov was issuing cure

11 notices and acting in a ways that were beyond his

12 authority as a contracting officer

13 representative?

14   A.   **I remember something about him issuing**

15 **a cure notice when only a contracting officer can**

16 **issue a cure notice.**

17        (Exhibit 104 marked for identification

18 and attached to the transcript.)

19   Q.   So --

20        MR. WAX:  Will you give me a second?

21        MS. HOSTETLER:  Yeah.  I'm just going

22 to put this on the record.

---

74

1    Q.   The court reporter's shown you what's

2 marked as Exhibit 104, which is an email string

3 at the top between you and Mr. Skov, copied to

4 several other people.  Let me know when you're

5 ready to answer a few questions on that.

6    A.   **I'm done.**

7    Q.   So does this refresh your recollection

8 that Mr. Skov, as a COR, was issuing at least one

9 cure notice to Montage during the course of this

10 project?

11   A.   **He'd issued a document that was called**

12 **a cure notice.  I don't know if it was a FAR part**

13 **49 actual cure notice.**

14   Q.   Fair enough.  He attempted to issue

15 what he said was a cure notice.  Fair enough?

16   A.   **Correct.**

17   Q.   And this was brought to your attention

18 and you immediately made sure that he knew that

19 that was not within the scope of his authority,

20 but was within the scope of Ms. Neal's authority,

21 correct?

22   A.   **Correct.**

---

75

1    Q.   And there's also a reference in here

2 where -- does this refresh your recollection that

3 Mr. Skov was trying to get Montage thrown off

4 this project?

5    A.   **I don't have that recollection.**

6    Q.   So when you say to Mr. Skov, "We will

7 not begin proceeding to terminate the contract in

8 August 2017 because the contractor's 157 days

9 begin" -- I think you mean behind schedule, you

10 didn't understand that Mr. Skov was trying to get

11 Montage thrown off this project?

12   A.   **That's correct, yes.**

13   Q.   Were you worried in July of 2016 that

14 the contractor was 157 days behind schedule?

15   A.   **It's an issue, yes.**

16   Q.   And were you aware at this point that

17 there had been some time extensions filed where

18 the contractor was requesting an extension of

19 time?

20   A.   **Oh, TIAs, yes.**

21   Q.   Did you ask to see them?

22   A.   **No.**

---

76

1    Q.   Did you ask what the status of those

2 were?

3    A.   **I did not.**

4    Q.   Did you review the documents that

5 Mr. Skov referenced to see if it warranted a cure

6 notice?

7         MR. WAX:  I'm going to object to the

8 form.

9    A.   **I did not.**

10   Q.   Did you leave that in Ms. Neal's

11 capable hands to resolve?

12   A.   **I did.**

13   Q.   Were there any other issues that you

14 can recollect about Mr. Skov's authority on this

15 project?

16   A.   **Not that I recall, no.**

17        (Exhibit 105 marked for identification

18 and attached to the transcript.)

19   Q.   I hand you what's been marked as

20 Exhibit 105, which is another email string

21 between you and Mr. Skov and others, October 3 of

22 2016.  And let me know when you're ready to

---

Transcript of David Vivian
Conducted on November 12, 2019

77

1  answer a few questions.
2      **A.   (Reviewing.) I'm done.**
3          MR. WAX:  Hang on one second.
4          THE WITNESS:  Okay.
5          (Exhibit 106 marked for identification
6  and attached to the transcript.)
7          MR. WAX:  Inasmuch as LBA is mentioned
8  in this you're not to discuss anything that was
9  discussed with them.
10 BY MS. HOSTETLER:
11     Q.   So does this refresh your recollection
12 that there may have been other issues on the
13 Guayaquil project regarding Mr. Skov and what he
14 thought his limits of authority were?
15     **A.   Yes.  This particular email, yes,**
16 **correct.**
17     Q.   And in this, if we go back a ways,
18 help me understand.  Mr. Skov is saying that his
19 position as COR gives him greater authority than
20 what you and Ms. Neal thought he had.  Is that
21 fair?
22         MR. WAX:  I'm going to object as to

78

1  form.
2      **A.   No, the project director is a position**
3  **that's assigned by OBO to their personnel.  And**
4  **as such, then he's authorized to work with post**
5  **and oversee the project for OBO.**
6          **As a contracting officer's**
7  **representative, that title and the letter that we**
8  **issue appointing him as a contracting officer's**
9  **representative gives him authority to work on the**
10 **government's behalf under the terms of the**
11 **contract.**
12     Q.   So there's a discussion in here about
13 whether or not there needs to be an
14 administrative modification to the contract.
15 What was the -- what would the administration
16 modification be?
17     **A.   It would be to identify the fact that**
18 **in division one OBO is placing — it's**
19 **acronyms — project director/COR.  So all of the**
20 **authority that is granted a COR is not provided**
21 **to the project director.  So at the time I**
22 **considered the slash to be inappropriate.**

79

1      Q.   Make sure I understand what you're
2  saying, is that in fact Mr. Skov did have greater
3  authority than you thought because of what was in
4  the division one specs.  Is that --
5      **A.   No.**
6      Q.   So I apologize.  I'm just not
7  understanding.
8      **A.   There's two different terms.  There's**
9  **the project director and then there's the**
10 **contracting officer's representative.  Project**
11 **director is granted by OBO.  They have no**
12 **contract authority and don't have any authority**
13 **to delegate contracting authority to a project**
14 **director.**
15         **The contracting officer has the**
16 **authority to delegate some responsibilities to a**
17 COR.  **And in doing so that it doesn't pass**
18 **automatically to the project director because the**
19 **project director comes from a different**
20 **authority.**
21     Q.   But Mr. Skov wearing his COR hat had
22 some additional contracting authority on this

80

1  project, correct?
2      **A.   He had additional — he had**
3  **contracting authority assigned to him by the CO,**
4  **yes.**
5      Q.   So why was the administrative
6  modification not issued?
7      **A.   Because in the end I determined that**
8  **administrative modification wasn't necessary,**
9  **that the contract and the procedures for**
10 **appointing a contracting officer representative**
11 **was clear and sufficient.**
12     Q.   And how did Montage know what
13 authority Mr. Skov had as opposed to when they
14 had to go to Ms. Neal as the contracting officer?
15         MR. WAX:  I'm going to object as to
16 form.
17     **A.   Because Ms. Neal, as the contracting**
18 **officer, has a warrant to her authority, and**
19 **she's a contract specialist when she didn't have**
20 **the warrant.  So she's working directly for the**
21 **contracting office.  And Mr. Skov is a COR with**
22 **specific authority assigned to him in his**

81

1  delegation letter.
2      Q.   So what I'm trying to understand is
3  you say in the top email to Mr. Skov, "You have
4  written notice and direction.  You as the COR
5  shall consider it a change to the contract."
6      A.   **I'm just trying to make sure that he**
7  **understands his authority as a COR is limited to**
8  **that specifically assigned to him in the**
9  **delegation letter.**
10     Q.   But there were certain things that he
11 could do as a COR that could modify the contract
12 within the scope of his warrant, correct?
13     A.   **I don't --**
14         MR. WAX:  I'm going to object to the
15 form.
16     A.   **I'm not sure he had a warrant.**
17     Q.   Okay.  Did you ever review his --
18 whatever documentation it is that made him the
19 COR on this project?  Have you ever reviewed
20 that?
21     A.   **Not his particular delegation, no.**
22     Q.   You go on to say, "We will not issue a

82

1  stand-alone mod for this as we do not wish to
2  draw attention to the indiscretion."  And I
3  realize there's more there, but let me just ask,
4  what do you mean you don't want to draw attention
5  to the indiscretion?  What's the indiscretion?
6      A.   **The fact that OBO has put in division**
7  **one the term project director slash COR, as if**
8  **they were equal.**
9      Q.   And then you end that sentence by
10 saying, "Next thing we know, contractors will be
11 digging to find problem areas to use against us."
12         What did you mean by that?
13     A.   **Just that.**
14     Q.   Can you explain that to me?  Are there
15 things -- are you suggesting it would make a
16 difference to a contractor whether it was just a
17 COR or a PD slash COR?
18         MR. WAX:  I'm going to object to the
19 form.
20     A.   **I'm just trying to identify the fact**
21 **that the project director and the COR is not the**
22 **same.  If there was an occasion where we had to**

83

1  **withdraw COR authority from a person and they**
2  **maintained the project director, I wanted it to**
3  **be clear that they're not equal.  So if you pull**
4  **one you can't continue with the other.**
5      Q.   What was the concern though with
6  contractors digging to find problems?  Was this
7  not an issue of authority?
8      A.   **I don't recall at this time.**
9      Q.   I apologize.  I stepped you on there.
10         Who's the current COR on the Guayaquil
11 project?
12     A.   **There is no COR.**
13     Q.   Is there anyone -- since the project
14 is not complete, is there anyone acting in that
15 role?
16         MR. WAX:  I'm going to object to the
17 form.
18     A.   **I don't believe there would be anyone**
19 **acting in the role, because you have to be**
20 **officially appointed in writing.  But certainly**
21 **the facilities manager would be responsible for**
22 **ensuring that any uncompleted work would be**

84

1  **finished.**
2      Q.   And who's the facilities manager on
3  this project?
4      A.   **I'm not sure.**
5      Q.   You mean on site in Guayaquil?
6      A.   **Yes, correct.**
7      Q.   In Mr. Skov left in August of 2018,
8  correct?
9      A.   **I'm not sure.**
10     Q.   Do you know who performed the
11 functions of the COR after August of 2018?
12     A.   **I do not.**
13     Q.   You are aware that substantial
14 completion was not granted until October and
15 December of 2018, correct?
16     A.   **I don't know specific dates.**
17     Q.   Are you aware that there were several
18 months prior to substantial completion being
19 granted that there was no COR on the project?
20     A.   **No, I'm not.**
21     Q.   Would that impact the progress of the
22 project?

Transcript of David Vivian
Conducted on November 12, 2019

22 (85 to 88)

---

85

1    A.    It shouldn't.

2    Q.    The court reporter is handing you
3 what's been marked as Exhibit 106, which is an
4 email string between you and Ms. Neal at the top,
5 dated March 10, 2017.  And let me know when
6 you've read that.

7    A.    (Reviewing.) Yes.

8    Q.    So focusing on the first page of
9 Exhibit 106, Ms. Neal is reporting to you, quote,
10 The actions taken by the OBO on site to involve
11 post has gotten out of control to where post is
12 contacting the DAS.  I asked that we set a
13 meeting with OBO CE Jorge Vazquez to discuss the
14 events of our site visit and a firm path forward.

15       Was the OBO on-site personnel that's
16 referenced here Mr. Skov and Mr. Wright?

17    A.    I believe so, yes.

18    Q.    And Ms. Neal's reporting to you that
19 they have gotten, quote, out of control to where
20 they're contacting the DAS.  Who's DAS?

21    A.    That's the Deputy Assistant Secretary.

22    Q.    That was an issue that concerned you

---

86

1 as well as Ms. Neal?

2    A.    Correct.

3    Q.    And what was your resolution to the
4 actions by Mr. Skov and Mr. Wright getting out of
5 control on post?

6    A.    Then we worked with the embassy to get
7 the contractor's payments of their employees
8 correct.

9    Q.    And so you on the top email report to
10 Ms. Neal that Jorge is heading to the site to
11 talk to his people, correct?

12    A.    Correct.

13    Q.    And that's referring to Mr. Vazquez?

14    A.    Correct.

15    Q.    What were your discussions between you
16 and Mr. Vazquez with regard to this issue?

17    A.    I don't think I had any discussions
18 with Mr. Vazquez on this issue.

19    Q.    So how did you know to advise Ms. Neal
20 that Mr. Vazquez is heading to the site to talk
21 to his people?

22    A.    I became aware of the knowledge

---

87

1 somewhere, but I don't know that I talked to
2 Jorge.

3    Q.    And Mr. Vazquez is Mr. Skov's
4 immediate report?

5    A.    Correct.

6    Q.    Or superior.  I'm not sure what the
7 right word would be.

8    A.    At this time he was the branch chief.

9    Q.    And what was Mr. Vazquez's role on the
10 Guayaquil project?

11    A.    He's the branch chief and OBO
12 responsible for that general area of contracting
13 work.

14    Q.    And so I'll take you back to
15 exhibit -- I think this was Exhibit 99, the
16 chart.  We have Mr. Skov in here.  So where's
17 Mr. Vazquez?  Is he also in that same box with
18 Mr. Skov?

19    A.    Yes.  Well -- yes, he's in the same
20 box but there would be another box here that
21 would show Jorge, and then below Jorge would be
22 Dave Skov.

---

88

1    Q.    Did you have conversations with
2 Mr. Vazquez about this project?

3    A.    I believe I did.

4    Q.    How often did you have conversations
5 with Mr. Vazquez about the Guayaquil project?

6    A.    Not very often, but I remember we did
7 have some conversations about this particular
8 issue where the contractor wasn't paying the
9 personnel.

10    Q.    And that issue got resolved, didn't
11 it?

12    A.    Correct.

13    Q.    And were you aware of Mr. Skov's and
14 Mr. Wright's involvement in that controversy?

15    A.    Yes.

16    Q.    Are you aware that Mr. Wright was
17 talking to Montage's employees and providing them
18 documentation in Spanish about what their
19 employee benefit rights were?

20    A.    No.

21    Q.    You were not aware of that?

22    A.    Not that I recall, no.

Transcript of David Vivian
Conducted on November 12, 2019

---

89

1    Q.    And you were aware that Mr. Skov
2 wanted Montage, or at least some of Montage's
3 folks, thrown off the job as a result of this?
4    **A.    Correct, yes.**
5    Q.    Were you aware that they had been
6 talking to apparently the local police and
7 understood that several Montage people were going
8 to be arrested?
9    **A.    No.**
10        MR. WAX:  I'm going to object.
11    Q.    Have you ever worked with Mr. Skov
12 before, before the Guayaquil project?
13    **A.    I may have.  I don't recall.**
14    Q.    Not directly.  It may have been one of
15 the other many projects you oversee?
16    **A.    Correct.**
17    Q.    Have you worked with Mr. Skov since
18 the Guayaquil project?
19    **A.    No.**
20    Q.    Have you ever worked with Mr. Wright
21 before?
22    **A.    Not that I recall.**

---

90

1    Q.    Are you currently working with
2 Mr. Wright on any projects that you're aware of?
3    **A.    Not that I know of.**
4    Q.    Were you involved with the Bishkek
5 project?
6    **A.    No.**
7    Q.    Let me show you what was previously
8 marked as Exhibit 2 to these depositions, which
9 is Mr. Skov's warrant.
10        MR. WAX:  Hang on.
11    Q.    Sir, showing you what's been marked as
12 Exhibit 2, which Mr. Skov identified as being his
13 warrant on the Guayaquil project.  How --
14        MR. WAX:  I'm going to object to the
15 form.
16    Q.    -- how does Mr. Skov's warrant as the
17 COR on the Guayaquil project relate to Ms. Neal
18 when she became a contract specialist?  I'm
19 trying to understand.
20        When Ms. Neal became the contract
21 specialist was she more on the same level with
22 Mr. Skov, or is that apples and oranges?

---

91

1    **A.    This is a warrant request for**
2 **Mr. Skov.**
3    Q.    Oh.
4    **A.    I don't know if we actually gave him a**
5 **warrant.**
6    Q.    So let's look at the next two
7 documents, Exhibit 3 and 4.
8        MR. WAX:  Sometimes my objections are
9 a little hint to you that maybe we're talking
10 about the wrong document.
11    Q.    So let me show you Exhibit -- well,
12 I'm just going to show you Exhibit 4 because --
13 let me show you Exhibit 3 and 4.
14    **A.    Okay.**
15    Q.    And I just want to tell you, Exhibit 4
16 is the only one that Mr. Skov signed as being the
17 warrant.  So can you look at that and identify
18 that as being the warrant for Mr. Skov's COR
19 duties on the Guayaquil project?
20        MR. WAX:  I'm going to object to the
21 form.  When there's a logical break, it's about
22 that time.

---

92

1        MS. HOSTETLER:  Of course.
2    **A.    I don't see a warrant with either of**
3 **these documents.**
4    Q.    Okay.  So tell me what Exhibit 4 is.
5    **A.    Exhibit 4 is a letter from Donna Neal**
6 **appointing Mr. Skov as the contracting officer's**
7 **representative.**
8    Q.    Okay.
9    **A.    And then the March -- that's**
10 **Exhibit 4.**
11    Q.    Right.  And Exhibit 3, I think we
12 earlier established, was never signed by
13 Ms. Neal.  So it's just some earlier version?
14        MR. WAX:  I'm going to object to the
15 form.
16    **A.    I'm not sure.**
17        MR. WAX:  Just so you know, you said
18 previously that Mr. Skov hadn't signed it, not
19 Ms. Neal.
20        MS. HOSTETLER:  Thank you, thank you.
21    Q.    Exhibit 3, Ms. Neal never signed --
22 well, actually I believe Ms. Neal initialed it

---

Transcript of David Vivian
Conducted on November 12, 2019

93

1 but Mr. Skov didn't sign.
2        MS. HOSTETLER: I think that's
3 accurate, Counsel.
4        MR. WAX: No, there's a difference
5 between initialing something and signing
6 something.
7        MS. HOSTETLER: Fair enough.
8    Q.    So if you look at the contracting
9 officer's -- what would we call that, an
10 appointment letter?
11   **A.    Yes.**
12   Q.    So if you would look at Mr. Skov's
13 appointment letter as COR, how do his duties
14 compare to Ms. Neal's duties when she became a
15 contract specialist?
16   **A.    When Ms. Neal became a contract**
17 **specialist she's still assigned to the**
18 **contracting office. So she still has the**
19 **authority of contracting to work on behalf of the**
20 **government. She doesn't have authority to**
21 **obligate the government any longer, but she has**
22 **the authority to perform contract-related duties.**

94

1    Q.    So would she still have the authority
2 to direct Mr. Skov on the Guayaquil project?
3    **A.    Correct.**
4        MR. WAX: I'm going to object to the
5 form.
6    **A.    Yes, correct.**
7    Q.    So let me ask just a couple more
8 questions and then we'll take a break.
9        MR. WAX: Thanks.
10   Q.    Let me take you back to Exhibit 46,
11 which is where we were talking before I took us
12 down this detour. We were talking about the
13 second page where it says, "OBO on-site personnel
14 were not warranted contracting officers nor
15 authorized to change the terms of the contract by
16 the contracting officer."
17       So was Mr. Skov authorized to make any
18 changes to the contract?
19   **A.    Not that I recall.**
20   Q.    Any changes to the contract had to
21 come through Ms. Neal or you, correct?
22   **A.    Correct.**

95

1        MS. HOSTETLER: We can take a break.
2        MR. WAX: Oh, thank you.
3        (A recess was taken.)
4        (Exhibit 107 marked for identification
5     and attached to the transcript.)
6 BY MS. HOSTETLER:
7    Q.    So Mr. Vivian, I've shown you what's
8 been marked as Exhibit 107, which is another org
9 chart similar to what -- well, not similar, but
10 an org chart different than what was Exhibit 99.
11 So can you tell me where on this org chart you
12 fall, if this is the right org chart?
13   **A.    I'm not on here.**
14   Q.    I don't think this is --
15       MR. WAX: No.
16       THE WITNESS: Yeah, yeah. Okay,
17 right.
18   **A.    Down the center, just one below that**
19 **first box, you've got the assistant secretary.**
20 **Then you have the managing director, Office of**
21 **Procurement Executive. And then the next box is**
22 **Office of Acquisition Management, that's me.**

96

1    Q.    Can you just put a star with red on
2 there so -- on the box that is you?
3    **A.    Okay. (Marking.)**
4    Q.    And so when you are the CO -- strike
5 that.
6        As the CO of the Guayaquil contract,
7 you can decide if changes need to be made to the
8 contract that are appropriate, that's within your
9 scope of responsibility?
10   **A.    Well, OBO would ask me and identify**
11 **changes that need to occur and then I would**
12 **institute those changes. So the change has to**
13 **come through the technical people.**
14   Q.    So a change doesn't start on your
15 side, it has to start on the OBO side?
16   **A.    Correct.**
17   Q.    Is that true for all changes?
18   **A.    Well, unless there's something that**
19 **changes in the basic Federal Acquisition**
20 **Regulation, but if there's anything to change on**
21 **the project it has to come through OBO.**
22   Q.    And --

Transcript of David Vivian
Conducted on November 12, 2019

---

97

1      MR. WAX:  Can you step out a second?
2 I want to help them out, but I don't want to be
3 accused of prompting the witness.
4      THE WITNESS:  Okay.
5      (Witness leaves room.)
6      MR. WAX:  I mean I think -- this is
7 always confusing to me too, because as you know,
8 I know you know, I'm recent to the government.
9 So there are phases in which AQM initiates things
10 and there are phases that come through OBO.  Like
11 he said earlier, AQM is involved in the contract
12 procurement phase and then OBO is involved in the
13 actual construction.  So I don't want you to be
14 misled.
15      MS. HOSTETLER:  Well, I think one of
16 the problems on this job is there were a lot of
17 people telling a lot of people what to do.
18      MR. WAX:  Yeah, that I don't know.
19 And whether they're telling them and whether
20 they're warranted, I don't know any of the facts.
21 But I just thought you would want to know that.
22      MS. HOSTETLER:  That helps.  Thank you

98

1 so much.
2      MR. WAX:  Okay.
3 BY MS. HOSTETLER:
4    Q.   So as the contracting officer
5 rendering a final decision on the Guayaquil
6 project, with whatever help you need to render
7 that decision, you are the final authority.  Is
8 that fair and accurate?
9    **A.   That's correct.**
10    Q.   So you don't have to go upstairs or
11 sidewise for anyone else's consent before you
12 issue a final accident?
13    **A.   That's not quite true.  Because once**
14 **write the final decision, our quality assurance**
15 **requirements indicate that it has to be passed**
16 **through the legal office.  And then it has to be**
17 **actually passed through the person that sits in**
18 **this position who is the director of OPE and AQM,**
19 **Office of Acquisition Management.  She gets to**
20 **look at it as well.**
21    Q.   So once you signed Exhibit 46 before
22 it got to Montage, what was the process that it

99

1 took?
2    **A.   Like I said, the group, Donna and all**
3 **the technical people, would have worked up the**
4 **proposed response.  It would have been reviewed**
5 **by legal and then reviewed by the director of AQM**
6 **before I sign it.**
7    Q.   So Donna and her team put together a
8 draft and then they send it to legal and to
9 OPE --
10    **A.   Correct.**
11    Q.   -- for their sign-off and then it came
12 back to you to issue?
13    **A.   That's the process, yes.**
14    Q.   And is that review by those other two
15 pieces of the Department of State merely for
16 quality or is it a substantive review?
17    **A.   Certainly the review by the attorneys**
18 **is something that they recognize they can support**
19 **and defend.**
20    Q.   So staying with Exhibit 46 -- let me
21 ask you that same question with regard to OPE.
22    Is that a quality review or a

100

1 substantive review of your final decision?
2    MR. WAX:  I'm going to object to form.
3    **A.   It could be a bit of both.**
4    Q.   To your knowledge, did either legal or
5 OPE make any changes to --
6    MR. WAX:  Don't --
7    MS. HOSTETLER:  Let me finish asking
8 the question first.
9    Q.   -- make my changes to what you signed
10 as Exhibit 46?
11    MR. WAX:  Don't answer.
12    I'm going to object.  You're inquiring
13 into privileged communications.  Do you want to
14 rephrase?
15    Q.   Do OPE make any changes?
16    **A.   They did not.**
17    Q.   Did legal make any changes?
18    MR. WAX:  Objection, privileged.
19    Do not answer.
20    Q.   Did you have any discussion with
21 anyone at OPE with regard to your final decision,
22 Exhibit 46?

