

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 4, 2023

**BY ECF**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

     **Re:**   ***United States v. Sina Moayedi*, S1 22 Cr. 188 (JSR)**

Dear Judge Rakoff:

     The Government respectfully submits this letter in advance of sentencing in the above captioned case, which is scheduled for August 10, 2023, at 4:00 p.m.  In April 2023, defendant Sina Moayedi (the "defendant" or "Moayedi") pleaded guilty, pursuant to a plea agreement with the Government (the "Plea Agreement"), to three counts: conspiracy to commit wire and bank fraud, conspiracy to commit bribery of a public official, and aggravated identity theft.  His guilty pleas stem from his 25-year fraud on the U.S. Government, through which he bilked the Government out of millions of dollars; corrupted countless co-conspirators, including a government insider, religious figures, and a Certified Public Accountant; created national security risks; and created risk and concern about the physical integrity of the structures that his company built for the U.S. Government, such as U.S. embassies, consulates, and marine barracks.

     Pursuant to the Plea Agreement, the applicable range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") would be 234 to 286 months' imprisonment; however, by operation of the statutory maximum punishment (12 years), the applicable Guidelines range becomes 144 months' imprisonment (the "Stipulated Guidelines Sentence").  For the reasons set forth below, the Government respectfully submits that such a sentence—144 months' imprisonment—would be fair and appropriate in this case, given the duration, sophistication, breadth, profitability, and persistence of his fraud; the fact that he was the leader of this 25-year scheme; the harms he caused, some of which are ongoing; and his repeated obstruction of justice, including his destruction of evidence after his release on bail in this case.

## I. OFFENSE CONDUCT

### A.  Overview

     In 1986, Moayedi founded Montage, Inc. ("Montage"), a construction company primarily involved in government construction projects, such as U.S. embassies, consulates, military posts, and marine barracks.  Moayedi owned and controlled Montage from 1986 until 2020.  From 1995 until 2020, Moayedi defrauded the U.S. Government by lying and cheating in various respects:

1. _Ownership_: In order to secure unmerited advantages in the bidding process, Moayedi lied that Montage was woman-owned or minority-owned.  He did so by enlisting several fraudulent "figurehead" owners who were female, Hispanic, and/or African-American.

2. _Employees' Qualifications_: In order to meet contractual requirements, Moayedi lied about his employees' qualifications, including by falsely claiming that (1) several Montage employees possessed engineering degrees, when they did not; and (2) several individuals worked for Montage, when they did not.

3. _Construction Experience_: Moayedi fabricated a portfolio of prior construction work that Montage had purportedly performed, including bogus multimillion-dollar projects for such entities as a hospital, monastery, and charter school.  To prevent the Government from uncovering these lies, Moayedi "backstopped" this fabricated experience in a few ways.  First, he created fraudulent email accounts and personas, so that someone else _appeared_ to be "vouching" that Montage had performed this prior work, when in fact, Moayedi himself was vouching for Montage using pseudonyms.  Second, Moayedi corrupted two religious figures at a monastery, so that they would vouch for imaginary $21 million construction projects that Montage had purportedly performed at the monastery.  Third, Moayedi and Montage submitted forged reference letters, on government letterhead, containing purported signatures of government employees.

4. _Financials_: Moayedi paid a Certified Public Accountant ("CPA") to prepare four sets of books and records for Montage, each of which was provided to a different recipient.  Each set of financials was fraudulent, and each was backed up by fabricated tax returns.

5. _Paying Bribes for Inside Information_: Moayedi paid bribes and kickbacks to a State Department engineer, May Salehi, in exchange for (1) a copy of a competitor's "bid package" that it had submitted to the State Department, and (2) confidential inside information relating to at least three State Department construction projects.

6. _Top-Secret Security Clearances_: To ensure Montage's eligibility for certain government contracts, Moayedi lied extensively to obtain and maintain a Top-Secret national security clearance.  In particular, he concealed his ties to Iran, including by lying about his dual citizenship with Iran, his possession of an Iranian passport, his property interests in Iran, his travel to Iran in 2008, and his contact with the Government of Iran (in order to obtain that passport).  He also lied about other (_i.e._, non-Iran) topics, including his children's dual citizenship and his ownership interest in various overseas properties.

7. _Fraud in the Execution_: Moayedi and Montage also engaged in fraud in the _execution_ of Government contracts, including by using substandard materials, using unqualified personnel, and falsifying an architect's signature and stamp on architectural plans that had not been reviewed by the architect—including plans that related to safety and structural issues, such as fire protection, roof design, and structural steel drawings.

8. _Concealment of the Scheme_: To conceal and perpetuate his scheme, Moayedi lied to the State Department, Treasury Department, Federal Bureau of Investigation, Department

of Defense, General Services Administration ("GSA"), Small Business Administration ("SBA"), and Internal Revenue Service ("IRS"); banks and bonding companies; and the courts, as he perjured himself in civil lawsuits involving Montage in 2003 and 2019.

In total, through his fraud, Moayedi's companies fraudulently obtained more than 25 government contracts, which were worth more than $125 million. (*See* U.S. Probation Office's ("Probation") final PSR dated July 21, 2023 (Dkt. 41 ("PSR")), ¶¶ 13-21).

In addition to defrauding the U.S. Government, Moayedi defrauded his primary bank ("Bank-1") and bonding companies by lying to them in multiple respects, including exaggerating Montage's bottom line by inventing lucrative, non-existent classified projects with distinctive names like "Area 6". (*Id.* ¶¶ 21, 62).

Finally, once this investigation came to light, Moayedi obstructed justice by witness tampering and by destroying electronic evidence of his fraud. (*Id.* ¶ 22).

### B. Fraud in the Procurement of Government Contracts

For 25 years, Moayedi engaged in a sustained campaign to defraud the U.S. Government. This campaign of deceit—his life's work—had various overlapping fraudulent tactics at different points in time. Moayedi used his company to defraud the government in both the *procurement* of government contracts and the *execution* of government contracts.

At the *procurement* stage, Moayedi's scheme had seven primary fraudulent tactics: (1) lying that Montage was woman-owned and/or minority-owned; (2) lying to obtain and maintain a Top-Secret national security clearance; (3) lying about Montage's purported construction experience; (4) lying that certain individuals worked for Montage; (5) lying that Montage's (actual) employees were qualified to do the work; (6) lying about Montage's financial condition; and (7) cultivating, and paying bribes to, a government insider in order to illegally obtain valuable inside information. These fraudulent tactics are discussed next.

#### 1. Ownership Fraud

To address the hurdles faced by small businesses owned by members of traditionally disadvantaged communities, the U.S. Government offers programs and incentives, two of which are particularly relevant here. The *first* is the SBA's 8(a) Business Development program (the "8(a) Program"), which offers qualifying small businesses federal contracting preferences. *Second*, and in addition, the Government offers other contracting opportunities and benefits reserved for distinct categories of businesses (*e.g.*, "woman-owned" small businesses (WOSB), "minority-owned" small businesses, etc.). Moayedi exploited both of these programs. (*Id.* ¶ 29).

*Moayedi's 8(a) Fraud*: Moayedi defrauded the 8(a) Program for over two decades, fraudulently obtaining $41 million in federal contracts that should have been awarded to legitimate participants in the 8(a) Program. Moayedi's 8(a) fraud involved not only Montage, but also two other shell entities that he surreptitiously controlled (Viking Contactors and Ponce Contractors):

- **Montage**:  Moayedi's fraud on the 8(a) Program began in 1995, when Montage fraudulently obtained 8(a) status by claiming that an African American man ("M-1"), was the president of Montage.  In fact, Moayedi owned and controlled Montage.  Based on Moayedi's misrepresentations, Montage was admitted into the 8(a) Program.  Montage took advantage of this opportunity and, during its nine years in the Program, received $31.4 million total through 37 government set-aside contracts.  (*Id.* ¶ 30).

- **Viking**:  In 2003, as Montage's 8(a) eligibility was expiring, "Viking Contractors" fraudulently obtained 8(a) status by claiming, falsely, to be owned by a Hispanic female (who was actually a Montage executive).  During its nine years in the 8(a) Program, Viking received $10 million through 27 government set-aside contracts.  (*Id.*).

- **Ponce**:  In 2016, Moayedi and an African American woman ("W-1") entered into a criminal agreement whereby W-1 agreed to serve as the putative president of Ponce Contractors.  In exchange, W-1 was to be paid a commission for signing documents and attending meetings.  In May 2020, Ponce fraudulently attained 8(a) status.  (*Id.*).

