

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 10, 2023

**BY ECF AND EMAIL**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
Daniel Patrick Moynihan U.S. Courthouse
New York, New York 10007

    Re:    *United States v. Sina Moayedi*, S1 22 Cr. 188 (JSR)

Dear Judge Rakoff:

    Sentencing in the above-captioned case is scheduled for Friday, August 11, 2023, at 2:00 p.m. The Government respectfully submits this letter in response to the defense sentencing submission dated August 3, 2023 (Dkt. 42 ("Def. Mem.")). The defense makes various arguments—and each of its primary arguments is inaccurate, misleading, or both. In fact, in some instances, the defense is regurgitating false claims that defendant Sina Moayedi ("Moayedi" or the "defendant") made to the Government to execute his underlying fraud. The defense's arguments suggest that, even now, the defendant has not accepted the full extent of his many crimes, nor come to grips with the full extent of harm he caused. For the reasons set forth in the Government's primary sentencing letter (*see* Dkt. 43), as well as those below, the Government respectfully submits that a sentence of 144 months' imprisonment is warranted in this case.

    **1. The Defendant's Alleged Motivations**

    At the core of the defense submission are the claims that: (1) Moayedi intended to do the work and did do the work; and (2) the Government got what it paid for. Over and over again, the defense repeats these themes. In fact, according to the defense, the reason Moayedi committed these crimes was his desire to do the hard work: "Sina Moayedi's crimes were motivated by a desire to actually do the hard work." (Def. Mem. 2). And, according to the defense, Montage actually did the work: "Montage did the work under the contracts and always intended to do so."[1]

---

[1] *See*, *e.g.*, Def. Mem. 2 ("Moayedi's misconduct . . . was all in service of being awarded, and then fulfilling, what he and Montage had contracted to fulfill – government contracts where Montage designed and built buildings or completed complex renovations."); *id.* (Unlike those defendants "whose entire operations were fraud factories, Sina Moayedi's crimes were motivated by a desire to actually do the hard work, to provide the design and build services required to complete overseas government construction projects."); *id.* ("[O]nly a certain class of offender actually provides goods or services to their victims commensurate with what the offender received"); *id.* at 33

Hon. Jed S. Rakoff                                                                                                August 10, 2023
United States District Judge                                                                                            Page 2

(*Id.* at 33).  But repetition and wishful thinking do not make something true.  Each of the defense's premises is wrong.  At least in many instances, Moayedi never intended to do the work; and Montage did not do the work.  In fact, Montage lacked the workforce necessary for largescale projects.  Instead of doing the work, Montage won contracts, farmed them out to foreign subcontractors, and maximized its profits.  Nor did the Government receive what it paid for.  As is demonstrated next, the conceptual linchpin of the defense submission is nothing but wishful thinking.  This defense claim—the very thing they claim differentiates him from other fraud defendants—is completely inaccurate.

*First*, start with the defense claims that Moayedi intended to do the work, wanted to do the hard work, and that Montage "did the work under the contracts". (*Id.* at 33).  These defense claims necessarily required that Montage had the ability to complete complex overseas government contracts, which comprised more than $100 million worth of the contracts at issue in this case.  But Montage lacked that ability.  Various of these overseas construction projects required 50 to 100 workers to do the work.  Yet Montage generally had only 5-10 employees, as the defense admits. (*Id.* at 12-13).  And this defense admission is confirmed by this five-year investigation, including documentary evidence of Montage's payroll as well as interviews of various witnesses who have described Montage's size consistent with the defense's characterization.  Moreover, some of Montage's 5-10 employees were in an office or administrative capacity in the Washington, D.C. area.  Thus, Montage lacked the ability—the manpower—to do largescale projects itself.  And importantly, the overseas contracts with the State Department required that the majority of the work be performed by the general contractor.[2]  But because Montage had only a handful of employees, it could not, and did not, meet that requirement.  In other words, Montage did *not* do the work.  Instead, Montage farmed it out to foreign contractors, contrary to contractual requirements.  Here are several examples:

1. **Prague Project**:  On September 30, 2016, Montage and the State Department signed an approximately $20 million contract for Montage to perform a Compound Security Upgrade ("CSU") at the U.S. Embassy in Prague, Czech Republic.  Just *one week later*, Montage subcontracted nearly 100% of the work to BRC, a Turkish subcontractor.  The subcontract between Montage and BRC begins by noting that Montage and the State Department had entered into a contract (the "Contract") for Montage to complete a CSU at the U.S. Embassy in Prague.  The next sentence reads: "WHEREAS**, MONTAGE desires to subcontract all of the work required under the Contract** for the execution and completion of the Project and Subcontractor desires to perform said work at the prices and upon the terms and conditions hereinafter expressed." *See* Ex. 1 (Montage-BRC Subcontract).  The subcontract continues by providing that the "**Subcontractor shall perform all work**" and "furnish all labor, materials,

---

("[T]he State Department received fair value for what they paid Montage because Montage did the work under the contracts and always intended to do so").

[2] *See* 22 U.S.C. § 4852(a) (restricting the bidding pool, for diplomatic construction or design projects, to U.S. persons or qualified U.S. joint ventures); 22 U.S.C. § 4852(f) ("With respect to a diplomatic construction project, a prime contractor may not subcontract more than 50 percent of the total value of its contract for that project."

equipment[, and so forth]" "necessary for the construction and completion of the Project as specified under the Contract"; the sole exception was that Montage would provide five employees for the Project.  Montage agreed to pay BRC $12 million in return for BRC's doing essentially "all of the work." (*Id.*).  Thus, on the Prague Project, Montage did not intend to do the work—and did not do the work.  Rather, Montage signed a $20.2 million contract, and immediately turned around and farmed it out for $12 million—an intended profit of more than approximately $8 million, or 40%.  Montage was essentially just a pass-through—a highly profitable pass-through.

Lest there were any doubt, Montage and BRC ultimately had a civil dispute that went to arbitration, and the Arbitration Decision resolving this dispute notes, among other things, that:

- "Because this was a diplomatic construction project, Montage was prohibited from subcontracting more than 50% of the total value of the construction project."

