# Exhibit 2

Arbitration Decision – Montage/BRC Dispute



AAA-ICDR (INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION)

ICDR Case No. 01-18-0004-1916

BRC ULUSLARARASI TAAHUT VE TICARET A.S. V. MONTAGE, INC.

PANEL MAJORITY FINAL AWARD

03 April 2020

Tribunal:
Judith B. Ittig (Co-Arbitrator)
Christine O.C. Miller (Co-Arbitrator)
Donald G. Gavin (Co-Arbitrator)

# Table of Contents

- Panel Majority Final Award ................................................................................................................. 0
- Introduction ........................................................................................................................................... 1
- Factual Background .............................................................................................................................. 1
- Determinations ...................................................................................................................................... 4

# Panel Majority Final Award

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the parties' agreement to arbitrate dated October 6, 2016, and having been duly sworn and having fully considered all the parties' written submissions and the testimony of the witnesses, exhibits and arguments of the parties presented for the Claimant as represented by Douglas L. Patin, Esq., and Sarah Osborne, Esq., of Bradley Arant Boult Cummings LLP and presented for the Respondent as represented by Bruce Blanchard, Esq., and Matthew Kapuscinski, Esq., of Odin, Feldman & Pittleman, PC, prior to, during and following the evidentiary hearing which was held on December 2, 3, 4, 5, 9, 10, and 12, 2019, have met and conferred on all the issues and concluded that the Final Award will issue by a Panel Majority[1] with a Dissent by a Panel Member. The Panel Majority does hereby FIND and AWARD, as follows:

## Introduction

1. This dispute concerns a compound security upgrade to the United States Embassy in Prague, Czech Republic.

2. Respondent/Counterclaimant Montage, Inc. ("Montage"), was engaged as prime contractor to perform this work by the U.S. Department of State, Overseas Building Operations ("OBO"). Montage subcontracted 100% of the installed prime contract work (labor and material) to Claimant/Counter-Respondent BRC Uluslararasi Taahut ve Ticaret A.S. ("BRC").

3. BRC contends that Montage wrongfully terminated BRC for default. Montage counterclaims that BRC abandoned the project in violation of BRC's subcontract. BRC seeks $6,512,476.47, plus interest, attorney's fees, experts' and consultants' fees and expenses, witness travel costs for deposition and hearing, and arbitration costs. Montage seeks $15,820,993.00 in damages, plus attorney's fees and costs.

4. BRC is a Turkish construction company with offices in Istanbul and Ankara. Montage is an American company with offices in Washington, DC.

## Factual Background

5.

---

[1] This award refers to the Panel as a whole concerning the Panel's ruling on Montage's objections to the Panel's and the International Centre for Dispute Resolution's jurisdiction.

Montage and OBO executed the project contract on September 30, 2016, for a fixed price of $20,282.303.68. The project consists of security upgrades to the United States Embassy in Prague, including a new Service Compound Access Control, reconstruction of an historic masonry perimeter wall, installation of new anti-climb gages and fencing, construction of a new emergency generator building, a new underground emergency fuel tank, a new Compound Escape Sanctuary, a new pouch vault, a new egress stair, a new attic catwalk, various security door replacements, three new Safe Areas, a new Consular entrance, new guard booth, new cashier booth, private transaction window, and a new Consular screening area. The agreed-upon project duration was eighteen months. Because this was a diplomatic construction project, Montage was prohibited from subcontracting more than 50% of the total value of the construction project. OBO issued a Final/Full Notice to Proceed on July 28, 2017, that provided for performance to begin on August 5, 2017, with a substantial completion date of no later than February 5, 2019.

6. BRC subcontracted with Montage on October 6, 2016, for a fixed price of $11,620,119.43, as modified. Section 1 of the subcontract provides that BRC was to perform all obligations for labor and materials under Montage's contract with OBO, with the exception of the employment of five staff members by Montage. With regard to the prime contract's limitation on the value of BRC's subcontract, BRC and Montage informally agreed that certain of BRC's suppliers would invoice Montage directly.

