UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

UNITED STATES OF AMERICA      :
                                 :

      - v. -                 :
                                 :        **S1 22 Cr. 188 (JSR)**

SINA MOAYEDI,             :
                                 :

                Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## POST–*FATICO* HEARING MEMORANDUM OF LAW OF
## THE UNITED STATES OF AMERICA

 

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

*Attorney for the United States*

Michael D. Neff
Assistant United States Attorney
   *Of Counsel*

The Government respectfully submits this brief to summarize the evidence presented at the recent *Fatico* hearing. This evidence proves three points by (much more than) a preponderance of the evidence. *First*, defendant Sina Moayedi made a series of cost-cutting, quality-sapping choices that virtually guaranteed that his company, Montage, Inc., would often struggle to do quality work. Moayedi's choice to prioritize penny-pinching over quality extended throughout nearly every facet of his business, including: hiring unqualified personnel, including through Craigslist; electing not to train personnel; paying low salaries; winning bids by touting qualifications of individuals who did not work for Montage; farming out work to extremely cheap subcontractors; and understaffing projects, which hampered productivity and harmed quality—but saved money for Montage.

*Second*, because of Moayedi's choices, Montage repeatedly did inadequate work. Buildings do not build themselves. Successful construction requires, *inter alia*, skilled personnel; enough personnel; basic organization, so the right materials arrive at the right time; quality control, so that mistakes are caught and the work is of quality; and a functional safety program to keep everyone safe and on the job. Montage fell short in all of these areas. As a result, its physical construction was repeatedly substandard. Time and again, the Department of State ("DOS") identified the quality of Montage's work as problematic. Yet Moayedi made no real changes in response.

*Third*, Moayedi was well aware that Montage did inadequate work. Moayedi spoke with DOS Project Directors about Montage's projects and deficiencies; responded to performance reviews of Montage ("CPAR"s); micromanaged his company; and criticized his employees, subcontractors, and their work. For instance, in the case of the Burkina Faso Project, Moayedi wrote (in an internal email): "The work is shabby"; "the duct bank the concrete and general upkeep of sites would flunk"; "we don't know what we're doing"; and "Hamadou"—his own employee— "doesn't have enough knowledge or expertise to know what to look for." In the case of the Prague Project, Moayedi wrote that Montage had not "*purposefully* installed deficient work." During the

Lagos Project, Moayedi criticized the "Extremely poor workmanship on the roof." And during the Bermuda Project, Moayedi referred to his own employees as "mules" and contrasted them with the much more knowledgeable DOS Project Director, whom Moayedi called a "thoroughbred."

This brief has two Parts. Part I demonstrates that Moayedi all but ensured inadequate work through the business practices he implemented at Montage. Part II demonstrates that Montage repeatedly did inadequate work, and Moayedi was keenly aware of that fact.

## I.   MOAYEDI ALL BUT GUARANTEED MONTAGE'S POOR PERFORMANCE THROUGH VARIOUS BUSINESS PRACTICES HE PURSUED AND PERSISTED IN

Moayedi made a series of cost-cutting, corner-cutting choices that virtually guaranteed Montage's struggles. Such choices permeated nearly aspect of his business. Section II.A addresses business practices relating to personnel, and II.B addresses practices relating to project execution.

### A.   Business Practices Relating to Personnel: Hiring, Training, Payment, Lies in Bids

Moayedi was "the boss" at Montage; he called the shots, as he has admitted. (*Fatico* Hearing Tr. ("Tr.") 357 ("Sina is Montage. Montage is Sina." "He is the boss."); PSR ¶ 131 (Dkt. 41); Plea Agmt (4-point leadership enhancement). The choices Moayedi made all but guaranteed that Montage would often provide inadequate construction to DOS.

*First*, Moayedi ran a skeleton operation that was ultimately incapable of even providing five Key Personnel for every project. As the defense has admitted, Montage had extremely few employees. (*See* Dkt. 42, 12-13 (Montage had 5-10 employees)). Montage's overseas construction projects often required anywhere from 50-100 workers on site per project, and Montage was required to self-perform more than 50% of the work. Yet given its size, Montage lacked the workforce to do the work itself or even to supply five Key Personnel per project. As the defense has pointed out, Montage was simultaneously working on at least 7 projects for DOS (Tr. 390); Key Personnel alone for such projects would amount to at least 30 individuals. Key Personnel are

the point people, on site, for quality, safety, construction security, and project management. Of course, at any point, Moayedi could have gone out and hired more employees, but he chose not to.

*Second*, Moayedi compounded his quantitative problem (*i.e.*, lack of personnel) by creating a qualitative problem: He hired unqualified individuals. He hired in ways unlikely to secure talent, such as hiring through Craigslist (*e.g.*, Nathan Marshall), or hiring a nanny/schoolteacher with no construction experience (*i.e.*, Analiza Lleses). (Tr. 167, 348-49). For instance, Samantha Garcia testified that Lleses was hired for the overseas role of construction security manager, and her hiring was the result of Moayedi asking Garcia if she "knew anyone who would be willing to get a security clearance and possibly travel to Spain for a project." (Tr. 349). *I.e.*, Moayedi sought a body; notably absent from his request was any mention of talent or construction experience.

*Third*, Moayedi failed to train his unqualified personnel. Testimony revealed a lack of any true training at Montage. Here are three examples: (1) Nathan Marshall—who had never done any overseas construction work or served as a Project Manager—attended *one or two days* of training just to get a certification (Tr. 169); (2) during five years at Montage, Garcia attended about five days of training in total, including multiple days on change orders and claims (Tr. 339-40); and (3) Analiza Lleses—the nanny/schoolteacher whom Moayedi hired for an overseas construction role—was "trained" via YouTube. Moayedi sent Lleses YouTube videos in lieu of providing real training to someone with no experience. The YouTube videos were entitled, "A Day in the Life: Construction Superintendent" and "Watch This Video Before Pouring A Concrete Foundation – Construction Tips". GX 125, 125A, 126, 126A. Yet even these videos were not intended to give Lleses actual knowledge/experience; rather, Moayedi just wanted her to *appear* knowledgeable:

> MOAYEDI: Analiza I need to send you to Prague in 2 weeks and try you as a temporary superintendent and see if you do well we can get a chance and make it a permanent position, for you in Prague, if they don't accept you after your initial 30/45 days stay there you return to D.C. but if they do accept you your stay will be permanent with a 2 week vacation every 6 months , **I will**

|  | **teach you all about being a super** |
|---|---|
| **MOAYEDI**: | Let's talk about this<br>Make some notes when you watch<br>https://m.youtube.com/watch?v=KY_UOXuankk |
| **LLESES**: | Ok Sina, I hope that everything will work out. **I will be happy to learn being superintendent with you.** |
| **MOAYEDI**: | Jack of all trades master of nine |
| **LLESES**: | **I hope that I can learn quickly** but **I will try my hardest to make it work**, I promise! |
| **MOAYEDI**: | I believe in you keep smiling, **look at the way the super walks in the video how he holds the role of drawings under his arm , his mannerisms, jumping on scaffolding** etc |

(GX 125). Four things stand out about this exchange: (1) Lleses clearly has no experience, which is why she must "learn" the role; (2) Moayedi knew she might not be "accept[ed]"; (3) Moayedi is "teaching" her via YouTube, as though the project were building a shed in one's yard, not a $16 million project at a US Embassy; and (3) Moayedi focused on how the construction superintendent *looked* in the video—not on his actual *work*. Moayedi highlighted how the superintendent "walks," holds "drawings under his arm, "jump[s] on scaffolding," and his "mannerisms."

