UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x   22 Cr. 188 (JSR)
UNITED STATES OF AMERICA,

      - against -

SINA MOAYEDI,

                Defendant.

-------------------------------------------------------------x


## DEFENDANT SINA MOAYEDI'S POST-*FATICO* HEARING BRIEF

FREDERICK L. SOSINSKY, ESQ.
45 Broadway, Suite 3010
New York, NY 10006
Phone: (212) 285-2270

SARA KROPF, ESQ.
REBECCA GUITERMAN, ESQ.
Kropf Moseley PLLC
1100 H Street, NW,
Suite 1220
Washington, D.C. 20005
Phone: (202) 627-6900

*Attorneys for Defendant*
    *Sina Moayedi*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

   I.   Montage Background ................................................................................................. 3

   II.  The State Department Was Under Extensive Political Pressure to Finish Embassy Projects by 2018 ................................................................................................................... 4

LEGAL ARGUMENT ........................................................................................................ 6

   I.   The Government Has Not Met Its Burden to Prove That Performing Substandard Construction Is Criminal in Nature ......................................................................... 6

      A.  Relevant Conduct Must Be Criminal in Nature ............................................... 6

      B.  The Government Does Not Identify Any Precedent that Criminalizes Substandard Construction and the Court Should Decline to Create One Here ...................... 7

      C.  The Court Should Decline to Apply a "Reckless Disregard" Standard ........... 9

      D.  The Government May Not Proceed on a Theory that Montage Made the Department of State's Oversight Role More Difficult ........................................................ 10

      E.  Because the DOS Knew About All These Construction Problems During the Projects, and Demanded that Montage Fix Them, They Are Not Evidence of "Fraud" ............... 11

   II.  There Is No Pattern of Substandard Construction Work Sufficient to Prove Mr. Moayedi's Intent .................................................................................................................... 15

   III. Montage's Use of Subcontracts Was Permissible Under the Contracts and Contemporaneously Disclosed to the DOS .......................................................... 20

   IV. Montage Did Not Intentionally Delay the Projects ............................................... 26

   V. The Safety Issues on Two Sites Should Not Affect the Court's Sentencing Decision ........... 28

   VI. The Government Has Not Proven That Mr. Moayedi Intended to Perform Substandard Work ....................................................................................................................... 31

CONCLUSION ................................................................................................................. 34

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Pages**

*BMY Combat Sys. Div. of Harsco Corp. v. United States,*
    38 Fed. Cl. 109 (1997) ............................................................................ 12

*Ciminelli v. United States,*
    598 U.S. 306 (2023) ............................................................................... 11

*Duncan v. Walker,*
    533 U.S. 167 (2001) ............................................................................... 11

*Elonis v. United States,*
    575 U.S. 723 (2015) ................................................................................. 8

*Frey v. Pekoske,*
    No. 18-CV-7088 (CS), 2021 WL 1565380 (S.D.N.Y. Apr. 21, 2021) ...................... 12

*Kelly v. United States,*
    140 S. Ct. 1565 (2020) ........................................................................... 11

*Moskal v. United States,*
    498 U.S. 103 (1990) ............................................................................... 12

*Ruan v. United States,*
    142 S. Ct. 2370 (2022) ............................................................................. 8

*Russell Motor Car Co. v. United States,*
    261 U.S. 514 (1923) ............................................................................... 12

*U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.,*
    612 F.3d 724 (4th Cir. 2010) ............................................................... 9,10,34

*United States ex rel. Schutte v. SuperValu Inc.,*
    598 U.S. 739 (2023) ................................................................................. 9

*United States v. Catchings,*
    165 F. Supp. 2d 12 (D.D.C. 2001) ........................................................... 6,8

*United States v. Chube II,*
    538 F.3d 693 (7th Cir. 2008) .............................................................. 16-17

*United States v. Grayer,*
    625 F. App'x 313, 315 (6th Cir. 2015) ........................................................ ,8

*United States v. Griffith,*
    584 F.3d 1004 (10th Cir. 2009) ............................................................ 6

*United States v. Menasche,*
    348 U.S. 528 (1955) ............................................................ 12

*United States v. Peterson,*
    101 F.3d 375 (5th Cir. 1996) ............................................................ 6

*United States v. Schaefer,*
    291 F.3d 932 (7th Cir. 2002) ............................................................ 6,8

*United States v. Sheahan,*
    31 F.3d 595 (8th Cir.1994) ............................................................ 6-7

*United States v. Silkowski,*
    32 F.3d 682 (2d Cir. 1994) ............................................................ 7

*United States v. Taylor,*
    816 F.3d 12 (2d Cir. 2016) ............................................................ 14,16,17

*United States v. Turner,*
    624 F. Supp. 2d 206 (E.D.N.Y. 2009) ............................................................ 7

*United States v. Wilson,*
    980 F.2d 259 (4th Cir. 1992) ............................................................ 7

## Statutes & Regulations

13 C.F.R. § 125.6(a)(3) ............................................................ 21

21 U.S.C. § 841 ............................................................ 8

48 C.F.R. § 2.101 ............................................................ 12

48 C.F.R. § 15.401(a) ............................................................ 25

48 C.F.R. § 15.402 ............................................................ 24, 25

48 C.F.R. § 16.202-1 ............................................................ 24

48 C.F.R. § 36.501 ............................................................ 20

48 C.F.R. § 42.1501 ............................................................ 3

48 C.F.R. § 42.1503(f) ............................................................ 3

48 C.F.R. § 46.101 ................................................................................................................ 12

48 C.F.R. § 52.219–14 .....................................................................................................20, 21

48 C.F.R. § 52.232-5 ............................................................................................................ 27

48 C.F.R. § 52.246-12.....................................................................................................11, 13

48 C.F.R. § 552.211-70 ........................................................................................................ 13

U.S.S.G. § 1B1.3 ............................................................................................................... 6,7

### INTRODUCTION

For more than 25 years, Montage and Sina Moayedi performed government contracts for more than a dozen federal agencies. During this time, they completed upwards of 400 separate government projects. As the Court learned at the *Fatico* hearing, during the pendency and at the conclusion of each such project, the agency project director and contracting officer were required to prepare detailed evaluation forms that any agency considering Montage's record of past performance could review. Through 2016, then, Montage had enjoyed, at a minimum, a satisfactory reputation as a government contractor. During 2016, Montage submitted bids for four complex, multimillion dollar, overseas projects. DOS awarded all four of them to Montage within two days of one another. Less than a year later, DOS awarded a fifth project to Montage.

It would be a remarkable occurrence for any small business contractor to perform in a manner free of tremendous challenge when winning five projects in a single calendar year. When one considers that at the time it was awarded these five jobs, Montage was already in the midst of performing two other overseas projects (plus two large domestic projects), it is not a stretch to say that it was "overwhelmed," as the project director on the Madrid job described the situation. In 2017 alone, Montage was working on 10 major projects. It is true that Sina Moayedi and Montage could have decided to walk away from two or three of the jobs awarded at the same time – even if doing so might have led to disqualification for future awards. In retrospect, that would have been a sensible decision. But, we submit, Sina Moayedi was a proud and confident man who believed that he could meet the challenge, somehow. And to a large extent he and Montage did. While the Madrid project was plagued with delays which cost Montage the majority of the contract value (and even more in agreed-to restitution), it completed the projects in Burkina Faso, Bermuda, and Ecuador. Until it fell out with its subcontractor in Prague, Montage completed about 75% of the work there as well. It finished projects in Abu Dhabi, Hong Kong, Nigeria, and Copenhagen.

Mr. Moayedi does not dispute that some of these projects went better than others. As anyone who has suffered through even a small home renovation knows, construction problems are inevitable. After two days of testimony, the Court may well have concluded that Montage's work on some of the projects was less-than-perfect. But in their opening post-*Fatico* hearing brief, the government appears to acknowledge that such subpar work was not endemic to Montage's business: Montage "would *often* struggle to do quality work"; Montage "would *often* provide inadequate construction to DOS." Govt. Brief, pp 1, 3.  Yet the government bears the burden of proving that Mr. Moayedi *intended* such substandard work.