Transcript of David Vivian
Conducted on November 12, 2019

26 (101 to 104)

---

101

1    A.    None that I recall.
2    Q.    And this is a yes or no answer.
3          Did you have any discussions with
4 legal with regard to Exhibit 46?
5    A.    Yes.
6    Q.    I'm going to ask you a question and
7 let him get his objection before you answer.
8          What were those discussions?
9          MR. WAX: Objection, privileged.
10         Do not answer.
11   Q.    Who makes the ultimate decision with
12 regard to any contract change?
13         MR. WAX: I object to form.
14   Q.    On the Guayaquil project, who was --
15         MR. WAX: I'm going to object to form.
16   Q.    -- who was the person who makes the
17 ultimate decision regarding any contract changes?
18         MR. WAX: I'm going to object to form.
19   A.    **The contracting officer would be the**
20 **individual who writes the actual modification to**
21 **incorporate the change. But it's a team effort**
22 **for the inclusion of any technical aspects of the**

---

102

1 project.
2    Q.    When you said that the contract change
3 would come from OBO, who at OBO would make the
4 decision to recommend to the contracting officer
5 that a change needs to be made?
6    A.    **Usually it's the contracting officer**
7 **representative.**
8    Q.    On the Guayaquil project, who was the
9 individual or position that made the -- any
10 proposed changes to the contract?
11   A.    **I don't know.**
12   Q.    Do you know if that was Mr. Skov's
13 role?
14         MR. WAX: Objection.
15   A.    **As COR he should have been advising**
16 **Ms. Neal of an RFP or a change was required.**
17   Q.    Getting back to your decision,
18 Exhibit 46, we're on page two. Right above where
19 it says claim one, there's a statement that says,
20 "None of the claims demonstrate" -- excuse me --
21 "None of the claims state or demonstrate that the
22 requirements of FAR 52.243-7 were followed, and

---

103

1 such failure precludes claims of constructive
2 changes even if otherwise meritorious."
3          Did you or your team look to see if
4 there were any notices provided for any of these
5 claims?
6    A.    **Yes, I believe they did.**
7    Q.    And did they find any?
8    A.    **Not that I know of.**
9    Q.    And that's true for all of the claims
10 in this?
11   A.    **Correct.**
12   Q.    The last sentence says, "Such failure
13 precludes claims of constructive changes even if
14 otherwise meritorious."
15         Were any of these claims otherwise
16 meritorious?
17   A.    **I can't remember.**
18   Q.    So let's run through these claims.
19 The first claim is for fire doors. So it's your
20 decision that Montage was required to provide the
21 new fire doors as part of the contract?
22   A.    **Well, my thing is that the**

---

104

1 **contracting -- the contractor submitted a claim**
2 **but didn't support it by providing any direction**
3 **that the government provided to install the**
4 **doors.**
5    Q.    Were the fire doors installed?
6    A.    **I'm not sure.**
7    Q.    Sitting here today you don't even know
8 if the doors were actually installed or not?
9    A.    **I do not inspect the project.**
10   Q.    But based upon -- as a contracting
11 officer, you don't know whether or not the fire
12 doors set forth in claim one of your final
13 decision were actually installed or not?
14   A.    **Sitting here today, no, I do not.**
15   Q.    So is it the government's position
16 that the fire doors were unnecessary or that they
17 were required by the contract?
18   A.    **Well, the contractor didn't -- it**
19 **didn't apply anything outside of the contract**
20 **that required the doors to be installed.**
21   Q.    I don't want to put words in your
22 mouth, but that sounded almost like you were

Transcript of David Vivian
Conducted on November 12, 2019

105

1  saying that the doors didn't need to be
2  installed?
3          MR. WAX: Objection to form.
4      Q.   Did I misunderstand you?
5      **A.   Well, this says that the claim letter**
6  **asserts that the fire doors replace fire doors**
7  **that the contract drawings showed as existing and**
8  **to remain.  And then the claim obviously — I**
9  **believe states that the contractor replaced the**
10 **fire doors.**
11     Q.   So the contractor did replace the fire
12 doors?
13     **A.   That's what the claim says.**
14     Q.   Do you dispute that?
15     **A.   No.**
16     Q.   And so then the question is, were they
17 required to replace the fire doors or were they
18 not required by the contract to replace the fire
19 doors?  And my question is, as issuing the final
20 decision what was your decision, that they were
21 required under the contract to replace the fire
22 doors or they were not?

106

1          MR. WAX: Object to the form.
2      **A.   My issue is that the letter, right**
3  **here in this document, says that the COR required**
4  **replacement of where the project director**
5  **required replacement of the fire doors, and the**
6  **COR has no authority to require replacement of**
7  **the fire doors.**
8      Q.   So maybe I understand what you're
9  saying now.  Is it fair to say that your decision
10 was in part based upon the fact that the COR
11 didn't have the authority to require the fire
12 doors to be replaced, that had to have come from
13 the contracting officer?
14     **A.   Correct.**
15     Q.   And did Ms. Neal tell you whether or
16 not she directed those fire doors to be replaced?
17     **A.   She did not.**
18     Q.   She didn't tell you?
19     **A.   She did not tell me.**
20     Q.   Thank you.
21          Who is Mr. Roddick?
22     **A.   Roddick?**

107

1      Q.   R-O-D-D-I-C-K.
2      **A.   Mr. Roddick is a — I'm not sure of**
3  **his position.  He is another individual that**
4  **works in OBO on the technical side of things.**
5  **Maybe an architect.**
6      Q.   Have you looked to see what the
7  drawings say with regard to these fire-rated
8  doors?
9      **A.   No, I have not.**
10          (Exhibit 108 marked for identification
11 and attached to the transcript.)
12     Q.   Let me show you what's been marked as
13 Exhibit 108 to these depositions.  And you're not
14 on this, so if you want to take a few minutes to
15 read it, let me know when you're ready to answer
16 questions.
17     **A.   I'm done.**
18     Q.   So I asked you earlier if you knew who
19 Mr. Roddick was.  Does this refresh your
20 recollection as to whether or not he was one of
21 the technical people for OBO on this project?
22     **A.   It does.**

108

1      Q.   And was he one of the technical people
2  working on the Guayaquil project for the
3  government?
4      **A.   By reading this email, it appears so.**
5      Q.   And so Mr. Roddick says that he agrees
6  "that the doors should be one hour so Montage --
7  Montages should change them and be paid extra for
8  that."
9          Do you see that on the front page?
10     **A.   I see that it states thanks for the**
11 **input and he's confirming that the doors need to**
12 **be changed.**
13     Q.   Right, they need to be changed.  And
14 that it's outside -- he said they should be paid
15 for it, right?
16     **A.   Oh, yes, I see that now.**
17     Q.   And Mr. Skov thanks him for his input
18 and says "I'll see that an RFP is issued,"
19 correct?
20     **A.   Correct.**
21     Q.   And do you know if an RFP was ever
22 issued?

Transcript of David Vivian

28 (109 to 112)

Conducted on November 12, 2019

---

109

1    A.   I do not.

2    Q.   If the contracting officer directed

3 this change, would it be a compensable change?

4        MR. WAX:  I'm going to object to the

5 form.

6    **A.   It would be a change we would pay a**

7 **fair and reasonable price for.**

8    Q.   Given your -- strike that.

9        Did you inquire of the contracting

10 officer whether or not she directed this change?

11   **A.   I did not.**

12   Q.   Given your determination that there

13 was no entitlement to this claim, did you proceed

14 to analyze the costs of the claims submitted by

15 Montage?

16       MR. WAX:  I'm going to object to the

17 form of the question.

18   **A.   I'm saying that based on the face of**

19 **the claim, I didn't have sufficient information.**

20 **And the team was responsible for working up my**

21 **decision on this one.**

22   Q.   So let me unpack that a little bit.

---

110

1        You as the contracting officer made a

2 decision there was not any entitlement to this

3 claim, correct?

4    **A.   Based on the submission, correct.**

5    Q.   And because you determined there was

6 no entitlement, you didn't look at the

7 reasonable -- look at the cost to see whether or

8 not they were reasonable or not, correct?

9    **A.   Correct.**

10       MS. HOSTETLER:  Off the record.

11       (Discussion off the record.)

12 BY MS. HOSTETLER:

13   Q.   Earlier I had asked whether -- some

14 questions about all of the claims as a whole, and

15 you said some were and some weren't.  And as we

16 go through each of these let's identify.

17       Is this a claim that, but for the

18 notice requirements, would have been deemed

19 meritorious?

20       MR. WAX:  I'm going to object on the

21 form.

22   **A.   Well, looking at all the other**

---

111

1 circumstances that may apply, we would certainly

2 review this.  And it may be acceptable.

3    Q.   Is this a claim in which you had

4 sufficient information in order to be able to

5 make a determination?

6    **A.   No.  Because the claim didn't identify**

7 **the specific direction from any person that**

8 **directed the change.**

9    Q.   And I think from your previous

10 testimony you said you didn't ask Montage to

11 provide any further information on this claim?

12   **A.   That's correct.**

13   Q.   Do you know whether or not Ms. Neal or

14 Mr. Skov asked Montage to provide further

15 information?

16   **A.   I do not know.**

17   Q.   So let me ask you a few questions

18 about claim two, which is the TSS designed

19 security conduit claim.  Take a minute and read

20 that.

21   **A.   Yes, I've read it.**

22   Q.   So the government had a separate TSS

---

112

1 contractor on this project, correct?

2    **A.   I'm not sure.**

3    Q.   Well, did you understand from a high

4 level claim two was for costs associated by

5 Montage to develop the infrastructure to connect

6 to the work being performed by the government's

7 TSS worker?

8        MR. WAX:  I'm going to object to the

9 form.

10   **A.   I do see that it's to do with the TSS**

11 **design security conduit plan, yes.**

12   Q.   Do you have any understanding as to

13 who the TSS contractor was on this job?

14   **A.   I do not.**

15   Q.   Are you aware that the TSS contractor

16 continued to revise their work until October of

17 2016?

18   **A.   I did not know that.**

19   Q.   Would you agree with me that any

20 additional work beyond the work that would be

21 shown on the RFP drawings would be extra work?

22   **A.   That would be a consideration, yes.**

---

Transcript of David Vivian

29 (113 to 116)

Conducted on November 12, 2019

---

113

1    Q.    And did you compare the RFP drawings
2  to the as-builts to see whether or not this was
3  extra work?
4        MR. WAX: I'm going to object to the
5  form.
6    A.    The team that drafted the -- I
7  suggested draft response would have been
8  responsible for reviewing the circumstances.
9    Q.    Did they tell you -- did Ms. Neal tell
10 you that she compared the RFP drawings to the
11 final as-built to determine whether or not there
12 was any additional work?
13   A.    She did not.
14   Q.    Is this a claim in which the
15 government needed more information?
16   A.    Certainly the team felt they had
17 sufficient information to at least deny the
18 claim.
19   Q.    For each one of these I'm going to ask
20 that question, is this more information or there
21 was sufficient information.
22   A.    Uh-huh.

---

114

1    Q.    And then I take at then that this was
2  not one of those claims that but for notice
3  requirement would have been deemed meritorious.
4  Is that correct?
5    A.    I can't say -- if additional
6  information was provided by the contractor it
7  would have been considered in the final decision
8  of whether it had merit or not.
9    Q.    Have you ever seen the drawings for
10 this project?
11   A.    Not that I recall.
12   Q.    So if I -- let me ask you this.  If I
13 show you the RFP drawings and show you the
14 as-built drawings, can you look at them to
15 compare whether or not that page is the same with
16 their additional TSS infrastructure?
17   A.    I would require technical personnel to
18 assist me in reviewing the drawings.
19   Q.    And who would be that technical person
20 that would help you review the as-built to see if
21 there were additional TSS structure that was not
22 represented on the RFP drawings?

---

115

1    A.    It would be the contracting officer's
2  representative, the COR, as well as any support
3  personnel that that individual needed.
4    Q.    So that would Mr. Skov and anyone he
5  felt he needed?
6    A.    Correct.
7    Q.    Do you know if Mr. Skov looked at the
8  RFP drawings versus the as-built?
9    A.    I don't know.
10   Q.    If the as-built shows additional TSS
11 infrastructure above and beyond what's in the RFP
12 drawings, that would be considered extra work?
13   A.    It could be, yes.
14   Q.    And it could be compensable?
15   A.    It could be.
16   Q.    And when you say could be, that would
17 be dependent upon what?
18   A.    That the work wasn't just rerouted,
19 that it was actually additional work and labor
20 and materials.
21   Q.    Having determined that there was no
22 entitlement to the changes that Montage asserted

---

116

1  in claim two, did the government analyze the cost
2  associated with it?
3        (Telephone ringing.)
4        MR. WAX: I'm going to object to form.
5    A.    Not that I recall.
6        MR. WAX: Can you hold on one second?
7  It might be China.  Sorry.  The reason I took
8  that -- I know it's rude -- is China's 12 hours
9  off.  So when they call me, I've got to take it
10 because I can't return the call.
11 BY MS. HOSTETLER:
12   Q.    If the additional -- if TSS
13 infrastructure was provided by a government
14 subcontractor and that information was then
15 provided to Montage, was that -- would that be
16 sufficient notice of direction?
17       MR. WAX: I'm going to object to the
18 form.
19   A.    I'm not sure.  I would have to review
20 such submission.
21   Q.    What is TSS?
22   A.    Technical security services.

---

117

1    Q.    And in a -- from a laymen's point of
2  view what is that?
3    **A.    That's all the electronic connections**
4  **to doors and windows and other security systems**
5  **to let us know if -- let the Marine and post know**
6  **if an alarm was going off or if something had**
7  **been violated.**
8         (Exhibit 109 marked for identification
9  and attached to the transcript.)
10   Q.    Mr. Vivian, the court reporter's
11 handed you what's been marked as Exhibit 109 to
12 these depositions.  And I appreciate that you're
13 not on this email, Ms. Neal is.  But take a few
14 minutes to look at it and I will ask you a few
15 questions about it.
16   **A.    (Reviewing.)  Yes, I've read it.**
17   Q.    So let's just identify the parties.
18 This is an email from Mr. Skov, the COR, to
19 Mr. Quarels, who's the PM for the contractor,
20 correct?
21   **A.    Correct.**
22   Q.    And also copying Mr. Alvia and

118

1  Ms. Neal.  Who's Mr. Alvia?
2    **A.    I don't know.**
3    Q.    And Ms. Neal at the time was the
4  contracting officer, correct?
5    **A.    Correct.**
6    Q.    So Mr. Skov is sending a notice -- an
7  email about revisions to the TSS drawings.  Does
8  this refresh any recollection you may have had
9  with regard to whether or not the TSS
10 infrastructure -- the TSS work was being done by
11 a separate contractor?
12   **A.    No, it doesn't.**
13   Q.    What is ProjNet?
14   **A.    ProjNet is the administrative system**
15 **OBO uses to track contracts -- projects.**
16   Q.    Change drawings would be updated to
17 the ProjNet system as needed.  Is that accurate?
18   **A.    I'm not sure.**
19   Q.    Have you ever looked at ProjNet?
20   **A.    Yes.**
21   Q.    Did you look at any of the
22 documentation in ProjNet with regard to -- let's

119

1  start with this claim.
2    **A.    Not that I recall.**
3    Q.    -- the TSS drawings?
4    **A.    No.**
5    Q.    Did you look at the documents in
6  ProjNet in any way in preparation of your final
7  decision reflected in Exhibit 46?
8    **A.    I did not.**
9         (Exhibit 110 marked for identification
10 and attached to the transcript.)
11   Q.    Showing you what's been marked as
12 Exhibit 110.  That's a screenshot -- is that a
13 screenshot from ProjNet?  I'll represent to you
14 that's what I believe it is.  Does that look
15 familiar to you?
16   **A.    It looks familiar, yes.**
17   Q.    And if you look through that, that
18 deals with -- down at the bottom it talks about
19 TSS DIFC.  And you see above -- where it's
20 Mr. Quarels and you see above that is a -- are
21 some drawings with the name Jerry Wessel,
22 W-E-S-S-E-L.  Do you see those?

120

1    **A.    Yes.**
2    Q.    Referencing that those are revised TSS
3  drawings.  Do you know who Mr. Wessel is?
4    **A.    No, I don't.**
5    Q.    Does that refresh your understanding
6  at all that TSS was contracted by the government?
7    **A.    No, it doesn't.**
8    Q.    So let me ask you about claim three,
9  which is the additional site utilities.
10        You've already testified that you
11 never visited the site, correct?
12   **A.    Correct.**
13        MR. WAX:  Can I just read this?
14        MS. HOSTETLER:  Sure.
15   Q.    What is your understanding of what
16 Montage was claiming for the additional site
17 utilities expenses?
18   **A.    That they did work above and beyond**
19 **what was required by the contract on the**
20 **utilities and TSS.**
21   Q.    And how did you determine -- strike
22 that.

121

1      You determined that there was no
2 entitlement to those utilities, those additional
3 costs?  Let me ask that a little bit cleaner.
4      Did you determine that Montage claimed
5 that they were entitled to any money for that
6 claim.
7    **A.   I determined that they were not due**
8 **money based upon this issue.**
9    Q.   And having determined that this was --
10 strike that.
11      Did you determine this was all work
12 required by the contract or required by the work
13 that they did as opposed to extra contractual
14 work?
15      MR. WAX: I'm going to object to the
16 form.
17    **A.   That they were not due money based on**
18 **their claim submission.**
19    Q.   So there's no question Montage did
20 this work, right?
21    **A.   I believe that's correct.**
22    Q.   And is it -- was it your decision that

122

1 this was work required by the contract?
2    **A.   That as well as the claim didn't**
3 **identify properly what the additional work was.**
4    Q.   So this is one of those claims where
5 there was some missing information that
6 prohibited the government from being able to make
7 a robust analysis.  Is that fair?
8    **A.   That's fair.**
9    Q.   Did you or Ms. Neal ever request that
10 additional information?
11    **A.   I'm not sure if they did or not.**
12    Q.   So which portion of this claim
13 submitted by Montage was for work that was within
14 the contract requirements?
15    **A.   Based on the review of the team and**
16 **their recommendation to me in the document that I**
17 **signed, they didn't see any merit to the**
18 **contractor's claim for additional cost.**
19    Q.   Do you know if any of the people who
20 put together this draft for you compared the
21 as-builts to the RFP drawings to see what work
22 was the same or different?

123

1    **A.   I do not.**
2    Q.   In your final decision you -- you
3 quote right at the very end of claim three, you
4 quote some language of the contract regarding
5 storm water?
6      MR. WAX: I'm going to object to form
7 of the question.
8    Q.   Look at item four, minimal storm
9 drainage piping along the two inlets and one
10 manhole.  Are you referring to the contract
11 documents in this section?
12    **A.   Where are we at?**
13    Q.   You divided this claim into four
14 parts, correct?
15    **A.   Right.**
16    Q.   So let me start with the fourth part.
17    **A.   Okay.**
18    Q.   You rely upon certain contract
19 documents for your decision, correct?
20    **A.   Correct.**
21    Q.   And don't -- the document that's
22 relied upon talks about an existing condition,

124

1 correct?
2      MR. WAX:  Where are you?
3      MS. HOSTETLER:  I'm reading the
4 gentleman's words.
5      THE WITNESS:  Yeah.  On page --
6 Exhibit 36.
7      MR. WAX:  Oh, we're not on claim
8 three?  Sorry.
9      THE WITNESS:  That first paragraph
10 under number four.
11 BY MS. HOSTETLER:
12    Q.   So you're referencing back to some of
13 the contract documents with regard to the
14 issue -- the storm drainage issue, correct?
15    **A.   Correct.**
16    Q.   And the contract section 8.2.3.1.2.2,
17 storm water that you're referencing, has two
18 parts.  It has an existing condition and a
19 proposed condition, correct?
20    **A.   Yes.**
21    Q.   And the proposed condition was shown
22 on the RFP drawings, correct?

125

1    A.    I'm not sure.
2    Q.    Was the proposed condition in the
3 contract documents the condition -- the solution
4 to this problem?
5        MR. WAX:  I'm going to object to the
6 form.
7    A.    It was a proposed solution.
8    Q.    Do you know if this was a solution
9 that was actually used by the contractor?
10   A.    I do not.
11   Q.    If the proposed solution didn't solve
12 the storm water existing condition and changes
13 had to be made, would that be extra contract
14 work?
15       MR. WAX:  Objection to form.
16   A.    It could be, correct.
17   Q.    And do you know here whether or not
18 this proposed condition worked?
19       MR. WAX:  Objection to form.
20   A.    I do not.
21   Q.    Isn't it true that the proposed
22 condition didn't solve the problem and that

126

1 Montage had to come up with a different solution?
2        MR. WAX:  Objection to the form.
3    A.    I'm not sure.
4    Q.    But if you would compare the as-builts
5 to the RFP drawings, they would show whether or
6 not the proposed condition was ultimately the
7 condition that was used on the project, correct?
8    A.    They should.
9    Q.    And if they showed a different
10 solution, then that should be extra work,
11 correct?
12       MR. WAX:  Objection to the form.
13   A.    Not necessarily.
14   Q.    And what would determine that?
15   A.    If the balance of the work to install
16 whatever solution was successful was no more or
17 no more expensive than this proposed solution,
18 then we would continue that change.
19   Q.    Fair enough.  So it might be a change
20 but it might be a change that didn't merit any
21 cost associated with it?
22   A.    It might be a different solution,

127

1 right.
2    Q.    And do you know who on behalf of the
3 government was involved in arriving at this
4 solution?
5    A.    No.  The government team as well as
6 the contractor's design team.
7    Q.    Mr. Skov arrived on the project in
8 mid-2016.  Is that correct?
9    A.    I don't know.
10   Q.    2015.  I'm off a year.
11       You don't know when Mr. Skov arrived
12 on the project?
13   A.    I do not.
14   Q.    Do you know whether or not Mr. Skov
15 supervised the solution to this problem?
16   A.    I don't know.
17   Q.    In your -- I take it these -- the four
18 categories were segregated out by Ms. Neal and
19 Mr. Skov?
20   A.    Correct.
21   Q.    The first one deals with the ductbanks
22 connecting buildings D and F via one

128

1 communications manhole.
2    A.    Yes.
3    Q.    Do you see that?
4    A.    Uh-huh.
5    Q.    Do you know whether that was --
6 whether that was even possible?
7    A.    No, I do not.
8    Q.    Isn't the issue that's being addressed
9 here that Montage had to -- somehow had to tie
10 into the MSGR building?
11   A.    Yes.
12   Q.    And the question was how they were
13 permitted or allowed to or required to tie into
14 the MSGR building?
15   A.    Yes, correct.
16   Q.    Were the manholes open during the site
17 visit?
18   A.    I'm not sure.  I wasn't there.
19   Q.    How would Montage know how to tie into
20 the MSGR?
21   A.    Well, they would have to look at the
22 requirements of the contract and route the

Transcript of David Vivian
Conducted on November 12, 2019

129

1  necessary connections to the MSGR.
2      Q.   But there's -- you quote here some
3  language from the contract that talks about what
4  they're supposed to be able to do.  If it's just
5  a matter of provide conduit, then it wouldn't
6  matter how they go or what order they went, it
7  would just be provide conduit, right, as opposed
8  to giving direction to where and how?
9      **A.   It may be that simple.  I'm not sure.**
10     Q.   Do you know how much additional
11 ductbank work and conduit was required by Montage
12 as a part of this claim?
13         MR. WAX:  I'm going to object to the
14 form.
15     **A.   No, I don't.**
16     Q.   Under item two you've got powered
17 ductbank from transformer room to D and F with no
18 manholes, and you've got some code sections here.
19 What does this have to do with Montage's claim?
20 How does this resolve Montage's claim?
21     **A.   It didn't resolve it.  It's just being**
22 **considered in the — by the team in the analysis**

130

1  **of the claim.**
2      Q.   Help me understand what these code
3  sections have to do with the additional site
4  utilities that Montage says that they were
5  required to do on this project?
6      **A.   These code sections are providing**
7  **additional information related to the performance**
8  **of the work required by the contract.**
9      Q.   Do any one of these code sections
10 dictate where this ductbank was supposed to be?
11     **A.   They may do.  I'm not sure.**
12     Q.   Well, under A.2.8.1.2, all of that
13 information does not appear to be site specific,
14 correct?
15     **A.   It would be site specific if any of**
16 **these conditions applied to the actual site.**
17     Q.   But the issue here is how you're going
18 to get from building D and F with no manholes.
19 So how do those sections tell the contractor how
20 they're supposed to do that?
21         MR. WAX:  I'm going to object to the
22 form.