*WOSB Fraud*:  In 2014, as Viking's 8(a) eligibility was expiring, Moayedi falsely reported a sale of Montage stock and an accompanying transfer of ownership of Montage to a Hispanic female ("W-2") in order to qualify for contracts that had been set-aside for WOSB.  (*Id.* ¶ 31).

Indeed, Montage registered with the Government as a minority-owned, woman-owned, Hispanic-American business for 2013 through 2019; W-2 was listed as the owner each year (and the president for all but 2013).  Moayedi repeated the essence of this false claim in various contexts, including in his national security clearance process in 2016, and a deposition in 2019, in which he claimed that W-2 had been the president of Montage "ever since" 2002.  (*Id.* ¶ 34).

By lying that Montage was a WOSB, Moayedi ensured that Montage was eligible for certain government contracts, such as the multimillion-dollar contracts that Montage was awarded for government construction projects in Copenhagen, Denmark and Ouagadougou, Burkina Faso. (For these contracts, it was a prerequisite that the bidder be woman-owned.)  In other instances (in which WOSB was not a requirement), Moayedi and Montage touted falsely that it was a "woman-owned business" while bidding contracts that it was ultimately awarded, such as the $17 million contract to rehabilitate certain buildings and to construct a new Marine Security Guard residence ("MSGR")[1] at the U.S. Consulate in Guayaquil, Ecuador.  (*Id.* ¶¶ 32-33).

Contrary to Moayedi's representations, W-2 was never the owner or president of Montage. This is clear from various sources, including: (1) W-2's SF-86 national security clearance forms, which revealed her part-time employment at Montage in a Human Resources capacity, and her fulltime employment at a *competing* construction company since 2014; (2) Moayedi's own words, as he told Bank-1, "*I am the sole owner and President of Montage and have always been*"; and (3) interviews of Montage personnel, which revealed that W-2 had never performed executive functions at Montage and some employees had never even heard of W-2.  (*Id.* ¶ 36).

---

[1] The United States Marines provide security at U.S. Embassies and Consulates worldwide.  The MSGR is where the Marines live while protecting the Embassy or Consulate.  (PSR p. 14, n.5).

### 2.  Lies to Obtain and Maintain a Top-Secret National Security Clearance

To be awarded certain government contracts, Moayedi and Montage needed a Top-Secret national security clearance.  In his applications to obtain and maintain a Top-Secret clearance, Moayedi lied repeatedly, especially about three topics.  *First*, he concealed his ties to Iran by lying about (i) his dual citizenship with Iran; (ii) his possession of an Iranian passport; (iii) his 2008 travel to Iran; (iv) his contact with the Iranian Government (to obtain that passport); (v) his contact with family in Iran; and (vi) his ownership interest in property in Iran.  For example, in 2011, Moayedi lied by claiming he had *relinquished* his Iranian citizenship and had *never* held multiple citizenships.  Yet at that time, he was a dual citizen and had an active Iranian passport.  *Second*, he concealed other foreign aspects of his life by failing to disclose his children's dual citizenship and his ownership interest in various overseas properties.  (Moayedi's unsigned will from 2009, which was recovered from his computer, noted his ownership of seven overseas properties in four foreign countries.  *See* Ex. A.)  *Third*, Moayedi lied about his ownership of Montage and other entities.  Through his lies, Moayedi deprived the U.S. Government of the opportunity to probe the foreign dimensions of his life and to investigate any national security concerns.  (*Id.* ¶ 95).

### 3.  Lying about Montage's Purported Construction Experience

Various contractors submit bids to federal agencies for construction projects, such as U.S. embassies and consulates.  These construction projects are extremely sensitive; they implicate the safety and security of U.S. diplomatic and military personnel overseas, and the security of sensitive information. Contractors need various qualifications to be awarded such projects, such as relevant construction experience, qualified personnel, stable financial condition, and in some cases, Top-Secret clearances.  For a typical project, contractors submit multi-hundred-page bids setting forth their company's qualifications as well as their projected profit on the project.  (*Id.* ¶ 38).

In furtherance of his fraud on the Government, Moayedi falsified Montage's construction experience by claiming that Montage had performed largescale, bogus construction projects.  To prevent the Government from uncovering these lies, Moayedi "backstopped" these phony projects in two principal ways.  *First*, he created fraudulent personas and email accounts, so that he could secretly vouch for Montage himself by using pseudonyms, such as "Ed Gonzales".  *Second*, he corrupted two high-level religious figures at a Franciscan Monastery, so that they would similarly vouch for non-existent work that Montage had purportedly performed at their monastery, such as $21 million complex projects.  These two methods are discussed next.  (*Id.* ¶ 39).

### a.  Fabricated Projects, Personas, and Domains

As to the first method, Moayedi backstopped the bogus construction experience listed in Montage's bids by creating fraudulent email accounts and personas, so that someone else *appeared* to be "vouching" for Montage's prior work.  In fact, Moayedi was secretly serving as Montage's reference.  To accomplish this, Moayedi created at least six online web domains that appeared to belong to legitimate entities (the "Fabricated Domains").[2]  This step was necessary so that

---

[2] A domain name is a simple, easy-to-remember identifier for individuals to access websites on the Internet.  For example, "usdoj.gov" and "yahoo.com" are domain names.

Hon. Jed S. Rakoff                                                                August 4, 2023
United States District Judge                                                            Page 6

Montage's purported references appeared to have legitimate email addresses.  The Fabricated Domains were extremely similar to, but one character or word different from, the legitimate web domain associated with the actual entity (*e.g.*, "HyundaiUAE.com" instead of Hyundai-UAE.com, or "ChavezCharter.org" instead of ChavezSchools.org for the Chavez Charter Schools).  (*Id.* ¶¶ 41-42).

In total, Moayedi used the Fabricated Domains to help win at least seven State Department construction projects between 2014 and 2016, worth $78 million in total.  These projects were located in Prague, Khartoum, Hong Kong, Abu Dhabi, Guayaquil, Madrid, and Tokyo.  (*Id.* ¶ 44).

Here is one example.  One of Moayedi's Fabricated Domains was "jhopkinsfacilities.org", pictured below:



Hon. Jed S. Rakoff                                                                    August 4, 2023
United States District Judge                                                                    Page 7

One email account hosted on this domain was "egonzales@jhopkinsfacilities.org". This Fabricated Domain enabled Moayedi to claim that Montage's relevant experience included a largescale project for Johns Hopkins University Hospital, when in fact, this project did not exist. In fact, on several occasions, the "egonzales@jhopkinsfacilities.org" email account sent emails to federal agencies, praising Montage and confirming that Montage had (purportedly) completed a largescale project at the hospital. Notably, Montage touted this purported work for the hospital in at least two successful bids for projects with the State Department, each of which involved a compound security upgrade at a U.S. Embassy—one in Spain, the other in the Czech Republic. Moreover, in connection with Montage's bid for the Czech Republic project, one of its written references was purportedly from "Edward Gonzales," on behalf of "Johns Hopkins University Hospital." This reference "highly recommend[ed]" Montage as a "professional" company that stayed "on budget" and "on time." This reference also vouched that the scope of this work for the hospital was $15 million. (This reference was provided in a Past Performance Questionnaire, which is submitted by prior clients of the contractor that is bidding for new work with the U.S. Government.)

Of course, Moayedi *was* "Ed Gonzales". In September 2020, law enforcement executed a search warrant at a Montage office and found two cellphones on Moayedi's desk in his office, which were seized. The first cellphone was a smartphone with Moayedi's longtime cellphone number; the second was a burner phone with a white piece of paper taped to the back, which said: **J. Hopkins 410-967-0840 Ed Gonzales**. When agents entered Moayedi's office to execute the search warrant, this burner phone—*i.e.*, the "Ed Gonzales" phone—was literally sitting on Moayedi's desk, right in between his computer and his landline phone. Moayedi's "Ed Gonzales" phone was, in other words, at his fingertips and ready for action:




Furthermore, Moayedi's office computer contained a "references" document that included, among other names, several of his (bogus) "references" and their contact information, including the password to the "egonzales@jhopkinsfacilities.org" email account and a phone number that matched the number for the "Ed Gonzales" burner phone:

HYUNDAI ENGINEERING & CONSTRUCTION COMPANY LIMITED – UAE
Makeen Tower Tourist Club Area 46101 Abu Dhabi
andresc@hyundaiuae.com
Carol Andres PM
Telephone: +971 2-643-2865
Fax: +971 2-643-2928
**Carol Andres**


Cesar Chavez Public Charter School
Gloria Martinez
202-262-5930
gmartinez@chavezcharter.org
RNovaris@chavezcharter.org


John's Hopkins University Hospital
Edward Gonzales
410-967-0840
egonzales@jhopkinsfacilities.org
123ricardo


Jrichards@jhopkinsfacilities.org
Ricardo


As further evidence of how Moayedi used the Fabricated Domains to further his fraud through bogus references, attached are two phony references submitted to the Government in support of Montage's bids, one of which involves Johns Hopkins.  *See* Exs. B and C.