- "Montage, Inc. ('Montage'), was engaged as prime contractor to perform this work by the U.S. Department of State, Overseas Building Operations ('OBO').  Montage subcontracted 100% of the installed prime contract work (labor and material) to Claimant/Counter-Respondent BRC Uluslararasi Taahut ve Ticaret A.S. ('BRC') . . . a Turkish construction company."

- Section 1 of the subcontract provides that BRC was to perform all obligations for labor and materials under Montage's contract with OBO, with the exception of the employment of five staff members by Montage.  With regard to the prime contract's limitation on the value of BRC's subcontract, BRC and Montage informally agreed that certain of BRC's suppliers would invoice Montage directly."

- "The reasons [that Montage terminated BRC relate to its] . . . apparent effort to retain from the approximately $20 million contract price with OBO the maximum amount when for roughly $12 million 100% of the labor and material had been subcontracted, contrary to the prime contract's requirement that Montage cannot subcontract more than 50% of the total value of the work."

See Ex. 2 (Arbitration Decision – Montage/BRC Dispute).

2. **Khartoum Project**: In 2017, the State Department and Montage entered into a $16.3 million contract for Montage to build the Marine Security Guard Residence at the U.S. Embassy in Khartoum, Sudan.  Later in 2017, Montage entered into a subcontract with Veyka, a Turkish subcontractor.  Pursuant to this subcontract, the "**Subcontractor will perform all work and furnish all labor, materials, equipment**, scaffolding, tools, supervision, supplies, security, applicable taxes, freight, insurance **and all other things necessary for the construction and completion of MSGR Expansion/Renovation project**." (Ex. 3 (Montage-Veyka Subcontract)).  This subcontract was signed by Sina Moayedi, on behalf of Montage.  (For good measure, Moayedi signed as the purported

Hon. Jed S. Rakoff August 10, 2023
United States District Judge Page 4

"Vice President" of Montage.) (*Id.*). Thus, just as with the Prague Project, Montage did not intend to do the work—and did not do the work—on the Khartoum Project. Rather, Montage signed a $16.3 million contract with the State Department, and promptly farmed it out for about $8 million—an intended profit of more than $8 million, or 50%. Again, Montage was just a highly profitable pass-through.

The Government reviewed a sampling of Montage's "Daily Reports" relating to the Khartoum Project, and they confirm that Montage provided only approximately a few employees (*e.g.*, 3-5 employees), while the subcontractor provided more than 50 employees, on average—*i.e.*, more than 90% of the labor. Below is a summary of Montage's Daily Reports for five days selected at random from the Khartoum Project, and attached as Exhibit 4 is one of those Daily Reports:

| Date | Project | State Dept. Personnel | Montage Personnel[3] | Number of Sub-contractors on Site |
|---|---|---|---|---|
| 11/8/2018 | Sudan | 1 | 5 | 43 |
| 12/1/2018 | Sudan | 1 | 5 | 52 |
| 12/30/2018 | Sudan | 2 | 3 | 64 |
| 1/12/2019 | Sudan | 2 | 5 | 59 |
| 2/28/2019 | Sudan | 2 | 4 | 56 |

In sum, contrary to the defense's claims, in at least many instances Moayedi did not intend to do the "hard work," and Montage did not do the work under its contracts. Notably, Montage won *five* State Department contracts in 2016 alone, including largescale overseas projects for $20 million (Prague), $15 million (Madrid), $6 million (Bermuda), and $5 million (Tokyo). A company with only 5-10 employees could never "do the work" for five projects simultaneously across the globe; it couldn't even provide five "key personnel" for each. The principal defense argument is wrong. The defense strained—mightily—to try to differentiate Moayedi from other fraudsters. The irony is that Moayedi *is* different: He is different in the extent, duration, and persistence of his mendaciousness. The defense called this case an "outlier," *see* Def. Mem. 2, and they are right (but not in the way that they mean): Few defendants have committed this much fraud for this long.

And Moayedi's mendacious tendencies appear to be ongoing. In his personal letter to the Court (*see* Def. Mem., Ex. J), Moayedi makes various self-serving claims that cannot be squared with the facts set forth above, including the following claims (emphasis added):

- Moayedi was "meticulous" and "self absorbed with the quality and the delicate balance of design and building aesthetics";

- He was "more dedicated to functionality" than to "financial gains";

---

[3] This chart gives Montage the benefit of the doubt and includes "Administrative Personnel" who were not involved in construction and who may not have been onsite at all.

- "It is against the fiber of my being to cheat and lie on Material and Methods of construction and for material gains at the cost of aesthetic losses. I would have never neglected the safety and security of our service men and women for project profits, and that is perhaps one the many reasons why **our profits were usually minimal.**"

- "Deep inside me, **I have never been driven by greed** or want of money"

- "**I am not a businessman**, I am a poet, writer, artist, and helper."

- "My entire adult life, I tried to make everyone happy in order for them to like me. **I lived for others and not myself**. I did what others wanted, to keep their opinion of me positive."

These are lies. The defendant is trying to dupe the Court, just as he duped the U.S. Government for decades. These lies confirm that the essence of the man remains unchanged: He says whatever he believes he needs to say, in the moment, to achieve his immediate goals, regardless of truth.

\* \* \*

Finally, recall that there was a second half to the core defense claim: The Government got exactly what it paid for. *See* Def. Mem. 33 ("[T]he State Department received fair value for what they paid Montage because Montage did the work under the contracts and always intended to do so"). Nothing could be further from the truth. The Government paid millions and millions of dollars for an *experienced* U.S. contractor—with *qualified* employees—to build structurally secure, informationally secure, fully functional facilities. The Government got none of those things, at least not consistently. The Government also paid so that it would have accurate drawings showing the buildings as they were actually built (*i.e.*, the "as-built" drawings). At least in some cases, such as the Guayaquil Project, the Government did not receive accurate drawings. Montage's Project Manager on the Guayaquil Project even confirmed (to the case agent) that the as-built drawings for that Project did not match the conditions on the ground in several respects, including the transit of electrical lines and piping. In other words, Montage just faked the as-builts; they made it up. They submitted architectural drawings that do not reflect reality. That means that the U.S. Government does not know where everything is within that structure. That is a deeply concerning fact. One can only hope that, when the time inevitably comes for some sort of repair, the repair is completed safely, even though a worker may not know what building systems he is going to stumble upon inside the walls or ceiling (*e.g.*, electrical, communications, water, fire suppression, HVAC, etc.).