7. OBO approved the baseline schedule ("BPES") on July 18, 2017. The BPES incorporated OBO's phasing of the work, which was required because of embassy activities that would be ongoing during the construction. Work commenced on site in August 2017. By October 2017, BRC, Montage and OBO recognized that the phasing was defective and impossible to follow. OBO therefore agreed that BRC could perform work out of sequence of the specified phasing, but, even so, construction progress fell behind. On December 7, 2017, OBO asked for a "what if" schedule. BRC responded that monthly updates would continue to show delay until a revised schedule was adopted. On April 12, 2018, OBO agreed that Montage and BRC would submit a revised BPES. OBO rejected the first revised BPES that BRC and Montage submitted. Montage and BRC then revised the schedule, and OBO finally approved it on August 21, 2018. At the insistence of OBO, this revised BPES ("BPES Rev 05") maintained February 5, 2019, as the substantial completion date.

8. In addition to the contract phasing problems, BRC encountered differing site conditions, defective design issues, and changes by OBO, all of which delayed the work. By the time of BRC's termination in October 2018, Montage had submitted 41 Requests for Equitable Adjustment ("REA") totaling $1,288,755 to OBO on behalf of BRC. Montage has since settled some of these REAs with OBO. REAs totaling $834,902.05 remain outstanding.

9. BRC's requests for time extensions were not submitted with the REAs. The parties differ on whether BRC had Montage's agreement to submit the direct-cost REAs without including time extension requests. BRC takes the position that Montage and it mutually decided to submit the direct costs claims first and then later separately submit the time-extension requests. Montage

contends that it was BRC's decision not to include the delays in its REAs and that Montage understood from BRC that the delays only amounted to 32 days; that BRC had told Montage that it could make up that time and meet the completion date; and that, even if the delays were not overcome by BRC, Montage could handle negotiating a 32-day delay with OBO. -

10.

The significant time period for this dispute is mid-October 2018, when BRC's and Montage's principals met and Montage issued a Notice to Cure to BRC and ultimately terminated BRC for default.

11.

At meetings on October 11 and 12, 2018, BRC's President, Halis Bozdemir[2], asked Montage's Vice President, Sina Moayedi, to finance BRC's monthly labor and material costs of approximately $270,000 and deduct those payments from amounts due BRC from OBO's payments to Montage. Mr. Moayedi offered to advance a lump sum of $50,000 and no more, although he testified that he offered to discuss other ways that Montage could help.

12.

On October 16, 2018, Montage received an email from Halis Bozdemir stating that BRC planned to reduce its management staff by three positions that had been used to fill three of the five positions that Montage was to provide under its contract with OBO, that Montage should pay all amounts from OBO without reduction, and that Montage should convert BRC's pending REAs into claims. On October 15, he told Mr. Unlu, the Project Coordinator, to come with Onur Bozdemir, the Finance and Administrative Manager on the project, to meet with him in Istanbul on October 16 in order to take over managing the project. On October 15 he directed Mr. Unlu to notify the project staff not to attend weekly project meetings, which they were not required to attend, and Mr. Unlu so notified project staff by email on that date. Up to that point, BRC personnel had attended all the weekly meetings. He further instructed Mr. Unlu to tell staff to cease electronic communication with Montage and that Mr. Unlu would be BRC's point of contact. Mr Unlu emailed staff to that effect on October 16. On October 15, Halis Bozdemir also explained that the October 12 meeting was difficult and that Montage was going to initiate arbitration and would not pay BRC any more money, so he told Mr. Unlu to move BRC's equipment stored on site to BRC's off-site bonded warehouse pending receipt of the next progress payment. Previously, BRC representatives had attended all the weekly meetings. After meeting with them on October 16, he dispatched Messrs. Unlu and Onur Bozdemir to travel to Prague on October 17 and take over as site superintendents to manage the project. They were issued one-way tickets. Montage was not notified of these developments.

13.

On October 17, 2018, Montage issued BRC a Notice to Cure pursuant to Section 15.1 of the subcontract. The Notice to Cure stated that BRC was subject to termination for default if it failed to comply with the notice directive to bring "the Project to a condition which makes timely completion reasonably foreseeable within three (3) calendar days of this notice." The cure notice charged BRC with performance deficiencies regarding shop drawing submittals, product data submittals, and material deliveries, which Montage stated "are now overdue and are having a direct negative impact on the Project Schedule and late start and finish dates" and "which has

---

[2] Halis Bozdemir is referred to by his full name, as another BRC manager and witness is his cousin Onur Bozdemir.