There was an obvious benefit of hiring inexperienced employees: Talent typically comes at a cost. A Montage Project Manager, Bill Owens, told a DOS Project Director that Montage "is not paying enough to attract key personnel." (GX 1362, p. 29 ("*Bill Owens-PM asked my opinion on several other key personnel options. He indicated that the Andersons don't seem to be panning out. He indicated that MTG is not paying enough to attract key personnel.*")).

*Fourth*, Moayedi concealed these qualitative and quantitative problems by lying to the U.S. Government about his employees and their qualifications. This fraudulent strategy helped him win projects but resulted in a "bait-and-switch," whereby Montage had touted highly qualified individuals but then provided incompetent ones. The most striking example of this relates to Key

Personnel. (In their bids, contractors provide information about their projected Key Personnel.) The chart below (GX 708) summarizes the Key Personnel whom Moayedi listed in Montage's bids for six DOS projects. This chart contains five Key positions and six projects, for a total of 30 "squares." Montage supplied names and qualifications for 27 of these 30 roles—and 22 of the 27 were fraudulent: 10 were identity theft victims who never worked for Montage, and 12 were for two Montage employees as to whom Moayedi lied by claiming that they had engineering degrees.

1. **Fake Employees**: Aaron Cropp and Sarah Powers never worked at Montage. PSR ¶ 60; Dkt. 44, p. 6. Moayedi stole their identities and exploited their credentials. For instance, in Montage's six bids summarized below, Moayedi listed Aaron Cropp 9 times—including as Quality Control Manager, Safety Manager, and Security Manager. For four projects below, Moayedi actually listed Aaron Cropp for two roles.

2. **Alex Gutierrez/Jonathan Ahmed**: Alejandro Gutierrez (a/k/a Alex Gutierrez) and Jonathan Ahmed did not have engineering degrees, but Moayedi claimed that both did.

**The Key Personnel (and Principal) Listed in Several of Montage's Proposals**

| | Guayaquil | Bermuda | Prague | Burkina Faso | Madrid | Khartoum |
|---|---|---|---|---|---|---|
| **Principal** | Sina Moayedi | Sina Moayedi | Sina Moayedi | Sina Moayedi | Sina Moayedi | Sina Moayedi |
| **Project Manager** | Alejandro S. Gutierrez | Jonathan Ahmed | Jonathan Ahmed | Jonathan Ahmed | Jonathan Ahmed | Jonathan Ahmed |
| **Superintendent** | Steven Shaffer Arnold Quayle | Alex Guierrez | Alex Gutierrez | Alex Gutierrez | Alex Gutierrez | Alex Guierrez |
| **Safety Manager** | Aaron Cropp | Aaron Cropp | Aaron Cropp | Aaron Cropp | Aaron Cropp | Richard Cunningham |
| **Quality Control Manager** | Sarah Powers Bruce Nobarian | Aaron Cropp | Richard Cunningham | Aaron Cropp | Richard Cunningham | Richard Cunningham |
| **Security Manager** | | | Aaron Cropp | | Aaron Cropp | Alex Gutierrez |

This chart embodies several of Moayedi's corner-cutting, quality-sapping choices. Because he lacked personnel, he listed the same people repeatedly. Because he lacked *qualified* employees, he listed fake employees and fake qualifications. There was an obvious solution to Moayedi's self-created problem: go out and hire a critical mass of qualified employees. Moayedi certainly could

have afforded it; as his 2009 Will and Testament confirmed, he owned more than ten real properties across the globe, such as in Washington, D.C., Virginia, Iran, the Bahamas, the Philippines, and Palau. (Dkt. 43, Ex. 1). But Moayedi chose never to hire a critical mass of qualified employees. Instead, he continued his cost-cutting, quality-sapping machinations in the execution phase.

### B. Business Practices Relating to Execution: Understaffing, Key Personnel, Subcontractors, Micromanagement

In the execution phase, Moayedi continued to employ various tactics that elevated penny-pinching over quality, including: understaffing projects, failing to provide certain Key Personnel for extended periods, providing unqualified individuals for other Key Personnel positions, dual-hatting, continuing to lie about his employees' qualifications, and farming out the work to extremely cheap subcontractors. Several of these tactics are discussed below, so this section will focus principally on subcontracting. One tactic that Moayedi employed was "turnkey" subcontracting, whereby Montage subcontracted out 100% (or nearly 100%) of the work to (typically foreign) subcontractors. (Tr. 365). Here are a few examples:

- **Prague**:  In 2016, DOS awarded Montage a $20.2 million contract to perform security upgrades at the U.S. Embassy in Prague. One week later, Montage subcontracted nearly 100% of the work to BRC, a Turkish subcontractor. This subcontract noted that: (1) Montage and DOS had entered into a contract (the "Contract") for Montage to perform work at the U.S. Embassy; (2) "MONTAGE desires to subcontract **all of the work** required under the Contract for the execution and completion of the Project"; and (3) the "Subcontractor shall perform **all** work" and "furnish all labor, materials, equipment[, and so forth]" "necessary for the construction and completion of the Project as specified under the Contract." Dkt. 44, Ex. 1 ("Montage-BRC Subcontract"). Montage would, however, provide five employees. The value of this subcontract was $12 million. Thus, Montage signed a $20.2 million contract, and subcontracted it out for $12 million—an intended profit of about $8 million, or 40%. In its bid to DOS, Montage had listed a projected profit of only $1.3 million. (GX 1206, 11).[1]

---

[1] This summary is confirmed by an arbitration decision that resolved a dispute between Montage and BRC. That decision noted, *inter alia*, that: (1) "Because this was a diplomatic construction project, Montage was prohibited from subcontracting more than 50% of the total value of the construction project"; (2) nonetheless, "Montage subcontracted 100% of the installed prime contract work (labor and material) to . . . BRC"; and (3) this extent of subcontracting was "contrary to the prime contract's" limitation on subcontracting. (Dkt. 44, Ex. 2 (Arbitration Decision)).