The evidence of Mr. Moayedi's knowledge and intent is just the opposite. The government elicited testimony during the hearing that Mr. Moayedi understood how government contracts work. He knew that Montage's work on the projects was subject to close on-site supervision by DOS project directors. He knew that when Montage did not complete the work in accordance with the contract, Montage would not receive its progress payments and that Montage had to fix substandard work at its own expense. He knew that when projects were delayed, DOS assessed hundreds of thousands of dollars in liquidated damages. And he knew that if Montage did poor work, Montage would receive negative evaluations and likely never win work again.

Mr. Moayedi pleaded guilty to certain conduct associated with Montage's bids for these projects. He admitted that he made multiple misrepresentations to win these bids. But that plea does not extend to the work Montage performed. And for good reason. Given the record here, it is implausible to conclude that Mr. Moayedi deliberately set out to perform substandard work on a few of these projects.

## BACKGROUND

### I.   Montage Background

Mr. Moayedi formed Montage in 1986, and Montage won its first federal government contract in 1993. Since then, Montage has been awarded 387 federal government contracts with a value of about $195 million. ECF 42 Ex. E (list of all Montage contracts). Over the last three decades, Montage won bids for construction projects for the Department of Justice, the Department of Homeland Security, the Department of Defense, the Department of the Interior, the Department of Labor, the Department of Transportation, the Equal Employment Opportunity Commission, the General Services Administration, NASA, and the Nuclear Regulatory Commission. The State Department alone awarded Montage 72 construction projects between 1999 and 2018. *Id.*

Contrary to the government's assertion, Montage's work was not repeatedly inadequate. In fact, Montage's extensive history of performance on federal contracts and its Contractor Performance Assessment Reporting System (CPARS) evaluations show the opposite. Past performance information from CPARS "is relevant information[] for future source selection purposes" and includes a detailed written evaluation of nearly every aspect of a contractor's work on a specific contract." 48 C.F.R. § 42.1501. The CPARS are available across all federal agencies in a searchable database and "provide a robust library of information that source selection officials can use to assist in making best value contract award decisions. By considering past performance information as part of the source selection, the government is better able to award contracts to proven performers," *See also* Tr. 318:6-10; 48 C.F.R. § 42.1503(f). Each time an agency decided to award a contract to Montage, it necessarily concluded that it was a "proven performer" after reviewing its past performance on federal contracts in the CPARS system. Had Montage not generally performed satisfactorily as a contractor, federal agencies would not have awarded it new contracts, or it would have been suspended or debarred from federal contracting altogether. *See*

ECF 42 (Moayedi Sentencing Memo.) at 51-52 (discussion of need to be "responsible contractor" with "satisfactory performance record" to be awarded federal contracts).

## II.   The State Department Was Under Extensive Political Pressure to Finish Embassy Projects by 2018

The government paints Montage as a uniquely bad contractor who bears sole responsibility for the problems with the at-issue projects. In so doing, the government ignores the role of the State Department's Department of Overseas Building Operations (OBO), which was in charge of embassy construction projects. It also suggests that Montage's work on these projects was so far below what would be expected for a contractor that the substandard work could only be the result of an intent to defraud. The bigger picture shows otherwise.

Following the deadly 1998 terrorist attacks on American embassies in Kenya and Tanzania, Congress passed the Secure Construction and Counterterrorism Act to authorize funds to improve embassy security. The State Department identified 180 embassies to be replaced by 2018. A 2005 GAO report about these efforts found that only 30 of the 180 projects were underway.[1] The 2018 deadline is relevant here—as that deadline approached, OBO no doubt felt increased pressure to finish projects or to cast about for someone to blame.

Numerous GAO reports detail problems contractors like Montage had when working with OBO. In 2009, a GAO report found that fewer contractors wanted to bid on OBO.[2] Contractors reported losing money on 42 percent of the contracts they performed for OBO.[3] Sixty percent of contractors that OBO spoke with "indicated they will not be pursuing future embassy projects because they believe State has not acted as a fair partner in overseeing its embassy construction

---

[1] https://www.cnn.com/2018/10/25/politics/gao-new-embassy-report/index.html (citing GAO Report found at https://www.gao.gov/products/gao-18-653).
[2] https://www.gao.gov/products/gao-09-48
[3] *Id*. (highlights page).

projects."[4] Contractors cited several challenges that affected their decisions to submit bids, "including meeting State's shortened construction schedules, supplying labor and material to remote locations, finding and retaining cleared American workers, managing financial constraints, and dealing with foreign governments."[5] A 2018 GAO report noted that OBO's low staffing affected the quality of OBO's work.[6] OBO also observed "adversarial relationships" between OBO and its contractors in one-third of OBO's case-study projects.[7]

The government elicited testimony during the *Fatico* hearing from two OBO project directors to the effect that Montage was "the worst contractor" that they dealt with during their time in construction. Tr. at 164, 252. But these statements ignore the fact that other, larger contractors worked on projects with many more problems. For example, a Baghdad construction project from 2007 had ***966 defects*** after completion.[8] A 2009 Monterrey, Mexico project went 23% over budget.[9]   In London, building systems had to be either abandoned or modified to function properly."[10] These are projects performed by major government contractors, not small businesses. Not one of them has been charged criminally for their substandard work.

---

[4] *Id.*
[5] *Id.* at 24.
[6] GAO-18-653, *Embassy Construction Pace Is Slower Than Projected, and State Could Make Program Improvements* (September 2018), https://www.gao.gov/products/gao-18-653
[7] *Id.*
[8] AUD/IQO-09-25, Audit of the Design and Construction of the New Embassy Compound in Baghdad, Iraq (Oct. 2009), https://www.stateoig.gov/report/aud-iqo-09-25.
[9] https://www.gao.gov/products/gao-18-653 (page 24).
[10] AUD-CGI-20-36 *OIG Report: Execution of the New Embassy Compound London Construction Project Offers Multiple Lessons* (July 2020), https://www.stateoig.gov/recommendation/aud-cgi-20-36-05

## <u>LEGAL ARGUMENT</u>

Although it titles its submission  a "memorandum of law," the government's filing is devoid of a single legal citation supporting its arguments. In fact, precedent does not support enhancing Mr. Moayedi's sentence in these circumstances.

**I.    The Government Has Not Met Its Burden to Prove That Performing Substandard Construction Is Criminal in Nature**

Mr. Moayedi was not charged with, nor did he plead guilty to, performing inadequate construction. Instead, the government asks the Court to consider the quality of Montage's construction on a handful of projects as relevant conduct to enhance his sentence. Courts across the country have uniformly held that relevant conduct cannot be "wrong" or "distasteful" to be considered at sentencing. It must be criminal in nature. The government has not met this burden.

### A.  Relevant Conduct Must Be Criminal in Nature

Although the Second Circuit has not directly addressed the issue, six other courts of appeal have held that relevant conduct must itself be criminal in nature. *See United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013) ("Although relevant conduct is not limited to conduct for which the defendant has been convicted, the conduct must amount to an offense for which a criminal defendant could potentially be incarcerated") (cleaned up); *United States v. Griffith*, 584 F.3d 1004, 1013 (10th Cir. 2009) ("Agreeing with the reasoning of our sister circuits . . .  we hold that for a district court to consider a defendant's conduct as 'relevant,'" government must prove conduct "constituting a criminal offense under either a federal or a state statute"); *United States v. Schaefer*, 291 F.3d 932, 940 (7th Cir. 2002) ("Our holding that relevant conduct under § 1B1.3 of the Guidelines is limited to criminal conduct is amply supported by the case law in other circuits"); *United States v. Peterson*, 101 F.3d 375, 385 (5th Cir. 1996); *United States v. Sheahan*, 31 F.3d 595, 600 (8th Cir.1994) ("We agree that the relevant conduct the sentencing court should consider

in the section 2F1.1 loss calculation is that which is attributable to the defendant's 'criminal conduct"); *United States v. Wilson*, 980 F.2d 259, 261 (4th Cir. 1992).