131

1      **A.   I don't know.  The architect or**
2  **engineer might be able to figure out actual code**
3  **appliances, or any other information provided**
4  **herein that would apply to the actual run of the**
5  **cable, but I'm not sure.**
6      Q.   Before you denied this claim, did you
7  look at the site survey report submitted for this
8  project?
9      **A.   I did not.**
10     Q.   Did you look at -- I believe I asked
11 you if you looked at any of the weekly reports
12 that Montage submitted for this project?
13     **A.   I did not look at them.**
14     Q.   Because you found that this was either
15 work that was required to be performed under the
16 contract or you didn't have enough information to
17 understand it, I take it you didn't review or
18 analyze the cost associated with this claim?
19     **A.   That's correct.**
20         MS. HOSTETLER:  Off the record.
21         (A lunch recess was taken.)
22 BY MS. HOSTETLER:

132

1      Q.   Mr. Vivian, before the break we were
2  talking about your final decision involving the
3  19 hard dollar claims that's Exhibit 46.  If I
4  can turn your attention to claim four on -- I
5  guess there's no page number.  But the number at
6  the bottom ends with 11730.  Take a look at that
7  and let me know what you're ready to answer
8  questions.
9      **A.   (Reviewing.)  Yes.**
10     Q.   So is this a claim where the
11 government had sufficient information to analyze
12 the claim?
13     **A.   I don't believe we did.**
14     Q.   Did you or anyone on your behalf ask
15 for additional information?
16     **A.   Not that I know of.**
17     Q.   You've denied this claim.  Did you
18 determine that this amount was not due and owing?
19 That was really a bad question.  Let me pull that
20 back and say, the third sentence says, "For the
21 first year on site the contractor plugged into
22 post power source without installing an adequate

Transcript of David Vivian
Conducted on November 12, 2019

133

1  way to measure total compensation and to
2  reimburse post."
3      MR. WAX: Consumption.
4      MS. HOSTETLER: Thank you,
5  consumption.
6      Q.   Do you know whether or not there was
7  an agreement for that?
8      **A.   I do not know.**
9      Q.   Do you know whether or not there were
10 weekly requests by Montage to settle up and pay
11 their portion of the power?
12     **A.   No, I don't.**
13     Q.   Was this claim denied on the merits?
14     MR. WAX: Object, calls for -- well.
15     **A.   Yes.  The team looked at it and**
16 **decided that this claim had no merit.**
17     Q.   And because it was denied on the
18 merits, did you have consider any of the costs
19 associated with this claim?
20     **A.   I did not.**
21     Q.   So this was not one of the claims that
22 you referenced on page two that might have been

134

1  otherwise meritorious if there had been a proper
2  notice?
3      **A.   Correct.**
4      Q.   Do you know if there was a direction
5  from the contracting officer with regard to the
6  issues in claim four?
7      **A.   No, I do not.**
8      Q.   So let me turn your attention to claim
9  five of the contractor's final decision,
10 Exhibit 46 and ask you to read that and I'll ask
11 you a few questions about that.
12     **A.   I'm done.**
13     Q.   So for claim five, is this a claim
14 where the government had sufficient information
15 to analyze the claim?
16     **A.   I believe so, yes.**
17     Q.   And did the government determine that
18 this was additional work outside the contract?
19     **A.   I believe we did not determine that it**
20 **was additional work.**
21     Q.   So you determined that this was work
22 required by the contract?

135

1      **A.   Correct.**
2      Q.   Was the work set forth in this claim
3  performed by Montage?
4      **A.   As far as I know, yes.**
5      Q.   And the claim was denied on its
6  merits?
7      **A.   Correct.**
8      Q.   And because it was denied on its
9  merits, did the government consider the cost
10 submitted?
11     **A.   We did not.**
12     Q.   Was this a claim that was considered
13 otherwise meritorious, as referenced on page two,
14 had there been a proper notice?
15     **A.   I don't believe so.**
16     MR. WAX: I'm going to object to the
17 form.
18     Q.   What is the basis for your
19 determination that this was -- this work was
20 required by the contract?
21     **A.   Based on the input of the team in this**
22 **description of the circumstances affecting the**

136

1  **claim, it looks to me like the project**
2  **required -- this work there was no additional**
3  **work required.**
4      Q.   And that's based upon the provision
5  that's set forth in your final decision under
6  claim four where you talking about piping
7  installation and underground piping and the
8  piping installation spec?
9      **A.   Correct.**
10     MR. WAX: Are we talking about five?
11     MS. HOSTETLER: Yes, sir.
12     MR. WAX: I thought you said four.
13     Q.   Were you aware of any contrary
14 opinions by OBO as to whether or not this was
15 work that was required by the contract?
16     **A.   No, I'm not.**
17     Q.   Would that have been important for you
18 to know?
19     **A.   No.**
20     Q.   Would it have been important for you
21 to know that OBO subject matter specialists
22 determined that this work was unnecessary?

Transcript of David Vivian
Conducted on November 12, 2019

---

137

1        MR. WAX:  Object to the form.
2     **A.   Unnecessary.  If it's required by the**
3  **contract, then it is necessary.  It is required**
4  **to be performed.**
5     Q.   And you're aware of the fact that
6  there was a question as to whether or not you
7  needed thrust blocks, joint restraints as well as
8  wrapping the joint?
9     **A.   No, I'm not aware of that.**
10    Q.   Let me ask you to take a look at
11 claim 6 of Exhibit 46.
12    **A.   Yes.**
13    Q.   Is this a claim where the government
14 had sufficient information to analyze the claim?
15    **A.   Yes, I believe so.**
16    Q.   And did the government determine that
17 this was additional work outside the contract?
18    **A.   We did not.**
19    Q.   And was the work set forth in this
20 claim done?
21    **A.   As far as I know, yes.**
22    Q.   And the claim was denied on its

---

138

1  merits, then?
2     **A.   Correct.**
3     Q.   And because it was denied on its
4  merits, did the government consider the cost
5  submitted?
6     **A.   We did not.**
7     Q.   Was this a claim that was otherwise
8  meritorious except for the fact that there may
9  not have been a notice?
10    **A.   No.**
11    Q.   Let me ask you to take a look at
12 claim 7 of your contractor final decision,
13 Exhibit 46.  It starts at the bottom of the page.
14    **A.   Yes.**
15    Q.   Is this claim where the government had
16 sufficient information to analyze the claim?
17    **A.   I believe so.**
18    Q.   And did the government determine that
19 this was additional work or this was work
20 required by the contract?
21    **A.   It was work required by the contract.**
22    Q.   And was that work set forth in this

---

139

1  claim done?
2     **A.   Yes, I believe it was.**
3     Q.   And was the claim denied on its
4  merits?
5     **A.   Yes, it was.**
6     Q.   And because it was denied on its
7  merits, did the government consider the costs
8  submitted?
9     **A.   We did not consider the cost.**
10    Q.   Was this a claim that was otherwise
11 meritorious as referenced on page two?
12    **A.   No.**
13    Q.   Do you know what this claim is about
14 on seven?
15    **A.   I believe I do.**
16    Q.   Can you, from a high level, explain to
17 me what that claim is?
18    **A.   It looks like an intake in the HVAC**
19 **system was placed close to the exhaust, in that**
20 **same system.  And so the intake would have been**
21 **pulling in the exhaust air.  So something had to**
22 **be done to stop the exhaust from creeping over to**

---

140

1  the intake.
2     Q.   And do you know what the proposed
3  solutions were?
4     **A.   No, I don't.**
5     Q.   Do you know whether that -- the louver
6  for the fresh air intake was required?
7     **A.   No, I don't.**
8     Q.   From your experience as a contract
9  officer and overseeing a lot of contract
10 officers, how long would it take to go through
11 the IDR process to redesign this portion of the
12 project?
13    **A.   I'm not sure.  I don't know.**
14    Q.   Could it take months?
15    **A.   Depending on the speed of the**
16 **architectural engineering firm, yes.**
17    Q.   Do you know whether or not Montage
18 sought the concurrence of OBO to not install the
19 louver as opposed to trying to redesign?
20    **A.   No, I don't.**
21    Q.   Would that make a difference in your
22 determination as -- on the merits of this claim?

---

141

1    A.    It depends on the circumstances.
2    Q.    And how so?
3    A.    Well, it depends on — I mean if this
4  was a contract requirement, the contractor is
5  required to install the louver.  If there was an
6  acceptable alternative means of construction, OBO
7  would consider it and we might issue a change to
8  the contract.
9    Q.    And even if that louver was determined
10 not to be necessary?
11         MR. WAX: Objection to the form.
12   A.    Then we would need a technical
13 analysis to identify that.
14   Q.    And if the contractor found such a
15 circumstance, what would be the appropriate
16 matter of bringing this to the government's
17 attention?
18         MR. WAX: Objection to form.
19   A.    A number of ways.  Just identify it to
20 the COR or to issue it as an engineering change
21 proposal.
22   Q.    Or how about an RFI requesting

142

1  information as to how to resolve the issue?
2    A.    That would be acceptable.
3    Q.    Do you know if that was done?
4    A.    No, I don't.
5    Q.    I ask you to take a look at your
6  denial of claim eight in the COFD, Exhibit 46,
7  and let me know when you're ready for questions.
8    A.    (Reviewing.)  Yes, I'm done.
9    Q.    Is this a claim where the government
10 had sufficient information to analyze the claim?
11   A.    I believe so, yes.
12   Q.    And did the government determine that
13 this was additional work, or it work required by
14 the contract?
15   A.    It was work required by the contract.
16   Q.    Was the work set forth in this claim
17 done?
18   A.    I believe it was.
19   Q.    Was the claim denied on its merits?
20   A.    Yes, it was.
21   Q.    Because it was denied on its merits,
22 did the government consider any of the costs

143

1  submitted?
2    A.    We did not.
3    Q.    Was this a claim that was otherwise
4  meritorious, as referenced on page two, except
5  for some notice provisions?
6    A.    No.
7    Q.    What is your understanding, again from
8  a high level point of view, of what Montage's
9  issue is with regard to claim eight?
10   A.    It appears to me that the contractor
11 was working on the irrigation system to install
12 some tanks and pumps, and when doing the
13 installation the contractor apparently dug up or
14 destroyed an existing pump and then they replaced
15 that pump in the course of installing the system
16 and then they would like to be paid for the
17 replacement of that pump.
18   Q.    Do you know if there was an existing
19 irrigation system on site?
20   A.    I believe there was.
21   Q.    Did you ever see it working?
22   A.    I did not.

144

1    Q.    Did you see any information that
2  showed that there was a working irrigation system
3  on site?
4    A.    I did not.
5    Q.    What is the basis of your
6  understanding that there was an existing
7  irrigation system on site?
8    A.    Well, just that the COR indicated that
9  the system was there and it had been removed by
10 the contractor, a portion of it.
11   Q.    And you're aware that at the time this
12 issue arose, the irrigation system allegedly
13 being destroyed, Mr. Skov was not on the project
14 site?
15   A.    I don't recall that.
16   Q.    In addition to reviewing the draft
17 final decision that you ultimately adopted and
18 signed, did you review the actual claims
19 submitted by Montage?
20   A.    I did not.
21   Q.    Is that -- is that true for all of the
22 claims that are -- for which you're denying in

145

1 Exhibit 46?
2   **A.   That's correct.**
3   Q.   Do you know if Ms. Neal investigated
4 the issues associated with any of these claims
5 and found differing conditions or differing facts
6 other than what's set forth in Exhibit 46?
7   **A.   I don't know.**
8   Q.   The second to the last paragraph of
9 this claim you state, "After having destroyed the
10 United States government's previously existing
11 irrigation infrastructure in the area in question
12 for its convenience of constructing other
13 underground utilities, the contractor wants to
14 charge the government for costs for the
15 irrigation infrastructure destroyed by its
16 construction operations."
17       Other than the information contained
18 in the several paragraphs under claim eight of
19 Exhibit 46, what knowledge do you have to support
20 that statement?
21   **A.   I have no other knowledge.**
22   Q.   Did you review any photographs?

146

1   **A.   I did not.  The team would have been**
2 **responsible for doing that.**
3   Q.   When you referred to the team, and as
4 you've previously testified, that's Ms. Neal and
5 Mr. Skov and anyone else that would have needed
6 to provide work --
7   **A.   Yes.**
8   Q.   -- did they do their analysis together
9 or separately?  How do they work?
10   **A.   I'm not sure how they worked.**
11   Q.   Do you know if they ever met to
12 discuss these issues?
13   **A.   I don't know.**
14   Q.   Do you know what they looked at and
15 relied on?
16   **A.   I do not.**
17   Q.   As the contracting officer submitting
18 a final -- strike that.
19       Take a look at claim nine of
20 Exhibit 46 and tell me when you're ready to
21 answer questions about that.
22   **A.   I'm done.**

147

1   Q.   With respect to claim 9 of the
2 contracting officer's final decision, Exhibit 46,
3 is this a claim where the government had
4 sufficient information to analyze the claim?
5   **A.   I believe we did.**
6   Q.   Did the government determine that this
7 was additional work?
8   **A.   We did not.**
9   Q.   Was this work required by the
10 contract?
11   **A.   Yes, it was.**
12   Q.   Was the work set forth in this claim
13 done?
14   **A.   I believe it was.**
15   Q.   And was the claim denied on its
16 merits?
17   **A.   Yes, it was.**
18   Q.   And because it was denied on its
19 merits, did the government consider the costs
20 submitted?
21   **A.   We did not.**
22   Q.   Was this a claim that was otherwise

148

1 meritorious, as referenced on page two, except
2 for notice requirements?
3   **A.   No.**
4   Q.   If this was work that was required by
5 the contract, where in the contract was this work
6 required to be done?
7   **A.   Well, it appears to me by this**
8 **paragraph here that the work was required to be**
9 **done in order for the contractor to do other**
10 **related work that's required by the contract.**
11   Q.   So it's not like it would have been
12 just set forth specifically line by line in the
13 contract, there would be a necessary implication
14 by other language in the contract?
15       MR. WAX:  I'm going to object as to
16 form.
17   **A.   Yes.  Other performance requirements**
18 **yes.**
19   Q.   Do you know what those other
20 performance requirements are that would have
21 necessitated this work?
22   **A.   It just says in here to -- for it to**

Transcript of David Vivian
Conducted on November 12, 2019

149

1  be able to perform other renovation work required
2  by the contract.  I don't know what work that
3  was.
4      Q.    I'm sorry.  You said you don't know?
5      A.    I do not know.
6      Q.    Keep your voice up --
7      A.    Okay.
8      Q.    -- just a little bit.  Thank you.
9            So take a look at your denial of
10 claim 10 and let me know when you're ready to
11 answer a few questions.
12     A.    (Reviewing.)  I'm done.
13     Q.    Is this a claim, with regard to
14 claim 10, where the government had sufficient
15 information to analyze the claim?
16     A.    I believe we did.
17     Q.    And did the government determine that
18 this was additional work or work required by the
19 contract?
20     A.    Work required by the contract.
21     Q.    And was the claim denied on its
22 merits?

150

1      A.    Yes, it was.
2      Q.    And because it was denied on its
3  merits, did the government consider the costs
4  submitted?
5      A.    We did not.
6      Q.    Was this a claim that was otherwise
7  meritorious except for notice requirements, as
8  you reference on page two?
9      A.    No.
10     Q.    Did the insulation change on this
11 contract?
12     A.    I'm not sure.
13     Q.    If there was a change in insulation
14 would that be -- assuming that it cost -- the new
15 insulation cost more than the other, would that
16 be an extra -- strike that.  Let me start that
17 whole sentence over again.  I apologize, sir.
18           If there was a change in the
19 insulation requirements under the contract and
20 the new requirements cost more than the old
21 requirements, would that be changed work?
22     A.    It would be something to consider,

151

1  yes.
2      Q.    Do you know if that's the case here?
3      A.    I don't know.
4      Q.    Let me ask you to take a look at your
5  denial of claim 11 and let me know what you're
6  ready to answer questions.
7      A.    (Reviewing.)  I'm done.
8      Q.    With regard to your denial of
9  claim 11, is this a claim where the government
10 had sufficient information to analyze the claim?
11     A.    I believe we did.
12     Q.    And did the government determine that
13 this was additional work or work required by the
14 contract?
15     A.    Work required by the contract.
16     Q.    And was the work set forth in this
17 claim done?
18     A.    Yes.
19     Q.    And was the claim denied on its
20 merits?
21     A.    Yes, it was.
22     Q.    And because it was denied on its

152

1  merits, did the government consider the cost
2  submitted?
3      A.    We did not.
4      Q.    And was this a claim that was
5  otherwise meritorious except for notice
6  requirements as you reference on page two?
7      A.    No.
8      Q.    Take a look at claim 12.
9      A.    (Reviewing.)  I'm done.
10     Q.    With regard to your denial of
11 claim 12, is this a claim where the government
12 had sufficient information to analyze the claim?
13     A.    I believe we did.
14     Q.    Did the government determine that this
15 was additional work?
16     A.    We did not.
17     Q.    Was the work set forth in this claim
18 done?
19     A.    I believe it was.
20     Q.    Did you deny the claim on its merits?
21     A.    Yes, I did.
22     Q.    And because you denied the claim on

Transcript of David Vivian
Conducted on November 12, 2019

153

1  its merits, did you consider the cost submitted?
2      A.   Did not.
3      Q.   Was this a claim that was otherwise
4  meritorious except for notice requirements, as
5  referenced on page two?
6      A.   No.
7      Q.   Take a look at page 13.  Excuse me,
8  claim 13.
9      A.   (Reviewing.)  Yes, I see it.  I'm
10 done.
11     Q.   And with regard to your denial of
12 claim 13, is this a claim where you had
13 sufficient information to analyze the claim?
14     A.   Yes, I did.
15     Q.   And did you determine that this was
16 additional work or work required by the contract?
17     A.   In part it looked like it was
18 additional work, but it was not performed
19 correctly.
20     Q.   And what do you mean by that?
21     A.   It says that direction was correct and
22 that the battens as originally installed did not

154

1  meet the contract requirements.  So it's maybe
2  rework, correction of previous work that was
3  done.
4      Q.   And do you know what the rework was?
5      A.   No.  It just says it didn't meet the
6  terms of the contract.
7      Q.   Did you investigate to find out
8  whether -- why it didn't meet the terms of the
9  contract in the first place?
10     A.   No.  The team would have been
11 responsible for determining that.
12     Q.   Was the work set forth in this -- in
13 this claim done?
14     A.   Yes, I believe it was.
15     Q.   Who on the team determined that this
16 was work that was required by the contract?
17     A.   I'm not sure who, actual person on the
18 team.
19     Q.   Was the claim denied -- did you deny
20 the claim on its merits?
21     A.   Yes, I did.
22     Q.   Because you denied the claim on its

155

1  merits, did you consider the cost submitted?
2      A.   I did not.
3      Q.   Was this a claim that was otherwise
4  meritorious except for notice requirements, as
5  set forth on page two?
6      A.   No.
7      Q.   Do you know how much of this was
8  rework?
9      A.   No, I don't.
10     Q.   What are wood battens?
11     A.   I believe there some kind of pickets
12 or something that goes on the roof.
13     Q.   And what did you understand was the
14 reason for why the wood battens were being
15 directed to be changed by OBO?
16         MR. WAX:  Objection to form.
17     A.   Because the battens, as originally
18 installed, did not meet the terms of the
19 contract.
20     Q.   And do you know what contract
21 requirements are?
22     A.   No, I don't.

156

1      Q.   Take a look at claim 14 and let me
2  know when you're ready.
3      A.   (Reviewing.)  I'm done.
4      Q.   With regard to your denial of
5  claim 14, is this a claim where the government
6  had sufficient information to analyze the claim?
7      A.   I believe we did.
8      Q.   And did you determine that this was
9  additional work or work required under the
10 contract?
11     A.   It was corrective work required by the
12 contract.
13     Q.   And how was it corrective work?
14     A.   Because the location of the two-car
15 canopy wasn't correct and had to be relocated.
16     Q.   And why was the location of the
17 two-car canopy not correct?
18     A.   I think it was jutting out into the
19 lane of traffic.  So it had to be relocated to
20 lessen any danger of it being damaged.
21     Q.   Didn't post want this relocated
22 because they didn't want to give up two parking

157

1  spaces?
2  **A.   I believe there was something about**
3  **post wanting it moved as well.**
4  Q.   And the fact that post wanted it moved
5  from its original location on the RFP drawings,
6  how did that factor into your decision to this
7  claim?
8  MR. WAX: Objection to form.
9  **A.   I don't recall.  The team would have**
10 **been responsible for evaluating that.**
11 Q.   But you are aware that it's not as if
12 the two-car canopy moved a few feet one way or
13 the other, but it was actually moved to another
14 portion of the compound?
15 MR. WAX: I'm going to object to form.
16 **A.   No, it was moved a distance, correct.**
17 Q.   And you know that post was involved in
18 the location of where it was moved?
19 **A.   I believe that's correct.**
20 Q.   And if it was moved because post
21 wanted it moved, would that have made this --
22 some of these -- some of this to be extra work?