As the Court may recall, the evidence linking Moayedi to the creation and control of the Fabricated Domains is extensive, and Moayedi has admitted that he created and controlled these domains.  As discussed in detail below, Moayedi deleted the Fabricated Domains and all associated email accounts in September 2021—just 17 days after his release on bail.  (*Id.* ¶¶ 45-46).

### b.  The Franciscan Monastery

Similar to the Fabricated Domains, Moayedi corrupted a Washington, D.C.–based Franciscan Friar so that this Friar would vouch, to the Government, that Montage had performed large-scale construction work at a Monastery, when in fact, Montage had not.  Specifically:

Moayedi cultivated a close relationship with religious personnel at the Franciscan Monastery of the Holy Land in America (the "Monastery") in Washington D.C., culminating in a *quid pro quo*, with considerable benefits to both sides.  Moayedi became a financial benefactor to the Monastery, attended fundraising dinners, and brought gifts to two Friars at the Monastery ("Brother-1" and "Father-1").  And Brother-1 and Father-1 vouched for Montage.  (*Id.* ¶¶ 47-48).

Starting in 2014, Moayedi submitted bid packages to the State Department containing massive amounts of invented work at the Monastery.  Moayedi listed Brother-1 as the purported

"contracting officer" who could verify the value, scope, and complexity of the work putatively performed. In bid packages, Montage claimed to have done approximately ten times as much work at the Monastery as it had, in fact, performed. Monastery records reveal that, in reality, Montage performed less than $2.5 million worth of work for the Monastery, in total, and that this work occurred between 2015 and 2017. Yet in at least four bids, Moayedi and Montage falsely claimed that, between 2012 and 2014, Montage had completed more than $21 *million* in work at the Monastery. Additionally, in at least six bid packages, Montage personnel were alleged to have served in key positions on Monastery projects—including individuals who had never worked for Montage. To take one example, in Montage's 2016 Khartoum bid submission, Moayedi alleged that Montage had constructed medical facilities, a cloister, parking lots, and an auditorium at the Monastery for $21.9 million between 2012 and 2014. These were lies. As noted, Montage did less than $3 million in work for the Monastery, starting in 2015.

Nonetheless, Moayedi obtained references from Monastery personnel. For instance, in 2014, Brother-1 signed a reference letter (drafted by Moayedi) touting Montage's professionalism and conscientiousness and "Mr. Moayedi's leadership." *See* Ex. D. Furthermore, in an April 2018 email to a U.S. State Department contracting officer, Brother-1 wrote: *"Montage has been a trusted contractor providing the Franciscan Monastery with Design and Construction services. Value of the last project Montage completed for us was approximately $24 Mill and it was finished in 2014/15. Monastery is a complex historic compound and Montage was able to keep us functional for 2 years while they renovated the Monastery. We continue to work with them, they are honest, enthusiastic, committed and their price proposals are reasonable. I highly recommend them to you."* And in April 2020, Moayedi caused Father-1 to send "verification" of a bogus $11.8 million project to the GSA.[3] (*Id.* ¶ 52).

### c.  Forgeries/Identity Theft of Government Employees

Finally, Moayedi and Montage submitted forged letters to the U.S. Government, which contained purported signatures of government personnel from NASA and the Washington, D.C. Housing Authority. These letters praised Montage's integrity and work. *See* Exs. E and F.

### 4.  Lying about Montage's Personnel and Their Qualifications

When construction companies submit bids for Government contracting work, they include information about the skills, education, and experience of their personnel who are projected to be assigned to the project (should the company be awarded the project). This experience/skills/expertise section is important to the Government's assessment of whether a given company has the skill and experience needed to successfully and timely complete a complex project. In fact, contractual provisions require that key personnel have certain experience. (PSR ¶ 56).

---

[3] Moayedi's efforts to maximize the benefits of his relationship with the Monastery continued even after his May 2021 arrest. In connection with his first bail application in this District, Moayedi submitted a brief and attached a letter of support from Father-1—a man who was complicit in Moayedi's fraud. Father-1's letter touted Moayedi's "deeply held integrity and honesty in every one of [Moayedi's] dealings with" Father-1 over the years. That was false. (PSR ¶ 54).

Hon. Jed S. Rakoff                                                    August 4, 2023
United States District Judge                                              Page 10

        In its bids to the Government, Moayedi and Montage greatly inflated its employees'
qualifications.  In addition, in some instances, Moayedi and Montage claimed that particular
individuals worked for the company, when in fact, they did not.  Moayedi and Montage lied about
Montage's employees' qualifications because, in truth, Montage's personnel routinely lacked the
minimum, contractually required education and experience to serve on complex overseas
construction projects.  In fact, Moayedi asked his employees to remove their publicly accessible
LinkedIn profiles in order to prevent Government personnel from learning about their true
backgrounds and inexperience. (PSR ¶ 57).  Several examples follow, which contrast the Montage
employee's resume as submitted to the State Department and in reality:

- A Montage employee, Thad Quarles, was submitted for the role of Project Manager in
  Guayaquil.  Quarles' resume claimed that he had a bachelor's degree in Civil Engineering
  and that he had years of full-time complex work in the construction field.  Neither
  representation was true.  Quarles did not actually graduate; and his security clearance
  application noted that he had sold meat as a door-to-door salesman, was a landscaper, and
  had built swimming pools for several years during the period in which his resume had
  claimed years of full-time complex work in the construction field.  (*Id.*).

- A Montage employee, Alex Gutierrez, was submitted for the role of Quality Control
  Manager and (Alternate) Project Manager.  Gutierrez's resume stated that he had earned a
  bachelor's degree in Building Engineering, but in fact, he had not.  (*Id.*).

- A Montage employee, Samantha Garcia, was submitted for the role of Project
  Manager/Warranty Manager in connection with Montage's bid for the Madrid Project.
  Garcia's resume claimed that she had earned a bachelor's degree in Civil Engineering and
  had managed projects throughout the United States.  In fact, Garcia had a degree in Interior
  Design (not Civil Engineering) and had never managed such projects.  (*Id.*).

- A Montage employee, Analisa Lleses, was submitted for the role of Construction Security
  Manager ("CSM") in connection with Montage's bid for the Madrid Project.  Lleses'
  resume claimed that she was "an experienced professional as a CSM managing information
  and personnel security" and cited five years' employment with Montage in support of the
  claim.  In fact, Lleses had been employed with Montage for only approximately three
  *months* and had no prior experience.  (*Id.*).

- A Montage employee, Dylan Smith, was submitted for the role of Safety and Health
  Program Manager ("SHPM") in connection with Montage's bid for the Prague Project.
  Smith's resume claimed that he had served as a SHPM since 2016 and had served as a
  Safety Manager with another construction company.  In fact, Smith had previously served
  only as an intern and in an entry-level position.  (*Id.*).

- A Montage employee, Spencer Voges, was submitted for the role of Quality Control
  Manager in Prague.  Voges' resume claimed that Voges had been employed at Montage
  since 2015 as a SHPM.  In fact, Voges had served only as a "Construction intern" for four
  months with Montage in 2016 and began employment in a position akin to an "Office
  Assistant" with Montage three months prior to the submission in 2017.  (*Id.*).

Hon. Jed S. Rakoff                                                          August 4, 2023
United States District Judge                                                      Page 11

This lack of experience was reflected in written assessments of the skills of Montage personnel.  For instance, the State Department–Bureau of Overseas Building Operations ("OBO") Project Director for the Bermuda Project stated Montage employees had an "*inability to read even basic architectural drawings*" and cited "*continuous safety violations involving eye protection, hard hats, masks and care of workers injured on site.*"  In addition, an OBO audit of the Prague Project found deficiencies in "*10 of 11 areas in which Montage is not implementing or managing a satisfactory safety and health program.*"  And a former Montage Project Manager in Madrid stated he was "unqualified" for that position.  (*Id.* ¶ 58).