2. **The Defense's Attempts to Minimize Moayedi's Misconduct**

In describing Moayedi's misconduct, the defense repeatedly attempts to minimize the extent of Moayedi's wrongdoing. Moayedi should be sentenced for what he actually did—not the defense's self-serving, inaccurate claims. Here are several examples of the defense's misleading, inaccurate, and/or self-serving positions, each of which (again) calls into question whether Moayedi has truly come to grips with the extent of his wrongdoing.

    A. <u>Stolen Resumes/Key Personnel</u>: As the Court will recall, one of Moayedi's fraudulent tactics was to claim falsely, in bids, that certain individuals were Montage employees, when in fact they were not. (PSR ¶ 60). This enabled Montage to present a more compelling bid by leveraging those non-employees' qualifications. (This fraudulent tactic was especially useful given how few employees Moayedi had, as noted above.) In discussing this aspect of the fraud, the defense writes, in part, "Even if these allegations are true, these were not resumes for key personnel that could possibly have influenced the agency's award of the contract." (Def. Mem. 55). That is wrong. Here are three examples from Montage's bids for the Guayaquil, Abu Dhabi, and Copenhagen Projects. Montage was awarded each of these contracts. In each instance, Montage listed four or five Key Personnel, two of whom (████████ and ████████ are non-employees who never worked for Montage. Moayedi personally signed two of these three bids (Guayaquil and Copenhagen).

*Guayaquil*

For this project, we have chosen the following key personnel carefully to include, personnel that all have more than 10 years' experience in governmental renovations and new construction. The proposed key personnel for this project include:

- **Project Manager** - Gordon C. Tegeler
- **Project Superintendent** - Steven H. Shaffer
- **Quality Control** – ████████
- **Safety Manager** – ████████

*Abu Dhabi*

For this project, we have chosen the following key personnel carefully to include, personnel that all have more than 10 years' experience in chiller installation and power upgrades. The proposed key personnel for this project include:

- **Director of Operations** - Gordon C. Tegeler
- **Project Manager** - Scott Keller
- **Project Superintendent** - Steven H. Shaffer
- **Quality Control** – ████████
- **Safety Manager** – ████████

<u>Copenhagen</u>

For this project, we have chosen the following key personnel carefully to include, personnel that all have more than 10 years' experience Federal renovations and upgrades. The proposed key personnel for this project include:

- **Director of Operations** – Sina Moayedi
- **Project Manager** – Marianela Lugo
- **Project Superintendent** – Wayne Jaeger
- **Quality Control** – ▮
- **Safety Manager** – ▮

Again, the defense is presenting a preferred narrative that is simply contradicted by the facts.

B. <u>Bogus References</u>: The Court will recall that Moayedi created the Fabricated Domains to "backstop" his claims about phony, largescale construction projects that Montage claimed to have performed. In particular, Moayedi used the Fabricated Domains to create various email accounts that he could use to provide bogus references to the Government in support of Montage's fictitious construction experience. (PSR ¶¶ 41-42). In discussing the Fabricated Domains, the defense writes: "Moayedi created these websites to provide some backup in the event that someone was to check his references – *which apparently never occurred*." (*Id.* at 72). The defense implies that the Fabricated Domains were of no moment because no one checked Montage's references. That is wrong. Attached is an email from a State Department contracting officers to one of Moayedi's pseudonyms, "Samad Mohammad," asking about "Montage's performance" and the size of the contract. "Samad Mohammad" replied, via email, "Montage is a Professional Contractor and we are happy with their performance. Final contract value for their last completed work was $24,980,000.00. I hope this helps." "Samad Mohammad"'s email address looked legitimate because Moayedi had created Fabricated Domains that were extremely similar to a legitimate entity, here the Washington, D.C. Housing Authority. Here, too, the defense is presenting a preferred narrative that is simply inaccurate.

C. <u>National Security Risks</u>: In the PSR and the Government's sentencing letter, the Government sets forth various actions that Moayedi took that created significant national security risk. The defense asserts that "the government has not offered any evidence of *damage* to national security." (*Id.* at 54). The defense is focused on proven "damage," but the Government's point is different: Through his repeated actions, Moayedi jeopardized the national security of the United States in various ways for nearly a decade and a half. Put another way, Moayedi repeatedly created *risk*, regardless of whether it materialized. That he would freely run such risks is

concerning, is revealing about his character, and suggests that he simply did not care whether those risks materialized, so long as he got his profits.

For example, Moayedi created national security risks by (1) cultivating and paying bribes to a State Department insider with a Top-Secret national security clearance; (2) lying on his own applications for a Top-Secret clearance; (3) maintaining a secret, uncleared Montage office in Maryland; (4) storing Top-Secret material at that uncleared office; (5) failing to use the secure, approved information sharing platform (Projnet)—and instead, using the commercially available Dropbox; (6) giving foreign nationals, who lacked security clearances, access to sensitive materials; and (7) renting "clean" computers, hiding Montage's actual computers, and telling foreign national employees to stay home during a government inspection. (PSR ¶ 95).