[*sic*] caused the Project delays in excess of 90 days." Montage further stated that BRC had failed to furnish a sufficient workforce to ensure timely completion, noting the lack of proficiency of the majority of BRC's workers.

14.
Following the issuance of the cure notice, Montage took certain steps that BRC argues prevented it from meeting its contract obligation to continue performance. When Mr. Unlu arrived on site the morning of October 18, Mr. Boiani, Montage's Project Manager, would not discuss the cure notice with him. On the afternoon of October 18, 2018, site access was denied to Messrs. Unlu and Onur Bozdemir after Mr. Boiani stopped BRC from removing U.S. government-owned equipment and BRC equjpment from the site. BRC's on-site personnel told Mr. Unlu that Mr. Boiani had asked OBO to withdraw their site access. Later that day, BRC's access to ProjNet, the computer program that contained the project records was closed to BRC at the request of Mr. Boiani. During the afternoon of October 18, Mr. Boiani actively solicited employment of BRC supervisory' employees and laborers on site, and he continued these efforts on October 19, along with Ieva Vaisvalis, Montage's Safety Manager, who discussed employment with the Uzbek workers on that date.

15.
BRC's President, Halis Bozdemir, entered the fray on the morning of October 18, 2018, when he emailed Kenneth J. Hawkins, OBO's Project Director, that "[BRC is] having serious problems with Montage, and Montage is planning to terminate our contract." He also claimed the Montage had not processed payments totaling more than $3.5 million and asked for a copy of the bond. Not only was this communication by the subcontractor directly to the OBO disallowed by the subcontract, but BRC had received in full all progress payments that it had submitted to Montage. Halis Bozdemir did not copy Montage on this improper communication, and exacerbated the situation by sending a similar email in the afternoon directly to the contract officer, again relating money problems with Montage and inquiring about the bond. Montage was justifiably concerned about these communications and the questions that they generated, but the Panel Majority is not persuaded that emails impacted what was going on in Prague.

15.
On October 19, 2018, BRC replied to the Notice to Cure. BRC notified Montage in writing that the grounds cited in the notice had been "fabricated in an angry, unreasonable response" to the October 12 meeting and the October 16 email from Halis Bozdemir and that the default notice was "an improper retaliation for the reasonable assurances [BRC requested] that BRC will be paid for work it has performed, and that Montage will process BRC's pass-through change orders." BRC complained that Montage had prevented BRC from attempting to cure. BRC concluded that "the cure notice is a breach of contract and [BRC] will proceed to demobilize and pursue our legal remedies." BRC ceased work on the project and began to demobilize on October 19, 2018.

16.
On October 23, 2018, Montage terminated BRC for default.

# Determinations

17.

    BRC challenges Montage's termination for default and asks the Panel to set it aside as a breach of contract and convert it to a termination for convenience. This matter is properly before the Panel pursuant to subcontract Sections 7.4 and 23, which allow BRC to proceed against Montage with respect to "a claim or dispute, which neither relates to, nor is the responsibility of [OBO]." Montage's objections to the Panel's jurisdiction are overruled. The Panel interprets this contractual provision to bar consideration of all the issues that BRC transmitted to Montage for submission to OBO as REAs seeking payment for the OBO's contract requirements, actions, decisions, and directions that caused BRC to incur ongoing losses for extra work on the project. Montage had helped BRC prepare its REAs and had warned BRC that OBO required that these REAs include time-impact analyses. BRC decided to press for payment and submitted REAs for payment only, intending to later submit requests for time. OBO's rejection of these REAs as deficient and the underlying merits of these REAs are beyond the jurisdiction of this arbitration, and the Panel Majority makes no findings concerning them.

18.