- **<u>Khartoum</u>**:  In 2017, DOS awarded Montage a $16.3 million contract to build the Marine Security Guard Residence ("MSGR") at the U.S. Embassy in Khartoum. Montage then signed an $8 million subcontract with Veyka, a Turkish subcontractor. Pursuant to this subcontract, the "<u>Subcontractor will perform **all work** and furnish all labor, materials, equipment</u>, scaffolding, tools, supervision, supplies, security, applicable taxes, freight, insurance <u>and all other things necessary for the construction and completion of MSGR Expansion/Renovation project</u>." (Dkt. 44, Ex. 3 ("Montage-Veyka Subcontract")). Moayedi signed this subcontract on behalf of Montage. Thus, Montage signed a $16.3 million contract with DOS, and subcontracted it out for about $8 million—an intended profit of about $8 million, or 50%. In its bid to DOS, Montage had listed a projected profit of only $1.19 million. (GX 1501, 12).[2]

- **<u>Madrid</u>**: In 2016, Montage and DOS signed a $15.4 million contract for Montage to perform security upgrades at the U.S. Embassy in Madrid. Montage thereafter signed a subcontract with Veyka, pursuant to which Veyka would perform the majority of the work. (Tr. 402-03). The value of this subcontract was around $5.25 million—about one third of the value of Montage's contract with the Government. (GX 1350). In its bid, Montage had listed a projected profit of only $1.59 million. (DX SG64, p. 12).

Montage's practice of subcontracting out the work extremely cheaply is important for several reasons. First, quality has a cost. Moayedi clearly prioritized price over quality. Second, Montage *claimed* that it was investing the majority of the contract price into the actual work; but in fact, Montage frequently appears to have invested only about *half* of what it claimed it would into the work. The rest was profit; Montage leadership privately acknowledged as much. (Tr. 404; GX 116 ("Hi Tim, Attached is the actual job cost. . . . What Nader sent to you was *our breakdown for government. We can never show them any profit above ten percent*. So the answer to your question is that *absolutely it is more profitable*")). Third, Montage's practice of subcontracting out the work to foreigners came with various significant risks, including that, to some extent, Montage gave up its ability to prevent substandard work. That is because Montage essentially gave up its ability to: (a) recruit and select qualified workers for the job; (b) control the work; and (c) avoid substandard work based on different standards in different countries. *See*, *e.g.*, Montage-Veyka

---

[2] Montage's "Daily Reports" for the Khartoum Project confirm that Montage provided only a few employees, while the subcontractor provided more than 50 employees, on average—*i.e.*, more than approximately 90% of the labor. (Dkt. 44 & *id.* Ex. 4).

Subcontract ("Montage will not be responsible for day to day management of Veyka crews."). And of course, Moayedi severely compounded all of these issues by providing unqualified Key Personnel who lacked the skill to effectively direct the work—or even adequately supervise it.[3]

In sum, it is hard to imagine a system more likely to result in inadequate work. And this was clearly *Moayedi's* system. Moayedi decided (1) which projects Montage bid; (2) how much Montage bid; (3) which individuals to list as Key Personnel in bids; (4) which purported qualifications (*i.e.*, lies) were listed on resumes; (5) which subcontractor to use; and (6) which figures to list in relation to subcontractors and other components of a bid. (Tr. 357, 357, 358, 359, 359, 404; GX 102, 103). The consequences of Moayedi's choices were unsurprising.

## II. <u>MONTAGE'S WORK WAS REPEATEDLY INADEQUATE, AS MOAYEDI KNEW</u>

Montage's work was inadequate on various DOS projects, including (1) the Burkina Faso Project; (2) the Prague Project; (3) the Madrid Project; (4) the Bermuda Project; (5) the Guayaquil Project; (6) the Lagos Project; and (7) the Khartoum Project. Each is discussed in turn.

### 1. <u>The Burkina Faso Project</u>

In 2016, DOS awarded Montage the $2.3 million Burkina Faso Project, which involved the design and construction of a new parking canopy structure, and the installation of a photovoltaic renewable power generation system integrated into that canopy, at the U.S. Embassy in Ouagadougou, Burkina Faso. The project was supposed to be completed in November 2017, and instead was completed in November 2018. In the final CPAR, DOS's Contracting Officer concluded that: "Given what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, I **would not** recommend them for

---

[3] Notably, before the Government agreed to contract with Montage, the Government required extensive information from Montage; there is no indication that Moayedi required such information in choosing his subcontractor. He appears to have been driven by cost. (*E.g.*, Tr. 364).

similar requirements in the future." (GX 1416). Underlying this recommendation were numerous issues, including the quality of Montage's work. The final CPAR (GX 1416) identified several particularly problematic areas:

1.  **Quality of the Work**: The "quality of the work on site was routinely marginal to unacceptable." Concrete was especially problematic. The "project required significant amount of concrete to be poured for column bases" to hold up the canopy. "The concrete delivered was routinely too dry and pours were generally chaotic efforts to pour buckets of water into the truck by hand, to push concrete down chutes with shovels, to deal with vibrators that stopped working. Also, the quality of alignment of some of the concrete bases resulted in the need for remedial action to ensure that the support columns that would be mounted on the studs would be safe to carry the load of the superstructure, as there was insufficient concrete beyond the studs." In addition, the formwork—*i.e.*, the molds that hold wet concrete until it sets—were "poor/thin"; the formwork "broke when concrete was poured in it." Yet Montage's position about its inadequate work was that "someone else . . . was at fault and things [were] beyond [Montage's] control even though they chose the method of execution, the resources to devote to the project, the subcontractors, the workforce, the CQC system, etc." (*Id.*).

2.  **"Insufficient Manpower," Incompetence, and Delays**: This project took twice as long to complete for several reasons. First, the work was of poor quality and sometimes needed to be redone, as noted. Second, there was "insufficient manpower on the job," which contributed to Montage's failure to complete the project on schedule. Third, Montage was inept and failed to achieve even the basics. For instance, during mobilization, Montage was unable to obtain utilities such as electricity and water. And during construction, Montage "toiled for months and couldn't find a core drill that was proper to drill through the perimeter wall for the electrical conduits to go through. Although the government kept reminding the contractor of these and other critical decisions that needed to be taken by management, they simply weren't done and the government had to step in to aid" Montage on these and other occasions by providing utilities, the core drill, "wood for formwork," and support given "excessive delays associated with backfilling and repaving." Fourth, Montage failed to course correct. The project was severely delayed "in spite of the government's engagement of the leadership of the company" at several key points to try to rein in Montage's "total lack of adherence to any schedule. New schedules would be made at each high level intervention only to see further delays downstream." Here, too, Montage "routinely blamed others, including their subcontractors, their suppliers, their own chosen local work force provider, etc. for their inability to stay the course." Yet again, Montage chose the planning, schedule, and methodology; Montage "needed to manage the situation and did not do so." These delays "cost the government in oversight time and effort" as well as the cost of renting replacement space for parking. (*Id.*).