The Second Circuit has held that where "the defendant engages in a clearly identifiable and repetitive 'behavior pattern' of specified criminal activity,' . . . the district court may rely on such conduct as "relevant" under the Guidelines regardless of whether that conduct was charged as part of the offense of conviction." *United States v. Silkowski*, 32 F.3d 682, 687 (2d Cir. 1994); *see also United States v. Turner*, 624 F. Supp. 2d 206, 209 n.1 (E.D.N.Y. 2009) (noting that "for foreign conduct to be relevant for § 1B1.3 purposes it must be criminal" and citing *Silkowski*).

We recognize that these decisions concerned sentencing court's increases to the sentencing guidelines as a result of consideration of "relevant conduct" rather than as other information otherwise material to sentencing.  But, we submit, the same reasoning should apply. If what is shown to exist does not amount to criminal conduct, enhancing punishment on this basis is equally suspect. The Court should hold that to be relevant conduct, the activity in question must be "criminal activity," *Silkowski*, 32 F.3d at 687, consistent with other circuits. "To hold otherwise would allow individuals to be punished . . . .  for activity which is not prohibited by law but merely morally distasteful or viewed as simply wrong by the sentencing court." *Peterson*, 101 F.3d at 385.

### B.  The Government Does Not Identify Any Precedent that Criminalizes Substandard Construction and the Court Should Decline to Create One Here

Nowhere in the government's extensive briefing—either before or after the *Fatico* hearing—does it identify what criminal law Mr. Moayedi violated when his company performed supposedly substandard construction work. This failure presents serious due process concerns. "When the Government fails to identify the applicable criminal statute [for relevant conduct], the defendant is denied notice and a fair opportunity to contest application of the enhancement." *United States v. Grayer*, 625 F. App'x 313, 315 (6th Cir. 2015) (remanding because court overruled

defendant's objection that the conduct was not illegal and did not "clearly identify[] the legal basis for its determination") (citing *Catchings*, *Schaefer*, and *Dickler*).

There is no law criminalizing imperfect construction on a government contract. Even more, there is no law criminalizing imperfect construction work when the government was aware of the problems and demanded that the contractor fix problems at its own expense in real time. Tellingly, the government does not cite *a single case in any circuit* where a court criminalized a government contractor for performing substandard work.

The government describes Montage's work as "inadequate" (p. 2, 9), "substandard" (*id.*), and "deficient" (p. 14). The adjectives reveal its real goal: impose an increased criminal penalty on Mr. Moayedi for negligent construction work. The problem, of course, is that the Supreme Court has made clear that the Department of Justice may not interpose a negligence standard into criminal statutes nor may courts criminally penalize a defendant for falling below a civil standard of care. *See, e.g.*, *Elonis v. United States*, 575 U.S. 723, 738 (2015) (refusing to adopt "reasonable person" standard for statute prohibiting interstate threats, noting that Court had "long been reluctant to infer that a negligence standard was intended in criminal statutes") (quotation marks and citation omitted); *Ruan v. United States*, 142 S. Ct. 2370, 2381 (2022) (following *Elonis* to reject government's proposed *mens rea* standard in § 841 case; holding that government's proposed standard of "objective honest-effort standard" would "turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, not on the mental state of the defendant himself or herself" and would impose an improper negligence standard in criminal case).

### C.  The Court Should Decline to Apply a "Reckless Disregard" Standard

The Court's order scheduling the *Fatico* hearing asked the parties to address "the dispute over whether the defendant [a] provided inadequate construction for the projects he was in charge of, and if so, [b] whether he did so intentionally or at least with reckless disregard." 8/14/23 Memo. The Court did not have the benefit of the parties' briefing as to the correct standard.

No statute or case law establishes that "reckless disregard" is the appropriate intent standard for criminalizing performance of a government contract. The Court's order appears to borrow from the civil False Claims Act's definition of "knowingly." *See, e.g.*, *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749–50 (2023) (holding that FCA's "knowingly" standard includes "the person 'acts in reckless disregard of the truth or falsity of the information'" and holding that "either actual knowledge, deliberate ignorance, or recklessness will suffice"). No case in this Circuit (or any other) has applied this standard to evaluate whether a government contractor engaged in substandard performance of a contract. The Court should decline to adopt such a standard here.

Even if the Court were to apply the reckless disregard standard from the FCA context, the government has not met it. The Fourth Circuit addressed a case involving claims of fraud against a contractor on an OBO embassy project where the contractor completed the project. *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010). The Fourth Circuit affirmed the district court's grant of summary judgment to the contractor. As it explained, "[t]he [job] site was full of OBO personnel and OBO inspectors routinely examined and approved First Kuwaiti's work. Evidence that the government officials were aware of any alleged defects and accepted First Kuwaiti's work anyway 'effectively negates the fraud or falsity required by the FCA.'" *Id.* at 729. Because, in *Owens*, the government was aware of all the whistleblower's alleged false claims—and still accepted the work—the plaintiff could "not

establish that the government was misled by First Kuwaiti." *Id*. The Fourth Circuit emphasized that despite the construction problems during the pendency of the work, OBO was there to inspect the work along the way. "This is not a case where a contractor was left to its own devices to complete a government project with only its commercial conscience as its guide," the court of appeals explained. Instead, "[t]his was a project that the government was heavily invested in— both because of its cost and because of the importance of making sure the job was done right. The State Department wanted an embassy that functioned well, and it wanted, above all, for its personnel to be safe. Inspectors were called in at every stage, government engineers were on site, and Owens's allegations were thoroughly investigated." *Id*. at 734-35. In the end, "[t]he government may rightly have issues with aspects of First Kuwaiti's performance. The merit of such complaints is not for us to say. What is evident, however, is that Owens has not shown anything rising to the level of an FCA violation on First Kuwaiti's part." *Id*. at 735.

The same is true here. The government had issues with Montage's work during several of the projects. But because DOS was on site and inspecting the work on a daily basis, any problems were "thoroughly investigated" and DOS was "not misled by" Montage in the quality of its work.

### D.  The Government May Not Proceed on a Theory that Montage Made the Department of State's Oversight Role More Difficult

The two former DOS employees who testified at the *Fatico* hearing (perhaps rightfully) expressed frustration that Montage projects required more time and effort on their part. But there was no evidence that DOS had to pay these employees overtime or hire extra personnel to oversee the Montage projects. Nor did either of the two witnesses testify that they had to work any extra hours. The government cannot rely on a theory that Mr. Moayedi defrauded the government by making construction projects more difficult or by requiring extra DOS oversight to ensure they were done correctly. The Supreme Court has squarely rejected the Department of Justice's efforts

to expand the wire fraud statutes to reach intangible rights. Most recently, in *Ciminelli v. United States*, 598 U.S. 306, 309 (2023), the Supreme Court unanimously rejected the Second Circuit's "right to control" theory because "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." This requirement reflects that the fraud statutes are not a general license for "the Federal Government … to enforce (its view of) integrity." *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020). The *Ciminelli* decision also rejected the right-to-control theory because it "vastly expands federal jurisdiction without statutory authorization" and "thus criminalizes traditionally civil matters." 598 U.S. at 315-16.