159

1  merits, you didn't consider any costs?
2  **A.   That's correct.**
3  Q.   Was this a claim that was otherwise
4  meritorious except for notice, as referenced on
5  page two of your final decision?
6  **A.   No, not to my recollection.**
7  Q.   Let me ask you to take a look at
8  claim 15.  Let me know when you're ready for some
9  questions.
10 **A.   (Reviewing.)  I'm done.**
11 Q.   With regard to your denial of
12 claim 15, is this a claim where you had
13 sufficient information to analyze the claim?
14 **A.   I believe there was.**
15 Q.   Did you determine that this was
16 additional work or work required by the contract?
17 **A.   Work required by the contract.**
18 Q.   And was the work set forth in this
19 claim done?
20 **A.   I believe it was.**
21 Q.   Was the claim denied on its merits?
22 **A.   It was.**

158

1  MR. WAX: Objection to form.
2  **A.   The team would have been responsible**
3  **for considering the results of the move and**
4  **whether it was an equitable adjustment for the**
5  **contractors not doing it so correctly than just**
6  **relocating it.**
7  Q.   And did you ask any questions about
8  the fact that this was moved in part because post
9  wanted it moved and whether or not that resulted
10 in any fair compensation that should be awarded
11 to the contractor?
12 **A.   I do not ask.**
13 Q.   Did you ask any questions about the
14 two-car canopy being moved and why it was being
15 moved and in any cost associated with that?
16 **A.   Not that I recall.**
17 Q.   Was the work set forth in the claim
18 done?
19 **A.   I believe it was.**
20 Q.   Was the claim denied on its merits?
21 **A.   It was.**
22 Q.   And because it was denied on its

160

1  Q.   And because it was denied on its
2  merits, did you consider the costs submitted?
3  **A.   I did not.**
4  Q.   Was this a claim that was otherwise
5  meritorious except for notice provisions, as
6  referenced on page two of your final decision?
7  **A.   Was not.**
8  Q.   Ask you to look at claim 16.  Let me
9  know when you're ready for questions.
10 **A.   (Reviewing.)  I'm done.**
11 Q.   With regard to your denial of
12 claim 16, is this a claim that you had sufficient
13 information to analyze?
14 **A.   I believe it was.**
15 Q.   And did you determine this was
16 additional work or work required under the
17 contract?
18 **A.   Work required by the contract.**
19 Q.   Was the work set forth in this claim
20 done?
21 **A.   Yes, it was.**
22 Q.   Did you deny the claim on its merits?

161

1    A.   I did.
2    Q.   And because you denied the claim on
3  its merits, did you consider the cost?
4    A.   I did not consider the cost.
5    Q.   Was this a claim that was otherwise
6  meritorious except for notice provisions, as
7  referenced on page two of your final decision?
8    A.   No, it wasn't.
9    Q.   Ask you to take a look at claim 17 and
10 let me know when you're done.
11   A.   (Reviewing.) I'm done.
12   Q.   Is claim 17 a claim where you had
13 sufficient information to analyze the claim?
14   A.   I believe there was.
15   Q.   Did you determine this was additional
16 work or work required under the contract?
17   A.   Work required by the contract.
18   Q.   And where in the contract was there a
19 requirement to put a textured finish on the new
20 MSGR privacy walls?
21   A.   It would have been somewhere in the
22 architectural engineering sections.

162

1    Q.   And do you know sitting here today
2  where that -- where those sections are?
3    A.   I don't know.
4    Q.   Was the work set forth in this claim
5  done?
6    A.   I believe it was.
7    Q.   Was the claim denied on its merits?
8    A.   Yes, it was.
9    Q.   And because you denied the claim on
10 its merits, did you consider the cost submitted?
11   A.   I did not.
12   Q.   Is this a claim that would have
13 otherwise been meritorious except for the notice
14 provisions?
15   A.   No.
16   Q.   Ask you to take a look at claim 18.
17   A.   (Reviewing.) I'm done.
18   Q.   With regard to your denial of
19 Montage's claim 18, is this a claim that you had
20 sufficient information to analyze?
21   A.   I believe so.
22   Q.   And did you determine that this was

163

1  additional work or work required by the contract?
2    A.   Work required by the contract.
3    Q.   And where within the contract was that
4  work required?
5    A.   I'm not sure.
6    Q.   Did you ask?
7    A.   I did not.
8    Q.   Was the work set forth in this claim
9  done?
10   A.   Yes, I believe it was.
11   Q.   Was the claim denied on its merits?
12   A.   Yes.
13   Q.   And because it was denied on its
14 merits did you consider the costs submitted?
15   A.   I did not.
16   Q.   Was this a claim that was otherwise
17 meritorious except for the notice provisions?
18   A.   No.
19   Q.   I'll ask you to take a look at
20 claim 19.
21   A.   (Reviewing.) Yes, I'm done.
22   Q.   So with regard to your denial of

164

1  claim 19, is this a claim where the government
2  had sufficient information to analyze the claim?
3    A.   I believe we did.
4    Q.   And did you determine that this was
5  additional work or work required under the
6  contract?
7    A.   Work required by the contract.
8    Q.   Was the work set forth in this claim
9  done?
10   A.   I'm not sure.
11   Q.   Did you ask?
12   A.   I did not.
13   Q.   Was the claim denied on its merits?
14   A.   Yes, it was.
15   Q.   And because it was denied on its
16 merits, did you consider any of the costs
17 submitted?
18   A.   I did not.
19   Q.   Was this a claim that was otherwise
20 meritorious except for the notice requirement?
21   A.   It was not.
22   Q.   So we've gone through the 19 claims

Transcript of David Vivian
Conducted on November 12, 2019

---

**165**

1  and you testified that you relied upon your team,
2  Mr. Skov, Ms. Neal and others who may have been
3  working with them.  Did you make any independent
4  analysis of the information they provided to you?
5      **A.   I did not.**
6      Q.   And I believe you also testified that
7  you did not review the actual claims themselves
8  submitted by Montage or the supporting
9  documentation for those claims, correct?
10     **A.   That's correct.**
11     Q.   So how can you be sure as the
12 contracting officer, if you didn't read the
13 claim, that your denials were accurate?
14     **A.   Because I have to rely on the**
15 **personnel that were tasked to analyze the claims**
16 **and provide information for my decisions.**
17     Q.   How much time did you -- did it take
18 you to arrive at your decision to execute
19 Exhibit 46 and deny these 19 claims?
20         MR. WAX: Objection to form.
21     **A.   I'm not sure how long it took.  It**
22 **took some time.**

**166**

1      Q.   Are we talking hours, days, weeks?
2      **A.   Probably days.**
3      Q.   And how long did you spend in
4  communications, I believe you said, with
5  Ms. Neal?
6      **A.   I can't remember.**
7      Q.   So if it took you days to decide to
8  execute what became your final decision, as
9  reflected in Exhibit 46, and you didn't look at
10 anything outside the four corners of what you
11 were provided as a draft of Exhibit 46, why did
12 it take so long?
13     **A.   Well, it just took days from the time**
14 **the document was submitted, my first initial read**
15 **of it, and then any additional reads of it and**
16 **talking to Ms. Neal and then, you know, finally**
17 **deciding to sign it.**
18     Q.   It wasn't like you dedicated a full
19 several days to it.  You had other
20 responsibilities wearing your hat as the chief of
21 your department, right?
22     **A.   Correct.**

---

**167**

1      Q.   So you issued a second final decision
2  in this case, correct?
3      **A.   Correct.**
4          MS. HOSTETLER:  And if you would show
5  the witness Exhibit 80.
6      **A.   (Reviewing.)  Ready.**
7      Q.   So Exhibit 80 is your final decision
8  as the contracting officer denying Montage's
9  entitlement to any time extensions on this
10 project, correct?
11     **A.   Correct.**
12     Q.   And my first question is going to be,
13 what was your process in arriving at your
14 decision?
15     **A.   Well, it would have been the same team**
16 **doing the analysis along with a scheduling expert**
17 **to review the time-impact analysis that the**
18 **contractor had submitted.**
19     Q.   So is it fair to say that Mr. Skov and
20 Ms. Neal, plus the scheduling consultant, along
21 with anyone else they needed to prepare the draft
22 of what is Exhibit 80?

**168**

1      **A.   Correct.**
2      Q.   Did you make any changes to that draft
3  before you executed it?
4      **A.   I can't recall at the moment.**
5      Q.   Would you have -- if you had made
6  changes would there be drafts of this contracting
7  officer's final decision in your files?
8      **A.   Could be, yes.**
9          MS. HOSTETLER:  I haven't seen any.
10 So Counsel, if there are any -- Mr. Vivian, if
11 you will provide them to your counsel and counsel
12 can provide them to us.
13         MR. WAX:  Hang on.  Let me just make
14 sure.  You want any drafts regarding Exhibit 80?
15         MS. HOSTETLER:  Yes, sir.
16         (Document/data request.)
17 BY MS. HOSTETLER:
18     Q.   Let me start with the fact that the
19 request for the contracting officer's final
20 decision was made in -- on April 10 of 2018.  Why
21 did it take so long for you to make your
22 decision?

---

Transcript of David Vivian
Conducted on November 12, 2019

169

1    **A.    Just administrative duties and other**
2 **responsibilities.  And studying the contractor's**
3 **submittal, their claim.**
4    Q.    So you actually looked at the
5 submittal made by the contractor for the time
6 entitlement claims?
7    **A.    No.  The team that was reviewing it**
8 **obviously needed more time, not myself.**
9    Q.    Did you ever look at the contractor's
10 claim for entitlement for time?
11   **A.    Not that I recall.**
12   Q.    If you look over the second page --
13 well, actually before we get to this, let me go
14 through the same question and maybe the same
15 answers with regard to the other final decision.
16        Other than being provided with a draft
17 of the final decision, which is Exhibit 80, what
18 additional documentation did you look at in
19 making your final decision?
20   **A.    I don't recall.**
21   Q.    Did you look at the contract -- excuse
22 me.

170

1        Did you look at Montage's claims that
2 they filed?
3    **A.    I'm not sure.  I don't recall.**
4    Q.    Did you look at -- were there any
5 recommendations made by either Ms. Neal or
6 Mr. Skov than what may be reflected in a
7 draft of your final decision?
8    **A.    I don't believe so, no.**
9    Q.    If you look at the top of page two of
10 your final decision, the last sentence before the
11 indented portion says, "The present claim is
12 presented in summary fashion in a six-page letter
13 supported only by a summary list of alleged delay
14 costs and contains little of substance other than
15 the following generalized list of grievances."
16        My first question to you is, did you
17 read the six-page letter?
18   **A.    I don't recall.**
19   Q.    Did you read the complete request for
20 time extension submitted by Montage and all the
21 accompanying exhibits?
22   **A.    No, I --**

171

1        MR. WAX:  Objection to form.
2    **A.    I don't believe I did.**
3    Q.    You're aware that TIA 1, which was the
4 claim for the vetting delays -- let me ask you
5 this.
6        Are you aware that TIA 1, for which
7 Montage is claiming entitlement to time, involved
8 delays associated with vetting?
9    **A.    Yes.**
10   Q.    And are you aware that that vetting
11 delay claim had multiple binders of emails and
12 documentation to support its claim?
13   **A.    No, I never saw that.**
14   Q.    Are you aware that Montage's claim one
15 for vetting delays also contains schedule
16 analysis as well as internal documentation
17 showing that there were delays associated with
18 vetting?
19   **A.    That would be required as part of a**
20 **TIA, correct.**
21   Q.    So it was required but you never
22 reviewed any of that information?

172

1    **A.    I don't recall reviewing it.**
2    Q.    I mean I have it and I can show it to
3 you because it's -- you're designated to testify
4 as to what you relied upon.  So it's important
5 for us to know whether you actually looked at it
6 or not.
7    **A.    Yes.  I don't recall looking at it.**
8    Q.    Okay, thank you.
9        In your analysis of the time claims,
10 for purpose of this I'm referring to the three
11 time claims for which you deny in Exhibit 80.
12        In your analysis of the time claims,
13 what did you do to analyze what you call the
14 generalized list of grievances on page two?
15   **A.    I relied on the panel of the team to**
16 **analyze the REA, the claim.**
17   Q.    And other than -- what did they tell
18 you with regard to this generalized list of
19 grievances?
20   **A.    I don't recall.**
21   Q.    Did you have any meetings with either
22 Ms. Neal or Mr. Skov or anyone else with regard

Transcript of David Vivian
Conducted on November 12, 2019

173

1  to any time entitlement?
2      **A.   I don't recall.**
3      Q.   Did you ask Ms. Neal or Mr. Skov any
4  questions about the generalized list of
5  grievances set forth on page two of your
6  contracting officer's final decision, Exhibit 80?
7      **A.   Not that I recall.**
8      Q.   Do you have any independent
9  information with regard to any of the information
10 on page two?
11     **A.   I do --**
12         MR. WAX: Objection to form.
13     **A.   I do not.**
14     Q.   Did Ms. Neal or Mr. Skov provide you
15 with any documentation regarding the information
16 contained on page two?
17     **A.   I don't recall.**
18     Q.   If they did provide you with
19 documentation, where would that documentation be?
20     **A.   I'm not sure.**
21     Q.   Can I ask you to look back to Exhibit
22 Number 1, which was the Notice of Deposition and

174

1  you were designated for categories 7, 8 and 43.
2  So item number 7 says, "The facts and details
3  regarding the contracting officer's final
4  decision dated August 17, 2018" -- which I
5  believe is Exhibit 80 -- "denying Montage's
6  certified claim number one, including reports,
7  recommendations, evaluations and other documents
8  considered by the contracting officer."
9          When you prepared for your deposition
10 today, did you look to see what information you
11 had in your possession that you relied upon in
12 preparation for executing the final decision
13 that's Exhibit 80?
14     **A.   I reviewed the final decision.  I did
15 not look anywhere else.**
16     Q.   How long did it take you to -- strike
17 that.
18         From the time Ms. Neal and Mr. Skov
19 presented you with a draft of Exhibit 80, how
20 long did it take you to execute this document?
21     **A.   I'm not sure how long it took.**
22     Q.   Hours, days, weeks, months?

175

1      **A.   No, certainly not months.  Maybe
2  hours.**
3      Q.   Where did you understand that the list
4  of grievances that's listed on page two of your
5  final decision came from?
6      **A.   I believe it came from the
7  contractor's actual claim submission.**
8      Q.   Let me show you what was previously
9  marked as Exhibit 58 to these depositions.
10         MS. HOSTETLER: Actually, that was
11 Exhibit 58 to Ms. Lugo's deposition.  So that's
12 Department of State.
13         MR. WAX: Oh.  You mean it's not going
14 to be in this pile?
15         MS. HOSTETLER: I have no idea what
16 the pile is that Jeff made.
17 BY MS. HOSTETLER:
18     Q.   While your counsel's looking, just so
19 you can be looking, I'll try to get him a copy,
20 I'm going to ask you if you've seen that document
21 before.
22         MR. WAX: You look at it.

176

1      Q.   Just so the record is clear, I'm
2  handing you what's been marked as Exhibit 58 to
3  Ms. Lugo's deposition, which is a September 1,
4  2015 time-impact analysis report.  And I can tell
5  you, if you look through, you'll see there's lots
6  of attachments.  There are many binders of
7  information that come with this.
8          So my first question is, have you seen
9  this document before?
10     **A.   I don't believe I have.**
11     Q.   If you haven't seen it, then I won't
12 ask you questions about it.
13         MR. WAX: Oh, thank goodness.
14     Q.   And I believe you've already answered
15 the question that there were at least four
16 binders of information that came with this, that
17 you didn't look at that information either?
18     **A.   Correct.**
19     Q.   So we're back to -- and I just want to
20 make sure now that we've looked at that.  Did you
21 look at either of the other two claims for time
22 extension?

177

1    A.    No, I did not.
2    Q.    What did you base your final decision
3 on?
4    A.    **The information provided in the**
5 **document that the team provided.**
6    Q.    And when you say the information that
7 was provided, is that a draft of Exhibit 80 or is
8 there a separate recommendation of some sort?
9    A.    **No, that is Exhibit 80.**
10        MR. WAX: Will you excuse me?
11        MS. HOSTETLER: Uh-huh.
12        (Discussion off the record.)
13 BY MS. HOSTETLER:
14    Q.    So there are three TIAs that you
15 denied in Exhibit 80, correct?
16    A.    **Correct.**
17    Q.    So let's just do them one at a time.
18 So TIA 1, is that a claim where you had
19 sufficient information to analyze the claim?
20    A.    **I believe so, yes.**
21    Q.    And did you determine that there was
22 entitlement to additional time?

178

1    A.    **The team did not determine, no.**
2    Q.    And did you make any independent
3 determination?
4    A.    **No, I did not.**
5    Q.    Did you deny the claim on its merits?
6    A.    **Yes, I did.**
7    Q.    And because you denied it on its
8 merits, did you consider the cost associated with
9 that claim?
10    A.    **I did not.**
11    Q.    With regard to TIA 3, is that a claim
12 where you had sufficient information to analyze
13 the information?
14    A.    **I believe we did.**
15    Q.    And did you determine that there was
16 an entitlement to time for TIA 3?
17    A.    **No, there was no entitlement.**
18    Q.    And was the claim denied on its
19 merits?
20    A.    **Yes, it was.**
21    Q.    And because it was denied on its
22 merits, did you consider the costs associated

179

1 with that claim?
2    A.    **Did not.**
3    Q.    And with respect to TIA 4, is that a
4 claim where the government had sufficient
5 information to analyze the claim?
6    A.    **We did.**
7    Q.    And did you determine that this
8 claim -- there was an entitlement to time
9 associated with that claim?
10    A.    **There was no time.**
11    Q.    And was the claim denied on its
12 merits?
13    A.    **Yes, it was.**
14    Q.    And because it was denied on its
15 merits, did the government consider the costs
16 submitted?
17    A.    **We did not.**
18    Q.    With regard to TIA 1, you were aware,
19 were you not, that for several months the RSO was
20 short-staffed -- let me start back.
21        What's the RSO?
22    A.    **It's Regional Security Officer.**

180

1    Q.    You're aware that for several months
2 the RSO was short-staffed on this project, were
3 you not?
4    A.    **No, I'm not.**
5    Q.    Would that fact have impacted your
6 understanding of Montage's claim?
7    A.    **No, it would not.**
8    Q.    You reference in your denial that this
9 is a total cost claim.  What do you mean by that?
10        MR. WAX: Hang on.  Were you just
11 talking about TIA 1?
12        MS. HOSTETLER: I was.
13        MR. WAX: And now you're talking
14 about?
15        MS. HOSTETLER: I asked a different
16 question.
17    A.    **Yes.  Total cost claim rather than an**
18 **itemized claim for individual events.**
19    Q.    So you did not consider TIA 1, 3 and 4
20 as relating to individual events?
21    A.    **The TIAs may have related to**
22 **individual events but the contractor, for the**

181

1  cost of the impact that they're claiming, just
2  grouped it all together.
3      Q.   You didn't understand that they were
4  asking for a daily rate?
5      A.   Yes, daily rate.
6      Q.   But you thought they were asking for
7  daily rate for the whole job?
8      A.   Correct.
9      Q.   I understand.  And what was the basis
10 of that understanding?
11     A.   Because the contractor didn't assign
12 individual costs to each one of the individual
13 items that they say delayed them.  They are
14 claiming an overall impact.
15     Q.   And when you were answering the
16 question you were pointing to the list of
17 grievances on page two.  Is that correct?
18     A.   That's correct.
19     Q.   With regard to claim number one,
20 TIA 1, which was the vetting claim, was that a
21 total cost claim?
22     A.   No.  I think that the entire submittal

182

1  was a total cost claim.
2      Q.   Fair enough.  Did you analyze TIA 1
3  alone as an independent claim?
4      A.   The team would have done the analysis
5  and provided me with their recommendation for the
6  contracting officer's decision.
7      Q.   And you've testified a few minutes ago
8  that whether or not the RSO was short-staffed
9  would not have impacted your denial -- would not
10 have impacted your denial of the claim?
11         MR. WAX:  Objection to form.
12     Q.   Is that a fair -- did I understand
13 you?
14     A.   That's correct.
15     Q.   Why wouldn't that have impacted the
16 denial of TIA 1?
17         MR. WAX:  Objection to form.
18     A.   Because the RSO having personnel isn't
19 a contract requirements matter, it's a matter of
20 how long we have to perform the necessary
21 security checks.  That is the issue.  Not the
22 staffing of the RSO's office.

183

1      Q.   And did you understand that the
2  government performed its staffing in a timely --
3  the government performed its vetting in a timely
4  fashion?
5      A.   That's what I understood, yes.
6      Q.   Did you ever look at the submittals
7  made by the government over time requesting their
8  employees and contractors and subcontractors to
9  be vetted?
10     A.   Well, I think the contractor would
11 make those submittals to the government, they're
12 requesting that personnel and contractors be
13 vetted.  But no, I did not look at that.
14     Q.   So if I went through, you know, was
15 this enough time from here to here, you just
16 didn't look at any of that information?
17     A.   That's correct.
18     Q.   You relied upon your team and they
19 made the recommendation and you endorsed that?
20     A.   Correct.
21         MR. WAX:  Can we take a break?
22         MS. HOSTETLER:  Sure.

184

1          MR. WAX:  Is this a bad time?
2          MS. HOSTETLER:  No, that's fine.
3          MR. WAX:  Thanks.
4          MS. HOSTETLER:  Uh-huh.
5          (A recess was taken.)
6  BY MS. HOSTETLER:
7      Q.   A couple questions.  On page four of
8  Exhibit 80, which is your August 17, 2018
9  contracting officer's final decision denying
10 Montage's time claim, in the third paragraph down
11 that starts with the contractor's proposal to
12 RFP 02.  Do you see that?
13     A.   Yes.
14     Q.   There's a reference there that this
15 included a time extension that absorbed all
16 alleged United States government delays until
17 that time, and very importantly proposed a new
18 construction duration and sequencing for each
19 building.
20         What were the alleged -- what were the
21 USGA delays that were alleged at that time?  What
22 are you talking about there?

185

1    A.   I don't know.
2    Q.   Do you know if the government was
3  having problems in turning over some of the
4  buildings to Montage on this project?  Problems
5  just from a time point of view?
6    A.   I believe there were some.
7    Q.   And that that related to the
8  government's willingness to issue this RFP 02 to
9  repair the roofs?
10    A.   I'm not sure about that.
11    Q.   At the bottom of page four of your
12  final decision on denying the time claims, you
13  make reference to mod 003, and that goes over to
14  the top of page five.
15         Is it your position that mod 003
16  released the claims for time extension for TIA 1?
17    A.   I'm not sure if it was TIA 1, but it
18  was -- anything that was covered by this
19  modification you would not -- the contractor
20  would not be able to revisit those issues.
21    Q.   Because the release that you reference
22  was a complete release for the work associated

186

1  with modification 003, correct?
2         MR. WAX:  Objection.
3    A.   Any time extension that was granted in
4  modification number 003 would have been covered
5  by that phrase.
6         MS. HOSTETLER:  If you would show the
7  witness Exhibit 86.
8    Q.   Mr. Vivian, if you would take a look
9  at what's previously marked, I believe in
10  Ms. Neal's deposition, as Exhibit 86, which is
11  modification 003 to the Montage contract.  And if
12  you look over on the second page of that, you
13  will see the release language that you quote in
14  your final decision.
15    A.   Yes.
16    Q.   So can you explain to me how this
17  modification and this release releases any of
18  Montage's claim for time asserted under TIA 1?
19    A.   (Reviewing.)  Well, it appears that
20  this modification settles all matters related to
21  the work required to perform the roof repairs.
22  And so if the contractor didn't get an agreement

187

1  by the government that we're settling the direct
2  costs, and maybe later consider any time, then we
3  would have a separate agreement to consider time
4  separately.
5    Q.   But this modification 003 doesn't
6  address the vetting delays that Montage was
7  asserting that happened earlier in the project,
8  does it?
9    A.   Not that I see on the face of the
10  modification, no.
11    Q.   Back to Exhibit 80, your final
12  decision.  You make reference -- on page four
13  over into page five -- and this relates to TIA 4.
14  And you do understand TIA 4 was Montage's
15  asserted delays associated with access to the
16  EOB?
17    A.   Yes.
18    Q.   Can you -- can you explain to me how
19  building D and F could be substantially completed
20  without access to the EOB?
21    A.   No, I could not.
22    Q.   On the last -- the second-to-last

188

1  paragraph of Exhibit 80, you make reference to --
2  you're responding to the claim being
3  substantially complete -- the project being
4  substantially complete.  And you refer to the
5  case that the "MSGR remains unoccupied by the
6  Marine security guards because Montage has failed
7  to complete the work necessary for occupancy,
8  including secure locks and life-safety issues of
9  earthquake protection."
10         As of August 17, 2018, what
11  life-safety issues were preventing the Marines
12  from moving into the MSGR?
13    A.   It just says earthquake protection.
14  I'm not sure what particular actual installations
15  were being described.
16    Q.   What was your involvement as the CO at
17  this time in the substantial completion
18  discussions with Montage?
19    A.   It was the team handling discussions
20  and working with the contractor.  I was not
21  particularly individually involved.
22    Q.   And by the team you're referring to

189

1  Ms. Neal and Mr. Skov?
2      **A.    Correct.**
3      Q.    Were Mr. Skov's absences from the
4  project site a contributing factor to any delay
5  asserted by Montage?
6      **A.    I'm not sure.**
7      Q.    Were you aware that he was absent from
8  the project site in 2016 as much as 25,
9  30 percent of the time?
10     **A.    No.**
11     Q.    I asked you earlier if you could
12 explain how buildings D and F could be
13 substantially complete without access to the EOB,
14 and you said you didn't know, I believe, correct?
15     **A.    Correct.**
16     Q.    Did you ask anybody?
17     **A.    No, I did not.**
18     Q.    Mr. Vivian, as the contracting officer
19 on this project, did you ever sit down with
20 Montage to try to negotiate or resolve these
21 various claims and TIAs that we've been
22 discussing here today?