In addition to Montage's failure to ensure the *quality* of its personnel, it also suffered from an inadequate *quantity* of personnel—a problem Moayedi sought to overcome by engaging in corporate espionage against a competitor.  Montage obtained, modified, and submitted resumes and qualifications for individuals who *had never even heard of Montage*, let alone worked there.  In its bids, Montage proposed these non-employees for key roles on Government projects and submitted these non-employees' resumes as though they had worked at Montage for years.  Three such identity theft victims were submitted to the State Department as part of Montage's staffing plan in its bid packages for at least seven projects (Hong Kong, Guayaquil, Prague, Bermuda, Bamako, Madrid, and Copenhagen).  (*Id.* ¶ 60).

### 5.   Lying about Montage's Financial Condition

In furtherance of his scheme, Moayedi and Montage executed a complex financial fraud.  Moayedi paid a CPA to prepare at least four different sets of books and records, with assistance from certain Montage employees.  Each set of financials was fraudulent; each set was backed up by fabricated tax returns; and each set was provided to a different recipient (*e.g.*, one set for the U.S. Government, another set for Bank-1, another set for a company that sold domestic construction bonds, and another set for a company that sold international construction bonds[4]).  In other words, Moayedi tailored financial representations to his particular audience, in furtherance of what he sought from each.  The primary participants in this financial fraud were Moayedi, the CPA (who had approximately 40 years of accounting experience prior to the start of this financial fraud in or around 2003), and the longtime Chief Financial Officer (CFO) of Montage.  (*Id.* ¶ 61).

To take one example, Moayedi repeatedly lied to his bank and bonding companies about Montage's bottom-line.  He did so by inventing non-existent classified projects, which he claimed were lucrative (*e.g.*, "Area 6").  By asserting that these projects were classified, Moayedi presumably evaded scrutiny from these financial institutions.  And by inflating Montage's bottom-line, Moayedi presented Montage as a more attractive bond candidate and thereby increased its odds of receiving a bond—and at an attractive price.  To take another example, Moayedi provided fabricated financials to Bank-1 in support of a line of credit, which ultimately grew to $3 million and which Montage used for business operating expenses.  (*Id.* ¶ 62).

---

[4] All State Department projects generally required a bond or surety, the cost of which was borne by the contractor, and was intended to guarantee satisfactory completion of the project.  *I.e.*, bonding companies provide contractually required insurance and are on the hook financially in the event that their client (*e.g.*, Montage) fails to complete the construction project.  (PSR ¶ 62).

Hon. Jed S. Rakoff                                                    August 4, 2023
United States District Judge                                                 Page 12

Montage kept a particular set of fraudulent books for the IRS, in which Moayedi understated his and Montage's income in certain instances to reduce their tax liability.[5]  (*Id.*).

As noted, there was a purported tax form that accompanied each set of books and records. As an example, Montage's longtime CFO showed agents two versions of the same document, which differed markedly, depending on to whom Moayedi was submitting the document.  The example was a Form 1040 from tax-year 2016.  In the version that Moayedi submitted to Bank-1 in connection with maintaining his line of credit, Moayedi reported earning approximately $2.6 million in income.  However, in the version of the form which Moayedi submitted to the U.S. Government, Moayedi reported earning only approximately $375,000, which would have reduced his tax obligation.  (*Id.* ¶ 63).

### 6.  Bribery of a Government Insider to Gain Unfair, Illegal Advantages

In order to obtain illegal advantages in bidding for Government contracts, Moayedi cultivated a government insider—then-State Department employee May Salehi—and paid her bribes and kickbacks in exchange for inside information.  Salehi was a longtime engineer in the State Department's OBO division, which directs the worldwide overseas building program for the State Department and the U.S. Government community serving abroad.  (*Id.* ¶ 77).

Between 2014 and 2020, Moayedi paid bribes and kickbacks to Salehi in exchange for: (1) a copy of another company's bid proposal to the State Department, so that Moayedi could see how another company structured its bids; and (2) inside bidding information for several State Department projects, including several projects that Montage was ultimately awarded (*e.g.*, Guayaquil, Madrid, Bermuda).  During the bidding process, Salehi covertly provided real-time inside information about the relationship between Montage and its competitors' initial bids, which was contrary to the sealed bidding process and gave Montage an enormous advantage.  (*Id.*).

For instance, in 2016, the State Department solicited bids for a compound security upgrade ("CSU") at the U.S. Consulate in Bermuda (the "Bermuda Project").[6]  As is typical, this project featured sealed bids, so that the bidders did not know what competitor companies had bid. Moayedi and Salehi exploited the fact that the State Department knew what the bidders did not. (*Id.* ¶ 78).

---

[5] Montage's outside CPA indicated that, in some years, Moayedi had understated his income to the IRS, but in other years, Moayedi had actually *overstated* his income to the IRS in order to ensure that his representations to the State Department (which had inflated Montage's profitability) were consistent with his representations to the IRS.  (PSR p. 24, n.12).

[6] CSUs "provide physical security upgrades to U.S. diplomatic facilities overseas to better protect buildings, people, and operations. The Compound Security Upgrade Program (CSUP) primarily targets facilities not scheduled for full new embassy compound construction."  (*See* https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/omb/expectmore/summary/10004646.2006.html) (last visited August 2, 2023).  The importance of CSUs emerged after the 1998 Kenya and Tanzania embassy bombings, when the State Department determined that the vast majority of diplomatic facilities did not meet security standards and were vulnerable to attacks.

Hon. Jed S. Rakoff                                                                August 4, 2023
United States District Judge                                                           Page 13

Five companies submitted technically acceptable bids, and Montage's was the lowest by about $1 million. The State Department gave these five bidders a two-day window to submit a revised bid, if they wished. During that two-day window, Moayedi called Salehi to seek confidential inside bidding information. (Salehi was involved in the Bermuda Project in multiple respects, including as the Chair of the Technical Evaluation Panel.) Salehi ultimately told Moayedi that all five bids were low, and that his bid was lowest by about a million dollars; Moayedi said that he would give her 1% of the contract value if he won; and as the conversation was ending, Salehi blurted out, "I have rugs to sell"—*i.e.*, Salehi was suggesting that they conceal this criminal arrangement by disguising it as a legitimate transaction involving the sale of a rug. This inside information enabled Moayedi to promptly increase Montage's bid by more than $917,000, yet remain the lowest bidder and therefore be awarded the contract. When Moayedi submitted Montage's revised bid, he lied as to the reason that Montage had increased its bid, falsely claiming that Montage had discovered "an arithmetic error in our estimate worksheets," thereby concealing the fact that Salehi had provided confidential inside bidding information. (*Id.* ¶¶ 79-81).

Over the next several months, Moayedi made a kickback payment of $60,000 to Salehi, in three installments. In connection with these payments, Moayedi used intermediaries to obscure the link between him and Salehi. To conceal the true purpose of the kickback payment, Salehi gave one of these intermediaries a Persian rug during their first meeting, which the intermediary passed to Moayedi. (*Id.* ¶ 82). (Ever the opportunist, Moayedi ultimately "regifted" this Persian rug to Father-1 in furtherance of the *quid pro quo* scheme. Law enforcement has since located and recovered this Persian rug. (*Id.* ¶ 53).)

## C. Fraud in the Execution of Government Contracts

After engaging in rampant fraud to win Government contracts, Montage continued to engage in fraud during the execution of contracts, including using several fraudulent tactics to maximize its profits and minimize its costs. *First*, Montage used (or attempted to use) less construction material, less expensive construction material, or lower quality construction material than was required by contract. *Second*, Montage used unqualified employees, which presumably was cheaper for Montage than paying qualified individuals. For example, during the execution of the $15 million Prague CSU project, Moayedi proposed to a Montage employee that this employee serve as a Construction Superintendent on the project. This employee did not possess education or experience in construction, and was plainly unqualified for the position of Construction Superintendent. Nonetheless, Moayedi sent this employee a link to a 4 minute and 42 second YouTube video providing an introduction to "A day in the life of a Construction Superintendent." Moayedi instructed this employee to pay close attention to behaviors in the video that would lead someone to believe that this employee in fact had experience, such as the way that the actor in the video "held [] drawings under his arm," the "mannerisms" depicted, and the actor's "jumping on the scaffolding." In the same conversation, Moayedi told his employee: "jack of all trades, master of n[o]ne." *Third*, Montage intentionally delayed projects, but sought to blame the Government for these delays, so that Montage could file "requests for equitable adjustments"—an attempt by Montage to pilfer still more funds from the Government. (*Id.* ¶ 66).