D. Bribe Contracts: As set forth in the final PSR and the Government's sentencing submission, Moayedi made bribe payments to May Salehi (a then-State Department engineer) on at least four occasions: once for a copy of a competitor's more professional bid package, so that Moayedi could improve his bids; and (at least) three times for confidential inside information about three overseas State Department projects, namely those in Ecuador, Spain, and Bermuda. (*Id.* ¶¶ 77-81). The defense admits that Moayedi made bribe payments to Salehi on two of these four occasions (the Bermuda Project and exfiltrating a copy of the competitor's bid package), but disputes the other two (*i.e.*, Ecuador and Spain). (*Id.* at 3). The defense is wrong. This investigation—which has included interviews of three of five participants involved in the bribery scheme, the obtainment of physical evidence, and analysis of phone call records, financial records, bid records, travel records, and emails—has revealed that Moayedi paid Salehi for inside information for at least three State Department construction projects (and likely far more). Among other evidence, the Government interviewed Salehi's intermediary ("Intermediary-1")—*i.e.*, the person whom Salehi paid to meet in person with Moayedi—Intermediary-1 stated the following, in substance and part:

- In or around 2014, Salehi approached Intermediary-1 with a business proposition: She asked him to relay inside information about bidding on construction jobs. Salehi explained that her friend Sina had a company named Montage that did work for the government. Salehi would give the information directly to Intermediary-1, and Intermediary-1 would deliver the information in person to Sina at his office. In exchange, Sina would provide Intermediary-1 with money, which Intermediary-1 split with Salehi. At times, Sina would pay Intermediary-1 directly, and at other times Sina would use a middleman.

- Intermediary-1 would generally meet Salehi in person to receive the information. The information would generally be that Montage should bid a little bit lower or higher on a project. Sometimes the information would be a little more specific, such as a dollar amount. Overall, this kind of exchange probably happened a handful of times. The money that they split was never

- more than a few thousand dollars. Intermediary-1 never saw any documents. It was always just information.

- Intermediary-1 clarified that the payments were for the information—they were not based on whether Montage won the bid. Intermediary-1 explained that, during one meeting with Sina's intermediary ("Intermediary-2"), Intermediary-2 delivered the bribe payment and said, "this was the money that your mother sent." Intermediary-1 split this bribe payment with Salehi. Intermediary-1 recognized the name of Intermediary-2 and produced his phone numbers from Intermediary-1's cellphone.

- Intermediary-1 estimated that the bribe payments totaled $25,000. Intermediary-1 recalled that these bribe payments related to a number of projects that were going on at once. Intermediary-1 did not recall all of the project names, but Madrid was definitely one of the projects for which he passed information between Salehi and Sina, and he also recalled hearing talk of Ecuador.

- When asked about Salehi's exfiltrating a bid package to Montage, so that Sina could better construct Montage's bid packages, Intermediary-1 recalled this being discussed with May, but he did not recall ever seeing or handling these documents himself.

Intermediary-1's statements have every hallmark of truth: They are against his penal interest; they are consistent with other evidence (testimonial, documentary, and electronic); they are precise; and he acknowledged the limitations of what he knew. Among various other things, Intermediary-1 had extensive phone contacts with co-conspirators during the period that the Guayaquil Project and another State Department project were both awarded, including Intermediary-1's direct phone contacts with Moayedi, Salehi, Intermediary-2, and the Montage corporate office. Notably, Intermediary-1 estimated that the amount of the bribes was generally a few thousand dollars each time that inside information was conveyed. He further estimated that the total amount was $25,000—suggesting that the number of bribes from Moayedi to Salehi exceeded the three that the Government has put forth.

In sum, the defense is again presenting a preferred, minimized narrative that is simply inaccurate.[4]

---

[4] The S1 Information to which Moayedi pleaded guilty specifically identified all three of these State Department projects: "to wit, MOAYEDI paid cash bribes and kickbacks to an engineer in the State Department's Overseas Building Operations division ("Insider-1") in exchange for confidential inside information relating to several State Department construction projects, including projects in Ecuador, Spain, and Bermuda."

Hon. Jed S. Rakoff  August 10, 2023
United States District Judge  Page 10

- E. <u>"28 Contracts"</u>: The defense strains unpersuasively to reframe and narrow this case: The defense suggests that this case relates to 28 contracts and seeks to exclude certain inculpating episodes and details which do not directly relate to those 28 contracts. This position is self-serving and wrong. The parties agree that the *gain* amount—which relates to *one enhancement*—is tethered to approximately 27 fraudulently obtained contracts. And 27 instances of largescale fraud would certainly be a very serious case. But there is much more, as the defense has known for the duration of the case. In fact, this case was intentionally charged as a 25-year conspiracy. The defendant committed a host of deceptive acts, including attempts, that unquestionably fall within the scope of the conspiracy. A number of these deceptive acts do *not* relate to a specific contract—yet they are set forth in either the Plea Agreement or the S1 Information to which he pleaded guilty. For instance, one Overt Act in the S1 Information notes that, in order to pass a Government inspection of Montage's office, Moayedi deceived the Government by temporarily renting replacement computers, and concealing Montage's actual computers in a different space. (S1 Information (Dkt. 35), ¶ 4(i)). Another Overt Act notes that Moayedi agreed to pay an African American woman to serve as the paper president of Ponce Contractors, including paying her to sign documents. *Id.* ¶ 4(j)). (The Government ultimately did not award *any* contracts to Ponce.) Neither of these Overt Acts relates to one of the 27 fraudulent contracts, but both were undoubtedly part of Moayedi's overarching conspiracy and clearly shed light on his misconduct, deceptiveness, and character. Similarly, the Plea Agreement highlights that Moayedi's employee (and relative), CC-1—an Iranian citizen—fraudulently used Projnet login information associated with Moayedi's wife (who is a U.S. citizen). This fraudulent tactic, too, is not linked to a specific contract, but again, provides insight into Moayedi's deviousness, mendacity, and disregard for rules meant to protect national security. And it is black-letter law that, in the interest of the Court's having the fullest information possible at sentencing, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

- F. <u>Forged Architectural Drawings</u>: As the Court will recall, Moayedi and Montage forged architectural drawings in multiple respects. *First*, Montage submitted approximately 37 forged architectural plans to the State Department, which contained the unauthorized electronic signature of the Designer of Record (*i.e.*, the architect), even though the DOR had neither reviewed nor approved these plans. These plans related in part to safety and structural issues, such as fire protection, roof design, and structural steel drawings. (PSR ¶¶ 69-71). *Second*, Montage faked the as-built drawings by submitting architectural plans that did not, in fact, match the conditions of the buildings as they were actually built. In fact, Montage's Project Manager for the Guayaquil Project *admitted* in an interview that the as-builts do not match the actual conditions on the ground. (*Id.* ¶¶ 75-76).