    The parties' respective statements and actions that precipitated the rupture of their working relationship under the subcontract were the product of a series of interactions that were fueled by frustration, miscommunication, anger, and disappointment. The Panel Majority was impressed that BRC and Montage had successfully collaborated on comparable construction projects in the past and that their principals, Halis Bozdemir and Sina Moayedi had a collegial relationship. This project with its built-in impediments and OBO's obduracy and lack of cooperation, as revealed by the documentary evidence, brought out miscommunications and misunderstandings between the two men that led them at a critical juncture to misinterpretations of the other's intentions. The events that played out on October 18 and 19, 2018, took place in this context. Nonetheless, a preponderance of the testimony and documentary evidence predominates in favor of a finding that Montage prevented BRC from continuing to work on the project and effectively locked out BRC's management and took over its work force prior to the running of the cure period. The Panel Majority observes that Montage's post-hearing briefs ignore both the testimony and documents in evidence cited by the Panel Majority. Reliance on these post-hearing briefs would lead to an incorrect conclusion.

19.

    BRC authored and submitted BPES Rev 05 in August 2018, maintaining the completion date of February 5, 2019, and eliminating all negative float through the date of BPES Rev 05. The evidence showed that OBO insisted that the date for substantial completion be maintained, the effect of which was that BPES Rev 05 could not fully address the past delays that had accrued. In the first month of this revised BPES, BRC's own schedules show that it was 32 days behind schedule for completion and that negative float was accumulating by 20 to 30 days per month.

20.

    Beginning on May 16, 2018, Halis Bozdemir emailed Mr. Moayedi that BRC was experiencing a cash-flow loss of $2.6 million on the project. An email dated October 2, 2018, stated that BRC's loss had grown to $3.99 million. Beginning in early October 2018, BRC and Montage's assistance with BRC's REAs came to a halt. Coupled with BRC's losses, this development prompted Halis Bozdemir to meet with Mr. Moayedi on October 11 and 12, 2018. During the meeting of October 12, Halis Bozdemir told Mr. Moayedi that the project would not complete on time and would take an

additional 10 months, according to Mr. Moayedi's notes of the meeting. Halis Bozdemir testified that he was protecting his company's reputation with OBO by continuing to work on the project and that he did not have an intention to demobilize. Montage takes the position that this is the first time that information of the full extent of the delay was communicated to Montage, and it was received as a surprise, given BRC's BPES Rev 05 and its statements to Montage that its time requests would, if submitted with its REAs at that time, amount to but 32 days.

21.

The Panel Majority views this meeting as pivotal because the principals immediately ceased their collaborative relationship. The deposition testimony of Marianela Lugo, Montage's Operations Manager, who attended the second meeting, was that Mr. Moayedi was mad at Halis Bozdemir after these meetings. Halis Bozdemir's October 16, 2018 email to Mr. Moayedi followed. After Ms. Lugo received a copy of Mr. Unlu's mail directing staff not to communicate with Montage, Ms. Lugo decided to draft a cure notice and informed Mr. Moayedi that "'I need to do something drastic to get their attention and perhaps bring them to the table.'" (Tr. at 1040.) Her testimony at deposition was slightly different, as Ms. Lugo stated that it was Halis Bozdemir's October 16 email that spurred her to discuss sending a cure notice. She then recalled: "'I wanted to jar, shake Halis and say, "Hey, you know, it's time to shape up or ship out...."'" (Tr. at 1131.) Upon receiving the notice to cure, BRC had the options of curing the deficiencies, requesting additional time to respond to the cure notice and negotiate to resolve the issues with Montage, or initiate an arbitration while carrying on the work pending the resolution of the parties' disputes. BRC, by its President, Halis Bozdemir, did not instruct Mr. Unlu or Onul Bozdemir to discontinue operations. On the morning of October 18, 2018, BRC's supervisors and laborers were on site and working full strength on the Project. During the morning, Mr. Unlu, consistent with Mr. Bozdemir's instruction, told workers to move some of BRC's equipment, consisting of scaffolding and tools, as well as a Barak security gate, U.S. government-owned property, to BRC's off-site storage facility. Mr. Bioani overrode the instruction to move the equipment before it had been loaded on the truck. Mr. Boiani asked OBO to withdraw Messrs. Unlu's and Onur Bozdemir's site access when they attempted to re-enter the site after lunch and to close down BRC's access to ProjNet.

22.