Critically, Moayedi <u>admitted</u> that Montage's work on this project was "shabby"—and that this failure was due to Montage's personnel. In an internal email to his colleagues, Moayedi wrote

that "the place is a mess," "**the work is shabby**," most of the work would "**flunk**," and he could

not disagree with the conclusion that "**we don't know what we are doing**." (GX 109) (emphasis

added). Moayedi explicitly linked Montage's failures to its personnel, noting that his own

employee, Hamadou, "doesn't have enough knowledge or expertise to know what to look for":

> From:     Sina Moayedi <sinam@montageinc.com>
> Sent:     Thu, 7 Jun 2018 12:34:31 +0000
> Subject:  Management
> To:       pm11@montageinc.com, pm13@montageinc.com
>
> Hamadou is a very nice guy and caring but doesn't have enough knowledge or expertise to know what to look for as you can tell from the pictures I sent you the place is a mess and the work is shabby with the exception of steel which looks good but the duct bank the concrete and general upkeep of sites would flunk and I was not able to disagree with post assessment that we don't know what we are doing I have come to the contribution that we will definitely need someone like Thad like Kenny who is smart and can manage out here
>
> Thanks Sina

(*Id.*). Of course, when the Government made some of the same points, Moayedi vigorously

disputed them in his CPARs response and blamed almost everyone (*e.g.*, the local banking system,

terrorist attacks, the U.S. Government, local power outages, local labor) *except* Montage. (GX

1416). But Moayedi's email to his colleagues confirms that he knew that Montage's work was

"shabby" and would "flunk"—and that was because his people lacked "knowledge or expertise."

Nor were the significant problems on this project limited to the above. On June 4, 2018, a

subcontractor fell off a severely inadequate scaffold and died. Three days after this death, Moayedi

wrote to two Montage colleagues that "the scaffolding was not adequate," "it was missing top

railing," "the wheels were too small . . . maybe about four times too small," "the system is missing

a lot of cross bracing," and "this is not going to go away very easily." (GX 108). Notably, in

Montage's bid to DOS (GX 1401, 1402), Moayedi had represented that Montage's Safety Manager

(and Quality Control Manager) would be the experienced Aaron Cropp (GX 1402, pp. 10-11, 16):

> Mr. Aaron Cropp (15+ years' experience) will be our Safety Manager/QC Manager. Mr. Cropp will manage the enforcement of the corporate Design and Construction QC manual as well as the Contract QC plan/requirements. He will review all submittals for RFP compliance and manage subcontractors' and suppliers' QA/QC programs. Acting also as

the Safety Manager, he will have the sole responsibility for ensuring the effective implementation, coordination, and enforcement of the Contractor's Accident Prevention Plan (CAPP). He will be available on-site for all of the construction period . . . .

Hamadou was not mentioned, in any way, in Montage's bid.

In the immediate aftermath of this death, Moayedi sent an email to a consultant in which he wrote, in part, "would you be available to travel to overseas job locations[?] . . . We need some one to go to Burkina Faso immediately to review our site safety program and an accident there." (GX 110). In response, the consultant sent Moayedi an email, stating, in relevant part:

Attached is our proposal for the Safety Consultation in Burkina Faso. As you will see our rate is daily for this sort of thing and our guy is available to leave immediately. The guy we can send is a former OSHA Instructor, holds nearly every safety certification offered and has served as a safety consultant on hundreds of federal projects.

(*Id.*). But the proposal evidently was too expensive for Moayedi, who replied, in relevant part, that the proposal was "rather steep."  (*Id.*). Not even a death changed Moayedi's near obsession with penny-pinching at the expense of quality and safety.

2.  **The Prague Project**

In 2016, DOS awarded Montage the $20 million Prague Project to perform a compound security upgrade ("CSU") at the U.S. Embassy in Prague, Czech Republic. Montage's work was inadequate in various respects, and ultimately, Montage was terminated for default. (GX 1234). In the 2018 CPAR, Montage received an "Unsatisfactory" rating for Quality and Schedule, and a "Marginal" rating for Management, Compliance with Safety Standards, and Construction Security. (GX 1222). Both ratings reflect "a serious problem" that has not been addressed (GX 809):

-  An "Unsatisfactory" rating means that the contractor's "Performance does not meet most contractual requirements and recovery is not likely in a timely manner. The element being assessed contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective."

-  A "Marginal" rating means that the contractor's "Performance does not meet some contractual requirements. The element being assessed reflects a serious problem for which the contractor has not yet identified corrective actions."

This CPAR identified numerous inadequacies, especially regarding the quality of the work. At the most basic level, Montage had "Several problems getting work constructed right the first time." (GX 1222). Here are several examples of problems, which relate to the roof, structural steel, perimeter wall and fence, welding, inexperienced personnel, problematic schedule and delays, etc.:

-   Montage did not install the roof correctly. Specifically, Montage failed to correctly install the vapor barrier, which helps to seal the roof and prevent condensation from forming inside the walls. Montage's "Lack of quality control led to" this "error". Montage did not detect this error; DOS's Quality Assurance team did.

-   There were "Various deficiencies with perimeter fence installation (such as bent posts, incorrect positioning of embed plates, and deficient expansion joints, poor construction, and unacceptable joint material)."

-   Montage's subcontractor installed the perimeter wall incorrectly, and Montage's QC team did not detect this error; DOS's Quality Assurance team did.

-   "Structural steel was not installed correctly."  It needed to be removed and re-installed.

-   "Almost all field welds showed signs of rust. An effective welding inspection program for quality control is needed."  *I.e.*, Montage lacked effective QC for welding.

-   During excavation, Montage "constant[ly]" cut "existing underground cables."

-   "Commonly reoccurring issues are installation of unacceptable backfill material, poor backfill procedures, and backfilling without compaction."  (Backfilling entails filling in the area around the foundation, *e.g.*, with compacted soil, in order to support the foundation. Backfill is critical the stability of the foundation.)

-   In summary, "**The number of construction deficiencies and the frequency with which they occur show a lack of effective Quality Control (QC) program**. QC activities do not appear to be closely coordinated with the project schedule and **deficient work continuously affects the project schedule by causing delays in the completion of construction activities**."

-   Montage's staffing caused some of these performance issues. "[F]illing the required management positions initially was problematic. The proposed temporary Superintendent did not meet the contract qualifications for the position. Furthermore, the Safety Health Program Manager (SHPM) and the Quality Control Manager are new in their position which result in some of the performance issues described."

-   As to its schedule, Montage "has been unable to maintain its performance schedule." Montage's updates to its schedule "constantly show a further and further completion date with no explanation in the narrative."

12

- As to safety, "Recurring safety items continually need to be corrected," including "use of welding screens, use of personal protection equipment (PPE), and fall protection."

- Finally, Montage "heavily relied" on the subcontractor to provide Quality Control. Moreover, DOS expressed "concern" about whether Montage was in compliance with the limitation on subcontracting, as the subcontractor provided labor, materials, and drove the schedule. Yet Montage did not have a language translator.