### E.   Because the DOS Knew About All These Construction Problems During the Projects, and Demanded that Montage Fix Them, They Are Not Evidence of "Fraud"

Because the DOS was contemporaneously aware of every construction defect identified by the government in its briefing, these construction problems are not "fraud." The Federal Acquisition Regulation (FAR) cited by the government differentiates between patent defects, latent defects, and fraud. *See* 48 C.F.R. § 52.246-12(i) ("Unless otherwise specified in the contract, the Government shall accept, as promptly as practicable after completion and inspection, all work required by the contract or that portion of the work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee").[11]

---

[11] Under well-settled principles of statutory construction, "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted). When interpreting the meaning of listed words in a statute, a court may not equate the meaning of one word in the list with any other word in the list; this interpretation would "violate[] the established principle that a court should 'give effect, if possible, to every clause and word of a statute.'" *Moskal v. United States*, 498 U.S. 103, 109 (1990) (quoting *United States v. Menasche*, 348 U.S. 528, 538–539 (1955)) (where statute of conviction prohibited knowing transportation of "falsely made, forged, altered, or counterfeited securities," Court rejected defendant's interpretation because it "essentially equates 'falsely made' with 'forged' or 'counterfeited.'"); *Frey v. Pekoske*, No. 18-CV-7088 (CS), 2021 WL 1565380, at *7 (S.D.N.Y. Apr. 21, 2021) ("Because the three duties in the proviso are listed in the disjunctive, separated by 'or,' the canon of *noscitur a sociis* usually does not apply, as it is presumed that Congress intended to give the terms their normal, separate meanings.") (citing *In re Gi Nam*, 273 F.3d 281, 288 (3d Cir. 2001), as amended (Dec. 6, 2001)); *see also Russell*

Patent defect, latent defect, and fraud each have distinct meanings. The FAR defines a "patent defect" as "any defect which exists at the time of acceptance and is not a latent defect." 48 C.F.R. § 46.101. The FAR defines "latent defect" to mean "a defect that exists at the time of acceptance but [which] cannot be discovered by a reasonable inspection." 48 C.F.R. § 2.101. The FAR does not define "fraud" but the Federal Circuit has defined it as "(1) a misrepresentation of a material fact; (2) an intent to deceive; and (3) reliance on the misrepresentation by the government to its detriment." *BMY Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 116–17 (1997).

Each construction issue identified by the government in its brief was known to the government at the time of acceptance of the work and was therefore a patent defect—and not fraud. The government offered Charles Lowther, the former DOS project director in Bermuda, as a witness. Lowther identified numerous construction defects during the project. But he admitted that by the time DOS, at his urging, issued the certificate of substantial completion, only eight minor items remained and "all the other" defects "had been fixed" by Montage:

> Q. All right. So this, those eight items were the only things that were left to be done on the Bermuda project when the certificate of substantial completion was issued and recommended by you in May of 2019, right?
>
> A. Yes.
>
> Q. So all the other things that you talked about had been fixed, right?
>
> A. Yes.  (Tr. at 306)

Indeed, government witness Scott McKee made plain that that whenever OBO issued certificates of substantial completion to Montage, this meant that essentially all of the work required to be performed under the contract was completed:

---

*Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) ("That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by its association.").

Q. OK. And I don't know if you teach this or do this, but to a layman, if you were just explaining the concept of substantial completion in your many years of experience, would it be fair to say that might be expressed as 95 percent or so of the work has been done?

A. That's fair.

Q. OK. Could be a little bit less or a little bit more than that, right? Yes?

A. Yes.

Q. And of course, in order to get substantial completion, there also has to be sign-offs from what are called fire and life safety inspectors on a job, right?

A. Yes. (Tr. 458-59).

DOS issued certificates of substantial completion for a number of the supposedly problematic projects, like Ecuador and Bermuda. Despite the government's claims—years after the fact—of inadequate work, the government would not have issued these certifications if the work required to be performed was not in fact performed. Under federal regulations, "work shall be deemed 'substantially complete' if and only if the Contractor has completed the work and related contract obligations in accordance with the contract documents such that the Government may enjoy the intended access, occupancy, possession, and use of the entire work without impairment due to incomplete or deficient work." 48 C.F.R. § 552.211-70. Before awarding a certificate of substantial completion, projects must pass a rigorous inspection process.

McKee reluctantly acknowledged that OBO had certified the Ecuador project as substantially complete in 2018 (Tr. 457) but denied knowledge that prior to substantial completion, the project director there had issued Montage scores of Special Inspection Reports or "SIRS" calling Montage's attention to what OBO considered to be outstanding issues that were required to be remedied before work was complete. That there were regular inspection reports provided by the government agency demonstrates their awareness of issues and acceptance that these issues had been satisfactorily addressed. Lowther described his extensive oversight over Montage. *See*

13

Tr. 313:12-14 ("Q. It sounds like you were doing inspections pretty much daily of what Montage was doing, is that right? A. Yes."). When asked whether there was anything he caught during his inspections that Montage did not fix, Lowther "[couldn't] think of any specific examples." Tr. 313:5-11. And ultimately, Lowther recommended substantial completion "because the work was done in accordance with the contract by the end." *See* Tr. 314:11-13. Lowther further explained that all the other construction issues he identified were fixed at Montage's expense:

> Q. What did you do when you found -- what did you ask Montage to do when you found that problem?
>
> A. I told them to fix it.
>
> Q. OK. And did they fix it?
>
> A. Yes.
>
> Q. Did the State Department pay for that fix?
>
> A. No.
>
> Q. Montage paid for it, right?
>
> A. Yes.
>
> Q. So that problem had to be -- when you found it during your inspection, Montage had to fix it and pay for it, is that right?
>
> A. Yes. (Tr. at 309).

*See also* Tr. At 311-13 (Lowther testimony that every time he found a problem with concrete or steel, he ensured that "Montage fixed it at their expense.").

Lowther's testimony that he required Montage to fix defects discovered during the project at Montage's expense is fully consistent with the FAR. *See* 48 C.F.R. 52.246-12(f) ("The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price"). As he admitted, McKee actually teaches a course on federal contract administration and the training deck describes the policy behind this

FAR section as "[e]stablish[ing] the right of the Government to inspect work" and "[r]equir[ing] the contractor to correct defective work." Ex. CC at 57.

What happened on these projects is precisely the process contemplated by the regulations; when problems emerged, government inspections identified them, the on-site DOS personnel required Montage to fix them at its expense, and the DOS signed off on the work. Having accepted the work at the time—with full awareness of the problems and how they were remedied —the government is precluded by regulation from coming back and re-styling these known problems as "fraud." *See First Kuwaiti*, 612 F.3d at 729 (where there was "evidence that the government officials were aware of any alleged defects and accepted First Kuwaiti's work anyway," this 'effectively negates the fraud or falsity required by the FCA'") (citation omitted).

## II. There Is No Pattern of Substandard Construction Work Sufficient to Prove Mr. Moayedi's Intent

The government cannot point to any direct evidence of Mr. Moayedi's intent to perform substandard construction work. Instead, it asks the Court to infer this intention from evidence that Mr. Moayedi engaged in business practices including allegedly hiring unqualified personnel, not training personnel appropriately, running a "skeleton operation," and "farming out the work to subcontractors." ECF 51 (Govt Fatico Br.) at 2, 7. These "choices permeated nearly aspect of his business" and "virtually guaranteed that his company, Montage, Inc., would often struggle to do quality work." *Id*. at 1, 2. The government then argues that the pattern of construction issues on seven Montage projects for the Department of State between 2008 and 2020 demonstrates Mr. Moayedi's criminal intent generally.