190

1      **A.    No, I did not.**
2      Q.    Did you not have -- at any time did
3  you not sit down and have a discussion with
4  Montage?
5      **A.    I probably did, but I don't recall.**
6      Q.    Did you meet with Sina Moayedi?
7      **A.    I met with the man often and I'm sure**
8  **we spoke about this project.**
9      Q.    And did you meet with him earlier this
10 year to discuss a resolution of Montage's various
11 claims and issues?
12     **A.    He called me about a settlement after**
13 **the -- after the claim -- or the appeal had been**
14 **filed.**
15     Q.    And did you have a discussion with him
16 about it at that time?
17     **A.    Well, I just accepted his notice that**
18 **he would like to settle, but I turned it over to**
19 **counsel because it had been appealed.**
20     Q.    Did you ask him to write a letter?
21     **A.    I believe I did.**
22     Q.    Did you respond to that letter?

191

1      **A.    No, I didn't.  I passed it to counsel.**
2      Q.    Did you tell Sina that it was out of
3  your hands to resolve, or words to that effect?
4      **A.    Something to that effect, yes.**
5      Q.    And so as the contracting officer on
6  this project, the decision to resolve the claims
7  is no longer within your purview.  Is that
8  accurate?
9      **A.    That's accurate.  After the appeal is**
10 **filed.  It's now in litigation.**
11     Q.    And that goes to legal?
12     **A.    Yes.**
13     Q.    If you didn't have any authority to
14 negotiate a settlement with Sina, why were you
15 talking to him and asking him for information
16 regarding settlement?
17         MR. WAX:  Objection to form.
18     **A.    Just he's a contractor involved in the**
19 **OBO construction program.  I didn't want to just**
20 **shut him down.  So if he still wants to be**
21 **involved, that's fine.**
22     Q.    Other than legal, is there anyone else

192

1  who has to pass off on a settlement?
2      **A.    Certainly OBO.  Probably OBO director**
3  **if there's a negotiated settlement rather than a**
4  **court order, yeah.**
5      Q.    Many hours ago I showed you a letter
6  about a CO visit to Guayaquil that Ms. Neal was
7  taking --
8      **A.    Yes.**
9      Q.    -- in the May 2018 timeframe.
10         Do you recall a series of meetings
11 with Ms. Neal and Montage and perhaps others
12 trying to arrive at a resolution of the
13 substantial completion issues?
14     **A.    I know there were issues but I'm not**
15 **sure what particular issues they were talking**
16 **about during the meetings.**
17         (Exhibit 111 marked for identification
18 and attached to the transcript.)
19     Q.    The court reporter's shown you what's
20 been marked as Exhibit 111 to these depositions,
21 which is an email initially from Donna Neal to
22 Sina.  And at the top you'll see Mr. Skov.  But

Transcript of David Vivian

Conducted on November 12, 2019

---

193

1  she is transmitting a letter that is signed by
2  you, as the contracting officer.  And that
3  letter's dated May 7, 2018.  I'll let you take a
4  look at it.  My question's going to be, do you
5  recall sending this letter?
6      **A.    (Reviewing.)  No, I don't recall**
7  **sending a letter.**
8      Q.    Do you recall having discussions about
9  any of the issues contained in this letter?
10     **A.    No, I don't.**
11     Q.    Is it fair to say that by May of 2018
12 there was a dispute, small D, between Montage and
13 the government as to whether or not Montage was
14 substantially complete on this project?
15     **A.    There was some disagreement, yes.**
16     Q.    Disagreement, that's better.
17     **A.    Yes.**
18     Q.    And Ms. Neal was trying to reach some
19 resolution over that disagreement, correct?
20     **A.    Correct.**
21     Q.    And as of this point, she was no
22 longer the contracting officer, which is why you

---

194

1  signed this letter?
2      **A.    For her, correct.**
3      Q.    Is it fair to say that this is a
4  letter that she prepared and knows the contents
5  of?
6      **A.    Correct.**
7      Q.    And you just signed it based upon your
8  faith in her as the former contracting officer,
9  that she knew what she was talking about?
10     **A.    Yes.  Because she's still the contract**
11 **specialist.**
12     Q.    Do you recall what response Montage
13 made to the May 7, 2018 letter?
14     **A.    No, I don't.**
15         (Exhibit 112 marked for identification
16 and attached to the transcript.)
17     Q.    Showing you what's been marked as
18 Exhibit 112, which is a color coded copy, which
19 is -- appears to be an interlineated version of
20 your letter to Sina showing Montage's reported
21 status of the project.  Do you see that, sir?
22     **A.    Yes.**

---

195

1      Q.    So first thing is I note that despite
2  you signing the letter to Sina, Mr. Moayedi sends
3  it back to Ms. Neal as the contracting officer.
4  At any point did you correct Mr. Moayedi as to
5  who was the actual contracting officer at this
6  time?
7      **A.    I did not.**
8      Q.    And if you look through this, is it
9  fair to say that Montage's almost immediate
10 response is, we've done most of all this work?
11     **A.    Yes.**
12     Q.    And do you know how long it took some
13 of these items to actually be removed from the
14 substantial completion checklist?
15     **A.    No, I don't.**
16     Q.    Do you know if that was an issue on
17 this job?
18     **A.    I'm not sure.**
19     Q.    Were you aware of any issue where
20 Mr. Skov was reluctant to have substantial
21 completion issued?
22     **A.    No, I'm not.**

---

196

1      Q.    Why didn't the government respond to
2  Mr. Moayedi's interlineation of your letter?
3          MR. WAX:  Objection to form.
4      **A.    I'm not sure if the government didn't**
5  **respond.  I didn't get involved in responding in**
6  **writing.**
7      Q.    Did you have an oral conversation with
8  regard to this matter?
9      **A.    I did not.**
10     Q.    What did it tell you about the
11 disagreement between the parties that the -- the
12 substantial completion checklist that's provided
13 with, looks like close to -- looks like 648
14 items, is returned immediately showing that a
15 good number of those items have already been
16 resolved?
17         MR. WAX:  Objection to form.
18     **A.    Well, it's positive that the**
19 **contractor is actually performing the work and**
20 **moving towards substantial completion.**
21     Q.    But what does it tell you about the
22 disagreement as to what was done versus what

---

Transcript of David Vivian
Conducted on November 12, 2019

197

1 wasn't done when -- within a short period of time
2 Montage says, but we've already done this work?
3          MR. WAX: Objection as to form.
4     **A.   It just shows that the contractor is**
5 **actually doing work and performing the work. So**
6 **they're working towards substantial completion.**
7     Q.   Did it lead you to have some concern
8 over whether or not the substantial completion
9 checklists that were being generated by the
10 government were accurate?
11    **A.   No, not particularly.**
12    Q.   Did it lead you to have any sympathy
13 for a contractor that immediately says of the
14 650 items, we've already done at least half of
15 these?
16    **A.   No.   They should get together with the**
17 **COR and identify the facts and get the list**
18 **corrected.**
19    Q.   And do you know if that was done?
20    **A.   No, I don't.**
21    Q.   So this is early May of 2018.  Were
22 you aware that the government had not completed

198

1 its own TSS subcontractor work on this project as
2 of that time?
3     **A.   No.**
4     Q.   I think we talked a little bit earlier
5 about some of the TSS.  Are you aware of the
6 problems with the government realizing that it
7 was responsible for providing the TSS information
8 so that -- and the TSS contractor, so that
9 Montage could hookup to that infrastructure?
10         MR. WAX: I'm going to object as to
11 form.
12         MS. HOSTETLER: That's kind of a
13 convoluted question.
14    Q.   Would you like me to ask it again?
15    **A.   Yes, please.**
16    Q.   So let's start with, do you recollect
17 sitting here today that the government's TSS
18 subcontractor didn't even show up on the job site
19 to do their work until January of 2018?
20    **A.   No, I didn't know that.**
21    Q.   Would that impact any of your
22 decisions on any of these time final -- strike

199

1 that.
2          Would that impact any of your view as
3 to when substantial completion ought to be
4 issued?
5     **A.   I would have to look at it and restudy**
6 **the circumstances.**
7     Q.   Would that impact any of your decision
8 on denying any of the time claims?
9     **A.   I would have to look at it to see if**
10 **it affected.**
11    Q.   Would that impact your decision in
12 assessing liquidated damages?
13    **A.   No.   Once again, I would have to look**
14 **at it and see what circumstances affected the**
15 **work.**
16    Q.   Mr. Vivian, the court reporter is
17 showing you what was previously marked in
18 Ms. Neal's deposition as Exhibit 68.
19         MR. WAX: Do you have a copy for me?
20         MS. HOSTETLER: Yeah, you should have
21 it.  That was from Ms. Neal's deposition.
22         MR. WAX: You said there was a name.

200

1 That's what threw me.  Okay.
2 BY MS. HOSTETLER:
3     Q.   Do you recognize your decision in the
4 assessing of liquidated damages dated January 28,
5 2019, which is Exhibit 68?
6     **A.   Yes, I have Exhibit Number 68.**
7     Q.   And you recognize that document?
8     **A.   No, not particularly.**
9     Q.   Take a minute and read it and I'll ask
10 you some questions about it.
11         MR. WAX: Am I looking at the same
12 thing?
13         THE WITNESS: No.
14         MS. HOSTETLER: No.
15    **A.   Because you've got a letter.  We've**
16 **got an email.  This is Exhibit 68.**
17    Q.   So let's take a minute.
18         So the record is clear, you've now
19 been handed Exhibit 62, which is in fact, is it
20 not, sir, your letter to Sina assessing
21 liquidated damages on Montage?
22    **A.   That's correct.**

201

1    Q.    And you assess liquidated damages
2  based upon a contract completion date of
3  September 24, 2017, correct?
4    A.    Correct.
5    Q.    So I just want to get that timeline in
6  front of you and we'll come back to that.  But
7  you were -- I believe -- let me just ask the
8  question again.
9        You're aware that the government's own
10 subcontractor was not arriving to the contract
11 site until January of 2018 for its TSS work?
12   A.    I was not aware of that.
13   Q.    Would that impact your decision to
14 assess liquidated damages as of September 24?
15   A.    I would have to review the
16 circumstances and see what I think at that point
17 with the contract before us.
18       MS. HOSTETLER:  Would you show the
19 witness Exhibit 72.
20   Q.    Please take a minute.  That's an email
21 string between you and Ms. Neal dated August 31,
22 2017.  Take a minute and look at that.  I have

202

1  just a few questions to ask.
2    A.    (Reviewing.)  Okay.
3    Q.    So does this refresh your recollection
4  that the government was required to furnish
5  certain signal and power cabling related to the
6  TSS?
7        MR. WAX:  I'll object.
8    A.    Well, in accordance with the reading
9  of this email, yes.
10   Q.    And that as of -- this is an email
11 string in August of 2017 where internally the
12 government's trying to decide what the best
13 course of action is as a result?
14   A.    Correct.
15   Q.    And actually Ms. Neal states to
16 Mr. Prior, copied to you, since the project is
17 behind and there are performance issues on both
18 sides of the contract, she suggests a certain
19 option, correct?
20   A.    Yes, correct.
21   Q.    And that option is that OBO is going
22 to take care of procuring the materials and

203

1  getting that on to the project site, correct?
2    A.    That option, yes.
3    Q.    Did that delay the project in any way,
4  do you know?
5    A.    I'm not sure.
6    Q.    Do you know what Ms. Vivian was --
7  excuse me -- what Ms. Neal was referring to when
8  she says there are performance issues on both
9  sides of the contract?
10   A.    That the contract was affected by the
11 government and by the contractor, as far as
12 performance goes.
13   Q.    And do you know what the performance
14 issues on the government's side are -- were?
15   A.    No, I don't.
16   Q.    The court reporter will show you
17 what's been marked as Exhibit 113 to your
18 deposition which is an email string, that I don't
19 believe you're on, from November -- from January
20 of 2018.
21       (Exhibit 113 marked for identification
22 and attached to the transcript.)

204

1        MR. WAX:  Did you give me two?
2        MS. HOSTETLER:  I may have.
3  BY MS. HOSTETLER:
4    Q.    Take a look and let me know when
5  you're ready to answer questions.
6    A.    (Reviewing.)  I'm done.
7    Q.    So does this refresh any recollection
8  you may have as to when the government
9  anticipated having their portion of the TSS work
10 done?
11   A.    Well, when I read this email, I see
12 that they thought the contractor for TSS would
13 arrive in January 2018.
14   Q.    And the fact that the government
15 hadn't completed their portion of the TSS work at
16 least by January, would that have any impact on
17 your assessment of liquidated damages as of
18 September 24, 2018?
19   A.    Well, I would have to look at the
20 circumstances that drove the government's TSS
21 completion to January to see if that had an
22 effect on anything else.

Transcript of David Vivian
Conducted on November 12, 2019

---

205

1    Q.    And did you look into that?

2    A.    No, I did not.

3    Q.    Were you even aware of that?

4    A.    No, I was not.

5    Q.    Did any of your technical team,
6  Mr. Skov or anyone else at OBO, alert you to any
7  of the TSS issues?

8    A.    Not that I recall.

9    Q.    Do you recall if Ms. Neal alerted you
10 to those TSS issues?

11   A.    Not that I recall.

12   Q.    As part of the TSS there's a video
13 that goes along with that DVR that goes along
14 with that TSS. It's a security video. Do you
15 have any knowledge of that?

16   A.    No.

17   Q.    Do you know when that actually arrived
18 on the project site?

19   A.    No, I don't.

20   Q.    So the court reporter's showing you
21 what's been previously marked as Exhibit 76,
22 which is an email string between Mr. Skov and a

---

206

1  Raymond Rines, R-I-N-E-S, USmax TSS punch list.
2  And let me know when you've had a chance to look
3  at that.

4    A.    (Reviewing.)

5          MR. WAX:  So this -- Jeff's seen this
6  already, right?  We don't have to worry about
7  redacting it.

8          MS. HOSTETLER:  Is Mr. Rines an
9  attorney?

10         MR. WAX:  Jeff I said.

11         MS. HOSTETLER:  Right.  Is Mr. Rines
12 an attorney?

13         MR. WAX:  Redaction for privilege
14 reasons.

15   A.    Yes, I'm done.

16   Q.    So based upon this email, it appears
17 that the TSS DVR that was delivered wasn't even
18 on site on May 19, 2018, correct, and that was
19 part of the TSS solution or the TSS work?

20         MR. WAX:  I'm going to object to form.

21   A.    I'm not sure.  I'm not sure how this
22 video master station plays into the whole system

---

207

1  integration.

2    Q.    Do you know if that TSS -- the DVR was
3  required in order for the Marines to occupy the
4  MSGR?

5    A.    I do not.

6          MR. WAX:  I'm going to ask Jeff
7  whether it needs to be redacted.  Can you just
8  sort make an internal note about that yourself?

9          MS. HOSTETLER:  We discussed this last
10 Friday.

11         MR. WAX:  Oh, you did?

12         MS. HOSTETLER:  This was in Ms. Neal's
13 deposition last Friday.

14         MR. WAX:  Okay.  Well, he might have
15 overlooked it or I might just be overly cautious.

16         You have a protective order, right?

17         MS. HOSTETLER:  Right.  Exactly.

18         MR. WAX:  Because it's not marked SBU.

19         MS. HOSTETLER:  Right.

20         MR. WAX:  Does your protective order
21 just say everything within and until later, or
22 are you specifically marking them on a

---

208

1  document-by-document basis?

2          MS. HOSTETLER:  We're marking them
3  document-by-document, but portions of the
4  deposition can be marked five days after.

5          MR. WAX:  Okay.

6    Q.    So the court reporter's handed you
7  what was previously marked as Exhibit 73.  And
8  again, I realize, sir, you're not on these
9  emails.  But I'm looking specifically for the
10 second email down where Mr. Skov is making a
11 reference to the TSS installation.  And let me
12 know when you're ready for a couple questions
13 about that.

14   A.    (Reviewing.)  I'm ready.

15   Q.    So Mr. Skov is reporting to Mr. Payne
16 that it looks like the TSS installation will be
17 complete on May 4 other than the L and L portion.

18         Let me ask you first of all, do you
19 know what that means, L and L, lock and leave?
20 Does that have any meaning to you?

21   A.    No, none.

22         MR. WAX:  I know you said on, but I

Transcript of David Vivian
Conducted on November 12, 2019

209

1 think you mean on or about.
2        MS. HOSTETLER: Oh, is that what that
3 is, o slash, on or about?
4        MR. WAX: Yes.
5        MS. HOSTETLER: Thank you.
6    Q.    Let me read that again so the record's
7 clear.
8    **A.    Okay.**
9    Q.    It says -- Mr. Skov is saying to Dan,
10 quote, It looks like the TSS installation will be
11 complete on or about May 4 (other than the L and
12 L).
13        And for the record, again do you have
14 any idea what the L and L portion is?
15    **A.    I have no idea.**
16    Q.    Mr. Skov goes on to say that the
17 remaining piece of the puzzle for the MSGR and
18 CES are the permanent cores and keys.
19        Is there a relationship between the
20 permanent cores and keys and the TSS?
21    **A.    Well, the permanent cores are door**
22 **locks.  And of course keys go to the door lock.**

210

1 **But I think the TSS has to be tied to the -- to**
2 **the door locks so that the Marine or anybody**
3 **would know if a door isn't locked.**
4    Q.    So is it fair to say then you couldn't
5 complete the key schedule until the TSS was
6 complete?
7    **A.    I'm not sure.**
8        (Exhibit 114 marked for identification
9 and attached to the transcript.)
10    Q.    Handing you what's been marked as
11 Exhibit 114, which is an email string between
12 Mr. Skov and Sean Peterson involving the
13 Guayaquil project, and ask you to take a look.
14 I'm going to ask you about that first section up
15 there but you can read the whole document.
16    **A.    Okay.**
17        MR. WAX: That's 114?
18        MS. HOSTETLER: Yes.
19    **A.    (Reviewing.) Yes.**
20    Q.    So this is a discussion with Mr. Skov
21 and a Sean Peterson.  Do you know who he is?
22    **A.    Sean Peterson.  I remember the name**

211

1 **but I don't remember what position he had.**
2    Q.    But he was on site in Guayaquil?
3    **A.    I don't know.**
4    Q.    Was working on this project, at least?
5    **A.    Involved in some way, yes.**
6    Q.    There's a discussion in this email
7 about getting occupancy for the MSGR so the
8 Marines could occupy the building, correct?
9    **A.    Correct.**
10    Q.    And Mr. Peterson suggests giving
11 Montage a conditional substantial completion
12 letter.  And Mr. Skov says, quote, Better a
13 conditional occupancy permit cable to post than a
14 conditional substantial completion to Montage.
15        Do you see that?
16    **A.    Yes, I do.**
17    Q.    Do you know why he would be making
18 that distinction or that recommendation?
19    **A.    No.**
20        MR. WAX: I would object to form.
21    Q.    Was there an effort by Mr. Skov or OBO
22 to delay substantial completion?

212

1    **A.    Not that I know of.**
2    Q.    You do see in the sentence above that
3 Mr. Skov makes the distinction that, quote, We
4 are faced -- the distinction we are faced with is
5 that the items that hold up the certificate of
6 substantial completion from Montage are not fire
7 and life-safety items.
8        Do you see that?
9        MR. WAX: The word "up" is not in that
10 sentence.  You said "that hold up."
11        MS. HOSTETLER: Oh, thank you.
12    Q.    "The distinction we are faced with is
13 that the items that hold the certificate of
14 substantial completion from Montage are not fire
15 and life-safety items."
16        Do you see that, sir?
17    **A.    I see that sentence, yes.**
18    Q.    Is it your understanding that if there
19 aren't fire and life-safety items and the project
20 is 90-percent complete, that substantial
21 completion would be reasonable?
22        MR. WAX: I'm going to object to the

Transcript of David Vivian
Conducted on November 12, 2019

213

1  form.

2     **A.   It depends on what isn't complete in**

3  **that five percent.**

4     Q.   And do you know as of April 30 what

5  was not complete?

6     **A.   I'm not sure.**

7     Q.   But it's fair to say Mr. Skov would

8  know whether or not those issues were fire and

9  life-safety items, correct?

10        MR. WAX:  I'm going to object to form.

11    **A.   He should know what's not complete in**

12  **the project.**

13    Q.   And so when he says they're not fire

14  or life safety, we should believe that that's

15  accurate?

16    **A.   If that's what he intends to say, yes.**

17    Q.   And as of April of 2018, do you know

18  what percent completion, according to the payment

19  applications, this project was?

20    **A.   No, I don't.**

21    Q.   Have you ever looked at the payment

22  applications?

214

1     **A.   No, I haven't.**

2     Q.   Are you involved in that process at

3  all?

4     **A.   No, I'm not.**

5     Q.   And if the payment applications show

6  that, as against the schedule of values, that

7  Montage was being paid 99 percent as of April of

8  2018, and there are not fire and life-safety

9  items at issue, can you explain to me why

10  substantial completion is not granted?

11    **A.   Once again, it depends on what items**

12  **aren't complete.  Because if the building can't**

13  **be occupied for the intended purpose, then it**

14  **can't be declared substantially complete.**

15    Q.   But you see here there's a discussion

16  that it can be occupied, correct, or at least the

17  MSGR can be occupied?

18    **A.   They're talking about occupancy permit**

19  **and whether they can get one or not, but they're**

20  **not the deciders.**

21    Q.   Who's the decider for that?

22    **A.   It's the assistant secretary for**

215

1  **management.**

2     Q.   Would you take a look at Exhibit 77.

3  I'll show you what's been marked as Exhibit 77,

4  which is an email string between Mr. Skov and

5  Mr. Prior and Sholeh Lee -- I may be

6  mispronouncing her name -- on July 6, 2018.  Take

7  a few minutes and review that document.

8     **A.   (Reviewing.)  Yes, ma'am.**

9     Q.   So Ms. Lee, is it pronounced Sholeh?

10    **A.   Sholeh.**

11    Q.   So Ms. Lee replaced Mr. Vazquez on

12  this project.  Is that correct?