*Fourth*, in connection with the Guayaquil Project, Moayedi and Montage submitted forged architectural drawings to the State Department, which related to important safety and structural

Hon. Jed S. Rakoff                                                    August 4, 2023
United States District Judge                                              Page 14

issues (like fire protection and roof design).  Specifically, between April 2016 and November 2016, Montage submitted approximately 37 forged architectural plans to the State Department which contained the unauthorized electronic signature of the Designer of Record ("DOR").  (The DOR is the head of the architectural/engineering ("A/E") team and is solely vested with the authority to draft and submit architectural drawings.)   The inclusion of the DOR's electronic signature conveyed, fraudulently, that the DOR had reviewed and approved these architectural submissions, when in fact, he had not.  These forged submittals related to safety and structural issues and critical building systems, including roofing, fire protection, structural steel, concrete, water treatment, and communications cabling.  (In addition, during this same seven-month period in 2016, Montage deliberately kept the DOR at a distance, thereby ensuring no active oversight of the project by the one individual authorized to perform it—the DOR.)  (*Id.* ¶¶ 69-71).

When State Department employees discovered the forged submittals, Moayedi lied in various respects to try to minimize, deflect, and mislead.  For instance, in a letter to the State Department in November 2016, which Moayedi signed, Moayedi falsely claimed, among other things, that: (1) a clerk had "mindlessly" affixed the DOR's signature on certain submittals; (2) the submittals at issue had been "previously approved" by the DOR; and (3) the DOR had authorized the use of his electronic signature for this purpose.  These were lies.  For instance, during an interview with the DOR, the DOR stated that he always insisted on a "wet signature" for approved submittals, and he had never authorized any use of his signature.  (*Id.* ¶¶ 72-73).

*Fifth*, later in the life of the Guayaquil Project, Montage and Moayedi again submitted forged architectural drawings to the State Department.  When Montage was nearing completion of the project, Montage submitted the "as-built" drawings, which show the conditions of the building as it was actually built (which can differ from the original plans).  Montage's as-built drawings were problematic in two respects.  First, they contained the DOR's stamp, even though the DOR had not signed or approved the as-built drawings.  Second, the as-built drawings submitted by Montage *do not match* the existing conditions of the compound in at least two respects: the first involves a portion of the electrical system, and the second involves the potable water system at the compound.  As to the former, the as-built drawings submitted by Montage do not accurately reflect the placement and routing of certain electrical components.  As to the water treatment facility that provides water to several buildings, the as-builts do not accurately reflect the equipment or layout of the water treatment facility that Montage constructed.  Instead, the as-builts appear to reflect that Montage copied-and-pasted a preexisting water treatment facility on site, which was completely different from the water treatment facility that Montage constructed.  (*Id.* ¶¶ 75-76).

### D.  Montage's Concerning Construction Practices

Under Moayedi's leadership and direction, Montage engaged in various practices that create ongoing risk and concern about the physical integrity of the structures it built, including (as noted above): lying about personnel and qualifications, lying about construction experience, using substandard materials, forging the architect's signature, and sending its employee a short YouTube video in lieu of actual experience/training/expertise.  (*Id.* ¶ 96).

In fact, a number of construction-related issues have already been identified, which relate to virtually every building system (*e.g.*, security, fire protection, structural, HVAC, insulation,

Hon. Jed S. Rakoff
United States District Judge

August 4, 2023
Page 15

concrete, etc.).  The final PSR contains several pages' worth of significant problems across various projects, *see* PSR pp. 36-38, and here are a few examples:

- *Roofing*: There was a large crack present in the middle of the concrete roof in the utility building.  (Guayaquil Project)

- *Structural Integrity*:
  - Montage incorrectly installed rebar in the concrete "anti-ram" barriers, resulting in reduced structural integrity.  (Bermuda Project)
  - Structural steel was not installed correctly in the building where security screenings took place.  (Prague Project)

- *Fire*:
  - Improper in ground-restraint of fire piping.  (Guayaquil Project)
  - Fire main fittings not fitted with corrosion protection.  (Guayaquil Project)
  - Fire main fittings not bituminously coated, as is required in a seismic zone.
  - Unrodded and unpiped clamp for building sprinkler feeds.  (Guayaquil Project)

- *Safety*:
  - Death of subcontractor involving scaffolding.  (Burkina Faso Project)
  - Scaffolding violations.  (Madrid Project)
  - Continuous safety violations involving eye protection, hard hats, masks, and care of workers injured on site.  (Bermuda Project)
  - Montage was not implementing or managing a satisfactory safety and health program.  (Prague Project)

- *Water*: Recurring broken water pipes, because Montage did not install a pressure-reducing valve in the water lines, thereby allowing over-pressurized water into the building and overtaxing the pipes.  (Khartoum Project)

Two case studies may be useful.  The first involves the Khartoum Project, where (among various other issues with Montage's work) the Building Automation System ("BAS") was not integrated properly with the building.  The BAS can be thought of as the "brains" of the building, which is intended to automate and synergize various functions within the building. This integration failure has necessitated the manual and local adjustment of various building systems instead of being automatically and effectively managed by the BAS.  In an interview, the former Senior Facilities Management Officer at the U.S. Embassy Khartoum described the MSGR as a "sealed" building and stated that issues could arise with fresh air flow to the Marine occupants without the ability to properly control the BAS.  (*Id.* ¶¶ 107-12).

The second involves the Guayaquil Project.  Inside the Guayaquil MSGR, the State Department discovered a series of water leaks in one location whose cause was improperly braced piping inside the walls.  This led to a complete tear-out and replacement of the drywall in that area.  Similarly, at least one witness interviewed described subpar HVAC work, particularly regarding the installation of the chiller and the chilled water piping for the air conditioning units.  Upon inspection of the work, this witness described condensation from the units as being "everywhere,"

Hon. Jed S. Rakoff                                                                August 4, 2023
United States District Judge                                                            Page 16

as there was improperly installed and wrongly sized pipe insulation, and the return air flow venting was not sufficient for the application, exacerbating the condensation problem.  In some cases, pipe insulation of different diameters were joined together, with tape improperly wrapped around them in order to make them fit.  (*Id.* ¶ 100).

In addition, State Department officials reported that there were recurring roof leaks in the MSGR, necessitating facilities staff to ascend the roof and regularly apply extra tar and sealant to the newly installed roof.  This leak was never able to be located or properly remediated and will soon need to be replaced at a high cost to the Government.  (*Id.* ¶ 103).

Lastly, the water filtration system for the MSGR and other buildings experienced recurring problems that were ultimately attributable to a one-way valve that was installed backwards.  Additionally, although the operating status and efficacy of the water filtration system was intended to be monitored remotely, the remote functionality of that system does not work correctly—instead requiring regular, manual inspections.  (*Id.* ¶ 104).

*   *   *

Finally, and separately, at one point Moayedi acknowledged, in an email to two high-level Montage employees, that Montage's work on a given project was "*shabby*" and that he was not able to disagree with the State Department's assessment that "*we don't know what we're doing*":

| | |
|---|---|
| **From:** | Sina Moayedi <sinam@montageinc.com> |
| **Sent:** | Thu, 7 Jun 2018 12:34:31 +0000 |
| **Subject:** | Management |
| **To:** | pm11@montageinc.com, pm13@montageinc.com |

Hamadou is a very nice guy and caring but doesn't have enough knowledge or expertise to know what to look for as you can tell from the pictures I sent you the place is a mess and the work is shabby with the exception of steel which looks good but the duct bank the concrete and general upkeep of sites would flunk and I was not able to disagree with post assessment that we don't know what we are doing I have come to the contribution that we will definitely need someone like Thad like Kenny who is smart and can manage out here

Thanks Sina
Sent from my iPhone

### E.  Conduct that Created National Security Risks

U.S. Embassies and Consulates serve to further the vital national security interests of the United States in 163 countries worldwide.  State Department compounds are staffed by large numbers of U.S. diplomats and their families, along with intelligence, law enforcement, and military personnel performing sensitive work and facilitating cooperation with the host country.