---

As the Court may recall from the Salehi sentencing, Salehi's counsel conceded, upon questioning from the Court, that there were three bribe incidents, not one. (*U.S. v. Salehi*, 21 Cr. 577 (JSR), Dkt 32 (Sent Tr.), pp. 37-39).

Hon. Jed S. Rakoff  August 10, 2023
United States District Judge  Page 11

The defense attempts to whitewash these forgeries in a few ways, each of which is inaccurate or misleading. But the most important point is that the defense does not appear to dispute that: (1) Montage improperly affixed the DOR's signature to 37 architectural drawings, including sensitive drawings about life-safety issues; and (2) Montage submitted as-builts to the State Department that do not match the actual conditions on-site. In other words, the Government did not get what it paid for.[5]

G. <u>Aggravated Identity Theft</u>: The defense acknowledges Moayedi's identity theft but seeks to downplay it, focusing on his use of pseudonyms and his abuse of prestigious entities such as Johns Hopkins University Hospital—both of which are fraudulent and reprehensible, but neither of which would constitute aggravated identity theft. (Def. Mem. 61-62). To be clear, Moayedi repeatedly abused various individuals' names, identities, signatures, and/or financial accounts in connection with various core aspects of his scheme, including (among other examples) that:

   a. As to his ownership fraud, Moayedi fraudulently signed documents in the names of the female "owners" of both Montage and Ponce;

   b. As to employee qualifications, Moayedi fraudulently included the names of three *non*-employees in at least six successful bids to the Government;

   c. As to the Fabricated Domains, Moayedi (i) registered most of them in his wife's name; (ii) registered one of them in the name of the "paper president" of Ponce; and (iii) used his mother-in-law's credit card information for payments for certain Fabricated Domains;

   d. As to fraudulent reference letters, Moayedi and Montage submitted forged letters to the U.S. Government, which contained the names and signatures of government employees from NASA and the Washington, D.C. Housing Authority;

---

[5] To be clear, the defense's arguments about these forgeries are flat-out wrong. For instance, contrary to the defense's characterization, Moayedi did not "disclose" these forgeries. Rather, when State Department employees discovered the forged submittals, Moayedi lied in various respects to try to minimize, deflect, and mislead. For instance, in a letter to the State Department in November 2016, which Moayedi signed, Moayedi falsely claimed, among other things, that: (1) a clerk had "mindlessly" affixed the DOR's signature on certain submittals; (2) the submittals at issue had been "previously approved" by the DOR; and (3) the DOR had authorized the use of his electronic signature for this purpose. These were lies. During an interview with the DOR, the DOR stated that he always insisted on a "wet signature" for approved submittals, and he had never authorized any use of his signature. (PSR ¶¶ 72-73). To take another example, the defense focuses on whether the DOR's *signature* on the as-builts was forged—but the defense does not appear to contest the even more serious allegation that they were faked, *i.e.*, that they simply do not match the conditions on the ground.

    e. As to fraud in the execution of government contracts, Montage—at Moayedi's direction—forged the DOR's signature on architectural plans, including architectural plans relating to safety and structural issues and critical building systems, including roofing, fire protection, structural steel, concrete, water treatment, and communications cabling.

In sum, Moayedi's extensive abuse of others' identities, from 1995 to 2020, was core to his multifaceted fraud.

H. <u>Ownership</u>:  As the Court will recall, Moayedi abused the 8(a) Program from 1995 to 2020 by enlisting approximately five "figureheads" to serve as the "paper owner" of three different entities (Montage, Viking, and Ponce).  Moayedi reaped the benefits: During Montage and Viking's combined 18 years in the 8(a) Program, the two companies fraudulently obtained approximately 64 government set-aside contracts, worth more than $41 million total.  (PSR ¶ 30).

Surprisingly, the defense appears to argue that Moayedi was not, in fact, the owner of these companies.  The defense acknowledges that Moayedi's conduct was fraudulent because he "controlled" these companies, rendering them ineligible for the 8(a) Program; but the defense maintains that it was literally "true that individuals who met the [8(a)] program's requirement to be part of a 'disadvantaged' group had a majority interest in these companies (Mr. Moayedi's first wife and Ms. Lugo)."  (Def. Mem. 46).  This is wrong, and is a further attempt to minimize.  As Moayedi wrote to Bank-1 in 2016, "*I am the sole owner and President of Montage and have always been*".  (PSR ¶ 36).  And during his guilty plea allocution, Moayedi stated, in part, "I knowingly agreed with others to falsely represent to the Department of State that Montage, Inc., a general contractor account owned in part and controlled by me, was a woman-owned business."  (Plea Tr. 17).  And Ms. Lugo, who is referenced by the defense, was employed part-time at Montage in a *Human Resources* capacity, and was employed fulltime at a *competing* construction company since 2014.  She exercised no executive functions at Montage.  (PSR ¶ 36).

I. <u>Moayedi's Payment of Taxes</u>:  The defense asserts that Moayedi has "paid taxes." (Def. Mem. 5).  While that is literally true, the defense implies that Moayedi has paid taxes *properly*, which he has not.  As the Court is aware, Moayedi executed a complex financial fraud as part of his scheme; this fraud involved his paying a CPA to create and maintain four different sets of books and records, each of which was fraudulent and each of which was supported by a fabricated tax return.  The CPA explained to the Government that, in some years, Moayedi understated his income to the IRS, but in other years, Moayedi actually overstated his income to the IRS in order to ensure that his representations to the State Department (which had inflated Montage's profitability) were consistent with his representations to the IRS.  (PSR p. 24, n.12).