BRC witnesses testified credibly that during the afternoon of October 18, Mr. Boiani began recruiting BRC supervisors and laborers to work for Montage and told BRC employees that Montage was taking over the job. During the afternoon of October 18, Mr. Boiani twice emailed Montage that Montage was "getting a good response" from workers, discussed housing arrangements for Turkish workers, and mentioned that these workers would be looking for some payment into their social security. In these circumstances, it was not surprising that the workers were confused. BRC's employees were mostly Turkish, and BRC also contracted for Uzbek, Slovak, and Romanian labor. Mr. Unlu was trying at the time to work on a response to the cure notice which required input from BRC's supervisors who were being recruited. In fact, one of the BRC supervisors whom Mr. Boiani recruited did not report for work on the following day. Because he was receiving reports that two supervisors and contract workers, particularly the Uzbeks, were responding to these overtures from Mr. Boiani, Mr. Unlu notified the respective contract-labor agencies on the evening of October 18 that the Uzbeks and Romanians were not to report for work on October 19. Some Uzbek workers did come on site the following day, however.

23.

All during October 18 and part of the 19th, Mr. Unlu was attempting to coordinate a response to the notice to cure. He maintained that ProjNet was under Montage's control and he needed access to uploaded data on ProjNet. He finally calculated that BRC was 32 days behind, not the 90 days asserted in the notice. Montage's interference with BRC's responding to the notice to cure was not the most important factor to him; rather, he was convinced that Montage did not want BRC to continue working on the project.

24.

Mr. Unlu's testimony concerning his perception of the situation as of the afternoon of October 18 that Montage did not want BRC to continue working was credible. He gleaned this from four factors: Mr. Boiani's unwillingness to discuss the cure notice; a report from a BRC supervisor that Mr. Boiani had asked OBO to withdraw Mr. Unlu's and Onur Bozdemir's site access; a report from BRC's ProjNet operator that the service was closed down, an action also attributed to Mr. Boiani; and reports from supervisors that Mr Boiani was recruiting supervisors and other employees. Mr. Unlu reasonably concluded that Montage was preventing BRC from continuing working. Mr. Unlu began to demobilize on October 19, 2018, leaving only a skeleton crew on October 20.

25.

Mr. Unlu testified pointedly that Mr. Hawkins was not on site on October 18. Mr. Unlu and another BRC witness testified that BRC's scaffolding that BRC attempted to remove was no longer needed for the building and that the tools were no longer needed at that particular location and were not being removed from the job, but to BRC's off-site facility. As for the Barak gate, Mr. Unlu believed that a dispute about whether Montage had paid BRC for certain equipment justified his instruction to remove it, but he stopped the action when Mr. Boiani objected. It was at that point that Mr. Unlu declined Mr. Boiani's request to inspect the off-site warehouse. Montage accuses BRC of voluntarily reducing its staff by 38% on October 19 despite the testimony of BRC's witnesses who reported to Mr. Unlu about Mr. Boiani's recruitment efforts, and there was no evidence that BRC was discouraging Turkish or Slovak workers from coming to work.

26.

The Panel Majority has carefully evaluated Montage's post-hearing briefs and determines that Montage's interpretation of the evidence is strained, at best. For example, Montage presents an alternative scenario whereby BRC could have continued performance by having Mr. Urlu communicate with the site personnel by cell phone, Skype, and email and Mr. Urlu could have obtained the infomation that he needed to respond to the cure notice by accessing BRC's own records. However, confronted by this option, Mr. Urlu responded that he personally needed to be on site to observe work on the project, that he did not have time to access BRC's records, with only three days to cure, when ProjNet would give him current information on submittals, and that the workers were confused when he was denied access and Mr. Boiani was recruiting.

27.

Montage's only witness who was on site both days was Ieva Vaisvalis, the Safety Manager. She testified that on the morning of October 18 there was confusion among the workers about what was happening and that she acted to reassure them. She told Uzbek workers that they were needed on site. She confirmed that Mr. Boiani was recruiting workers on October 18 and 19. On October 19, Ms.Vaisvalis herself worked to enlist the Uzbeks who had returned to the site. Mr. Boiani, Montage's Project Manager, was not listed as a witness by either party. Montage's

        Operations Manager, Ms.Lugo, testified about BRC's work on the project, her attendance at the October 12, 2018 meeting with Halis Bozdemir, and the cure notice. She was the most knowledgeable of Montage's witnesses about the specifics of BRC's performance, although her first visit to the project site occurred after termination. Therefore, it became all the more concerning to the Panel Majority that Ms. Lugo's testimony was off-hand, glib, and replete with references to documents that Montage had riot produced. Her notice to cure improvised the 90-day period of delay by her changing the logic of the baseline schedule, contrary to the requirement in the prime contract requiring OBO to approve such a change. Ms. Lugo effort to distance herself from the problems with OBO's specifications and sequencing that Montage previously had acknowledged totally failed. The Panel Majority did not find her testimony credible under the circumstances.