(*Id.*). In summary, nearly every area of this project was substandard, from personnel, to work, to delays, to safety. The Contracting Officer concluded that, given what she knew as of the time of this CPAR, she would not recommend Montage in the future.

In his response to this CPAR, Moayedi acknowledged that the work was deficient, writing in part: "At no point has Montage **purposefully installed deficient work**." *Id.* (emphasis added). However, Moayedi sought to blame all problems on Montage's subcontractor, BRC. All deficiencies "related solely to Montage's previous subcontractor BRC," and Montage had since removed BRC from the site and "corrected the Subcontractor's work noted in this CPARS, including the SCAC Roof, the Structural Steel for the SCAC, embedded plates for deal tray windows, installation of backfill, [and] perimeter fence installation." (*Id.*). Importantly, this lengthy list meant that, as to the quality of the work, Moayedi agreed with the Government that all of these areas were problematic. However, Moayedi claimed that Montage's willingness to correct work—when the Government's Quality Assurance team identified issues—somehow demonstrated that Montage had "an effective Project Execution and Quality Control management program." (*Id.*). This is total nonsense. Effectiveness is not a willingness to redo constantly inadequate work, when called out on it. Finally, as to the Government's concern that Montage was subcontracting too much of the project, Moayedi claimed that Montage had "complied in full" with the contractual limitation on subcontracting. That was a lie. In fact, as noted above, Montage subcontracted essentially "all of the work" to BRC.

Moayedi's emails about this project are revealing. In July 2017, fairly early in the project, Moayedi's underling sent him an email, urging him to reconsider the QC Manager in Prague:

> I think we need to strongly reconsider our qc manager in prague. Tom is telling me that obo is asking alot of questions about qc Mgr. **They are saying that the qc Mgr should be doing the qc themselves** and that they should be in the field 50 % of time amongst other things like **doing inspections them self** etc. With drawings spec and tape measure in hand.

GX 100 (emphasis added). Moayedi replied, "True but 50% coming from Tom, if he gets of his chair and visits the site often helping Zarina with slump etc it may work." *Id.* Tom Boiani was the Project Manager; Zarina was the QC Manager. Thus, Moayedi was writing that, if the Project Manager "visits the site often" and helps the QC Manager, such as with "slump" (which is part of the concrete process), then "it may work." *Id.* This was an admission that Montage's QC Manager was unable to do QC work herself and needed "help" "often." Montage's QC "plan" essentially was to see what they could get away with. Moayedi's approach to QC therefore mirrored his approach to the Superintendent position, as this was the project for which Moayedi had told nanny/teacher Analiza Lleses, "I need to send you to Prague in 2 weeks and try you as a temporary superintendent . . . I will teach you all about being a super" and then sent her YouTube videos.

In another email, this one from March 2018, Moayedi scolded Project Manager Tom Boiani about a letter Montage had received from DOS. Boiani replied, in part, "Sina, . . . You can not teach welders via You tube and expect it to come out correctly." (GX 107). Moayedi answered, "Tom who's side are you on, I understand that the welders have their certs? **Your job is to defend us on site**." *Id.* (emphasis added). This is an astonishing take on the Project Manager's job; Moayedi clearly prioritized loyalty over talent, and fighting the Government over providing quality. Boiani responded that two welding inspecting companies had both examined the welds and given them a failing grade. Boiani also explained that Halis (BRC's principal) "told his team to take down the steel and start again as *even he was not satisfied*." *Id.* (emphasis added).

14

In addition to the many examples above, there were two fires onsite during the Prague Project. (GX 1230, 1227). One occurred in August 2018, while BRC workers were doing welding inside of the U.S. Embassy; below are screenshots of the video of this fire (GX 1230, 1231):

 

The second fire resulted from the (prohibited) use of a space heater in January 2019. (Tr. 422, GX 1227). Notably, in Montage's bid to DOS (GX 1207, p. 42), it had represented that Aaron Cropp would be both the Safety Manager and Security Manager on this project. That was a lie. In fact, the CPAR noted that Montage's Safety Manager and QC Manager "are new in their position which result in some of the performance issues described." (GX 1222). Indeed, the CPAR identified several "Recurring safety items," including relating to welding and fall protection. The welding fire occurred just two months after the scaffolding death in Burkina Faso. (*Id.*).

Given all its failures, Montage was ultimately terminated for cause due to, among other things, the facts that it "failed to prosecute the work with diligence," was "862 days late without excuse," and had "delayed the progress of the work by failing to pay its subcontractors." GX 1234.

### 3.  **The Madrid Project**

In 2016, DOS awarded Montage the $15.4 million Madrid Project to perform security upgrades at the U.S. Embassy in Spain. Montage's work was inadequate in various respects, and ultimately, Montage was terminated for default. Montage was terminated because of its "failure to complete the project," "failure to progress the work," "unsatisfactory planning [and] scheduling,"

non-compliance with subcontracting limitations, "failure to properly manage the project," "failure to maintain quality control," and "failure to meet safety and health requirements." (GX 1366).

DOS's Project Director for this project, Kevin Mizell, testified that "Montage and their performance in Madrid was the worst I had seen in all nine years [at DOS] and in all my career." (Tr. 164). He testified that, in order to succeed on this project, a prime contractor would need an approved design, a viable schedule, experienced personnel, enough personnel, the right materials, planning ability and coordination, an effective quality control program, applicable permits and safety-related measures, and they would need to pay subcontractors if they used them. Montage "performed unsatisfactorily" in <u>all</u> nine of these critical areas. (Tr. 24). He testified that, by the end of the 28-month project period, Montage *should* have performed 100% of the work—but had performed less than 10%. (Tr. 21). Unsurprisingly, Montage received "Unsatisfactory" ratings— in 2018 and 2019 CPARs—for Quality, Schedule, Management, and Regulatory Compliance.  The Contracting Officer concluded, in both years, that she would **not** recommend Montage for future similar contracts. (GX 1353, 1354). DOS identified inadequacies in virtually every area, including:

1. **Quality Control**: Montage's QC Program was fundamentally flawed. Its QC Managers are "inexperienced," and its QC Program "lacks critical expertise such as National Electrical Code and FEBR installations." Montage did not even have a QC Manager on site until more than halfway through the project; and that QC Manager promptly became frustrated and quit. (GX 1369). Then, Montage had its scheduler serve as QC Manager, but his "understanding of the construction documents was limited," and the QC Program "suffered" without "an adequate person" in that role. (Tr. 46-47). Montage's submittals were also "Poor and unsatisfactory," and appeared not to have "been reviewed by anyone of competency," which caused delays. (Tr. 39-41).