The Second Circuit restricts the use of evidence of a defendant's "pattern of conduct" as circumstantial evidence of intent to those situations where the government can prove "consistent" behavior by the defendant in the same time period. In *United States v. Taylor*, 816 F.3d 12, 26 (2d

Cir. 2016), the defendant was convicted of engaging in structured transactions to evade reporting requirements. There, the government offered evidence at trial that over a 20-month period, the defendant had made multiple cash deposits totaling over $10,000 at the same time at the same credit union branch office but split them between two accounts (meaning that no deposit into a single account was more than $10,000). The government argued that this pattern of "split deposit" conduct was evidence of the defendant's intent to engage in structured transactions. But the evidence also showed that in the same time period, the defendant made multiple single deposits exceeding $10,000; in fact, there were more single deposit transactions. *Id*. at 26 ("there are more than twice as many instances in which Taylor made deposits exceeding $10,000 than instances in which he purportedly split his transactions for the purpose of avoiding the reporting requirements"). This evidence, concluded the Second Circuit, "was insufficient for the jury to conclude that Taylor's transactions constitute 'a pattern of structured transactions' intended to evade currency reporting requirements," because "a pattern ***necessarily implies consistent behavior***, which would allow a rational jury to infer beyond a reasonable doubt that the behavior is not coincidence but rather demonstrates the defendant's intent to evade the reporting requirements." *Id*. (emphasis added). The Second Circuit vacated the defendant's conviction because his pattern of making deposits above $10,000 was inconsistent and thus insufficient evidence of his intent. *Id.*; *see also United States v. Chube II*, 538 F.3d 693, 705-06 (7th Cir. 2008) (reversing sentence because sentencing court did not properly "distinguish between conduct that is unlawful and conduct that is the result of mistake or inadvertence" for purposes of a relevant conduct enhancement" and instead made an "assumption of a lack of legitimate medical purpose for every prescription in 98 files after discussing only 10 files with any specificity").

*Taylor,* we submit, requires the Court to evaluate the totality of Montage's work in the same period to determine whether it reveals a pattern of "consistent behavior" of providing substandard work and does not permit the Court to rely only on the seven projects identified by the government in its brief. The CPARS for Montage are a valuable source of contemporaneous information about how DOS viewed Montage's work. Mr. Moayedi responded to CPARS, Tr. 371, and would have been well aware that if Montage received negative reviews, it may not win future work. Mr. Lowther conceded that "CPARSs are important to contractors because contractors know that the government is looking at their previous CPARS to decide whether to award them new work," Tr. at 319. The government training module for CPARS echoes the same point.[12]

From 2008 to 2020, Montage performed at least thirteen federal construction contracts.

---

[12] The government's official training module for contracting officers explains the purpose of the CPARS process (Ex. SG-9):

> The past performance evaluations written in CPARS provide a robust library of information that source selection officials can use to assist in making best value contract award decisions. By considering past performance information as part of the source selection, the government is better able to award contracts to proven performers.

> Because evaluations are written on an annual basis, the system provides up to date documentation of a contractor's performance.

> Evaluations also serve to motivate good performance under currently active contracts. Contractors take the ratings and narratives they receive on evaluations very seriously as they impact a contractor's ability to obtain future business.

> Therefore, contractors are motivated to perform well under current contracts in order to receive a positive evaluation and thus have a better chance of being awarded more government contracts in the future. In addition, the evaluation provides the contractor with valuable feedback as to whether their performance is meeting contract requirements, thus facilitating government-contractor communication.

For six of these contracts, the contracting officer concluded that "[g]iven what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, *I would recommend them for similar requirements in the future.*" *See* Exs. SG-4, SG-10, SG-8, SG-11,SG-13, SG-14 (Copenhagen, Hong Kong, Lagos,[13] Khartoum, and two FBI projects) (emphasis added). The Tokyo project was terminated for the convenience of the State Department very early in the project so there is no review of Montage's work. In sum, then, Montage worked on 12 federal contracts for which the Court has reviews by the contracting officer.

---

[13] Even though the government obtained the final Lagos CPARS directly from the Department of State while preparing for the *Fatico* hearing, it tells the Court that the document is "highly irregular" and "suspicious." *See* Govt Fatico Br. at 24 n.6. This is improper argument as it misrepresents the facts.

The facts show that the lead agent on this case, Christopher Swenson, reached out to the help desk for the CPARS system to obtain Montage's CPAR reviews on August 31, 2023. In response, Angela Watson, the DOS CPARS Team Leader responded to Agent Swenson on August 31, 2023. She informed him that "[t]wo evaluations were in the system as completed for Contract Base Number: SAQMMA08C0270 (do not know if they were unarchived by NAVSEA, but where there in CPARS for me after using the evaluation/contract status report module)." She then cuts and pastes into her email the two evaluations. One of the evaluations she provides from the DOS system is the 2016 final Lagos evaluation that concludes, "Given what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, I would recommend them for similar requirements in the future."

Curiously, the government produced a version of this email communication in a nearly-unreadable font. *See* Exhibit AA (original produced email). The defense has cut and pasted the email into a Word document and increased the font to a readable size in Exhibit BB for the Court's reference.

Given this record, the Court should disregard the government's argument that the final Lagos CPARS is suspicious, as the evidence directly contradicts it.

For six of those contracts, the review is positive. Thus, even if the Court concludes that Montage did inadequate work on six contracts, it unquestionably did adequate work on the other six. Under *Taylor*, Montage's performance was not "consistent" and thus cannot supporting a finding of intent here.

More qualitatively, the contracting officers had many positive statements about Montage. On the Hong Kong project, the contracting officer noted that "the contractor was able to perform at a higher level and complete the project within budget and ahead of schedule." Ex. SG-10 at 2. She also noted that "the overall success of the project was due to a willingness to work with the US Government contracting officer's representative and solve problems" and that he "would be happy to work with them again on a future project." *Id*. The interim (75%) CPARS for Khartoum stated that "Montage required a large amount of support from their subcontractor and from OBO onside (sic) management to allow for this project success," but that "the project was being executed successfully during this period of review" and "the Contractor has met quality requirements as described by the acting Project Director on site." Ex. SG-11 at 2. The FBI CPARS noted that "the contractor displayed a cooperative attitude in its relations with the Government's representatives and was responsive to request for information." Ex. SG-13 at 2.

There were most certainly negative comments about Montage on other CPARS. But the government's burden here is higher than showing that Montage did subpar work on a few projects. Rather, it must show that Mr. Moayedi *intended* to perform substandard work on government contracts. The evidence is, at best, inconsistent on this point and the government has therefore not met its burden. The government ascribes a criminal intent to Mr. Moayedi from Montage's work on half these projects and ignores Montage's adequate work on the other ones.

**III.    Montage's Use of Subcontracts Was Permissible Under the Contracts and Contemporaneously Disclosed to the DOS**

The government has still not fully abandoned its argument that Montage had to self-perform at least 51% of the work on these projects. Govt Fatico Br. at 2 (Montage "was required to self-perform more than 50% of the work"). This position ignored the reality of how government construction contracts work. The Small Business Administration ("SBA") recently acknowledged the obvious: "The SBA recognizes that subcontractors often perform the majority of the actual construction work because the prime contractor frequently must engage multiple subcontractors specializing in a variety of trades and disciplines." *Ownership and Control and Contractual Assistance Requirements for the 8(a) Business Development Program*, 87 FR 55642-01; *see also* 48 C.F.R. § 36.501 (Performance of work by the contractor) (stating general rule that the prime contractor in construction projects should "ordinarily" be required to self-perform "not less than 12 percent unless a greater percentage is required by law or agency regulation" and noting that "[s]pecialties such as plumbing, heating, and electrical work are usually subcontracted, and should not normally be considered in establishing the amount of work required to be performed by the contractor."). The FAR authorizes that specialized construction work (to be performed by a so-called "trade") is not included when calculating the limits of the work a subcontractor can do.