13    **A.   I believe so.**

14    Q.   So that means Ms. Lee is Mr. Skov's

15  immediate superior, correct?

16    **A.   Correct.**

17    Q.   So Ms. Lee at OBO is writing to

18  Mr. Skov and others.  And she says that, "If the

19  United States government (USG) can occupy

20  buildings D and F, then we should."  And she goes

21  on to say, "If we are occupying the MSGR, which

22  is personnel-occupied building but not occupying

216

1  D and F, which are shops and storage, we would

2  need to have a written justification on why."

3        This is July of 2018.  Did you ever

4  see any written justification such as Ms. Lee is

5  suggesting in this email?

6     **A.   No, I didn't.**

7     Q.   I ask you to take a look at -- so

8  who's the MO in that sentence?

9     **A.   I guess --**

10    Q.   "The MO is on board not occupying."

11  She's quoting what Mr. Skov was saying below.

12    **A.   Management officer.**

13    Q.   So who is that?

14    **A.   I don't know who it is.  It's someone**

15  **at post, at the embassy.**

16    Q.   And so Mr. Skov was reporting that the

17  management officer was not on board occupying

18  those buildings, and Ms. Lee is coming back and

19  saying, well, we need a written justification?

20        MR. WAX:  I'm going to object as to

21  form.

22    Q.   Correct?

Transcript of David Vivian
Conducted on November 12, 2019

217

1    **A.    That's correct.**
2    Q.    And Mr. Skov's basis for what he says
3    the MO is on board with not occupying is because
4    of the permanent nonsecure cores, correct?
5    **A.    Correct.**
6    Q.    That that was the issue holding it up?
7    **A.    Yes.**
8    Q.    Do you know if there ever was -- well,
9    strike that.  You weren't on this so you wouldn't
10   know if there was a response.
11         Were you aware of this issue at all?
12   **A.    Not that I recall, no.**
13   Q.    I ask you to take a look at
14   Exhibit 78.  And this again is an email between
15   Ms. Lee and Mr. Skov.  And take a couple minutes.
16   I'm going to ask you about that top email, but
17   read as much of it as you want.
18   **A.    I'm ready.**
19   Q.    So this is a couple days later.
20   Ms. Lee is emailing Mr. Skov and says, "The
21   certificate of occupancy is issued by OBO for a
22   Marine house.  See attached, which includes the

218

1    clearances.  Note my previous email regarding
2    occupying buildings D and F.  We need a
3    substantial completion on the project unless
4    there's a compelling justification to not occupy
5    D and F, which I have not seen thus far."
6         Have you ever seen a compelling
7    justification not to occupy D and F?
8         MR. WAX:  I'm going to object as to
9    form.
10   **A.    Not that I recall.**
11   Q.    Ms. Lee goes on to say that, "We need
12   these items:  DS substantial compliance cable,
13   final."  Do you know what that is?
14   **A.    Diplomatic security performs an**
15   **inspection of the facilities to ensure that the**
16   **office's security and safety is -- security is**
17   **installed in the building.  And they'll issue a**
18   **compliance certificate saying that yes, they've**
19   **reviewed it and they found it to be compliant.**
20   Q.    And their compliance is more than just
21   what Montage is doing, it involves other security
22   issues as well?

219

1    **A.    It would -- the separate TSS**
2    **contractor, it would look at that work as well.**
3    Q.    Then it says PD substantial completion
4    letter.  What is that?
5    **A.    That's the COR's substantial**
6    **completion letter saying that the project is**
7    **substantially complete.**
8    Q.    And then there's an OBO fire
9    compliance memo.  What do you understand that to
10   be?
11   **A.    That's OBO fire inspectors have gone**
12   **down and looked at the project to ensure that it**
13   **is compliant with all safety requirements.**
14   Q.    And so all of these issues are OBO's
15   responsibility leading up to substantial
16   completion, correct?
17   **A.    Not the DS.  DS is separate.**
18   Q.    Fair enough.
19         Were you aware of this discussion in
20   July of 2018 regarding the timing of substantial
21   completion?
22   **A.    No, I was not.**

220

1    Q.    At the time you were the CO on this
2    project, correct?
3    **A.    Correct.**
4    Q.    Are these the types of issues that you
5    should have been made aware of as you were
6    getting closer -- as the contractor was getting
7    closer to substantial completion?
8         MR. WAX:  Objection to form.
9    **A.    No.  It appears to be OBO and others**
10   **working to assure that the building is complete**
11   **before we issue substantial completion.  That's**
12   **their duty.**
13   Q.    So if that's July, the first
14   substantial completion wasn't issued until
15   October, correct?
16   **A.    Correct.**
17   Q.    What held it up?
18   **A.    I'm not sure.**
19   Q.    Have you looked into that?
20   **A.    No, I have not.  I'll show you what**
21   **was previously marked as Exhibit 81.  And I will**
22   **say for the record, there are a lot of**

Transcript of David Vivian
Conducted on November 12, 2019

221

1  attachments to this.  And if you want to see them
2  I have them and you can see them.  It's an
3  October 8, 2018 letter addressed to Ms. Donna
4  Neal contracting officer from Sina Moayedi.
5       MR. WAX:  Is this the one, the line of
6  questioning you had, or are we moving to a new
7  topic?
8       MS. HOSTETLER:  No, we're still on
9  substantial completion.
10      Q.   Let me just start, have you seen this
11  document?
12      A.   Not that I recall.
13      Q.   Let me ask you, as of October 8, 2018
14  you were the contracting officer, correct?
15      A.   Yes, correct.
16      Q.   Was this something that -- and I'm
17  happy to let you read it -- that Donna Neal
18  should have passed along to you for a response or
19  is this something she should have handled on her
20  own?
21      A.   It's something she should have handled
22  on her own as experienced personnel.

222

1       Q.   If you haven't seen it, I'm not going
2  to ask you about it, but I'm happy to let you
3  peruse it to make sure that you haven't seen it.
4       A.   Oh, no, I haven't seen it.
5       Q.   Do you recall in this October --
6  strike that.
7            You were the contracting officer in
8  the fall of 2017, correct, after Ms. Neal's
9  warrant expired in September.  Is that correct?
10      A.   Correct.
11      Q.   Do you recall Montage filing their
12  time claims and request for contracting officer's
13  decision in the fall of 2017?
14      A.   No, I don't.
15      Q.   Do you recall being part of any
16  discussion with Ms. Neal to request Montage to
17  pull back their claims?
18      A.   No, I don't.
19      MS. HOSTETLER:  Did you want to take a
20  break?
21      MR. WAX:  I did.
22      MS. HOSTETLER:  We can do the break

223

1  and then we can come back to this.
2       (A recess was taken.)
3       (Exhibit 115 marked for identification
4  and attached to the transcript.)
5  BY MS. HOSTETLER:
6       Q.   Mr. Vivian, let me ask you -- before
7  we go to Exhibit 115, let me ask you to go back
8  to Exhibit 62 which is your assessment of
9  liquidated damages letter.
10      A.   Yes.
11      Q.   So Mr. Vivian, you have in front of
12  you Exhibit 62, and that's where you've assessed
13  liquidated damages based on a completion date of
14  September 24, 2017.
15           First of all, did any of the
16  discussion that we just had or the documents that
17  you looked at that dealt with TSS and doors and
18  cores make you question or think that there might
19  be more information that you need in order to
20  assess liquidated damages as of September 24,
21  2017?
22      A.   Not at this time.

224

1       Q.   So how is the amount of the liquidated
2  damage determined, the per-day rate?
3       A.   The per-day rate is OBO's costs for
4  actually keeping personnel at site to surveille
5  the contractor's performance.
6       Q.   And is this an amount that's set forth
7  in the contract?
8       A.   Yes, it is.
9       Q.   And have you looked in the contract to
10  see where that is set forth?
11      A.   Yes, I have.
12      Q.   And correct that it references it as
13  Guayaquil, Mexico.  Do you recollect that?
14      A.   Guayaquil, Mexico?
15      Q.   We can pull that.  I have to find out
16  which document it is here.
17      A.   F2?
18      Q.   Yeah, it's F2, but I need to find the
19  exhibit in here.
20      MS. HOSTETLER:  With your permission,
21  may I just show him my copy just to refresh
22  your --

Transcript of David Vivian

Conducted on November 12, 2019

57 (225 to 228)

---

225

1      MR. WAX:  Yeah, you can reference it
2 on the record.
3      Q.   I've got page 19.  Take a look at that
4 document.  Does that refresh your recollection as
5 to the amount set forth in the contract as far as
6 the assessment of liquidated damages?
7      **A.   Yes, it does.**
8      Q.   And doesn't it refer to Mexico as
9 well?
10     **A.   Yes, it does.**
11     Q.   So did you look to see if that was an
12 error on the Mexico side or on the Guayaquil
13 side?
14     **A.   Oh, it's a typo in the Guayaquil**
15 **contract.  So Mexico is the typo.**
16     Q.   So this is the accurate amount for
17 Guayaquil?
18     **A.   Correct.**
19     Q.   And do you know how that rate was
20 determined, the build up of that rate?
21     **A.   Yes.  OBO calculates that rate.**
22     Q.   And so there's a document that says

---

226

1 here's what the rate is and you're given that in
2 contracting to put into the contract, correct?
3      **A.   Correct.**
4      MS. HOSTETLER:  I don't think we've
5 seen that, but I would like to see that.  So if
6 you'll add that to your list.
7      MR. WAX:  You know, my list is getting
8 kind of long and wacky.  So --
9      MS. HOSTETLER:  It cannot be anywhere
10 near as long as the list we had in Nela's
11 deposition.
12     MR. WAX:  But what I would suggest,
13 and I'm going to do my best --
14     MS. HOSTETLER:  The court reporter
15 marks every time there's a request for a
16 document.
17     MR. WAX:  No, no, I'm aware of that.
18 But I don't know whether we've gotten authority
19 to pay them yet.  So it might make sense for you
20 to do a letter to Jeff.
21     MS. HOSTETLER:  We'll do that too.
22     MR. WAX:  But how would you want me to

---

227

1 describe it?
2      MS. HOSTETLER:  So just the -- I
3 guess --
4      MR. WAX:  Calculation of LDs?
5      MS. HOSTETLER:  -- it would be the OBO
6 calculation --
7      THE WITNESS:  Yeah, LDs, right.
8      MS. HOSTETLER:  -- for the daily rate.
9      THE WITNESS:  Correct.
10     (Document/data request.)
11 BY MS. HOSTETLER:
12     Q.   And Mr. Vivian, you don't have any
13 input into that calculation?
14     **A.   No, I don't.**
15     Q.   And that deals with on-site personnel
16 costs?
17     **A.   Correct.  Yes.**
18     Q.   And so when you -- SO let's look at
19 your Exhibit 62.  When you assess liquidated
20 damages on January 28, 2019 back from
21 September 24, 2017, do you have -- did you look
22 or investigate as to whether or not there were

---

228

1 on-site personnel from the 24th of September of
2 2017 up until the completion of the assessment
3 period?
4      **A.   No, I did not.**
5      Q.   You're aware that Mr. Skov left the
6 project during that time period, correct?
7      **A.   Yes, I am.**
8      Q.   And that there was no other COR or a
9 PD that went to Guayaquil?
10     **A.   Correct.**
11     Q.   Did you make any determination as a
12 result of any proration that would be
13 appropriate?
14     **A.   No, I did not.**
15     Q.   Where does the September 24, 2017 date
16 come from?
17     **A.   That's the contract completion date**
18 **established in one of the modifications that**
19 **changed the time.**
20     Q.   Does the government claim that all the
21 delay past September 24, 2017 was the sole
22 responsibility of Montage?

---

Transcript of David Vivian
Conducted on November 12, 2019

229

1    A.    That's correct.

2    Q.    Does the government own any delay from
3  September 24, 2017 until substantial completion
4  was issued?

5        MR. WAX:  Objection to form.

6    A.    Not that I'm aware of.

7    Q.    And just since there was an objection.
8  Is the government responsible for any delay past
9  September 24, 2017 on this project?

10   A.    Not that I'm aware of.

11   Q.    But you are aware that you accepted a
12 schedule and paid the contractor on a schedule
13 with a February 2018 substantial completion date?

14   A.    Would you repeat that question?

15   Q.    Uh-huh.  But you're aware that the
16 government accepted a schedule and paid the
17 contractor on a schedule with a February 2018
18 substantial completion date?

19       MR. WAX:  I object as to form.

20   A.    I'm not sure about that.

21   Q.    Prior to assessing the liquidated
22 damages, did you look at any of the TIAs that had

230

1  been submitted on this project?

2    A.    No, I did not analyze them myself.

3    Q.    Did you look at any of the attachments
4  to the TIAs?

5    A.    I did not.

6    Q.    What investigation, if any, did you do
7  as to the causes of delay beginning on
8  September -- or the cause of delay on this job?

9    A.    I relied on the -- on the team that
10 was actually reviewing the TIAs as well as the
11 scheduling expert that we hired to assist.

12   Q.    That's RMCI, Resource Management
13 Consultant, something like that?

14   A.    I'm not sure which one.

15   Q.    Did you read their report?

16   A.    No, I did not.

17   Q.    So relied on Mr. Skov and Ms. Neal to
18 tell you what was in that report?

19   A.    Correct.

20   Q.    Did you get a recommendation from
21 Mr. Skov or Mr. Neal -- Mr. Skov or Ms. Neal
22 regarding the assessment of liquidated damages?

231

1    A.    I'm not sure.  Ms. Neal, yes.  Not
2  Mr. Skov.

3    Q.    And was Ms. Neal's recommendation to
4  you oral or in writing?

5    A.    Oral, I believe.

6    Q.    And what did Ms. Neal recommend to
7  you?

8    A.    Said the contractor late and
9  liquidated damages were authorized.

10   Q.    And any further discussion on that?

11   A.    Some discussion with counsel.

12   Q.    But with Ms. Neal any further
13 discussion as to the basis of why she thought
14 liquidated damages were appropriate to assess?

15   A.    Not particularly that I recall.

16   Q.    And when was that discussion vis-a-vis
17 your letter of January 28, 2019?

18   A.    It was sometime prior to the issuance
19 of the letter, but I'm not sure.

20   Q.    Was that a face-to-face meeting?

21   A.    Yes, I believe it was.

22   Q.    Do you recall how long that meeting

232

1  lasted?

2    A.    No, I don't.

3    Q.    How often do you assess liquidated
4  damages?

5    A.    Whenever the contract authorizes it
6  and the government is not responsible for the
7  delay.

8    Q.    Is it a more unusual circumstance or
9  is it typical in your experience?

10   A.    No, it's more unusual.

11   Q.    And prior to assessing these
12 liquidated damages, did you go back and review
13 any documents on ProjNet?

14   A.    No, I did not.

15   Q.    Did you go back and review any of the
16 documents on the shared drive that you had within
17 your department?

18   A.    No, I did not.

19   Q.    Did you look at the project schedules?

20   A.    No, I did not.

21   Q.    Did you look at the schedule updates?

22   A.    No.

Transcript of David Vivian
Conducted on November 12, 2019

233

1    Q.    Did you look at any of the
2 correspondence from the contractor as to what was
3 happening on the job?
4    A.    No, I did not.
5    Q.    I asked you earlier about a project
6 schedule that was accepted by the government
7 showing a substantial completion date in February
8 of 2018.
9        Do you recollect any conversations or
10 written communications with Ms. Neal regarding
11 her request for a schedule update showing a
12 substantial completion deadline of February 2018?
13   A.    No, I don't.
14   Q.    Would you take a look at what has been
15 marked as Exhibit 115 to your deposition. And
16 let me know when you're ready for questions.
17 It's October 23, 2017.
18   A.    This one?
19   Q.    Yeah, it's right here.
20        So Mr. Vivian, you've been handed by
21 the court reporter an email string from Ms. Neal
22 to you, remission of LDs, Guayaquil MSGR,

234

1 October 23, 2017. Take a minute and look at that
2 and I want to ask you a few questions.
3    A.    (Reviewing.)
4        MR. WAX:  When you make copies on two
5 sides, is that how they were produced to you or
6 is that just --
7        MS. HOSTETLER:  I have no idea.
8 That's how I usually do it just to save paper.
9        MR. WAX:  Because I think it makes no
10 sense.
11   A.    Yes, I read it.
12   Q.    So does this refresh your recollection
13 of -- that Montage had filed some claims in the
14 fall of 2017?
15   A.    I'm reading the email, but I don't
16 have recollection of that.
17   Q.    Ms. Neal says to you, quote, Montage
18 did pull back their claim as requested and agreed
19 to negotiate, close quote.
20        Did you ask Ms. Neal to request
21 Montage to pull back their claim and negotiate?
22   A.    I don't recall.

235

1    Q.    Do you know if there was a
2 negotiation?
3    A.    I don't remember.
4    Q.    Ms. Neal goes on to say that Bill
5 Prior's draft of the letter of intent to assess
6 LDs, close quote.  That letter was never sent,
7 was it, sir?
8    A.    I don't know.
9    Q.    Do you know if there ever was a letter
10 to Montage -- strike that.
11        Prior to your January 28, 2019 letter
12 assessing liquidated damages, had Montage been
13 put on notice that the performance period had
14 expired and liquidated damages could be assessed?
15   A.    I don't know.
16   Q.    Isn't that standard practice?
17   A.    Usually, yes.
18   Q.    Did you follow-up with Ms. Neal about
19 Montage pulling back their claim and agreeing to
20 negotiate?
21   A.    No, I did not.
22   Q.    Do you recall in the September/October

236

1 time period that Ms. Neal met with Montage and
2 discussed pulling back the claim and a resolution
3 to the impasse of accessing the EOB?
4        MR. WAX:  I'm going to object as to
5 the form.
6    A.    No, I don't.
7    Q.    So counsel objected, so let me ask.
8 During this time period wasn't there an issue
9 that -- that Montage was saying that they need
10 access to EOB and the government was saying you
11 can't have access to EOB.  Whatever reason there
12 was this disagreement between the parties as to
13 access of the EOB.  Do you recollect that?
14   A.    I remember something vaguely on that
15 subject, yes.
16   Q.    And do you recollect that Ms. Neal was
17 trying to break that logjam?
18   A.    That would have been her
19 responsibility, within the terms of the contract,
20 yes.
21   Q.    If you would take a look at what was
22 previously marked as Exhibit 64.

237

1        So the court reporter has put in front
2  of you what was previously marked as Exhibit 64,
3  which is an email between Donna Neal and Mr. Skov
4  and Ms. Lee. Let me know when you're ready for
5  questions.
6      A.   Yes, I'm ready.
7      Q.   And so Ms. Neal is stating that she
8  met with Montage and that they were going to
9  submit a PES showing a February substantial
10 completion, correct?
11     A.   Correct.
12     Q.   And do you know for a fact that they
13 did this?
14     A.   I do not know.
15     Q.   And are you aware that OBO accepted
16 this?
17     A.   No, I'm not aware.
18     Q.   Are you aware of any of the
19 circumstances as to why Mr. Skov was denying
20 access to the EOB?
21     A.   I do not recall, no.
22     Q.   Are you aware the beginning in the

238

1  fall of 2017, all PES updates showed a February
2  substantial completion date?
3      A.   No, I'm not.
4      Q.   Would you take a look at Exhibit 65.
5  Which is the narrative that goes with the
6  schedule. And I can provide you with the
7  schedule if that's helpful.
8        Have you seen this document before?
9  It's an October 19, 2017 -- dated October 19,
10 2017, and it's a PES month September 2007 update
11 narrative.
12     A.   No, I have not seen this before.
13     Q.   This would be uploaded along with the
14 actual schedule to ProjNet. Is that correct?
15     A.   Yes, that's a possibility. Correct.
16     Q.   Let me ask you to take a look at
17 Exhibit 65, previously marked as Exhibit 65.
18     A.   That's the one I'm looking at.
19     Q.   Oh, Exhibit 66. Which is another
20 series of emails with Mr. Skov. This one
21 includes Mr. Rendon and then Ms. Lee and
22 Ms. Neal.

239

1        MR. WAX: I don't see a Rendon. What
2  am I missing?
3        MS. HOSTETLER: First one.
4        MR. WAX: Oh, sorry.
5      Q.   So Mr. Skov is advising Ms. Lee that
6  the September 2017 PES submission Montage
7  uploaded on October 30, 2017, correct?
8      A.   Correct.
9      Q.   And Ms. -- he was responding to
10 Ms. Lee's question of did Montage submit the
11 schedule update showing the February completion
12 date?
13     A.   Yes, correct.
14     Q.   And he's saying yes, it happened?
15     A.   Yes.
16     Q.   Do you have any reason to believe that
17 that didn't happen?
18     A.   No.
19     Q.   And that's a September -- excuse me --
20 a February 2018 schedule update.
21        So take a look at Exhibit 67. So
22 Exhibit 67 is an email between Ms. Neal, Ms. Lee

240

1  and Ms. Lugo. Let me know when you're done
2  reading it.
3      A.   (Reviewing.) Yes.
4      Q.   So in December Ms. Neal is confirming
5  to Montage that the project schedule updates show
6  a February completion and that once Ms. Leah
7  approves the schedule, then the government will
8  begin processing some of the retainage to be
9  released, correct?
10     A.   Correct.
11     Q.   And in fact that schedule was approved
12 and some retainage was released, was it not, sir?
13     A.   I don't know.
14     Q.   Take a look at Exhibit 68. This is an
15 email string in December of 2017 on release of
16 retainage, which Ms. Neal said could only happen
17 after Ms. Lee approved the schedule. Let me know
18 when you're ready to answer questions.
19     A.   (Reviewing.) Ready.
20     Q.   So once again we're talking about
21 releasing the retainage based upon the February
22 substantial completion schedule, February 2018

241

1  substantial completion schedule.  Ms. Neal also
2  requests Ms. Lee to look into issuing substantial
3  completion for the MSGR, correct?
4      **A.    Correct.**
5      Q.    Do you know if that was done?
6      **A.    No, I don't.**
7      Q.    She also references, "The contract
8  states there can be per-building substantial
9  completions issued."
10         Were per-buildings substantial
11 completions issued?
12     **A.    Not that I recall.**
13     Q.    At the top Ms. Lee makes reference to
14 discussing retainage between Ms. Lee and Ms. Neal
15 because that has, quote, been a difficult issue
16 in the past, close quote.  Do you know what that
17 reference is to?
18     **A.    No, I don't.**
19     Q.    Was the retainage released?
20     **A.    I don't know.**
21     Q.    Take a look at Exhibit 69.  Exhibit 69
22 is an email string between Mr. Skov, Ms. Lee and

242

1  Ms. Neal in December of 2017.
2      **A.    Yes.**
3      Q.    And so based upon the government
4  accepting a project schedule showing a February
5  completion, it's a February 2018 completion, the
6  government is releasing $371,469.96 in retention,
7  correct?
8          MR. WAX:  Objection, form.
9      **A.    That's what it appears, yes.**
10     Q.    Do you know for a fact that actually
11 happened?
12     **A.    No, I don't.**
13     Q.    Take a look at Exhibit 70.  Exhibit 70
14 is an email string between Montage and Mr. Skov
15 where Mr. Skov advises Montage that in
16 recognition of Montage's progress towards
17 completion and the updated schedule showing
18 February completion, retained earnings will begin
19 to be released.
20     **A.    Correct.**
21     Q.    So it's fair to say that based upon a
22 February substantial completion project schedule,

243

1  the government was releasing a portion of the
2  retainage?
3      **A.    Correct.**
4      Q.    So when you go back to your
5  Exhibit 62, which is your liquidated damage
6  assessment letter, if Ms. Neal and Mr. Skov and
7  Ms. Lee are working on an accepted project
8  schedule with a substantial completion date of
9  February 2018, why are you assessing liquidated
10 damages back to September 24, 2017?
11         MR. WAX:  Objection to form.
12     **A.    Because this was a negotiated**
13 **agreement to release retainage based on the**
14 **contractor providing an accurate schedule.  So it**
15 **would not actually affect the actual performance**
16 **date in the contract.**
17     Q.    So is it your testimony that the
18 contractor should have known that the actual
19 performance schedule was still September 24,
20 2017?
21     **A.    Yes.**
22     Q.    And that the contractor should not

244

1  have relied upon the government accepting the
2  substantial completion date of February 2018?
3          MR. WAX:  Objection, form.
4      **A.    Correct.**
5      Q.    Do you know if the contractor was ever
6  told that?
7          MR. WAX:  Objection to form.
8      **A.    The contractor has a copy of the**
9  **contract with the established completion date in**
10 **it.  So that date was not changed by modification**
11 **to the contract, so the contractor should have**
12 **known that the date was not changed.**
13     Q.    And this was done as part -- started
14 with this whole discussion of requesting the
15 contractor pull back their claims so there could
16 be some negotiation.  Is that accurate?
17         MR. WAX:  Objection to form.
18     **A.    It appears so by the chain of emails,**
19 **yes.**
20     Q.    And so was there any discussion of the
21 contractor's claim?
22     **A.    I'm not sure.**

Transcript of David Vivian

Conducted on November 12, 2019

---

245

1   Q.   Were you involved in any discussion of
2   the claim that the contractor agreed to pull
3   back?
4   **A.   Not that I recall.**
5   Q.   Are you aware of any discussion that
6   Ms. Neal had with regard to the claim that the
7   contractor agreed to pull back?
8   **A.   I'm not aware of any.**
9   Q.   And so it's your testimony that the
10  contract pulling back that claim had nothing to
11  do with extending substantial completion to
12  February?
13       MR. WAX: Objection to form.
14  **A.   No, I'm not saying that.**
15  Q.   So would it be fair to say that by the
16  contractor pulling back that claim they
17  thought -- he's going to object.
18       Is it fair to say that the contractor
19  pulling back that claim was part of the
20  negotiation to have the parties agree to a
21  February substantial completion date?
22       MR. WAX: Objection to form.