Because of its sensitive work for government agencies around the world, Montage maintained a Top-Secret facility security clearance to enable it to hold information pertaining to highly classified plans, specifications, blast data, and other information for government projects. Based on U.S. Government classification designations, any breach or unauthorized disclosure of Top-Secret information, by definition, is said to cause "exceptionally grave" damage to national

Hon. Jed S. Rakoff
United States District Judge

August 4, 2023
Page 17

security. *See*, *e.g.*, 22 C.F.R. § 9.5. In addition to the facility clearance for Montage, Moayedi and several other Montage employees were entrusted by the United States with individual security clearances ranging from Secret to Top-Secret. Moayedi has held a Top-Secret clearance since in or around 2007. (*Id.* ¶ 94).

Through his repeated actions, Moayedi jeopardized the national security of the United States in various ways for nearly a decade and a half. (*Id.* ¶ 95). For example:

- *Lies About His Iranian Citizenship and Enduring Connections to Iran*: As noted, Moayedi lied repeatedly in his national security clearance process, including by concealing his Iranian citizenship, Iranian passport, enduring connections to Iran, and overseas properties.

- *Bribing a State Department Insider*: As noted, Moayedi cultivated a State Department insider (who herself held a Top-Secret clearance) and paid her bribes and kickbacks.

- *Montage's Secret Office in Maryland*: For many years, Montage maintained a secret office in Maryland which was its primary place of business, but which premises were unknown to the U.S. Government. This office was mislabeled[7] and owned by a shell company. Unlike Montage's putative place of business in Washington, D.C.—which was known to the Government—the Maryland location did not hold an authorization to hold classified information. A former Montage Facility Security Officer ("FSO") explained that the reason for this secret office in Maryland was that Moayedi lived in Maryland but did not want to go through the Government's official approval process required to authorize a change in his business location. The former FSO further explained that Moayedi "did not often" respect security regulations, and cited at least one instance in which Moayedi removed Top Secret material from Montage's Washington, D.C. office and stored it at Montage's uncleared, undisclosed Maryland office for months before giving it to an unidentified company, whereupon it was mailed back to the Washington, D.C. office. This chain of events brazenly violated secure handling protocols for classified material.

- *Failure to Use an Approved, Secure Information-Sharing Platform*: Montage was required to use the State Department's secure information sharing facility, called "Projnet," to share all aspects of a project's design specifications. Montage violated this requirement (along with government regulations relating to information security) by regularly using the commercial service Dropbox to share and hold Sensitive but Unclassified (SBU) material pertaining to numerous projects. Indeed, during a forensic examination of electronic equipment seized from Montage's offices, numerous viruses, trojans, and worms were identified in Montage's devices and systems network. This created avenues through which a variety of data and information could have been covertly exfiltrated from Montage's systems without Montage's knowledge.

---

[7] The name by the entrance of this office states, "ASAM," which is short for the American Society of Addictive Medicine. (PSR p. 35, n.23).

- _Giving Foreign Nationals, Who Lacked Security Clearances, Access to Sensitive Materials_: Montage employed numerous foreign nationals "off the books," including citizens of Iran, India, and Ukraine.  One of these foreign nationals personally described that, in practice, they had unfettered access to secure materials because these materials were often "spread out and unsecured" inside of Montage's office.  A second employee confirmed this and added that one of the uncleared foreign nationals working at Montage was assisting on a classified project in India.  Finally, another foreign national employed by Montage was an Iranian citizen and relative of Moayedi's; Moayedi let her assume the identity of his wife (who, unlike this other relative, was a U.S. citizen) and access Projnet.

- _Renting "Clean" Computers and Telling Foreign National Employees to Stay Home during Government Inspection_: In late 2015 or early 2016, Government inspectors conducted a scheduled inspection of Montage's office to ensure proper handling of sensitive government materials.  In advance of that scheduled inspection, Moayedi and Montage leadership took at least three extremely deceptive actions.  First, Moayedi and Montage leadership instructed Montage's non–U.S. citizen employees to stay home, rather than come to work.  Second, Moayedi and Montage leadership concealed Montage's regular computers and documents by hiding them in another space that Montage controlled within the same building; this other space was locked.  Third, Moayedi and Montage leadership rented temporary replacement computers.  In other words, Moayedi was cognizant of the ramifications of the discovery of mishandling sensitive data, and accordingly rented "clean" computers—solely for this inspection.

### F.  The Defendant's Obstruction of Justice

As stipulated in the Plea Agreement, Moayedi obstructed justice by: (1) committing perjury in a deposition with the State Department in 2019; (2) witness tampering in 2020, right after this investigation became overt; and (3) destroying evidence in 2021, shortly after his release on bail.

#### 1.  Moayedi's Perjury—2019

Montage was involved in civil litigation with the State Department relating to the offenses in the Information, in particular the Guayaquil Project.  During that civil lawsuit, Moayedi lied during a sworn deposition, in November 2019, by claiming to be the Vice President of Montage.  Moayedi's lie continued to conceal his true role as owner and president of Montage—and therefore was in furtherance of his long-running ownership fraud on the Government.[8]  (_Id._ ¶ 89).

#### 2.  Moayedi's Witness Tampering—2020

The Government's investigation became overt in September 2020, when search warrants were executed at the defendant's residence and at Montage's offices.  Shortly after these warrants

---

[8] In fact, Moayedi lied in court proceedings as far back as 2003:  In June 2003, Moayedi filed a declaration, under penalty of perjury, declaring, "I am the Vice President of Operations for Montage, Inc."  (PSR p. 33, n.20).

Hon. Jed S. Rakoff                                                    August 4, 2023
United States District Judge                                              Page 19

were executed, a Montage employee placed a phone call to W-1—*i.e.*, the woman who was serving as the "paper President" of Ponce—and asked W-1 to come meet with Moayedi. When W-1 arrived at the Montage office, Moayedi met her outside and suggested they go for a walk. During this walk, Moayedi said, in substance and in part, "You never saw me do anything illegal, right?" and "You never received any money from Montage, right?" (*Id.* ¶ 87).

In fact, Moayedi and W-1 had conspired to commit crimes for several years, and W-1 had regularly received payments from Moayedi and Montage. Specifically, in July 2016, Moayedi and W-1 had entered into a written contract, whereby she agreed to serve as the putative president of Ponce, in exchange for payments from Moayedi and Montage. Under this arrangement, W-1 was paid a monthly stipend, and was also paid for attending meetings and signing documents, and was also to be paid a commission for any contracts awarded to Ponce. W-1 was even paid for attending this particular meeting with Moayedi in fall 2020. In May 2018, Moayedi and Montage submitted a fraudulent application to the SBA so that Ponce could gain entry into the 8(a) Program; this application included misrepresentations as to the company's ownership, financial condition, and purported construction experience. Ponce did, in fact, fraudulently gain subsequent entry into the 8(a) Program. (*Id.* ¶ 88).

### 3. Moayedi's Destruction of Significant Evidence While Released on Bail—2021

By way of context, after several bail hearings, Moayedi was ordered released (over the Government's objection) by the Part I judge, Judge Liman, in June 2021. In granting release, however, Judge Liman warned Moayedi pointedly, stating:

> I concluded that this was a very close case. If there is any bit of an infraction, if there is anything that the defendant does or those in his family do that calls into question this ruling, I will be quite open to an application to detain the defendant on the finding that there is no combination of conditions that would reasonably assure his presence in court. In other words, the defendant should take no comfort based upon the present record that if there's any transgression, that he will be able to remain at liberty and not detained.

(Dkt. 10 (Bail Appeal Tr.), p. 66). The defendant ultimately met all of the conditions of release, and was released, on August 17, 2021. (Dkt. 15).

Just 17 days after his release on bail, Moayedi deleted the Fabricated Domains. As noted above, the Fabricated Domains included at least six web domains that Moayedi had used to help inflate Montage's purported construction experience in bids for U.S. Government construction projects. This was extremely important evidence—evidence that the Government did not possess, and did not know about at the time Moayedi was released from prison on August 17, 2021. Moayedi was successful: Because he instructed GoDaddy to delete the Fabricated Domains, GoDaddy no longer has this evidence. Fourteen days after Moayedi's directive to delete, the email accounts at issue were permanently deleted, per GoDaddy records. Thus, Moayedi intentionally deprived the Government and the Court of extremely powerful evidence of his fraud, and further deprived the Government of the ability to pursue any leads from this evidence. (*Id.* ¶ 85).

Hon. Jed S. Rakoff                                                                        August 4, 2023
United States District Judge                                                                        Page 20

Of note, deleting a GoDaddy domain is a multi-step process with various fail-safes; a user must confirm, several times, that he wishes to delete a product.[9] Even after completing the deletion process, there is another opportunity to undo a deletion, as GoDaddy sends users a confirmation email inviting the user to call GoDaddy's support team if the deletion was a mistake. (*Id.* ¶ 86).