J. <u>Highlighting Others' Wrongdoing</u>:  The defense repeatedly points out other individuals' and entities' actions, such as others' potential abuse of the 8(a) Program.  To the extent the defense's allegations about others are relevant at all, they merely

Hon. Jed S. Rakoff  August 10, 2023
United States District Judge  Page 13

    K. <u>Montage's Concerning Construction Practices</u>: Finally, the defense lodges a procedural argument, claiming that the Court should not consider the evidence that Montage's structures are flawed. The defense is incorrect.[6]

    The defense's arguments ring hollow. The Government has been arguing, since 2020/2021, that Montage committed fraud in both the procurement of government contracts and the execution of government contracts. The Government has noted, since 2020/2021, that Moayedi and Montage engaged in various concerning practices, including (1) lying about employees' qualifications and lying about non-employees' purported employment at Montage; (2) making up Montage's construction experience and references; and (3) forging the architect's signature on architectural plans relating to safety and structural issues, such as fire protection, roof design, and structural steel drawings. The Government also noted for the defense, in 2021, the issues surrounding the subcontractor's death in a scaffolding accident. Montage's various concerning practices create obvious and meaningful risk about the quality of its work. That these risks have already led to problems is not especially surprising; it merely illustrates why Moayedi's conduct was so dangerous in the first place.

    As the defense is aware, this information further disproves their preferred narrative—that Moayedi wanted to do the work, did do the work, and the Government received good buildings despite Moayedi's fraud.

    The defense's approach is particularly without merit because of the extent to which Moayedi appeared to be entirely untroubled when Montage could not meet what it believed was the minimum water pressure required to comply with the International Fire Code. Rather than seek to address this apparent life-safety issue regarding fire suppression, Moayedi appeared to direct that Montage simply ignore the problem and hope the State Department did not raise it:[7]

---

underscore the degree of corruption and, accordingly, the importance of general deterrence.

[6] By way of background, when the Government submitted its Offense Conduct Statement to Probation, it included a lengthy section entitled, "PHYSICAL SECURITY/CONCERNING CONSTRUCTION PRACTICES." In the draft PSR, Probation included a brief summary of this section (including the title), but not the full section. The Government objected, requesting that Probation include the full version of this section (which we re-attached to our objection). Ultimately, Probation included the full recitation in the final PSR. Contrary to the defense's hypothesis, there was no attempt to "sneak" anything into the final PSR; this information has been in the Offense Conduct that the Government provided Probation from the start.

[7] At the Government's suggestion, a test of the fire suppression system occurred in 2021 and passed the applicable requirements. Montage appears to have misunderstood the applicable standard.

Hon. Jed S. Rakoff  
United States District Judge

August 10, 2023  
Page 14

| | |
|---|---|
| From: | Sina Moayedi |
| To: | pm11@montageinc.com |
| Cc: | Thad Quarles (PM Montage); pm13@montageinc.com |
| Subject: | Re: GYE-MSGR: RFP-004 RFI"s Sent To OBO 09132016 \| OBO Answered RFI"s 01102018 |
| Date: | Saturday, January 19, 2019 11:11:27 PM |

Please let's only discuss this with OBO if they bring it up again in writing,

Thanks Sina  
Sent from my iPhone

On Jan 20, 2018, at 11:41 AM, Rock Meng <rock@capitolfpe.com> wrote:

> In accordance with International Fire Code, the minimum fire flow for hydrant demand is 1,500 GPM. Since the public water supply could only provide 24.6 lps (400 GPM), it cannot support the required fire flow. As such, it is impossible to meet the code requirements due to insufficient flow.

And in another email, this one from February 2011, Moayedi acknowledged the "extremely poor workmanship on the roof," and concluded, "if a real inspector inspects the roof it would not pass inspection." Despite the poor workmanship, Moayedi continued to subcontract with the relevant subcontractor, BRC, several times thereafter (including on the Prague Project, as noted at the start of this letter).

> Guys, Not sure what the we need to do, about the extremely poor workmanship on the roof, there was at least 4 large areas of ponding 2 days after it had rained, and many surfaces are uneven, if a real inspector inspects the roof it would not pass inspection. Our site staff did not share this with us??  
> Sina

In sum, the defense has been on notice, for years, of various Montage practices that create obvious risks to the physical integrity of the structures. Moayedi's choices are deeply concerning, regardless of whether they have already led to a cracked roof, issues with potable water, and more. As Moayedi acknowledged in an email to two high-level Montage employees, Montage's work on a given project was "*shabby*" and he was not able to disagree with the State Department's assessment that "*we don't know what we're doing*".

3. **The § 3553(a) Factors**

The defense makes various arguments relating to the § 3553(a) factors; none is persuasive.

a. <u>*Seriousness of the Offense, Respect for the Law, and Just Punishment*</u>: The defense spends one sentence on these core sentencing considerations. Remarkably, in a section (ostensibly) dedicated to "respect for the law," the defense does not mention the defendant's repeated perjury or repeated obstruction of justice. Nor does the defense even attempt to grapple with (1) the scope, duration, and sophistication of Moayedi's scheme; (2) the lengths to which he went to carry out this fraud; (3) his leadership role; (4) his corrupting influence; and (5) the array of harms he caused. The defense presumably ignores this sentencing factor because a very significant sentence is required to account for the magnitude and scope of Moayedi's crimes. For a party seeking an 80% reduction from the bottom of the stipulated Guidelines calculation (48/234), it is telling that the defense does not even engage with how their requested sentence in any way comports with the need for the punishment to fit the severity of the crime.

b. <u>*Deterrence*</u>: The defense approaches general deterrence as though this were an ordinary white-collar case, not a 25-year scheme marked by tremendous deception, corruption, persistence, and profitability, along with an array of (intensifying) crimes. Of course, the more sophisticated and deceptive a scheme is, the less likely it will be detected and prosecuted—and thus the more severe the punishment must be to deter such schemes. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