28. Because the parties' subcontract does not include a choice-of-law provision, federal common law should apply, given that a Miller Act payment bond is involved and BRC intends to seek relief on it in federal court. *See F.D. Rich Co.* v United States, 417 U.S. 116, 127 (1974) (cited in *United States ex rel. Tusco, Inc. v. Clark Constr. Grp., LLC,* 235 F. Supp. 3d 745, 756 n.13 (D. Md. 2016). The subcontract does not override federal common law insofar as the issue of whether either party has breached the contract; indeed, the subcontract does not purport to set forth every circumstance that can constitute a breach. Section 7.4 of the subcontract, however, limits arbitration to claims against Montage to those that "neither relate[] to, nor [are] the responsibility of [Montage]." The Panel Majority has applied this provision.

29. Montage' termination of BRC was issued on October 23, 2018. The termination for default was wrongful as it was effectively taken by "locking out" BRC's management from the job site and hiring its employees and workers prior to the expiration of the three-day cure period. The reasons for taking this action are clouded by admissions of anger and the apparent effort to retain from the approximately $20 million contract price with OBO the maximum amount when for roughly $12 million 100% of the labor and material had been subcontracted, contrary to the prime contract's requirement that Montage cannot subcontract more than 50% of the total value of the work. The Panel Majority further finds that BRC's demobilization was excused due to Montage's interference with BRC's performance and that these actions of Montage constitute a prior material breach of contract that excused BRC from its obligation under the subcontract to continue performance during a dispute. *See Randy Kinder Excavating, Inc v. JA Manning Constr. Co.,* 899 F.3d 511 (8th Cir. 2018).

30. The Panel Majority finds and concludes that Montage's termination of BRC was wrongful under federal common law and must be treated as termination for convenience for purposes of damages under the Section 15.4 of the subcontract. The parties' subcontract governs the Panel Majority's determination of damages just as it limits BRC's arbitrable claims solely to claims against Montage. Subcontract Section 7.4 provides: "If [BRC] has a claim or dispute, which neither relates to, nor is the responsibility of [OBO], [BRC] may proceed in accordance with Section 23, herein." Section 23, in turn, governs arbitration. The Panel Majority has applied all the relevant subcontract provisions, but they do not override federal common law. If a prime contractor prevents a subcontractor's continued performance, the cited case law recognizes that continued

performance is not required and that the obligation to continue performance will be excused. The subcontract does not purport to deal with this situation, but federal common law has recognized it and generated controlling case law. Similarly, although the subcontract provides for BRC's remedies if Montage should stop work on the project for seven days, this provision is irrelevant because Montage did not stop work on the project; rather, it prevented BRC from continuing to work on the project. The testimony and documents supporting Montage's preventing BRC's continued performance are clearly supported in the record, as discussed above, and cannot be ignored by the Panel Majority.

31.

Section 15.4 of the subcontract sets forth BRC's remedy for a wrongful termination:
If MONTAGE wrongfully terminates [BRC], MONTAGE shall be liable to [BRC] for costs MONTAGE would have paid if Montage would have terminated [BRC] for convenience. [BRC's] remedy hereunder shall be exclusive....

(Block capitalization in original.) Section 14.1 of the subcontract on termination for convenience entitles BRC "to receive payment for work actually performed and a reasonable overhead and profit in connection with such work."

32.

BRC's damages totaling $6,512,476.47 are based on *quantum meruit,* which corresponds to the methodology set forth in the subcontract. BRC's accounting and damages expert, William Walter, presented an extensive analysis of job-cost records, including a report from Mazars on the reliability of BRC's job costs incurred on the project. This type of analysis, however, is not the departure point for the Panel's determination of damages. Again, the subcontract controls because it disallows an arbitration to consider the responsibility of OBO, and all of BRC's claims for work performed over the subcontract price assign responsibility to OBO.