2. **Quality of Work**: Montage never completed *any* security upgrades in 28 months. (Tr. 86). DOS gave Montage permission to perform construction work in three areas, and Montage failed to complete any of them. These tasks were not especially complicated, yet there were "substantial deficiencies" with the elevator cladding, for instance. (Tr. 66-67; GX 1354). Montage also broke irrigation lines. (GX 1362, p. 134). Montage's inability to complete any work was in part due to its inadequate planning. (*E.g.*, Tr. 64).

3. **Safety**: Montage's Safety and Health Program was "[u]nsatisfactory," due in part to "lack of expertise," "lack of enforcement," and lack of presence. (Tr. 51). Montage did

not consistently have a Safety Manager (SHPM) on site. (*Id.*). There were safety violations, including one in which the SHPM indicated that a scaffold was safe, but it was not. DOS detected this issue. (Tr. 51-52). A DOS health-and-safety field audit found deficiencies in 10 out of 11 areas. (Notably, in its bid to the State Department, Montage had listed Aaron Cropp as both its Safety Manager and its Security Manager.)

4. **Schedule**: Montage submitted many schedules, but none was viable. (GX 1369). Montage's schedule listed many activities as complete when, in fact, those activities had not even begun; and when Montage submitted a revised schedule, its math did not add up, as it had "lost" more time than had passed since its last schedule. (Tr. 30).

5. **Design**: Montage never finished the design. (GX 1354; Tr. 25).

6. **Personnel**: The majority of Montage's personnel did not understand the basics of embassy construction. (Tr. 45). And during this project, Montage submitted falsified resumes for several of its employees, including Analiza Lleses, Spencer Voges, and Samantha Garcia. (Tr. 57-58).

In summary, as Mizell put it in an email, Montage has "**no real technical competence to perform at or near OBO's minimum level of marginal performance**. We're supplementing and bolstering them through many performance metrics (quality, security, local legal compliance, management). They're 'hands off' approach (subcontracting the entirety of the work . . . and supplying some FEBR products) is proving quite ineffective." (DX KM-21) (emphasis added).

Moayedi was keenly aware of these widespread problems. *First*, Moayedi handled Montage's responses to CPARs. (GX 1355). *Second*, Moayedi spoke with Mizell on various occasions throughout the project, and Mizell raised concerns repeatedly.[4] (Tr. 81-84.) In one exchange, Moayedi told Mizell, "Sorry to see things not as hoped…it is frustrating." Moayedi then assured Mizell, "Through time you will see a different face." Moayedi gave his "personal commitment" and assured Mizell that "Madrid is most important project we have right now." (GX

---

[4] Mizell's daily journals reveal numerous conversations with Moayedi from September 2017 until April 2019. During this period, and among other conversations with Moayedi, Mizell expressed concerns to Moayedi about the on-site Project Manager's lack of authority, which was thwarting progress; Mizell and Moayedi discussed "obstacles" including "staffing attrition, work permits"; and Mizell expressed "concern" to Moayedi "about schedule and projected productivity." (GX 1361, pp. 59-60 (9/15/2017); GX 1362, p. 49 (1/23/2018); *id.* at 120 (6/14/2018)).

1361, pp. 59-60 (9/15/2017)). But despite Moayedi's reassurances, nothing changed about Montage's approach to the project. (Tr. 83-84). *Third*, as time went on and Montage made no real progress, DOS issued Letters of Concern "directly" to Moayedi. (Tr. 84). As Mizell wrote in an email, the Contracting Officer "issued a letter of concern August 13, 2018 echoing the PD's [*i.e.*, Mizell's] letters of concern since January 2018. **Sina breathed out immediate threatenings in response to the CO's letter but no substantive action has been put forth**." (DX KM-21) (emphasis added). In sum, Moayedi was well aware of the problems; he just chose not to fix them.

### 4. The Bermuda Project

In 2016, DOS awarded Montage the $6.2 million Bermuda Project to perform security upgrades at the U.S. Consulate in Hamilton, Bermuda. DOS's Project Director on this project, Charles Lowther, testified at the *Fatico* hearing that Montage was "the worst contractor I've dealt with in my 30 years in the construction industry." (Tr. 252). He identified numerous respects in which Montage's people and work were inadequate:

1. **Quality of Personnel**: Montage's personnel were inept. They "typically had very little understanding of basic construction methods, they were unable to read plans, they were unable to understand the concept of planning ahead for construction, ordering materials and just being prepared for any part of the project when they actually started working on it." (Tr. 255). Montage's Project Managers "lacked knowledge of basic construction methods means or methods. They were repeatedly shown to be deficient in their understanding of reading plans or specifications. . . . Almost every level, they were deficient." (Tr. 256). One of Montage's Project Managers, Alex Gutierrez, was "incompetent"; "lied to me several times about safety incidents"; "misread" drawings; "misordered materials"; and "never once had a schedule that was accurate." (Tr. 257-59). Lowther ultimately requested that Gutierrez be removed from the project. (*Id.*). Montage's Quality Control Managers fared no better: "they did not understand basic construction practices. They didn't know how to read plans or drawings." (Tr. 262). For instance, Yash Davoodi—who was serving as both QC Manager and Safety Manager—appeared to have never done anything like this before. Davoodi "did not have a basic knowledge of construction," "didn't know how to read rebar shop drawings," had never heard of a proctor test (a standard test used to determine moisture content), and "didn't know most of the things that we were doing." (Tr. 263-64).

2. **Quantity of Personnel**: Montage "never had very many people there." (Tr. 265). To finish the project on time, Montage would have needed an average of at least 15.1

people on site, every day. In fact, Montage provided an average of only "about 8.1 personnel per day for the life of the project." (Tr. 265-66). Unsurprisingly, Montage finished the project very late. Montage's "late completion was a result of their own incompetence, lack of planning and inability to properly prosecute the work," including this "lack of personnel," which was "clearly the responsibility of Montage." (GX 1132). In fact, for over half a year, Montage had no Project Superintendent at all, contrary to the contract. This increased the workload of "the in-experienced PM." (*Id.*).

3. **Subcontracting**: Montage used an inexperienced subcontractor, then complained about that subcontractor. Specifically, Montage submitted a resume for a local subcontractor; this resume stated that the subcontractor had done only one project—the home of the owner of the company. Lowther told Montage, "this was a problem," because he "didn't think the [subcontractor] had sufficient experience in concrete and other building methods," including FEBR (forced entry/ballistic resistant) materials. "I said, these guys are not up to the standard that you need." But Montage chose to proceed with this local subcontractor. Within a few months, however, "the Montage team was complaining to [Lowther] that the local subcontractor was not supporting them." Montage later fired this local subcontractor. (Tr. 267).

4. **Micromanagement**: Lowther testified that "the site team was never given the authority to prosecute the work in the way that they should have." (Tr. 270). Lowther raised this issue in the first CPAR (of three) on this project (GX 1130), and Moayedi responded that "We have provided our on-site PM with authority to perform his duties." (*Id.*). But in fact, "Nothing changed" throughout the project. (Tr. 274).