Each of the contracts at issue herein included the contract provision that Montage needed to perform only 15% of the work.[14] The FAR section for "Limitations on Subcontracting" provides that for construction contracts that are *set aside* for small businesses like Montage, the company "will perform at least 15 percent of the cost of the contract, not including the cost of materials,

---

[14] Each of the eleven DOS contracts inserts the specific FAR clause permitting 85% of construction work to be subcontracted by Montage (§ 52.219–14). The cited sections of each contract are: Lagos (§ I.100); Guayaquil (§ I.100); Abu Dhabi (IDIQ proposal § I.100); Copenhagen (IDIQ proposal § I.100); Hong Kong (§ I.100); Prague (§ I.100); Burkina Faso (IDIQ proposal § I.100); Bermuda (IDIQ proposal § I.100); Tokyo (§ I.100); Madrid (§ I.100); Khartoum (§ I.100).

with its own employees." 48 C.F.R. 52.219–14. And if the subcontractors to whom Montage gave work were themselves small businesses, then Montage was permitted to subcontract 100% of the work to them. The SBA regulations provide that "[i]n the case of a contract for general construction, it will not pay more than 85% of the amount paid by the government to it to firms that are not similarly situated." 13 C.F.R. § 125.6(a)(3). If the subcontractors that Montage used were "similarly situated"—that is, small businesses themselves—then the work that Montage subcontracted to them does not count towards the 85% limit.

The government shifts gears in its brief, arguing that Mr. Moayedi's sentence should be enhanced because (1) he used "turnkey" subcontracting in Prague, Khartoum and Madrid, meaning that "Montage subcontracted 100% (or nearly 100%) of the work"; (2) the subcontractors were "extremely cheap"; (3) Montage "claimed it was investing the majority of the contract price into the actual work" but "frequently appeared to have invested only about half" and the "rest was profit"; and (4) Montage's practice of using "foreigners came with various significant risks." Govt Fatico Brief at 7-8. The Court should reject each of these arguments.

As an initial matter, Montage did not subcontract all its work to subcontractors. The government continues to push this narrative, even though its own investigation contradicts it.

*Prague*. Montage was to receive $21,278,637.54. The subcontract with subcontractor BRC was for $12 million or about 56% of the contract value, but there was no evidence about how much BRC actually received from Montage. Montage disclosed to DOS in its bid for the project that it would work with other specialized subcontractors in local restoration; telecommunication work; fire protection work; electrical work; laboratory services; and demolition and earth works. *See* Ex. DD at 55 (excerpt from Volume 2 of Montage's Prague bid). The government offered no evidence

showing that BRC performed all the work on the contract—it simply assumes this fact from the contract's imprecise language.

**Khartoum**. The contract itself states that "Montage desires to subcontract *certain part of work specified*" in the contract. Ex. EE hereto (emphasis added). The contract includes a list of 14 specific "exclusions" from the contract that are not part of Veyka's work. *Id.* Attach. 1. The government incorrectly asserts that this contract was for "100% (or nearly 100%) of the work." Given that Veyka excluded portions of the work from its contract, it did not perform "nearly 100%" of it.

**Madrid**. Montage received only $2,922,335.41 of the contract's value of $15,453,200, because the contract was terminated before any substantial construction began.[15] The government points to a subcontract between Montage and Veyka for $5.25 million. It offered no evidence of how much Veyka was paid or what part of the work Veyka performed. The government's brief makes no mention of the fact that Veyka confirmed for the government in September 2023 that it did not perform all the work on the contract and that its scope of work specifically excluded all of the design work; complete project management, liaison with client, contract management; complete scheduling, quality management and safety management; supply of mechanical/electrical/plumbing system materials and equipment; supply of security elements including forced entry/ballistic resistant doors and windows; specialty installation of bifold gates and barriers; installation of technical security system; and any work for which the contract required a U.S. citizen. Ex. FF (September 2023 Veyka letter). The government knows that Veyka denies that Montage subcontracted with it to perform "100% (or nearly 100%) of the work," yet the government continues to represent the opposite. Also, Montage proposed in its bid for the Madrid

---

[15] The evidence at the *Fatico* hearing revealed that the DOS issued only two "limited notices to proceed" with construction. Both LTNPs were extremely narrow.

project that it would work with other specialized subcontractors in warehousing and shipping; forced entry and ballistic resistance doors/windows; security upgrade work; design work; steel products supplier and rebar; temporary office and storage; technical security system installation; design adaptation and local permitting. Ex. GG hereto (excerpts from Volume 2 of Montage's bid).

The government claims that the subcontractors' work was "extremely cheap." But it cites no evidence in support of this claim comparing the price for the chosen subcontractors against the price from any other subcontractor. The government seems to argue that part of Montage's scheme was to make a bigger profit by subcontracting work to companies for less than what Montage would be paid on the contract. Govt Fatico Br. at 7 ("Montage claimed that it was investing the majority of the contract price into the actual work; but in fact, Montage frequently appears to have invested only about half of what it claimed it would into the work. The rest was profit."). Putting aside that there is nothing illegal about making a profit, this argument is wrong on several fronts.

*First*, the government permitted its witness, Samantha Garcia, to incorrectly answer the Court's questions about what information was included in Montage's bids. Upon questioning from the Court, Ms. Garcia testified that the bids included a representation by Montage about how much it would pay a subcontractor (Tr. at 362-63):

> THE COURT: Just so I understand this, are you saying that the amount that was submitted to the government that included an amount for the subcontractor was an amount higher than subcontractor had agreed to do the work for?
>
> THE WITNESS: Correct.
>
> ***
>
> THE COURT: So this purports to be the amount that the subcontractor has agreed to charge, yes?
>
> THE WITNESS: Yes.
>
> THE COURT: In fact, it is not that; true? It is that plus some additional dollars?
>
> THE WITNESS: Yes.

The government did not correct Ms. Garcia at the time, even though it knew that her testimony was incorrect. Instead, defense counsel cross-examined Ms. Garcia with Montage's proposal for the Madrid project (Ex. SG-64). Upon questioning, Ms. Garcia offered truthful testimony that Montage's bids do not include a representation of how much Montage would pay the subcontractors. Tr. at 393-94 (agreeing that the bid does not represent "to the government how much it plans to pay its subcontractors to work").

**Second**, on a fixed price contract like the ones here, the government is not entitled to know—or question—how much profit a contractor ultimately makes. "A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." 48 C.F.R. § 16.202-1. By regulation, all risk and all reward inures to the contractor: "This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties." *Id*.

**Third**, Montage was the lowest bidder on these contracts. The government provided information about the number of bidders on 8 of the 11 projects. **Every single one** had "two or more" bidders: Burkina Faso (6 bidders); Ecuador (4 bidders); Bermuda (6 bidders); Madrid (5 bidders); Hong Kong (2 bidders); Lagos (2 bidders); Prague (5 bidders); and Khartoum (3 bidders). Under the FAR, the government was prohibited from demanding that Montage justify its cost or questioning its profit margin.[16] Not only does the bidding competition provide assurance Montage

---

[16] The FAR specifically prohibits an agency from asking a contractor to justify its cost or profit numbers when there is more than one bidder on the contract; the existence of multiple bids provides the agency with conclusive assurance that a contractor is not seeking an unreasonable profit for a project. Under FAR, the contracting officer must "[p]urchase supplies and services from responsible sources at fair and reasonable prices." *Id*. § 15.401(a). If the contracting officer determines the award price following "adequate price competition," then the agency may not demand any "additional data" from the contractor to evaluate the reasonableness of the price charged or profit to be earned. *Id*. § 15.402(a)(2)(i). There is "adequate price competition" when "[t]wo or more responsible offerors,

was proposing a  are not proposing an unreasonable price, but the DOS would calculate its own internal estimate, called the "independent government estimate" or IGE for each project before seeking bids.[17] The IGE is not shared with the bidding contractors. As the below chart shows, Montage was the lowest technically qualified bidder on the 8 projects. Montage was also below the IGE for 7 of 8 projects.