---

246

1   **A.   The contractor pulling back the claim**
2   **was in accordance with the team and the**
3   **contractor included, agreement to have**
4   **discussions rather than go straight to a**
5   **contracting officer's decision.**
6   Q.   And were there such discussions?
7   **A.   I'm not sure.  I would assume so.  If**
8   **the team said -- if the contractor pulled back**
9   **the REA and the team said, hey, the contractor**
10  **pulled back the REA, which is in those emails,**
11  **then I would believe that the government team**
12  **followed through and had negotiations.**
13  Q.   And sitting here today are you aware
14  of any such negotiations?
15  **A.   I am not.**
16  Q.   What did you understand the contractor
17  pulled back?
18       MR. WAX: Objection to form.
19  **A.   The contractor pulled back a request**
20  **for a contracting officer's final decision.**
21  Q.   And that was on the extension of time,
22  wasn't it, the time claims?

---

247

1   **A.   I believe so, yeah.**
2   Q.   Would you be surprised if the
3   contractor was never afforded an opportunity to
4   meet with Ms. Neal and Mr. Skov to discuss those
5   claims?
6   **A.   Would I be surprised?**
7   Q.   Surprised.  You said you thought that
8   was the reason why they pulled back their claim
9   was to negotiate, right?
10  **A.   Yes --**
11       MR. WAX: Objection.
12  **A.   Yes, I would be surprised.**
13  Q.   Were you ever advised by your team
14  that they never sat down and negotiated?
15       MR. WAX: Objection to form.
16  **A.   I was not.**
17  Q.   Is that something that as a
18  contracting officer you should have been made
19  aware of?
20       MR. WAX: Objection to form.
21  **A.   Yes.**
22       MS. HOSTETLER: I'm ready to start a

---

248

1   new topic, if you want to take a five-minute
2   break.
3       MR. WAX:  I want to go home.  How much
4   longer?
5       MS. HOSTETLER:  I'm moving.  Do you
6   want to take just a five-minute break and I'll
7   mark a few exhibits and maybe we can be done?
8       MR. WAX:  Yeah.
9       (A recess was taken.)
10      (Exhibit 116 marked for identification
11  and attached to the transcript.)
12  BY MS. HOSTETLER:
13  Q.   Mr. Vivian, you received multiple
14  requests, letters, emails from Montage asking
15  them to remove Mr. Wright and Mr. Skov from this
16  project, correct?
17  **A.   Correct.**
18  Q.   So before you is Exhibit 116, which is
19  potentially one of those documents.  This is May
20  of 2017.  Take a minute and look at that and I'll
21  ask you a few questions.
22  **A.   (Reviewing.)  Yes.**

---

Transcript of David Vivian
Conducted on November 12, 2019

249

1    Q.    So this email seems to be a request by
2  Montage to -- or excuse me -- by the government
3  to remove some Montage people; specifically
4  Mr. Wright, correct?
5    **A.    Correct.**
6    Q.    Is it typical for a CM to request
7  removal of a contractor?
8    **A.    It sometimes happens.**
9    Q.    So at this time Ms. Neal was still the
10 contracting officer?
11   **A.    I believe so.**
12   Q.    What investigation -- you told
13 Ms. Neal to say, tell them we will investigate.
14 What investigation happened?
15   **A.    We just looked into the contract**
16 **whether we could remove a person because they**
17 **didn't follow a safety aspect, and we found no**
18 **supporting evidence.**
19       MR. WAX:  You found what?
20       THE WITNESS:  We found nothing that
21 would allow us to remove a contractor for this
22 one single incident.

250

1    Q.    This wasn't the only time that
2  Mr. Wright tried to get some of the Montage
3  people removed, correct?
4    **A.    I'm not sure.  I believe it happened**
5  **on other occasions.**
6    Q.    And you recall receiving numerous
7  formal letters from Montage, and even Montage's
8  counsel, requesting the removal of Mr. Skov and
9  Mr. Wright, correct?
10   **A.    I remember receiving emails from**
11 **Montage, correct.**
12   Q.    Did you not receive any of the letters
13 that were sent from Montage's counsel?
14   **A.    I don't recall letters, no.**
15   Q.    Were you not aware that Ms. Hamidina,
16 who's sitting right next to me, wrote half a
17 dozen letters to Ms. Neal requesting that
18 Mr. Skov and Mr. Wright be removed from the job
19 because they were hampering the project?
20   **A.    Not in particular, no.**
21   Q.    Those didn't come to you?
22   **A.    No, not that I recall.**

251

1    Q.    Was Mr. Skov a hindrance on this
2  project?
3    **A.    Not as far as I could see.  He was**
4  **trying to ensure the government got the project**
5  **it had acquired in accordance with the terms and**
6  **conditions of the contract.  But other than that,**
7  **no.**
8        (Exhibit 117 marked for identification
9  and attached to the transcript.)
10   Q.    Do you know if -- what Mr. Skov was
11 doing on the project was actually enforcing the
12 contract?
13   **A.    That's what OBO informed me of, yes.**
14   Q.    So you had conversations with people
15 at OBO about Mr. Skov's conduct on the project?
16   **A.    As far as I recall, yes.**
17   Q.    And who did you discuss that with?
18   **A.    Mostly with Donna and through Donna.**
19   Q.    And as best you can recall, what were
20 those conversations?  What were the issues that
21 were raised and what were the responses that were
22 received?

252

1    **A.    I remember -- apparently to me it was**
2  **a conflict of -- personality conflicts with the**
3  **contractor's personnel and our personnel.  And I**
4  **spoke to Donna about it and she spoke to OBO, and**
5  **it appeared to me that it was a personnel**
6  **conflict and that both teams just needed to get**
7  **together, get the work done and leave each other**
8  **alone.**
9    Q.    Were some of the issues -- strike
10 that.
11       Did Mr. Skov in addition to having a
12 personnel conflict with Montage, did he also have
13 issues with Ms. Neal?
14   **A.    I don't know.  I never heard of any.**
15   Q.    Maybe better said, did Ms. Neal have
16 issues with Mr. Skov?
17   **A.    Some, I believe.**
18   Q.    And some of those issues were that he
19 wasn't respecting her authority as the contract
20 officer?
21   **A.    I don't think it went that far.**
22   Q.    How would you describe those issues?

253

1     A.   Just really a nuisance.  Having a
2 personnel issue, a personal problem working with
3 the contractor.
4     Q.   So Ms. Neal's issue with Mr. Skov was
5 only that Mr. Skov and Montage had issues?
6     A.   That's what I believe.
7     Q.   I'll show you what's been marked as
8 Exhibit 117 to these depositions.  It's an email
9 string between you and Ms. Neal in February of
10 2017.  I'm only going to ask you about the first
11 section on top, but feel free to read as much of
12 this email as you choose.
13     A.   (Reviewing.)  Yes, I read it.
14     Q.   So Ms. Neal is reporting to you,
15 quote, The COR constantly challenging the CO's
16 decisions and revisiting the determination made
17 by contracting only hampers the progression more
18 than it already S.  I think she probably meant
19 as.
20     A.   Is.
21     Q.   Or is.
22          So is that consistent with the

254

1 communications that you had with Ms. Neal about
2 Mr. Skov's conduct on this job?
3     A.   Yes, correct.
4     Q.   Does that refresh your recollection
5 that he was challenging her decisions as well as
6 having a personnel issue with Montage?
7     A.   Well, decisions can be challenged.
8 She just has to put her foot down and assure that
9 the contracting officer's representative is
10 abiding by the contract and her direction in
11 accordance with the contract.
12     Q.   And did she put her foot down?
13     A.   As far as I know.
14     Q.   And did Mr. Skov acknowledge her
15 authority?
16     A.   Yes, I believe he did.
17          MS. HOSTETLER:  Would you provide the
18 witness with Exhibit 58.
19     Q.   The court reporter's handed you what's
20 been previously marked as Exhibit 58, which is an
21 email string, March of 2017, between you and
22 others.  Take a minute and look at that.  And I'm

255

1 going to ask you again about the top email, but
2 read as much as you choose.
3     A.   I might have something different here.
4     Q.   Is it not --
5     A.   Which exhibit?
6     Q.   Exhibit 58.
7          MR. WAX:  No.  It's a Telecon memo.
8          THE WITNESS:  Yeah.
9          MS. HOSTETLER:  Okay.
10          (Exhibits 118 and 119 marked for
11 identification and attached to the transcript.)
12 BY MS. HOSTETLER:
13     Q.   Mr. Vivian, do you recall Ms. Neal
14 telling you that Mr. Wright would refer to
15 Montage or its employees as grunts?
16     A.   I don't recall that.
17     Q.   And do you recall Ms. Neal telling you
18 that during a Q and A session he asked one of
19 Montage's contractors if he's, quote, having fun
20 yet?
21     A.   I don't recall that.
22     Q.   Do you recall Ms. Neal telling you

256

1 that that was consistent with the behavior that
2 she saw from Mr. Wright during her site visit in
3 February of 2017?
4     A.   I don't recall that.
5     Q.   Who is Chrissy Fields?
6     A.   Chrissy Fields is another contracting
7 officer in the contracting office who works with
8 me.
9     Q.   And Mr. Powell, Robert Powell?
10     A.   He's the director of my section, of
11 AQM.  My boss.
12     Q.   And so why would Ms. Neal be copying
13 Ms. Fields and Mr. Powell about an issue with
14 Mr. Wright?
15     A.   I'm not sure.
16     Q.   Do they have any -- do they have any
17 reporting or supervisory obligations over
18 Mr. Wright?
19     A.   No.
20     Q.   Let me show you what's been marked as
21 Exhibit 118 to these depositions.  It's an email
22 between you and Mr. Skov of June of 2017.  Take a

257

1  minute and look at it.  I'm going to ask you a
2  few questions.
3      **A.    (Reviewing.)  Yes, I'm done.**
4      Q.    So your email to Mr. Skov ends with,
5  "Please explain in detail the issues you are
6  attempting to create."
7          Is that your view, that Mr. Skov would
8  attempt to create issues with the contract --
9  contractor?
10     **A.    Well, he's wondering about who gave**
11 **the contractor authority to change designers from**
12 **Page, so Page to BCG.  And it was probably**
13 **accepted considerably before this letter -- or**
14 **this email changed hands.  So I'm trying to find**
15 **out what exactly is his issue with the contractor**
16 **having changed years ago to a different designer.**
17     Q.    Do you recall if he ever responded to
18 you?
19     **A.    I don't recall.**
20     Q.    Let me show you what's been marked as
21 Exhibit 119, which is a June 30, 2017 email.
22 Take a look at that.  Again, this is between you

258

1  and Ms. Vivian.
2          MR. WAX:  He is Mr. Vivian.
3      Q.    Excuse me, you and Ms. Neal.  And this
4  may be the response to the last or it may be a
5  different issue.  But take a look at it and I'll
6  ask you some questions.
7      **A.    (Reviewing.)  Yes, I'm done.**
8      Q.    So it appears that Ms. Neal responded
9  to that email chain, whether or not Mr. Skov did
10 or not, and she says, quote, He, referring to
11 Mr. Skov, likes to stir the pot, so to speak,
12 close quote.  Is that your impression of Mr. Skov
13 as well?
14     **A.    Yeah, uh-huh.**
15     Q.    Did that create problems with the
16 contractor?
17     **A.    I don't know.  They seem -- like I**
18 **said, they seem to have a personality conflict**
19 **getting along with each other.**
20     Q.    You recollect that there was an issue,
21 I believe we touched on it earlier this morning,
22 with Montage hiring a local labor lawyer to

259

1  resolve some labor issues on site?
2      **A.    Correct, yes.**
3      Q.    And I think I asked you some questions
4  earlier this morning that I don't believe that
5  you're aware of.
6          Were you aware of Mr. Wright's
7  involvement in talking to Montage's employees?
8          MR. WAX:  Objection to form.
9          MS. HOSTETLER:  Let me rephrase that.
10     Q.    Were you aware that Mr. Wright was
11 requesting translation of employee compensation
12 information to provide to Montage's employees?
13         MR. WAX:  Objection to form.
14     **A.    I knew there was an issue with**
15 **compensation to the employees and that the COR**
16 **and Mr. Wright was working to ensure the**
17 **contractor's personnel were being compensated**
18 **correctly.**
19     Q.    Is it your recollection that you --
20 that Mr. Wright and Mr. Skov were supposed to be
21 working this issue through on behalf of the
22 government?

260

1      **A.    Correct, yes.**
2      Q.    So your testimony is that you knew
3  that was happening and you approved of their
4  involvement?
5      **A.    I knew that they -- they felt that the**
6  **employees had complained that they weren't**
7  **getting compensated properly in accordance with**
8  **the Ecuadorian laws.  And if the personnel were**
9  **not getting compensated properly, then the U.S.**
10 **government would be held responsible.  In fact,**
11 **the ambassador would be held responsible for**
12 **paying the employees any money due to them.**
13         **So yes, it was the government's**
14 **responsibility to assure that the contractor was**
15 **operating in accordance with the local labor**
16 **laws.**
17     Q.    Didn't you actually tell Mr. Skov and
18 Mr. Wright several times to stand down and let
19 Montage work that issue?
20     **A.    Sure, yes.  I mean we identified the**
21 **problem and now we have to make sure that they're**
22 **getting it.  So they should -- not to be too**

Transcript of David Vivian
Conducted on November 12, 2019

261

1 involved in the contractor's business of
2 compensating their employees, but certainly
3 involved enough to ensure that they were doing it
4 properly.
5    Q.    And in fact they were involved because
6 they were circulating information to the
7 employees, were they not?
8    A.    I don't know.  They were circulating
9 information to -- the employees were given new
10 information and they were getting --
11   Q.    No, sir.  No, sir.
12       MR. WAX:  Can we let one person finish
13 and then the next person go?
14   Q.    Are you done with your answer?
15   A.    I'm done.
16   Q.    Are you aware that Mr. Wright was
17 providing information to the employees suggesting
18 that they were not being properly compensated?
19   A.    I'm not aware of that.
20   Q.    Are you aware that Mr. Wright was
21 talking to the employees and trying to get them
22 to strike?

262

1    A.    I'm not aware of that.
2        MS. HOSTETLER:  Can you show the
3 witness Exhibit 55?
4    Q.    You're looking at Exhibit 55, which
5 has some affidavits, some in English and some in
6 Spanish.
7        Have you seen that document before?
8    A.    I don't recall seeing it.
9        MR. WAX:  Are you saying this is an
10 affidavit?
11       MS. HOSTETLER:  Yes.  It was attached
12 to an email.
13   Q.    Have you not seen this document
14 before?
15   A.    I don't recall seeing it.
16   Q.    Is this the kind of information that
17 as -- you were not the CO at the time, but you
18 were the CO's supervisor, that you would want to
19 know about that was happening on the job site?
20       MR. WAX:  Objection to form.
21   A.    Well, if there was any encouragement
22 for the workers to go on strike, then yes, that

263

1 would be something the government would be --
2 would need to be aware of.
3    Q.    But you weren't -- you're telling me
4 you were not aware of this email so you didn't
5 investigate this issue, correct, or this
6 affidavit?
7    A.    I don't recall seeing this affidavit.
8        MR. WAX:  I don't have an affidavit.
9 Am I looking at the right document?
10       MS. HOSTETLER:  Yes, you are, sir.
11   Q.    Did Ms. Neal bring this issue to your
12 attention?
13   A.    I don't recall.
14   Q.    Would you take a look at Exhibit 61.
15 This is an email string between, at the bottom,
16 Ms. Neal, Mr. Wright and others, and at the top
17 just between Mr. Rendon and himself and
18 Mr. Wright.  So take a few minutes and look at
19 that and I'll ask you a few questions.
20   A.    (Reviewing.)  Okay.  I can't read the
21 Spanish ones.
22   Q.    I can't either.

264

1        Were you aware that Mr. Wright
2 requested Mr. Rendon to translate the benefits
3 into Spanish?
4    A.    Into Spanish?  No, I was not aware.
5    Q.    Do you see where he specifically asks
6 Mr. Rendon to translate the benefits into
7 Spanish?
8    A.    Yes, I see that here, but I wasn't
9 aware of it.
10   Q.    And this is after the CO, Ms. Neal,
11 told Mr. Wright that Montage is having their
12 attorneys work through this issue, correct?
13   A.    Correct.
14       (Exhibit 120 marked for identification
15 and attached to the transcript.)
16   Q.    The court reporter has marked as an
17 exhibit to these depositions Exhibit 120, an
18 email string.  And again, you are, I believe,
19 copied on a couple of the emails later but
20 certainly not the last several.  Take a minute
21 and read that and I'm going to ask you a few
22 questions about it.

265

1    A.    (Reviewing.)  Yes, I'm done.
2    Q.    Exhibit 120, does this refresh your
3 recollection to the fact that you got involved in
4 this dispute?
5    A.    Oh, I remember the dispute, yeah.
6    Q.    And you got involved, at least
7 according to this email string, when Mr. Skov
8 copies you on one of the emails --
9    A.    Correct.
10    Q.    -- and then you're throughout the
11 rest?
12    A.    Right.
13    Q.    And you tell Mr. Skov -- and I'm
14 referring to the email at the bottom of what ends
15 with 24.
16    A.    Yes.
17    Q.    So it's the February 24, 2017,
18 6:04 a.m.  You tell Mr. Skov essentially that
19 it's not his job to adjudicate the complaints,
20 correct?
21    A.    Correct.
22    Q.    Mr. Skov responds and you come back to

266

1 him later that day and you say, quote, Allow the
2 contractor to work and resolve the issues with
3 its workforce.  Just because there are complaints
4 does not make them correct or -- I think you mean
5 true, correct?
6    A.    Yes.
7    Q.    And Mr. Skov responds to you that he
8 doesn't take any sides on this matter, correct?
9    A.    Correct.
10    Q.    But he didn't -- he continued to be
11 involved, did he not?
12    A.    Yes, he was.
13    Q.    You again tell him in a later email,
14 "It took years for these folks to realize they
15 wanted to raise allegations of mistreatment with
16 Montage.  Twenty four days is not a long for
17 Montage and its workers to hold discussions to
18 resolve these issues," correct?
19    A.    Correct.
20    Q.    And then there's some internal email
21 between Mr. Skov and Mr. Wright where apparently
22 you're not high on their list.  Fair enough?

267

1    A.    Yeah, reasonably.
2    Q.    Where Mr. Wright says to Mr. Skov,
3 "This guy needs to be taken down"?
4    A.    Uh-huh.
5    Q.    Did you ever sense any sort of
6 animosity from Mr. Wright?
7    A.    No.
8        (Exhibits 121 through 125 marked for
9 identification and attached to the transcript.)
10    Q.    Let me show you what was marked as
11 Exhibit 121 to these depositions, which is
12 another email string.
13        MR. WAX:  Exhibit 121?
14        MS. HOSTETLER:  Yes, sir.
15    Q.    Involving some of these issues.  And
16 just a few questions.  You'll see part of it's
17 that same email string at the end and then
18 different people get on as it finishes.
19    A.    (Reviewing.)  Yes.
20    Q.    So referring to Exhibit 121, on the
21 front page there's an email from you to Nicole
22 Varnes or Varnes --

268

1    A.    Yes.
2    Q.    -- on March 9, 2017.  Who is she?
3    A.    I'm not sure.  It must be somebody in
4 OBO.
5    Q.    And these other people that are copied
6 on here, which it looks like your actually just
7 responding to an email, do you know who they are?
8 Can you tell us who they are?  We know who Jorge
9 Vazquez is.  At the time he was Mr. Skov's
10 immediate superior.  Do you know who Karen
11 Heimsoth is?
12    A.    No.
13    Q.    Toby Kinnett?
14    A.    No.
15    Q.    Ardeshir Kanga?
16    A.    Kanga, yeah.  He's a person in OBO
17 construction management.  I'm not sure what
18 position he had at the time.
19    Q.    And how about Brian McKenna?
20    A.    Yeah.  He's also a person in OBO.
21 And -- OBO construction management.
22    Q.    Phyllis Patten?

Transcript of David Vivian
Conducted on November 12, 2019

68 (269 to 272)

269

1    A.    She's an assistant on the 13th floor
2  to the OBO director, I think.
3    Q.    Stephen Stewart?
4    A.    No.
5    Q.    Powell --
6    A.    Bob Powell?
7    Q.    Yeah, Bob Powell.  Oh, I guess it's
8  Bruce Stephen Stewart maybe.
9    A.    Yeah.
10    Q.    And Bob Powell?
11    A.    He's my supervisor.
12    Q.    And do you know why all of these
13  people were included in this email string
14  discussing this labor issue?
15    A.    No.  Somebody included them.
16    Q.    And that was Ms. Varnes included them?
17  Because you were responding to her email.
18    A.    Yeah.  They were included at some
19  point before I even responded.
20    Q.    These are all people above Mr. Skov?
21    A.    I can't say that for sure.  Because
22  this is OBO's organization.