### G. Moayedi's Routine Abuse of Individuals' and Entities' Identities

Moayedi regularly abused various individuals' identities (and/or identifying information) in furtherance of his multifaceted fraud scheme, including (for instance): (1) submitting bids to the State Department that included the resumes of three individuals who did not, in fact, work for Montage; (2) having a foreign national employed by Montage work under the identity of Moayedi's wife (who is a U.S. citizen); (3) using a notary stamp in the name of Gloria Linda Martinez; (4) forging the architect's signature on architectural plans submitted to the State Department; (5) abusing the identities of his "figurehead" owners, including W-1 and W-2, such as signing W-2's signature; and (6) taking various actions in the names of his relatives, including his wife and mother-in-law, whose identities he abused in connection with the Fabricated Domains. Moreover, as noted, in connection with his Fabricated Domains, Moayedi also appropriated and misused other entity names (such as Johns Hopkins University Hospital, NASA, HyundaiUAE, Chavez Charter Schools, and the Washington, D.C. Housing Authority). (*Id.* ¶ 91).

## II. **PROCEDURAL HISTORY**

On May 28, 2021, Moayedi was arrested on a three-count Complaint charging him with wire fraud, wire fraud conspiracy, and bribery of a public official, in violation of 18 U.S.C. §§ 1343, 1349, 201, and 2, respectively. (Dkt. 1). In June 2021, after extensive bail litigation, Moayedi was ultimately ordered released on bail, once he satisfied all of his bail conditions. On August 17, 2021, he met those conditions and was released. (Dkt. 15). Within about one week, he violated his bail conditions by unilaterally dispensing with the requirement that he remain in the custody of a third-party custodian, his brother. Shortly thereafter, on September 3, 2021, Moayedi violated his bail conditions again, this time by deleting the Fabricated Domains. Once the Government discovered that Moayedi had violated his bail conditions, the Government requested, and Your Honor issued, an arrest warrant, resulting in Moayedi's re-arrest in Maryland on January 4, 2022. Moayedi was remanded in the District of Maryland and transported to this District. After a bail hearing before Your Honor in April 2022, Moayedi was ordered detained.

On April 19, 2023, Moayedi pleaded guilty to a three-count Superseding Information, charging a conspiracy to commit wire and bank fraud from 1995 to 2021, in violation of 18 U.S.C. § 371; a conspiracy to commit bribery of a public official from 2014 to 2020, in violation of 18 U.S.C. § 371; and aggravated identity theft from 1995 to 2021, in violation of 18 U.S.C. § 1028A. As part of his plea agreement, Moayedi admitted to obstructing justice in three respects. He also agreed to forfeiture of **$17,795,098.50** and restitution of **$6,588,679.63**. (Dkts. 35, 36, 37, 38).

---

[9] *See*, *e.g.*, GoDaddy, *Delete products in my GoDaddy account*, *available at* https://www.godaddy.com/help/delete-products-in-my-godaddy-account-7468 (last visited August 4, 2023). (PSR p. 32, n.19).

On July 21, 2023, Probation issued the final PSR and recommended the Stipulated Guidelines Sentence of 144 months' imprisonment. (PSR pp. 79-81). Among other things, Probation noted that, given the extent of Moayedi's crime, his advisory Guidelines range "greatly surpasses" the statutorily authorized maximum punishment. (*Id.* p. 81). The PSR also notes that, for (non-cooperating) defendants with the same Guidelines calculation, the average sentence imposed was 222 months' imprisonment and the median sentence was 210 months. (PSR p. 57).

## III. <u>APPLICABLE LAW</u>

As the Court is well aware, although the United States Sentencing Guidelines are no longer mandatory, they provide strong guidance to courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines' relevance stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). After making that calculation, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to deter criminal conduct, and the need to promote respect for the law. *Gall*, 552 U.S. at 50 & n.6. If the judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50.

## IV. <u>DISCUSSION</u>

The Stipulated Guidelines Sentence of 144 months' imprisonment is warranted in this case in light of the nature, duration, complexity, scope, profitability, and persistence of Moayedi's scheme; his leadership role; the many harms he caused; and his repeated obstruction of justice, including his destruction of evidence after his release on bail in this case.

### A. Nature, Circumstances, and Seriousness of the Offense; Respect for the Law; and Just Punishment

For a quarter century, Moayedi committed exceptionally serious crimes. He spearheaded a sustained campaign to defraud the U.S. Government, the taxpayer, his financial institutions, his competitors, and the many individuals and entities he exploited, including his own relatives. His operation was a sham through and through: He lied to ensure Montage's eligibility for sensitive government projects; he lied to be awarded those projects; he committed fraud while building those projects, resulting in flawed buildings; he lied to try to cover up his "shabby work"; he lied to try to conceal his scheme; and once his scheme came to light, he obstructed justice repeatedly. Several aspects of his scheme are especially noteworthy.

The *first* is the sheer breadth, scope, and duration of his scheme. To execute his 25-year scheme, Moayedi lied to, among others, the following entities: the State Department, the Treasury

Hon. Jed S. Rakoff                                                                    August 4, 2023
United States District Judge                                                                 Page 22

Department, the Department of Defense, the Federal Bureau of Investigation, the GSA, the SBA, the IRS, federal courts (*e.g.*, a 2003 Declaration and a 2019 Deposition), Bank-1, international and domestic bonding companies, the Maryland Secretary of State, and more.  He lied about ownership, citizenship, foreign ties, construction experience, references, personnel, employees' qualifications, architectural plans, taxes, non-existent "classified" projects, and more.  His lies bore fruit.  His companies fraudulently obtained more than 25 government contracts, which were worth more than $125 million in total.

The *second* is the deceptiveness and sophistication of Moayedi's fraud.  Examples abound, but a few notable instances include: (1) his inventing bogus prior construction projects; (2) his "backstopping" those imaginary projects by creating Fabricated Domains, fraudulent personas, and phony references; (3) his paying a CPA to create four sets of books and records, each supported by a fraudulent tax return; and (4) his renting temporary "clean" computers—and removing Montage's actual computers—in order to pass a Government inspection of Montage's offices, the purpose of which was to ensure proper handling of sensitive government materials; (5) his paying bribes and kickbacks to a government insider in exchange for (i) a copy of a competitor's "bid package", and (ii) inside information about several State Department projects; (6) his use of a notary stamp to notarize fraudulent documents to supply them with apparent legitimacy; and (7) his instructing employees to remove their publicly accessible LinkedIn profiles, so that government employees could not readily discover the lies in their resumes.

The *third* is Moayedi's leadership role and his corrupting influence.  As he admitted in his Plea Agreement, Moayedi was the undisputed leader of this massive fraud scheme.  And he used charm, charisma, and persuasion to corrupt co-conspirators so that they would assist and expand his fraud.  For instance, Moayedi cultivated a government insider (May Salehi); he corrupted two Franciscan Friars; he corrupted a CPA with four decades of experience; he enlisted five figurehead owners so that he could fraudulently obtain 8(a) status; and he corrupted countless underlings to help further his fraud.  His mentality is perhaps best summarized through one sentence he said, in sum and substance, to an underling in a closed door, one-on-one meeting: "*I need to know if you are willing to set aside your conscience for the good of the company.*"  Moayedi's role, at the very top of this scheme, and his severe corrupting effects, should be reflected in his sentence.

The *fourth* is the array of harms he caused—for individuals, competitors, taxpayers, national security, and for the United States' interests abroad:

- At the individual level, Moayedi harmed those whose names he exploited, including his identity theft victims (*e.g.*, his wife, mother-in-law, the DOR/Architect, a NASA employee, a Washington, D.C. Housing Authority employee, the woman whose name he used with his fraudulent notary stamp, etc.).

- At the industry-level, Moayedi hurt his competitors by cheating and winning more than $125 million worth of federal contracts that he otherwise would not have been awarded.

- As to financial harm, Moayedi cheated the U.S. Government and its taxpayers, because Montage's work was "shabby," by Moayedi's own admission.  Taxpayers paid for buildings that are supposed to last decades (and project American values and

Hon. Jed S. Rakoff                                                                                    August 4, 2023
United States District Judge                                                                                 Page 23

excellence), and instead, we received buildings that already have significant problems, like a cracked roof, after just a few years.