Strikingly absent from the defense's assessment of deterrence is any mention of specific deterrence. That is presumably because, for 25 years, Moayedi had every opportunity to stop engaging in fraud and deception, but did not. He could have stopped once he was a millionaire. He didn't. He could have stopped once he owned five properties. Or ten. Or thirteen. He didn't. He could have stopped when certain slivers of his fraud were detected, or almost detected, such as the 37 forged architectural plans, or his use of Dropbox to share and store sensitive materials. He didn't. He could have stopped when a subcontractor died in a safety-related accident during construction in Burkina Faso. He didn't; in fact, just three weeks later, he kept cutting corners on that project by lying about the professional experience of the new project controls engineer. He could have stopped when law enforcement executed search warrants at his home and business; he didn't, instead choosing to witness tamper. He could have stopped when he was arrested; he didn't, instead choosing to destroy evidence. In sum, it is telling that the defense does not even seek to engage with how their preferred sentence accounts for the extreme persistence of Moayedi's mendacious tendencies.

c. *Protecting the Public from Further Crimes of the Defendant*: The defense claims that "Moayedi poses effectively zero risk of reoffending." (Def. Mem. 66). This is an astonishing claim in a case in which Moayedi has (1) lied for 25 years, and (2) sought to conceal his schemes (and evade punishment) by lying to federal courts repeatedly, witness tampering, and violating his bail conditions by destroying evidence despite a direct warning from a federal judge.

   Furthermore, according to the defense, Moayedi's "advanced age makes a return to crime far less likely." (*Id.*). This is another puzzling claim. Moayedi defies all statistical trends. He committed the instant offense across four decades of his life, from age 39 to 66. The most intense period of the fraud was from age 59 to 66 (2014-2021). The idea that his age is *mitigating* is a remarkable claim, especially because his crimes intensified as he aged, and because he continued committing crimes in his mid-sixties, *after* spending several months in jail in mid-2021.

d. *Avoiding Unwarranted Sentencing Disparities*: The defense has summarized various cases that Your Honor presided over, but none of those cases appears to have involved procurement fraud, bribery of a public official, a 25-year scheme, obstruction of justice, or national security risks—let alone all of these factors. While the defense has styled this subsection "Avoiding Unwarranted Sentencing Disparities," they ignore the fact that this § 3553(a) factor concerns avoiding "unwarranted sentence disparities among defendants with similar records *who have been found guilty of similar conduct*." 18 U.S.C. § 3553(a)(6). None of the cases cited by the defense involves similar conduct to this one. Indeed, the defense cites to cases involving, among others, a retail theft ring that stole $2 million from Macy's and Bloomingdale's; and an investment fraud scheme that stole $2.4 million from investors. (Def. Mem. 74-75). That is clearly serious conduct, but it bears no relation—whatsoever—to the magnitude, complexity, duration, profitability, deceptiveness, and harmfulness of the defendant's schemes.

e. *Obstruction of Justice*: As to his repeated obstruction of justice, Moayedi makes three arguments. First, the defense asserts, "acts such as these are often enough engaged in" but do not always result in "significantly enhanced sentences." (*Id.* at 78). Rather than say, unequivocally, that this conduct was wrong—and detrimental to the justice system—the defense essentially shrugs. This is an unpersuasive, and potentially dangerous, argument. Moayedi destroyed evidence less than one month after his release on bail. He presumably considered the anticipated costs and benefits of this course of action and likely reasoned that the cost of destroying evidence—an increase in punishment, should he be caught—was worth the potential benefit to him: depriving the Government, a jury, and the Court of everything that evidence revealed. The legal system relies on accurate, fulsome information to ensure justice for all, including defendants. The consequences can be enormously significant (*e.g.*, for defendants, victims, and others) when any individual deliberately destroys evidence, resulting in incomplete information for the justice system's truth-seeking function. The consequences for such an individual must also be significant. That general observation is even more

important here, because Moayedi's actions are part of a broader pattern of behavior in which he displayed no respect whatsoever for the law or legal proceedings.

Second, the defense engages in whataboutism, directing the Court to one instance of undeniably poor judgment by May Salehi. (*Id.*). To the extent it is relevant at all, Salehi's serious mistake—telling a co-conspirator to deny that they had worked together—only underscores the severity of Moayedi's obstruction. Unlike Moayedi's obstructive campaign, Salehi's conduct occurred once; did not involve the permanent destruction of evidence; and was promptly disclosed (and indeed volunteered) by Salehi's counsel to the Government. Nor did Salehi violate her bail conditions in other respects (as did Moayedi), including his unilaterally dispensing with the third-party custodian requirement, just one week following his release on bail.

Third, the defense's attempts to deflect are bundled with an attempt to minimize, as the defense asserts: "Nor should Sina's September 2021 *nonrenewal* of internet website domains that served to back up the references Montage listed on its bid applications support an increase in the sentence imposed here." (*Id.* at 79). This is severely misleading. By analogy, if someone throws a rock through a glass window, thereby destroying the window, we would not refer to it as a "non-preservation" of the window. "Non-renewal" connotes inaction; *e.g.*, letting something expire. That is the exact opposite of what Moayedi did. He took the bull by the horns:

On September 3, 2021, GoDaddy sent Moayedi an email relating to *one* service associated with *one* of his Fabricated Domains (the "Email"). The Email notified Moayedi that this one specific service would auto-renew in 10 days; no action was required on Moayedi's part. Within approximately one hour of receiving this email, Moayedi deleted *all* of the Fabricated Domains in their entirety, including approximately ten email accounts. To achieve this, Moayedi took approximately 20 affirmative steps, including logging into the GoDaddy website; retrieving, from his wife's email account, a one-time access code sent by GoDaddy; providing that access code to GoDaddy; selecting the various products he wished to cancel/delete; reaffirming several times that he wished to delete them; requesting that a final confirmatory email be sent for each service/domain (that email began, "Are you sure?"), and selecting "Yes, I want to delete!" approximately 12 times. Fourteen days after Moayedi's directive to delete, the email accounts at were all "permanently deleted," per GoDaddy records:

## Notes for Shopper ID 66005969
## 1/1/2012 to 12/14/2021

| Entered Date / By | Note |
|---|---|
| 9/17/2021 6:06:42 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address smithb@dc-ha.org has been permanently deleted from workspace. |
| 9/17/2021 6:06:41 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address rnovaris@chavezcharter.org has been permanently deleted from workspace. |
| 9/17/2021 6:06:40 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address ndmmontage@ndm-montage.com has been permanently deleted from workspace. |
| 9/17/2021 6:06:38 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address mohammads@dc-ha.org has been permanently deleted from workspace. |
| 9/17/2021 6:06:35 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address jrichards@jhopkinsfacilities.org has been permanently deleted from workspace. |
| 9/17/2021 6:06:34 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address gmartinez@chavezcharter.org has been permanently deleted from workspace. |
| 9/17/2021 6:06:33 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address egonzales@jhopkinsfacilities.org has been permanently deleted from workspace. |
| 9/17/2021 6:06:23 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address andresc@hyundaiuae.com has been permanently deleted from workspace. |
| 9/17/2021 6:06:22 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address andersonmichael@pgschools.us has been permanently deleted from workspace. |
| 9/17/2021 6:06:21 AM / Webmail Provisioning / Client IP: GoDaddy Internal | Email address admin@ponceinc.us has been permanently deleted from workspace. |

Notably, Moayedi had already paid for several domains until 2024 and even 2025; there was no need to take any action whatsoever, nor did he "non-renew" them. He took various affirmative steps to delete all of them—permanently.

## Domain List - All for Shopper ID 66005969

| Domain Name | Status | Created | Expires | Order ID |
|---|---|---|---|---|
| DC-HA.ORG | 8 Cancelled | 5/28/2013 | 5/28/2021 | 553377615 |
| PGSCHOOLS.US | 8 Cancelled | 5/28/2013 | 5/27/2021 | 553377615 |
| JHOPKINSFACILITIES.ORG | 8 Cancelled | 9/13/2013 | 9/13/2020 | 594664211 |
| CHAVEZCHARTER.ORG | 8 Cancelled | 9/23/2013 | 9/23/2020 | 598511949 |
| HYUNDAIUAE.COM | 8 Cancelled | 12/12/2013 | 12/12/2023 | 629621776 |
| NDM-MONTAGE.COM | 8 Cancelled | 4/15/2014 | 4/15/2024 | 680272405 |
| UNITEDBANKS.US | 8 Cancelled | 8/5/2014 | 8/4/2024 | 719881286 |
| PONCEINC.US | 77 Expired domain hold | 3/13/2015 | 3/12/2025 | 805297618 |

In sum, the defense's attempt to sanitize Moayedi's obstruction reflects an ongoing desire to mislead and minimize. This failure to acknowledge the gravity of his actions should factor into the Court's sentencing calculus.

f. *The Guidelines Range*: The defense assails the Guidelines range as "terribly irrational and unjust" (Def. Mem. 30), but this criticism rings hollow on the facts of this case, given that the parties' Plea Agreement has already reduced the Guidelines range by nearly 50%. (The top of the stipulated Guidelines range, as mathematically calculated, was 286 months; the Stipulated Guidelines Sentence is 144 months.) In short, those who commit 25-year frauds; lead those schemes; corrupt numerous co-conspirators; obstruct justice; reap the nine-figure financial benefits; and create physical and national security concerns, should expect very significant sentences.

The defense also appears to suggest that the loss to the Government is "zero" in this case—an argument that is not only wrong factually and legally, but also comes dangerously close to breaching the parties' plea agreement. This argument is wrong for several reasons. The parties have agreed, under the Guidelines, that the Government sustained a loss but it cannot reasonably be determined. That's because some species of loss are extremely difficult to quantify—*e.g.*, the value of an Embassy's being open, thanks to timely completion of the a project; the value of an Embassy's water systems and HVAC systems functioning as intended; the value of having accurate as-built drawings, so that the Government knows where things are and can safely, confidently, and efficiently repair things as needed; the harm to Montage's competitor companies, who lost out on prestigious, lucrative projects; the value that is lost when a law-abiding contractor exits the government contracting industry, as one did here, because it determines that it cannot successfully compete against cheaters; the damage to American interests when America is trying to fight for anti-corruption measures abroad, yet suffering from corruption-and-bribery schemes at home; etc. In addition to these (and other) species of loss that are extremely difficult to quantify generally, another species of loss cannot be fairly determined *yet*, because Montage buried problems inside of ceilings above and concrete below. Accordingly, the parties agreed, in the Plea Agreement, to use the gain from the offense, "because there is a loss but it cannot reasonably be determined."[8]

---

[8] The defense also cites Moayedi's medical conditions as a reason for lenience. The BOP has reviewed his medical conditions (as outlined in his BOP medical records and in the draft PSR) and has confirmed that it is well-equipped to handle and address these conditions. *See* Ex. 5, p. 3 (July 20, 2023 letter from Dr. Diane Sommer, Regional Medical Director for the Northeast Region of the Federal Bureau of Prisons ("Based on the information provided to me and my knowledge of the BOP's medical resources, the BOP is able to continue with the appropriate care for Mr. Moayedi should he be sentenced to a term of incarceration and committed to the custody of the BOP.")).

* * *

  For 25 years, Moayedi lied, cheated, and stole. He corrupted countless co-conspirators; he displayed a callous disregard for national security and physical security; and he obstructed justice repeatedly to try to evade punishment. He was motivated by money. And he simply did not care about the collateral damage he caused—whether to his employees, subcontractors, competitors, minority groups, or the United States. Moayedi now claims he is a changed man. Notably, in connection with this sentencing, Moayedi submitted a letter to the Court which is replete with lies, some of which are excerpted and bolded above. It is unfortunate, but unsurprising, that even now, Moayedi continues to lie and minimize. That is his essence as a man.

  For the reasons set forth above, and in our primary sentencing letter, the Government respectfully requests that the Court impose a sentence of 144 months' imprisonment.

              Respectfully submitted,

              DAMIAN WILLIAMS
              United States Attorney for the
              Southern District of New York

      By: _____
              Michael D. Neff / Louis A. Pellegrino
              Assistant United States Attorneys
              (212) 637-2107/-2617

cc: Frederick L. Sosinsky, Esq. (via ECF)
   Sara Kropf, Esq.