33.

BCR's federal law cited on point emanates from the United States Court of Appeals for the Fourth Circuit, recognizes *quantum meruit* as the accepted measure of recovery, irrespective of any bid amount. *See United States v. Algernon Blair, Inc.,* 479 F.2d 638, 641 (4th Cir. 1973) (footnote omitted). However, this recovery is allowed only when the Government is a party or the owner's conduct is attributable to the prime contractor. *W.F. Magann Corp. v. Diamond Manufacturing Corp.,* 775 F.2d 1202, 1206 (4th Cir. 1985), involved a suit by a subcontractor against the prime for wrongful termination when differing site conditions and deficiencies in the specifications attributable to the Corps of Engineers caused the subcontractor's performance issues. The appeals court affirmed the district court's ruling that the government owner's deficiencies that caused the subcontractor to stop performing and subjected it to a default termination could be attributed to the prime contractor. The subcontractor therefore could recover from the prime contractor in *quantum meruit.* In contrast, BRC's subcontract forecloses any recovery in an arbitration brought against Montage that is based on the fault or responsibility of OBO, the owner.

34.

In the circumstances of this case, which involve an action by a subcontractor against the prime

contractor only, BRC is not eligible for recovery against Montage based on the value of work to the government owner. BRC thus is remitted to the measure of the amount due for contract work through the date of termination. After over a year lapsed since submittal and the hearing without a question raised as to whether OBO has approved the amount for payment, the Panel Majority awards BRC the remaining progress payment as per Invoice No. 16, $1,482,295.46.

35.

BRC claims that it is entitled to recover the tax liability imposed on BRC Europe, BRC's wholly-owned subsidiary, by the Czech government because Montage failed to register for Value Added Tax ("VAT") at the beginning of the project and Montage did not cooperate with BRC on VAT after BRC left the project.

36.

The evidence shows that BRC Europe made arrangements to receive VAT directly from the Czech government throughout the project without the assistance of Montage. In December 2018, BRC submitted an invoice to Montage for a claim for VAT payment reimbursement from the Czech government, asking that Montage "accept" the invoice. Montage did not accept the invoice, giving as its reasons that BRC did not supply any supporting documentation or explanation.

37.

The contract between Montage and OBO provides for OBO reimbursement of Czech VAT paid by Montage. Montage, by contract, was required to register for VAT. BRC registered BRC Europe so it could receive VAT reimbursement and in August 2017, BRC notified Montage that Montage must register for VAT, Montage did not do so until November 2018. After it left the project, BRC issued a final invoice to Montage for the Czech services that were provided. Montage's refusal to accept BRC's invoice resulted in the Czech government demanding payment of $542,056.00 for prior VAT reimbursements given to BRC Europe.

38.

BRC's claim for VAT totals $542,056.00. This claim is granted. Montage's claim for VAT is denied.

39.

As a consequence of the Panel Majority's finding that the default termination must be overturned, Montage is not eligible for an award on its counterclaims for reprocurement costs or liquidated damages, and they are denied.

40.

Montage presented evidence of other costs and damages that it seeks to recover: reimbursement of the bond cost paid by Montage on behalf of BRC, an overpayment made by OBO to Montage and Montage to BRC on Progress Payment No. 15, and the cost of OBO's decision to de-scope work from the contract for stone unit pavers. The Panel Majority has determined that Montage may not recover the bond cost, but may recover the amount of the overpayment and cost of the stone unit pavers. BRC previously reimbursed Montage for the bond cost. RX 6 dated Dec. 7, 2016. This document refers specifically to the bond cost. RX-151, JX-212, and JX-244, upon which Montage relies, were not used with a witness or argued by counsel during the hearing. The Panel allowed the parties to rely on listed exhibits not used with a witness if they were argued or presented by counsel at the hearing. Moreover, RX-151 is written in Turkish, and no translation was provided.

JX 212 and JX 214 were not provided to the Panel in hard copy, as requested. Montage's argument rests on a footnote in its post-hearing brief. The hearing was the venue to submit evidence in support of Montage's claims. The Panel majority thus has no basis to rely on these documents. With respect to Progress Payment No. 15, which Montage paid to BRC, OBO later notified Montage that it was reducing the amount paid by $325,345.50 because of an overpayment by OBO. Montage is therefore awarded a reduction with respect to Progress Payment No. 15 in that amount.