5. **Quality of Work**: This multitude of failures was reflected in repeatedly inadequate work. Indeed, in the CPAR, Montage received an Unsatisfactory rating in all five areas assessed: Quality, Schedule, Management, Regulatory Compliance, and Site Cleanliness. (GX 1132). "Montage has never appeared to be on board with the concept of a Quality Control Program." (GX 1131). Lowther "repeatedly discovered work that did not meet quality standards or materials used that had never been approved by submittals, which was the clear responsibility of the QC manager." (GX 1132). Examples abound, and include incorrect fire glazing, incorrect installation of insulation, incorrect installation of part of the HVAC, incorrect installation of drain lines, incorrect installation of drywall, incorrect routing of cables, incorrect installation of doors, incorrect installation of a fire extinguisher cabinet, "ineptly constructed" knee wall, improper use of non-fire rated wood, and incorrect pouring of concrete. (GX 1131, 1132). As to concrete, Lowther "had to teach" the Montage site team "about the fundamentals of concrete," including the need to use shop drawings, how to read shop drawings, and how to set rebar; Lowther had to "correct" Montage's rebar placement "every" time, as Montage never got it right without his help. (Tr. 284-85). Lowther even served, for free, as a rebar inspector, even though Montage was responsible for having such an inspector. (*Id.*).

Moayedi was clearly aware of this multitude of problems. *First*, Moayedi responded to

CPARs, on behalf of Montage. (GX 1133). In his CPARs responses, Moayedi lied and attacked

Lowther. When DOS noted in a CPAR that Montage was not on board with a QC program, that could not have surprised Moayedi; after all, in its bid to DOS, Montage had listed Aaron Cropp as both the QC Manager and the Safety Manager for this project—but in fact, Montage provided Yash Davoodi, who did not even know the basics of construction. *Second*, during the Bermuda Project, Lowther issued Montage several "Cure Notices regarding their lack of performance," including three in one year; he also sent a Letter of Concern Regarding the Montage Safety Program to Moayedi and others on May 14, 2018. (GX 1131). "Specific [safety] concerns included a lack of adequate fall protection, insufficient safety barricades and a lack of adequate eye protection."  (*Id.*). (*I.e.*, Lowther identified a lack of adequate fall protection just three weeks before the fall from a scaffold resulted in death in Burkina Faso.)  Moayedi's emails reveal that he and his subordinates were concerned about termination for default. Jonathan Ahmed wrote to Moayedi:  "Sina, Alex and I were discussing yesterday that the best way to protect ourselves might be to **start digging up the site** maybe for duct banks and perimeter walls and such. **This way it will be that much more difficult to terminate us because they will have a bunch of open excavations around site sitting for a year** until they get another contractor in there." (GX 105). Ahmed added, "They will start demolishing pavers on Monday which is also kind of digging us in." (*Id.*). Moayedi replied by setting forth strategies that would help Montage "overturn a termination for default," such as demonstrating that Montage encountered "unforeseen site conditions" and local corruption. (*Id.*). *Third*, Lowther met Moayedi in person in Bermuda. Lowther told Moayedi, in substance, that "the site team does not have the authority from you that they need to prosecute the work"; Lowther suggested that Moayedi "give them more authority and trust them more." Moayedi replied, in substance, "Look, you're a thoroughbred and all my guys are mules, and I -- so they are incapable of actually performing the way you think they should." (Tr. 287).

In sum, this project featured plainly inadequate work, but was ultimately completed for one reason: Lowther was unwilling to accept failure and went tremendously above and beyond his role to compensate daily for Montage's widespread incompetence and inadequate work. (Tr. 293-94).

### 5. **The Guayaquil Project**

In 2014, DOS awarded Montage the Guayaquil Project to construct an MSGR and renovate other buildings at the U.S. Consulate in Guayaquil, Ecuador. Montage performed inadequately in nearly every respect. In the final CPAR, Montage received a grade of "Unsatisfactory" in five different categories: Quality, Schedule, Cost Control, Management, and Regulatory Compliance. (GX 984). There were at least five major problems with Montage's work on this project:

1. **Forged Architectural Plans**: Between April 2016 and November 2016, Moayedi and Montage submitted at least 37 forged architectural plans to DOS which contained the unauthorized electronic signature of the Designer of Record ("DOR"). (The DOR is the head of the architectural/engineering ("A/E") team and is vested with the authority to draft and submit architectural drawings.) The inclusion of the DOR's electronic signature conveyed, fraudulently, that the DOR had reviewed and approved these architectural submissions, when in fact, he had not. These forged plans related to safety and structural issues and critical building systems, including roofing, fire protection, structural steel, concrete, water treatment, and communications cabling. (In addition, during this same seven-month period, Montage deliberately kept the DOR at a distance, thereby ensuring no active oversight of the project by the one individual authorized to perform it.) (GX 984; PSR ¶¶ 69-71). Moayedi was aware of these forgeries and acknowledged them (once they were detected by DOS); but he lied to DOS to try to mischaracterize and minimize them. *See* Dkt. 43. It is hard to overstate the impact of this issue. Montage was responsible for both the design and the construction on this project, but the DOR did not approve critical aspects of the design. Montage simply did physical construction work, without input from the head of the A/E team.

2. **Design and Construction Inadequacies**: The final CPAR notes that the design had several inadequacies, including: (1) failure to meet the requirement "that prohibits utility lines from transiting" certain "security, telecommunications, and electrical spaces"; (2) failure to cool server, electrical, and electronics spaces in MSGR; (3) an uneven floor in the MSGR; (4) "failure to coordinate civil and structural drawings," which resulted in permanently relocating a parking canopy, during construction, in order to mitigate impact on traffic flow and to ensure safe clearance for cars. The final CPAR also noted a series of construction inadequacies, including that Montage: (1) failed to provide above ground irrigation tanks and potable water tanks; (2) "failed to protect existing underground irrigation lines during installation" of underground infrastructure; (3) failed to replace the infrastructure it destroyed; (4) failed "to deliver

permanent cores and keys"—a failure that was ongoing as of seven months after the contract expiration date, which would have harmed security; and (5) "failed to provide required submittals and data in the timely manner required by contract to enable the USG QA inspectors to perform their function." (GX 984). This fifth failure may be the most serious: Montage failed to provide required information to the Government at a time when the Government could have actually used that information to perform Quality Assurance. This failure is serious in its own right—and is exacerbated by Montage's forgery of architectural plans; both eliminated or reduced layers of expertise. Finally, Moayedi's emails point to another construction issue:  When the DOR provided cost estimates of analyzing structural calculations and performing new seismic calculations for the roof walls & HVAC pads,[5] Moayedi's colleague replied, in substance and part, that there should be no additional cost, and that the DOR's "Engineers have undersized all the Wiring." (GX 114).