| Project | # Bidders | Montage Bid | Next Closest Bid | IGE |
|---------|-----------|-------------|------------------|-----|
| Bermuda | 6 bidders | $5,389,500 | $6,649,352 | $7,734,789 |
| Burkina Faso | 6 bidders | $2,295,000 | $2,715,292 | $2,485,335 |
| Ecuador | 4 bidders | $16,162,230 | $16,810,674 | $19,383,544 |
| Hong Kong | 2 bidders | $15,492,074 | $39,330,790 | $17,268,974 |
| Khartoum | 3 bidders | $15,621,498 | $15,785,112 | $15,857,810 |
| Lagos | 2 bidders | $25,804,185 | $23,347,190[18] | $20,796,214 |
| Madrid | 5 bidders | $15,453,200 | $10,809,728[19] | $23,092,812 |
| Prague | 5 bidders | $15,989,413 | $18,402,083 | $15,874,086 |

To credit the government's argument about Montage's use of subcontractors, the Court would need to conclude that even though the other qualified bidders' price proposals were higher than Montage's bids, and even though the DOS' independent estimate was higher than Montage's bid, Montage still did something illegal by subcontracting work in a way that earned Montage a larger profit than the government now deems appropriate years later. The fact is, even if DOS had chosen another contractor to perform this work, DOS would have paid that contractor *more* than it paid Montage. Montage's effort to subcontract work did not result in increased costs for DOS in any respect.

---

competing independently, submit priced offers that satisfy the Government's expressed requirement." *Id*. § 15.402(c)(1)(A).

[17] The Department of State procurement regulations provide that an "independent Government cost estimate (IGCE) is the U.S. Government's estimated cost/price of the proposed acquisition.  Its purposes are: (1)  To serve as the basis for reserving funds for the contract as part of acquisition planning; (2)  To serve as a basis for comparing costs or prices proposed by offerors; and (3)  To serve as an objective basis for determining price reasonableness." *State Department Foreign Affairs Manual*, 14 FAH-2 H-350.

[18] DOS ultimately dropped other bidder from process because it did not have appropriate security clearance for the project.

[19] DOS determined that the low bidder was not technically qualified to perform the work. The bid by the other technically qualified bidder was higher than Montage's ($15,995,282).

## IV.     Montage Did Not Intentionally Delay the Projects

Throughout this sentencing process, the government has argued to the Court that Montage intentionally delayed its work so that Montage could make more money. In its sentencing memo, the government claimed that "Montage continued to engage in fraud during the execution of contracts, including using several fraudulent tactics to maximize its profits and minimize its costs." ECF 43 at 13. According to the government's filing, "Montage intentionally delayed projects, but sought to blame the Government for these delays, so that Montage could file 'requests for equitable adjustments'—an attempt by Montage to pilfer still more funds from the Government." *Id*.

The government has now abandoned this argument. And it abandons it for good reason: it was utterly wrong on the law and the facts. The evidence at the *Fatico* hearing revealed that delaying projects did not make more money for Montage. Rather, delaying projects cost Montage hundreds of thousands of dollars.

If a project is delayed, then the contracts impose liquidated damages on a daily basis. On the Ecuador project, liquidated damages were $5476 per day or $164,000 per month. On the Bermuda project, liquidated damages were $1591 per day or about $47,000 per month. And on the Prague project, liquidated damages were $4079 per day or about $122,000 per month. Mr. Lowther, the DOS project director in Bermuda, confirmed that no contractor wants to have liquidated damages assessed against them and that those liquidated damages could wipe out a contractor's entire profit (Tr. at 317).

> Q. And the State Department in this matter ultimately charged Montage liquidated damages in excess of $451,000, is that right?
>
> A. Yes.
>
> Q. And that was for the delay, right?
>
> A. Yes.
>
> Q. So the delay cost Montage money, right?

A. Yes.

Q. And in your experience, do contractors want to have liquidated damages charged to them on their contracts?

A. No.

Q. Can that, in fact, wipe out the entirety of the profit on a contract?

A. It can.

There are other negative financial impacts of a delay in project completion. The government can keep the 10% "retainage" that it holds back from each progress payment along the way. Tr. at 464 (testimony of Scott McKee); 48 C.F.R. § 52.232-5 (in fixed fee contracts, "if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved."). The contractor can submit a time impact analysis (TIA) to the contracting officer, arguing that any delay was caused by the government and not the contractor. If the TIA is denied, then the contractor can only try to litigate the matter in federal court, which is expensive and time consuming. A delay can also lead to termination for default, as happened with the Madrid project. In that circumstance, the contractor not only has a black mark on its record, but it does not make any profit on the project. And finally, as explained above, delay can lead to a negative CPARS rating, making it less likely that a contractor will win future bids. In sum, an experienced contractor like Mr. Moayedi would understand that a delay will only cost Montage money in the short term and the long term.

## V.     The Safety Issues on Two Sites Should Not Affect the Court's Sentencing Decision

The government argues that Sina Moayedi's failure to hire properly qualified site safety managers led to a series of serious incidents. Chiefly, the government contends that a death resulting from a worker's fall from a scaffold at one jobsite and two fires that took place at a second jobsite demonstrate that Mr. Moayedi had little concern with workplace safety. Whatever might be said about the experience of the site safety managers which Montage employed, it is terribly unfair to saddle Sina Moayedi with responsibility for the incidents in question.

With respect to the worker who fell from a scaffold while working on the Burkina Faso project, this worker was employed as a painter by the painting sub- subcontractor. According to an investigation undertaken by the United States embassy culminating in a lengthy report issued some ten days after the death of the worker (attached hereto as Exhibit HH), the painting subcontractors had been specifically instructed by Montage's project manager prior to beginning work on the project that workers were not to remain upon the scaffolds in use when moving them from location to location. The painting subs were then reprimanded by Montage's project manager just two days before the tragic incident for moving the scaffold while a worker was still atop the platform and unaffixed to its railings. On the date of the incident, June 4, 2018, the painters not only disregarded Montage's recent reprimand but disregarded the specific instructions of their own boss on the scene to have the worker on the scaffold come down before they moved the scaffold to a new area. When the painters were moving the scaffold, the wheels became stuck at a speed bump in the parking lot. The painters lifted that part of the structure thinking they could move it past this obstacle. Instead, the scaffold tipped over, the worker grabbed one of the cross pieces of the scaffold framing causing it to bow but fell onto his back and struck his head on the pavement. The report concluded that the direct cause of the accident was the painters' lack of adherence to proper safety protocols.

Witness statements attached as exhibits to the embassy's report contain admissions by the workers in question that they disregarded safety instructions. *Id*.

Following the accident, Montage's CFO and Mr. Moayedi flew to Burkina Faso, met with authorities, and ensured that Montage fully cooperated with the investigation – as the report makes clear. Montage instituted stricter written guidelines concerning the use of scaffolds by subcontractors and sent an additional employee to assist in site safety efforts through completion of the project. *See* Exs. HH, II, JJ, KK. Mr. Moayedi also reached out to the family of the worker in question and paid for travel and funeral expenses for his family. For all the government's concern about this incident in 2023, it had no effect on DOS's contemporaneous review of Montage's work. The CPAR for the Burkina Faso project (GX 1416) fails even to mention the death of this painting subcontractor employee,  perhaps a recognition that Montage was not to blame for this tragic event.

With respect to the fires at the Prague work site, as the Court observed, the fire that started when subcontractor employees conducted welding work too close to flammable materials was quickly put out by a fire extinguisher located just feet from where the workers were situated. According to witness statements, the entire incident took less than 30 seconds. Though it is regrettable that this took place, there was no damage caused to the structure and no injuries to any workers. Montage employees completed an incident report included in Exhibit LL which indicates that all workers at the site received additional instructions regarding the safe use of welding equipment.