270

1    Q.    And when you say in your email of
2  March 9, 2017 on Exhibit 121, quote, It is coming
3  from your PD, close quote, what do you mean by
4  that?
5    A.    It's coming from the person that --
6  OBO's project director, they assigned to the
7  project.
8    Q.    In other words, you thought they were
9  taking issue with something that the contracting
10  side was doing when it was really information
11  that was being stirred up by Mr. Skov?
12        MR. WAX:  I'm going to object to the
13  form.
14    A.    Well, it's -- the information is
15  coming from him, right.
16    Q.    And then you go on to say that all
17  communication issued by the CO is official.  What
18  do you mean by that?
19    A.    The contracting officer -- if I signed
20  as the contracting officer or anybody signs as
21  the contracting officer, it is official contract
22  correspondence.

271

1    Q.    And that's in response to Ms. Varnes's
2  requests for why nothing official has been done
3  to resolve this issue?
4    A.    Correct.
5    Q.    And then you end by saying,
6  "Termination has not been considered as there's
7  no evidence of any mistreatment has occurred.
8  The project is near completion.  I believe the
9  workers may be concerned about their future."
10        Did you think that resolved
11  Ms. Varnes's concerns?
12    A.    I'm not sure.
13    Q.    Did you hear any more from any of the
14  other people that were copied on this, including
15  your boss, as to what's going on?
16    A.    Well, there were -- there was regular
17  correspondence about the proper payment of
18  workers down in Guayaquil, to ensure that this
19  didn't come back and get assessed against the
20  U.S. government if they weren't properly
21  compensated.
22    Q.    And once again, Mr. Skov and

272

1  Mr. Wright have their private conversation on the
2  top?
3    A.    Uh-huh.
4    Q.    Did Mr. Skov ever exhibit any sort of
5  animosity towards you?
6    A.    No.
7    Q.    So when he says let me know -- I guess
8  this would be Mr. Wright saying to Mr. Skov, "Let
9  me know if you want me to step in on this and get
10  right to the point of contracting falling flat on
11  its face," you --
12    A.    Yeah, that's Mr. Skov.
13    Q.    That's Mr. -- that's to Mr. Skov from
14  Mr. Wright, correct?
15    A.    No, from Mr. --
16    Q.    -- Wright to Mr. Skov?
17    A.    Yeah.  No, it says to Mr. Skov.  Oh, I
18  see, from Mr. Wright.  It's reversed.
19    Q.    And I think I had asked you earlier,
20  you had never sensed any animosity from
21  Mr. Wright?
22    A.    That's correct.

273

1   Q.   Have you ever met Mr. Wright?

**2   A.   Not that I recall.**

3   Q.   And I think I asked you.  You're not

4   working on any current projects with him or

5   anything?

**6   A.   No, I'm not.**

7       MR. WAX:  When you refer to

8   Mr. Powell, can you refer to him as his

9   supervisor and not his boss?

10      MS. HOSTETLER:  Okay.  Fair enough.  I

11  didn't mean anything by that.

12      THE WITNESS:  I know.

13      MS. HOSTETLER:  So I apologize if that

14  was not appropriate.

15      THE WITNESS:  Not to worry.

16  Q.   Let me show you what's been marked as

17  Exhibit 122 to your deposition and take a minute

18  and look at it.  You are on the bottom email but

19  again not on the top email.

**20  A.   (Reviewing.)  Yes.**

21  Q.   So in Exhibit 122, Mr. Wright is

22  reaching out to Mr. Vazquez.  And in the chain of

274

1   command he would be a supervisor to Mr. Wright.

2   Mr. Vazquez would be a supervisor to Mr. Wright?

**3   A.   Correct.**

4   Q.   With Mr. Skov in between?

**5   A.   Yes.**

6   Q.   And so Mr. Wright's reaching out to

7   Mr. Vazquez as well as Ms. Neal as the

8   contracting officer, you and several others

9   requesting some action.  You then turn around and

10  request Montage to respond and give you some

11  information --

**12  A.   Correct.**

13  Q.   -- correct?

**14  A.   Yes.**

15  Q.   Mr. Wright then forwards that on to

16  Mr. Coleman.  Who is Mr. Coleman?

**17  A.   Someone at the Guayaquil embassy.  I'm**

**18  not sure who he is.**

19  Q.   And so Mr. Wright is telling the

20  embassy, somebody at the embassy that it doesn't

21  sound like contracting is too excited about your

22  situation.  Were you taking this matter

275

1   seriously?

**2   A.   Yes, of course.**

3   Q.   And in fact Montage responded to you,

4   did they not?  Showing you Exhibit 123, which is

5   an email string of March 10, 2017.  Take a minute

6   and look at that.

**7   A.   (Reviewing.)  Yes, I'm done.**

8   Q.   So in this email, which is a variation

9   or a continuation of Exhibit 122, in Exhibit 123,

10  Montage responds and says they're going to

11  provide you documentation, and they clearly take

12  issue with Mr. Wright's characterization of

13  what's happening, correct?

**14  A.   Correct.**

15  Q.   And did in fact Montage provide you

16  with information and ultimately get this issue

17  resolved?

**18  A.   Yes, they did.**

19  Q.   And of course we have Mr. Wright and

20  Mr. Skov once again emailing at the top.

21      Did you consider the -- Mr. Wright's

22  email to Mr. Vazquez an internal email that

276

1   shouldn't have been distributed outside of

2   contracting?

**3   A.   No.**

4   Q.   So let me show you what's been marked

5   as Exhibit 124, which is another version of that

6   email string.  You'll see that same request at

7   the bottom, you know, from Mr. Wright to

8   Mr. Vazquez and others, and then you to Montage

9   and Montage back to you.  And then the last --

10  the front page is new information.

**11  A.   (Reviewing.)  Yes, I'm done.**

12  Q.   So when you described earlier there

13  was a personnel issue between Montage --

**14  A.   Personality conflict.**

15  Q.   Personality conflict -- is what

16  Mr. Skov was referencing on the bottom of this

17  page in response to Montage evidence of what you

18  viewed as a personality conflict?

**19  A.   Correct.**

20  Q.   And your response to them, as the

21  former military officer that you are, is just

22  finish the project construction, please, correct?

Transcript of David Vivian
Conducted on November 12, 2019

277

1    A.    Correct.
2    Q.    And again of course Mr. Wright and
3  Mr. Skov have their side chat?
4    A.    Yes.
5    Q.    I guess I should say saying, "This guy
6  is beyond believe." I think that means belief,
7  not believe.
8          Were you informed that Mr. Wright had
9  discussions with folks about getting arrest
10 warrants issued for Nela and Thad relating to
11 this labor dispute?
12   A.    No.
13   Q.    Is that the kind of thing that should
14 have come to your attention?
15   A.    It should not occur, right.
16         MS. HOSTETLER: Can you show the
17 witness Exhibit 5 to Mr. Skov's deposition?
18   Q.    So that's the wrong exhibit, sir. So
19 you can try to read it, but I can tell you those
20 are Mr. Skov's notes.
21   A.    That's brutal, yeah.
22   Q.    So while we're looking for what that

278

1  document is, because clearly I wrote down the
2  wrong number again, let me show you what the
3  court reporter's marked as Exhibit 125 to this
4  deposition. And this is in that same timeframe
5  as the last several emails that we've been
6  looking at. So March 13, 2017. Take a look at
7  this document and I'll ask you a few questions.
8    A.    (Reviewing.) Yes, I'm done.
9    Q.    So on Exhibit 125, it's a March 13,
10 2017 email from you to Patricia Fietz. Who is
11 she?
12   A.    Someone again at the -- she's the
13 principal officer. Yeah, she's someone at the
14 embassy -- or the consulate in Guayaquil.
15   Q.    And also this is to Mr. Wright and
16 copied to Mr. Skov. Was Mr. Skov not on site
17 during this project or this portion of the
18 project?
19   A.    I'm not sure.
20   Q.    So the last sentence of that second
21 paragraph says, "Any action directed by us, based
22 on misinterpretation of the contractor's

279

1  documentation or the Ecuadorian laws or that is
2  at odds with the terms of the settlement
3  negotiated between the contractor and its
4  employees, may come back on us."
5          What did you mean by that?
6    A.    I mean that we should let the
7  contractor work out their issues with their
8  employees and not get involved in -- get in the
9  middle of it.
10   Q.    And did Mr. Skov and Mr. Wright
11 continue to get in the middle of this issue?
12   A.    Well, they continued to inform the
13 people at the embassy -- or at the consulate and
14 us in Washington that there was an issue that
15 needed to be resolved.
16   Q.    And is it fair to say that Mr. Skov
17 and Mr. Wright had a contrary view of the
18 situation than you did?
19   A.    Well, they were handling it in a
20 different manner than what I would have
21 preferred, which would have been to just work
22 with the contractor to get it corrected without

280

1  getting numerous individuals involved.
2          MS. HOSTETLER: Would you show the
3  witness Exhibit 54.
4    Q.    I would like to show you what's
5  previously been marked as Exhibit 54, which is an
6  email between Mr. Wright and Mr. Skov, "Re: Top
7  secret until the cat jumps out of the hat,"
8  March 15, 2017. And I believe it relates to the
9  same issue, the labor dispute.
10   A.    (Reviewing.) Yes, I'm done.
11   Q.    So were you aware that Mr. Wright and
12 Mr. Skov were discussing warrants for Nela and
13 Thad?
14   A.    No, I wasn't.
15   Q.    Is that the type of information that
16 should have been passed up to the contracting
17 officer and then to you?
18   A.    I don't know if it's true or not. I
19 have no idea about this.
20   Q.    Mr. Wright's using his personal
21 account for this. And I believe the David L.M.
22 Skov is not his government email.

Transcript of David Vivian
Conducted on November 12, 2019

281

1    A.    Uh-huh.
2    Q.    Mr. Wright says, "I image termination
3 this week?"
4        Did you understand Mr. Wright and
5 Mr. Skov to be rooting for termination for
6 Montage?
7    A.    Not that I know of.  They never voiced
8 that to me.
9    Q.    Did you understand that they were
10 rooting for arrest warrants for some of Montage's
11 key personnel?
12    A.    They never communicated that to me.
13    Q.    That would be inappropriate, wouldn't
14 it?
15    A.    I had seen no issues that would
16 justify such an action.
17    Q.    And if they were rooting for them to
18 be terminated and arrested, that would be
19 inappropriate for a contracting officer
20 representative and a contracting -- a CM?
21        MR. WAX: Objection.
22    A.    Well, they have no ability to

282

1 influence such a decision.
2    Q.    They certainly have the ability to
3 influence a termination to the extent that they
4 can impact how the contract -- contractor works
5 and hold the contract to higher-than-required
6 contract standards and specifications.  I mean
7 certainly a PD and a COR and a CM have a lot of
8 ability to influence whether or not a contractor
9 has a good working relationship or whether
10 they're constantly on the line trying to get them
11 terminated?
12        MR. WAX: Objection, form.
13    A.    They can influence the contractor's
14 performance but they can't influence a
15 termination.
16    Q.    Can they hinder the project?
17        MR. WAX: Objection, form.
18    A.    I suppose they could find a way.
19    Q.    And if they hinder the project and it
20 causes delay, can that result in potentially
21 termination by the contracting officer?
22    A.    There are a number of issues that have

283

1 to be considered before a contracting officer
2 terminates a contract.  And I don't think we
3 would get that far in this situation.
4    Q.    You know that with regard to this
5 labor issue they were even asking for the bonds,
6 and I believe it's even referenced in Exhibit 54,
7 they were asking for the bond information?
8    A.    That's correct.
9    Q.    And you told them that that was a
10 contracting responsibility and if somebody needed
11 to do that, you or Ms. Neal would take care of
12 that, correct?
13    A.    Correct.
14    Q.    Do you have any idea what Mr. Wright
15 means when he says, "Hopefully then you can head
16 Viv's way when the investigation starts"?
17    A.    No idea.
18    Q.    Do you know what investigation he was
19 talking about?
20    A.    No.
21    Q.    There was another issue on this
22 project that dealt with the submission of

284

1 drawings and the appropriate --
2        MR. WAX: Seal.
3        MS. HOSTETLER: Thank you.
4    Q.    -- the appropriate seal that went on
5 it.  Do you recall that issue?
6    A.    Yes, I do.
7    Q.    And Mr. Wright and Mr. Skov referred
8 to that as fraud and falsification, correct?
9    A.    Correct.
10    Q.    And you recall that the government
11 ultimately resolved that as being a clerical
12 error?
13    A.    No, I don't remember that.
14        MS. HOSTETLER: Will you show the
15 witness Exhibit 58.
16    Q.    If you would take a look at what was
17 previously marked as Exhibit 58.  And the section
18 is this one in between with the Najib OBO/CE, and
19 it's the third bullet point down.
20        MR. WAX: What is this?
21    A.    (Reviewing.)  Yes, I read that
22 section.

285

1    Q.    Does this refresh your recollection
2 that the issue that Mr. Skov and Mr. Wright
3 referred to as falsification and fraud were
4 resolved as a clerical error?
5    **A.    No.  That's this gentleman, Najib,**
6 **talking to Mr. Skov and whoever else this**
7 **document is addressed to.  But when I spoke to**
8 **Montage about it, they told me that there was an**
9 **issue with the person in the designer of record,**
10 **that she had an accident or something and she was**
11 **in the hospital.  And there was some issue with**
12 **people not stamping the documents as was agreed**
13 **by their original contract.  And I spoke to other**
14 **people in OBO about it and legal counsel.  And we**
15 **basically agreed that there was no harm or intent**
16 **to defraud the government or to falsify**
17 **documentation.  They were using the staff to**
18 **further the project by stamping the documentation**
19 **and submitting it as they would have done.  It**
20 **was all correctly submitted.  They weren't trying**
21 **to get away with anything.**
22    Q.    And that was ultimately resolved,

286

1 correct?
2    **A.    Yes.  There were a set number of**
3 **documents that I understand were incorrectly or**
4 **falsely stamped.  And we worked through those**
5 **number of documents and that was the end of the**
6 **issue.**
7    Q.    Was it the end of the issue for
8 Mr. Wright and Mr. Skov?
9    **A.    I'm not sure.**
10       MS. HOSTETLER:  Why don't we take five
11 minutes.  I think I only have a couple more
12 documents, but I want to consult here.
13       MR. WAX:  Thanks.
14       (A recess was taken.)
15       (Exhibits 126, 127 and 128 marked for
16 identification and attached to the transcript.)
17 BY MS. HOSTETLER:
18    Q.    Mr. Vivian, let me show you what's
19 been marked as Exhibit 126 to this deposition,
20 which is another email between Mr. Wright and
21 Mr. Skov.  And I know that you're not on this,
22 but take a look and read it.  I'm going to ask

287

1 you about the items at the bottom under ALM.
2    **A.    (Reviewing.)  Okay.**
3    Q.    So ALM is your group?
4    **A.    Correct.**
5    Q.    Are any of those 11 items that
6 Mr. Wright lists in Exhibit 126 accurate
7 depictions of project issues on this project?
8    **A.    No.**
9    Q.    You would disagree with all of those?
10    **A.    Yes.**
11    Q.    Do you know --
12    **A.    Maybe some discussions with the**
13 **contractor without reporting it to the field,**
14 **yes, that's a possibility.**
15    Q.    Is that -- that happens on many
16 projects, probably?
17    **A.    Sure.  Because we're the contracting**
18 **officer.  So if the contractor wants to talk to**
19 **us, then they want to talk to us.**
20    Q.    Are you aware of any reason why
21 Mr. Wright would be preparing such a list?
22    **A.    No.**

288

1    Q.    Let me show you what's been marked as
2 Exhibit 127, which is another email chain that
3 you are not on.  So take a minute and look at it.
4 This is between Mr. Wright and Mr. Powell.  And
5 Mr. Powell is your superior?
6    **A.    No, no.  This is a different Powell.**
7    Q.    Oh, I see.  Thank you.  Thank you.
8    **A.    (Reviewing.)  Yes.**
9    Q.    So the beginning of this email is on
10 the back page of Exhibit 127.  This is an email
11 string in May of 2017.  Mr. Wright is emailing to
12 Mr. Powell stuff but he's making reference to
13 criminal -- alleged criminal conduct by Montage.
14 Do you see that, sir?
15    **A.    Yes.**
16    Q.    Did Mr. Wright or Mr. Skov ever bring
17 to your attention any allegations of criminal
18 conduct by Montage such as referenced in this
19 email?
20    **A.    No.**
21    Q.    If there were such criminal conduct
22 wouldn't you have needed to be aware of it as the

289

1  contracting officer?

2      **A.   Certainly aware of it.  But of course,**
3  **I can't get involved in criminal activity.  I**
4  **would have to turn that over to the proper**
5  **authorities.**

6      Q.   But you would want to know if there
7  was any criminal -- even allegations of criminal
8  activity on a project that you're overseeing?

9      **A.   Yes.**

10     Q.   Mr. Wright also suggests that you, as
11  the contracting officer's boss, his words, not
12  mine, is lining his pockets.

13     **A.   Yes.**

14     Q.   Did Mr. Wright ever express such --
15  anything such like that to you?

16     **A.   No.**

17     Q.   Do you know where that comes from?

18     **A.   From his head.  No, I have no idea.**

19     Q.   Maybe not his head.

20     MR. WAX: That's a good one.

21     THE WITNESS: Yeah, yeah, definitely.

22     MR. WAX: I needed that.

290

1      Q.   Let me show you what's been marked as
2  Exhibit 128 to these depositions and ask you to
3  take a look at that.

4      MR. WAX: I'm going to object to the
5  introduction of this document, which is on its
6  face privileged.

7      MS. HOSTETLER: Is this an attorney?

8      MR. WAX: No.  It's law enforcement
9  privilege.  It says so right on the document.

10     MS. HOSTETLER: Where does it say
11  that?

12     MR. WAX: Right on the back.  "Law
13  enforcement sensitive.  Do not forward, release
14  or disseminate." So you work this out with Jeff.

15     MS. HOSTETLER: All right.  I will
16  work that out with Jeff.

17  BY MS. HOSTETLER:

18     Q.   So let me ask you, Mr. Vivian.  Are
19  you aware of an OIG investigation?

20     MR. WAX: Okay.  Let's stop right
21  there.

22     MS. HOSTETLER: Can I not ask him

291

1  that?

2      MR. WAX: No.  It's done.  Work it out
3  with Jeff.

4      MS. HOSTETLER: I understand.  Put
5  your objection on the record.

6  BY MS. HOSTETLER:

7      Q.   Are you aware of an OIG investigation
8  involving senior management at OBO?

9      MR. WAX: I'm just going to direct the
10  witness not to answer.

11     Q.   Mr. Vivian, you described Mr. Wright
12  and Mr. Skov's relationship with the contractor
13  as a personality conflict?

14     **A.   Correct.**

15     Q.   Did that personality conflict impede
16  the contractor's ability to sit down and
17  negotiate project issues?

18     **A.   I'm not aware -- I can't comment on**
19  **that.  I don't know.**

20     Q.   If there was a personality conflict
21  between Mr. Skov, Wright and Montage, Mr. Skov
22  and Wright on one side and Montage on the other,

292

1  would that impede their ability to meet and
2  confer on issues relating to the project?

3      **A.   It shouldn't.  They're professionals.**
4  **They should be able to get around that.**

5      Q.   Would that personality conflict affect
6  the -- the ability to timely resolve RFIs?

7      **A.   It should do, but once again they're**
8  **professionals.  It may do, but they're**
9  **professionals.  It should not.**

10     Q.   Did it?

11     **A.   I'm not sure.**

12     Q.   How about RFPs, timely result in RFPs?

13     **A.   I'm not sure.**

14     Q.   Your job during part of this as the
15  contracting officer was to be the arbitrator of
16  disputes and recognize when the government was
17  engaging in conduct that would hinder the
18  project.  Did Mr. Skov and Mr. Wright engage in
19  such conduct that hindered the project?

20     **A.   I'm not sure.**

21     Q.   Based upon your disagreement with many
22  of the things that Mr. Wright and Mr. Skov

Transcript of David Vivian
Conducted on November 12, 2019

293

1 reported, how can you rely upon their
2 representations to you in rendering your final
3 decisions?
4     **A.    I have to just look at the record and**
5 **rely on Donna Neal, who was assisting and**
6 **reviewing the information with them and other OBO**
7 **personnel to have reached the proper decision.**
8     Q.    The record being the drafts of the
9 contracting officer's final decisions that you
10 were provided.  Is that the record you're
11 referring to?
12     **A.    That's the decision that they were**
13 **providing to me.  That is my suggestion, right.**
14     Q.    But you had Mr. Skov and Ms. Neal
15 jointly providing you information.  Do you know
16 how much of that information came from Mr. Skov
17 versus from Ms. Neal?
18     **A.    No, I do not.**
19     Q.    Let me just show you one more
20 document.  I have a couple questions.
21         (Exhibit 129 marked for identification
22 and attached to the transcript.)

294

1     Q.    Mr. Vivian, the court reporter's
2 handed you Exhibit 129, which is the
3 September 2018 GAO report.  You're familiar with
4 this report, are you not, sir?
5     **A.    I've seen it before, yes.**
6     Q.    Let me ask you to turn to page 43.
7 And there's a section that says, "Formal
8 partnering during construction could help avoid
9 collaboration challenges that effect efficiency
10 at project delivery."
11     **A.    Yes.**
12     Q.    Would you read that paragraph to
13 yourself and let me ask you a question about it.
14     **A.    (Reviewing.)  Yes, I've read it.**
15     Q.    Would it be fair to say that that
16 paragraph described the Guayaquil project?
17     **A.    A difficult working relationship with**
18 **the project director, yeah, I would agree with**
19 **that.**
20     Q.    And that OBO was a difficult business
21 partner?
22     **A.    Yeah, I would agree with that.**

295

1     Q.    So if you turn the page to page 44.
2 "On-site OBO contractor relationship is important
3 to project collaboration."
4         You would agree with that, would you
5 not, sir?
6     **A.    Sure, yes.**
7     Q.    And you would agree at the beginning
8 of that second paragraph, that PDs are critical
9 to the success of embassy projects?
10     **A.    Yes, correct.**
11     Q.    And that while some PDs make an active
12 effort to collaborate with contractors, other PDs
13 do not?
14     **A.    I agree with that.**
15     Q.    And is it fair to say that on this
16 project we're in the other PDs do not category?
17     **A.    I would agree with that.**
18     Q.    And if you go on down it says that
19 their interviews reflected that PDs who do not
20 collaborate well can have a challenging
21 relationship with a contractor that makes it
22 difficult to reach timely solutions to project

296

1 and contract issues.
2         Would you agree that that was an issue
3 on this case, on this project?
4     **A.    Yes.  But there's two sides to every**
5 **argument.  The contractor was not helpful in all**
6 **instances as well.**
7         MS. HOSTETLER:  I think those are my
8 questions.  I thank you for your time today, sir.
9         THE WITNESS:  Thank you.
10         MR. WAX:  Thank you for a relatively
11 painless experience.
12         (Off the record at 6:14 p.m.)
13
14
15
16
17
18
19
20
21
22

297
1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2
3           I, Paula Flint, the officer before
4   whom the foregoing deposition was taken, do
5   hereby certify that the foregoing transcript is a
6   true and correct record of the testimony given;
7   that said testimony was taken by me
8   stenographically and thereafter reduced to
9   typewriting under my direction; that reading and
10  signing was not requested; and that I am neither
11  counsel for, related to, nor employed by any of
12  the parties to this case and have no interest,
13  financial or otherwise, in its outcome.
14          IN WITNESS WHEREOF, I have hereunto
15  set my hand and affixed my notarial seal this
16  24th day of November 2019.
17  My commission expires January 31, 2023.
18  Notary Registration Number:  277127
19
20
21
22