- As to national security, Moayedi created significant national security risks through his sustained disregard for rules and laws meant to protect our country, its people, and its information—*e.g.*, mishandling classified information; maintaining an uncleared secret facility; using an unapproved computer system (Dropbox) for sensitive materials; bribing a government insider; and lying extensively to maintain a Top-Secret national security clearance.

- And as to physical security, Moayedi and Montage's substandard construction practices resulted in flawed buildings, including issues with potable water, air quality, electrical systems, fire suppression systems, communications systems, a crack in the roof, termite-infested canopies, and more. These were the predictable consequences of his corner-cutting approach, as exemplified by his sending an unqualified employee YouTube videos about pouring concrete—instead of sending qualified personnel to a construction site. Indeed, Moayedi approached construction as though he were building an unimportant backyard shed to store a few pieces of old equipment. But he was paid to build secure Embassies, Consulates, and Marine Barracks for United States diplomats, servicemen and women, law enforcement, and intelligence personnel, who need functional facilities to carry out essential work. The United States deserved better.

In sum, Moayedi was the mastermind of a tremendously harmful scheme.

The *fifth* is his obstruction of justice. Neither a court-authorized search of his home and business, nor a federal arrest, nor a federal judge's direct warning, did anything to stop Moayedi. Rather, when Moayedi learned that he was under investigation in late 2020, he witness tampered by urging W-1 to lie to investigators. And after Judge Liman's pointed warning at the bail appeal in June 2021, Moayedi promptly destroyed significant evidence.

In sum, the nature and circumstances of this offense—including its seriousness, sophistication, deception, duration, profitability, and harmfulness—call for an extremely serious sentence. Such a sentence is also needed to ensure just punishment, respect for the law, and to protect the public from further crimes of the defendant. Moayedi is incorrigible. For 25 years, he has displayed no regard for laws, rules, people, or anything other than himself and his desire to siphon off as much as he could from the U.S. Government. He has fully earned a 12-year sentence.

### B. Deterrence

Deterrence considerations, both general and specific, also support a Guidelines sentence.

As to general deterrence: *Any* of the defendant's fraudulent tactics—*e.g.*, lying to obtain 8(a) status and preference for three entities; lying to obtain a Top-Secret national security clearance; lying extensively in bids for lucrative government contracts; paying bribes to a government insider; corrupting religious figures so they would lie to the Government; forging an architect's signature on architectural plans; mishandling classified information; cheating on taxes;

Hon. Jed S. Rakoff                                                                                         August 4, 2023
United States District Judge                                                                                   Page 24

committing bank fraud; stealing others' identities to commit crime; committing perjury repeatedly; obstructing justice post-arrest; etc.—would warrant a meaningful sentence. Each of these fraudulent tactics is a very serious crime in its own right. It would be important to send a message that the penalty is significant for someone who engages in *any* of these fraudulent tactics. But the calculus is altogether different for someone who commits *all* of this misconduct. In such a case, the punishment must be severe in order to be commensurate with the gravity of the crimes. A 12-year sentence would send that message. Such a sentence is particularly important because fraud in government contracting is extremely common, costly, and corrosive.

As to specific deterrence, the Stipulated Guidelines Sentence is warranted given, among other things, (1) Moayedi's 25-year fraudulent campaign; (2) Moayedi's leadership role; (3) Moayedi's corrupting numerous co-conspirators others to assist him in the scheme; (4) the fact that court proceedings have not deterred him, as he has lied repeatedly to courts over the past 20 years; (5) the fact that federal search warrants, a federal arrest, and even a federal judge's direct warning did not deter him in this case, as evidenced by his obstruction of justice thereafter; and (6) the fact that his fraud scheme continued even after several especially high-leverage moments that might have caused another criminal to stop. These high-leverage moments include, among others, the discovery of the 37 forged architectural plans in 2016; a sub-contractor's death in June 2018, when a scaffold was moved with a subcontractor still on it, resulting in his falling to his death; and the arrest of a different State Department insider in 2019 (*i.e.*, not May Salehi), in connection with a bribery and procurement fraud scheme.

In particular, the subcontractor's death *should* have sent an especially clear message to Moayedi. Just three days after the subcontractor's death, Moayedi wrote to two Montage colleagues, in part, that "the scaffolding was not adequate," "it was missing top railing," "the wheels were too small . . . maybe about four times too small," "the system is missing a lot of cross bracing," and "this is not going to go away very easily":

**From:**    Sina Moayedi <sinam@montageinc.com>
**Sent:**    Thu, 7 Jun 2018 12:03:53 +0000
**Subject:**  Scaffolding
**To:**      pm11@montageinc.com, pm13@montageinc.com

I talked to the haget his assistant and his replacement and also I talked to the post safety manager a local man named Donaldo and he was saying that in their opinion the scaffolding was not adequate it was missing top railing and he is correct as you can see in the photo he also said the wheels were too small and he is right they maybe about four times too small He also said it should have had all three girls as a Nela has pointed out and also the system is missing a lot of cross bracing when it's moved there is a lateral movement and it twists as it is moving he did say however that they believe there is a big human factor and there was a human error involved so I think the report they are going to write is going to be 50% scaffolding was wrong 50% the man on the scaffolding made the wrong decision they also said they will not be able to share the report with us. He said they are going to form a board of investigation and investigate further because it was a death I take this to mean this is not going to go away very easily also I instructed Hamadou to get an engineer to do I took at design of the next improved scaffolding and we get that submitted and approved and we do our own engineering on it before making a prototype having the prototype approved before use

Hon. Jed S. Rakoff                                                                            August 4, 2023
United States District Judge                                                                        Page 25

Moayedi also included a photograph of the scaffolding in his email, which confirmed his description:



And yet, just a few weeks after a subcontractor on the Burkina Faso Project died due to safety-related issues, Moayedi continued to cut corners on this project.  Specifically, in late June 2018 (the same month as the death), Moayedi hired M-1 to serve as a project controls engineer. In the resume submitted to the government by Moayedi, Moayedi claimed M-1 had worked with Montage since 2017, performing duties such as "*enforcement of quality and safety controls*," "*implement[ing] company safety health and hygiene practices*," and "*quality control*."  In reality, M-1 had begun employment with Montage just six days earlier on June 20, 2018.  Two versions of M-1's resume were forensically recovered from Moayedi's office computer—one entitled "old resume" and another entitled "[M-1] resume."  Metadata from these files indicate the last author of each document was "Sina" and the last modified dates were M-1's date of hire—June 20 and June 21, 2018, respectively.  The "old resume" file did not contain any reference to Montage

Hon. Jed S. Rakoff                                                                August 4, 2023
United States District Judge                                                          Page 26

employment.  In other words, Moayedi lied about M-1's experience for this key oversight role.  It is astonishing, but telling, that Moayedi was not in any way deterred by a death.  He is incorrigible.

For 25 years, Moayedi had every opportunity to stop engaging in fraud and deception, but did not.  The only way to stop him is to incapacitate him.

### C.  The Defendant's History and Characteristics

This extensive fraud scheme was Moayedi's life's work.  His essence, as a man, is to lie, cheat, and steal; that is his "default" mode.  His criminal choices are all the more notable because he had various advantages and desirable attributes, including education, intellect, skills, ambition, family support, opportunity, and wealth.  He could have made a living, and an impact, the right way—but for 25 years, he chose otherwise.  And he reaped the benefits.  Through his fraud, he made millions of dollars.  He owned a multimillion-dollar house in Chevy Chase, Maryland; a 97-acre horse farm in Virginia; single and multi-family residences in Washington, D.C.; a beach house on Cat Island, Bahamas; a farm and a condominium in Iran; and, according to his unsigned 2009 will recovered from his computer, several additional overseas properties (frequently held in the name of others).[10]  Montage's longtime CFO stated that Moayedi even expressed the desire, during the scheme, to purchase a private jet.  In sum, this was a crime of greed—and it was committed by someone with advantages that most people can only dream about.  Thus, this sentencing factor, too, counsels in favor of the Stipulated Guidelines Sentence.

### V.  CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 144 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:  _Michael D. Neff_
Michael D. Neff / Louis A. Pellegrino
Assistant United States Attorneys
(212) 637-2107/-2617

cc:     Frederick L. Sosinsky, Esq. (via ECF)
         Sara Kropf, Esq.

---

[10] In a 2017 unsigned version of his will, Moayedi lists of total of ten properties that he owns or partially owns in the "Real Estate" portion of his will, including a total of two overseas properties, located in the Philippines and the Bahamas.