41. BRC's claims for REAs that have not been paid or are outstanding are denied without prejudice.

42. At the outset of this arbitration, and again at the commencement of the evidentiary hearings, Montage challenged the arbitrability of this dispute on the grounds that requiring it to arbitrate a dispute involving claims for which the Government is responsible and for which Montage is not liable to pay BRC unless paid by the Government would place Montage in a position that leaves it responsible for the actions of others. Montage also argued that the administration of this case by the International Centre for Dispute Resolution ("ICDR") is improper as the ICDR lacks jurisdiction. By Decision and Order of April 2, 2019, the Panel overruled Montage's objections without prejudice, recognizing that factual determinations yet to be made could affect this ruling with respect to arbitrability. Montage's objections to arbitral jurisdiction are overruled, and the April 2, 2019 ruling stands and remains in force as part of the record of this arbitration.

43. Section 24 of the subcontract provides that the "prevailing party shall be entitled to recover reasonable attorney's fees, costs, charges, and expenses expended or incurred" in enforcing the provisions of the subcontract. Because the Panel Majority has overturned the termination for default, BRC has prevailed on its principal claim. BRC's attorneys' hourly rates are well within the range of hourly rates charged in this jurisdiction by attorneys with their experience and competence. BRC's total fees are reasonable for the efforts expended in this arbitration, both in presenting its claim and defending against Montage's counterclaims. BRC's expenses, including the fees for foreign counsel, are also reasonable. Although BRC did not call Greg Crider, Claimant's scheduling expert, as a rebuttal witness, the Panel Majority deems the expert fees for his scheduling analysis were necessary for the presentation of BRC's case and reasonable. Although BRC did not recover in *quantum meruit,* disallowed in the circumstances by both federal common law and the subcontract, BRC prevailed on the issue that drove the hearing and all briefing: whether the default termination should stand. No rule limits an arbitrator's discretion determining the prevailing party's fee award to a mathematical percentage. The Panel Majority therefore awards BRC the full amount of attorney's fees, other litigation costs (excluding payments to the American Arbitration Association), and expert witness fees.

44. BRC seeks pre- and post-judgment interest on an award in its favor. Inasmuch as the amount to be awarded to BRC was an unliquidated sum, the Panel Majority finds that BRC should be denied pre-award interest. BRC is entitled to interest from the date of this award at the rate specified in 28 U.S.C. §1961(a).

45.

The final calculation of damages is, as follows:
BRC is awarded:

| | |
|---|---:|
| Progress Payment No. 16 | $1,482,295.46 |
| VAT | 542,056.00 |
| Attorney's Fees of Bradley Arant Boult Cummings, LLP, other litigation costs, and Expert fees | 956,622.27 |
| Less stone unit pavers | (293,000.00) |
| Less overpayment for Progress Payment No. 15 | (325,345.50) |
| Total | $2,362,628.23 |

For the reasons stated above, the Panel Majority AWARDS, as follows:

1. Respondent Montage, Inc. shall pay the amount of TWO MILLION THREE HUNDRED SIXTY-TWO THOUSAND SIX HUNDRED TWENTY-EIGHT DOLLARS AND TWENTY-THREE CENTS ($2,362,618.23) to Claimant BRC Uluslararasi Taahut ve Ticaret A.S., plus interest calculated in accordance with 28 U.S.C. §1961(a) from the date of this Final Award until paid.

2. The termination for default of Claimant BRC Uluslararasi Taahut ve Ticaret A.S. is overturned and converted into a termination for convenience.

3. The administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling $54,348.15 and the compensation and expenses of the Arbitrators totaling $186,492.08 shall be borne by the parties in equal shares. Therefore, BRC Uluslararasi Taahhut ve Ticaret AS has to pay Montage, Inc., an amount of $8,199.07.

4. This Final Award resolves all claims and counterclaims and other relief submitted to this arbitration with the exception of BRC's REAs. All other claims and counterclaims not expressly granted herein are hereby denied.

5. This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.