3. **Failure to Provide Key Personnel**:  Montage "has not provided the five, full-time, on-site key managment staff required by the contract." For example, for 344 work days, Montage "failed to provide an on-site, full-time Project Controls Engineer (PCE) as required by contract." (GX 984). Montage's failure to provide Key Personnel may relate to the fact that three of the six Key Personnel listed in Montage's bids did not, in fact, work for Montage.

4. **The First Two Years**:  Montage "failed to provide effective commissioning services for the first two years of the contract." (GX 984).

5. **Post-Construction Issues**:  There have been a host of post-construction issues at the U.S. Consulate in Guayaquil, including: (1) HVAC issues, humidity, condensation, and black mold in the MSGR (GX 987); (2) a cracked roof and ceiling (GX 987); and (3) termites (GX 987).

## 6.  The Lagos Project

In 2008, DOS awarded Montage the $26.1 million Lagos Project, which involved renovations at the U.S. Consulate in Lagos, Nigeria and construction of a new annex. The contract was awarded in 2008, and had an original completion date of March 8, 2009. (GX 809). Montage ultimately completed this project more than 3.5 years late in late 2012. (*Id.*). In late 2012, when the work was 99% complete, DOS issued a CPAR with an overall rating of "Marginal."  (*Id.*). In particular, "Quality" was problematic:

---

[5] Ecuador is in an earthquake zone, and indeed, during the Guayaquil Project, there were two earthquakes greater than 7 on the Richter Scale.

**Quality**

| | |
|---|---|
| Quality of Workmanship: | MARGINAL |
| Adequacy of the CQC Plan: | MARGINAL |
| Implementation of the CQC Plan: | MARGINAL |
| Quality of QC Documentation: | MARGINAL |
| Storage of Materials: | MARGINAL |
| Adequacy of Materials: | MARGINAL |
| Adequacy of Submittals: | MARGINAL |
| Adequacy of QC Testing: | MARGINAL |
| Adequacy of As-Builts: | MARGINAL |
| Use of Specified Materials: | MARGINAL |
| Identification/Correction of Deficient Work: | UNSATISFACTORY |

(*Id.*). In the narrative section, the CPAR identified a host of problems, including: (1) "Problems with timely procurement of materials and adequate supervision persisted throughout the Project"; (2) Montage "vigorously resisted bring[i]ng the Contractually required Geotechnical Engineer to perform geotechnical requirements"; (3) Montage "resisted procurement of contractually required security materials," such as x-ray machines, metal detectors, and retina scanners; (4) Montage resisted using a specific type of cement for production of concrete; (5) Montage encountered "issues with the production of concrete"; (6) Montage purchased "incorrect power supply" voltages for the fire panel and subalarm panels; (7) Montage's inadequate procurement resulted in materials for a secure area "being compromised," which caused a delay of several months as materials needed to be reprocured; and (8) Montage "fell behind early in the project" and failed to take "the necessary steps to recover including but not limited to br[i]nging adequate site supervision to site." (*Id.*).

Moayedi's emails provide an example of another inadequacy during the Lagos Project. In February 2011, Moayedi sent an email to fellow Montage executive Marianela Lugo, stating: "Guys, not sure what we need to do about **the extremely poor workmanship on the roof**. There was at least four large areas of ponding two days after it had rained and many surfaces are uneven. **If a real inspector inspects the roof, it would not pass inspection**. Our site staff did not share

23

this with us? Sina." (GX 119 (emphasis added)). Moayedi's email is striking. To his credit, he is clear-eyed (at least in an internal email) about how terrible the work is. He acknowledges that the work is "extremely poor"; that it relates to "the roof," which (obviously) is critical to the safety and security of the building; that there were several "large areas of ponding"—*i.e.*, areas in which water had pooled on the roof, which creates risks of leaks, cracks, and ultimately instability; and that "many surfaces [on the roof] are uneven" (which increases risks of ponding). Furthermore, Moayedi acknowledged that this "extremely poor" work would fail inspection by "a real inspector," if inspected. Of course, Montage was responsible for quality control, so this was an implicit admission that Montage's quality control manager had failed to ensure quality, as did the workers who constructed the roof. But Moayedi did not say, "this is clearly unacceptable, we need to fix the roof." Instead, he wrote he's "not sure" what they need to do.

In summary, a few things stand out about the Lagos Project. First, Montage clearly resisted taking *expensive* steps (even though they were contractually required), such as procuring machines that ensure physical security or bringing a geotechnical engineer to site to ensure safety. Second, Montage failed to provide adequate site supervision "throughout the Project." Of course, this also saved Montage money. Third, Montage finished this project nearly four years late. Per the CPAR, there was a direct link between Montage's inadequate staffing and its problematic performance. Fourth, Moayedi clearly knew that there was an extreme inadequacy of the work, which implicated safety and structural security. And he knew, in real time, that this failure implicated both those doing the work and those (putatively) providing oversight.[6]

---

[6] At the *Fatico* hearing, the defense sought to admit *only* a 2016 CPAR for the Lagos Project (Tr. 383, DX SG-8), not the 2012 CPAR when the project was "99% Completed" (GX 809). Fortunately, the Court indicated it would accept all or none of the CPARs for this project. The 2016 CPAR for this project is highly irregular, suspicious, and should be accorded no weight. The 2016 CPAR changed certain of the "bottom-line" ratings, but provided no narrative or new facts. To be clear: There was no reason to issue a CPAR in April 2016. As that 2016 CPAR stated, the

7. **The Khartoum Project**

In 2017, DOS awarded Montage a $16.3 million contract to build an MSGR at the U.S. Embassy in Sudan. Montage then subcontracted "all" of the work to Veyka, as noted. In the final CPAR, DOS's Contracting Officer noted that she "would not" recommend Montage for similar contracts in the future. (GX 1517). Underlying this recommendation were "Marginal" grades for both "Quality" and "Management," including "Lots of warranty issues" with Montage's work.

## CONCLUSION

For the foregoing reasons, the Court should easily conclude, by (much more than) a preponderance of the evidence, that: (1) Montage repeatedly performed inadequate construction; (2) Moayedi was in charge of Montage and these projects; and (3) based on Moayedi's actions, deception, and refusal to change his approach despite repeated failures, Moayedi intended that result or at least acted with reckless disregard.

Dated:  New York, New York
       November 7, 2023

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York

By: *Michael D. Neff*
            Michael D. Neff
            Assistant United States Attorney
            (212) 637-2107

Cc: All Counsel of Record (by ECF)

---

Lagos Project was finished by January 23, 2013. (DX SG-8). No work occurred after early 2013; that's why there are no CPARS in 2013, 2014, and 2015. CPARs are assessments of Contractor Performance, but there was no performance to assess after early 2013. And the DOS employee who issued the 2016 CPAR was not involved in any way in the Lagos Project; has never been to Nigeria; and did not even work for DOS during most of the Lagos Project.