The other fire at the Prague project was caused by a portable space heater used by workers there during the winter months. While, again, it is lamentable that this occurred, such mishaps are not terribly unusual. The Consumer Product Safety Commission estimates that there are

approximately 1700 residential fires and 70 deaths in the U.S. each year associated with the use of space heaters during the cold weather months.[20]

As was the case with the Burkina Faso CPAR, the Prague evaluation made no mention of either of the two fire incidents.  In fact, while the Prague CPAR rates Montage as "unsatisfactory" for quality of work and scheduling, it rated Montage "marginal" for safety compliance.  Though such a classification is worthy of no commendations, it reflects, we submit, a recognition that Montage was likely not responsible for the two unfortunate incidents involving fires.

## VI.  The Government Has Not Proven that Mr. Moayedi Intended to Perform Substandard Work

The government has not met its burden to show that Mr. Moayed intended that Montage perform substandard work on these projects for several reasons in addition to the ones above.

*First*, the emails cited by the government show that Mr. Moayedi, when confronted with problems on projects, took steps to fix them. The government's brief cites an email from Mr. Moayedi from June 2018 showing that he was aware of problems on a job site. If the government were correct about Mr. Moayedi's intent, then one would expect him to ignore the problem or suggest that he expected it all along, Instead, he decides that Montage needs to assign a more experienced project manager to the site, suggesting that he wanted to *improve* the work, not simply acquiesce or push for inadequate work. GX 109 ("I have come to the contribution [conclusion] that we will definitely need someone like Thad [Quarles] like Kenny [Mattingly] who is smart and can manage out here."). The government also cites an email exchange about whether on-site welders had the proper certification to do the work. GX 107. Mr. Moayedi emails another Montage employee with his understanding that the welders did have the proper certification—he certainly

---

[20] https://www.cpsc.gov/Newsroom/News-Releases/2023/CPSC-Warns-Consumers-to-be-Cautious-When-Using-Space-Heaters-Furnaces-and-Fireplaces-This-Winter

does not suggest that uncertified welders should be doing the work instead. The Montage employee confirms that, "yes the welders do have certifications" and explains that they need "an independent testing agency inspects the welds." *Id.* The email exchange reveals that Mr. Moayedi was mistaken as to the contract requirement for approval of the welds, not that he was trying to bypass any contract requirement.

*Second*, the government requested statutory immunity for a long-time Montage employee, Samantha Garcia. Even with immunity, Ms. Garcia did not testify that Mr. Moayedi intended to do substandard work on these projects. Ms. Garcia confirmed that Mr. Moayedi was "up to speed" on a "high level" on the Montage overseas projects. (Tr. at 344). However, she also explained that he was "not so much" involved in the "day to day" work on those same projects. *Id*. Notably, Ms. Garcia—who worked side by side with Mr. Moayedi for many years—offered no testimony that he intended to do substandard work on these projects or that he did so to cut costs or increase profit. No witness at the *Fatico* hearing testified that Mr. Moayedi's intent was to perform substandard construction work on these projects.

*Third*, the government describes Montage's work as "repeatedly inadequate." Govt Fatico Br. at 8. This description is belied by DOS's contemporaneous and repeated approval of Montage's monthly requests for payment. DOS paid Montage tens of millions of dollars over several decades, establishing the inescapable truth that Montage's work met the quality standards of the contract. The FAR provides the requirements for payments under fixed price construction contracts. According to 48 C.F.R. § 52.232-5(b), "the Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." As McKee testified, a contractor is entitled to

be paid only for work performed pursuant to a government-approved schedule and only "for work that's finalized during that month that meets the quality standards of the contract." *See* Tr. 452:11-18. McKee explained that "in general, quality means meeting the specifications and construction requirements in the contract," and if a contractor does not meet these standards, the contractor should not expect to be paid, assuming the government does its due diligence. *See* Tr. 453:8-16.

In accordance with the FAR, the fixed price construction contracts at issue required the contracting officer or contracting officer representative (COR) to conduct detailed inspections of the work before signing off on Montage's requests for payment. *See* ECF 42 Ex. B (IDIQ contract), § G.5 ("Following receipt of the Contractor's request for payment, and on the basis of an inspection of the work, the CO or COR shall make a determination as to the amount which, in his/her opinion, is then due."). As detailed in Mr. Moayedi's sentencing memorandum, these inspections are quite thorough. First, the CO or COR "reviews the initial invoice and determines if the invoiced costs are commensurate with the progress made and if the work for which [the contractor] is requesting payment has been satisfactorily performed." ECF 42 Ex. D (OIG Report), at 3. Then, to "monitor the percentage of completion and the status of the . . . Project, . . . the COR/Project Director (PD),OBO engineers, and the [contractor] personnel walk through the work site and discuss the project's progress, including any issues with meeting technical specifications and the quality of building materials." *Id.* The COR then "uses the information obtained from quality assurance and work progress inspections to discuss with [the contractor] any concerns or discrepancies identified with the invoice submitted." *Id.* Once the agency is satisfied that the contractor's "invoiced costs are commensurate with the work progress described and the work is deemed satisfactory on the basis of quality assurance and work progress inspections," the agency will pay the invoice. *Id.*

Charles Lowther explained that he would review Montage's monthly requests for payment and would approve them ***only if*** the work was done in compliance with the contract. *See* Tr. 328:6-329:2:

> Q. Now, along the way in the Bermuda project Montage would submit request for payment; is that right?
>
> A. Yes.
>
> Q. And you would approve them?
>
> A. Yes.
>
> Q. And you would review them before you approve them; correct?
>
> A. Yes.
>
> Q. And the request for payment are several pages long; right?
>
> A. Yes.
>
> Q. And the request for payment would say exactly what work had been done in conformance with the contract during that period; correct?
>
> A. Yes.
>
> Q. And after you reviewed those requests for payment from Montage, you approved them; right?
>
> A. Yes.
>
> Q. And you wouldn't approve them if they hadn't done the work in compliance with the contract to get paid for that portion of the contract; right?
>
> A. In general, yes.

Mr. Moayedi would have also understood that (1) the DOS would have on-site personnel who would monitor all work in person and on a daily basis; (2) if DOS found problems in construction, Montage would have to fix those problems at Montage's own expense; (3) if Montage performed badly, it would receive negative CPARS and would not be awarded future contracts. Given his knowledge of the process, it makes zero sense that Mr. Moayedi would intend to do inadequate work on these projects.

## **CONCLUSION**

The government asks the Court to set a dangerous precedent in government contracting cases. Where a contractor does not meet contract requirements, the agency has many civil and administrative remedies available: demanding that the contractor fix the work at its own expense, terminating the contract for cause, seeking a claim on the contractor's performance bond, keeping the retainage amounts, imposing liquidated damages, referring the case to the DOJ for a False Claims Act investigation, and so forth. But what the government seeks to do here is—for the first time ever as far as the defense can discern—hold a contractor **criminally liable** for **poor construction work** without any proof of a specific misrepresentation about the work itself. Allegations of fraud "cannot be construed to include a run-of-the-mill breach of contract action." *First Kuwaiti*, 612 F.3d at 734. "Allowing a remedy for fraud to be put to such use . . . also drives up the costs of contracting for the government. Worse still, it threatens to penalize good faith disagreements over matters of commercial judgment." *Id*. It would ultimately "discourage many perfectly honest companies from wanting to do business with the United States." *Id*.

The Court should find that the government failed to prove that Mr. Moayedi intentionally provided substandard construction work to the federal government, and likewise decline to enhance his sentence based on the quality of the construction work at issue.

Dated: New York, New York

      November 22, 2023

                        Respectfully submitted,

                        FREDERICK L. SOSINSKY, ESQ.
                        45 Broadway, Suite 3010
                        New York, NY 10006
                        Phone: (212) 285-2270

                        SARA KROPF, ESQ.
                        REBECCA GUITERMAN, ESQ.
                        Kropf Moseley PLLC
                        1100 H Street, NW,
                        Suite 1220
                        Washington, D.C. 20005
                        Phone: (202) 627-6900

                        *Attorneys for Defendant*
                          *Sina Moayedi*