UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :
UNITED STATES OF AMERICA    :
                                             :
        - v. -                      :
                                             :        S1 22 Cr. 188 (JSR)
SINA MOAYEDI,                      :
                                             :
                      Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## POST–*FATICO* HEARING REPLY BRIEF OF
## THE UNITED STATES OF AMERICA


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

*Attorney for the United States*

Michael D. Neff
Assistant United States Attorney
   *Of Counsel*

The Government respectfully submits this response to the defense's post–*Fatico* hearing brief (Dkt. 52 ("Def. Br.")). The defense brief is striking in several respects. *First*, the defense does <u>not</u> contest the vast majority of the points in the Government's post-hearing brief. *Second*, the defense argues, for the first time, that the *Fatico* hearing was pointless, because the issue in dispute cannot be held against a defendant at sentencing. That argument is clearly wrong, but it is telling that the defense seeks to undo the hearing. *Third*, the defense raises certain narrow arguments— about the quality of the work and Moayedi's state of mind—which are wrong, misleading, or both. In totality, the evidence establishes by (much more than) a preponderance that: (1) Moayedi was in charge of Montage and its construction projects, (2) Montage repeatedly performed inadequate construction, and (3) Moayedi intended that result or at least acted with reckless disregard.[1]

## I. <u>THE DEFENSE HAS CONCEDED THE VAST MAJORITY OF RELEVANT FACTS</u>

The defense brief covers all manner of interesting topics—from the Fourth Circuit's case law in the civil context, to the *mens rea* required to convict a doctor of a narcotics offense, to the Bridgegate case, to alleged political pressure on the State Department, to how bad *other* contractors are. What the defense brief does not do, however, is challenge the core facts at issue in this case.

The Government's principal post-hearing brief (Dkt. 51 ("Gov. Br.")) made three primary points. *First*, Sina Moayedi made a series of cost-cutting, quality-sapping choices that virtually guaranteed that his company, Montage, Inc., would struggle to do quality work. Moayedi's choices extended throughout virtually every facet of his business, including: hiring unqualified personnel; electing not to train personnel; paying low salaries; winning bids by touting qualifications of individuals who did not work for Montage; farming out work to extremely cheap subcontractors;

---

[1] The Government respectfully requests to submit a reply longer than ten pages because the defense brief: (1) goes well beyond the scope of the Court's Order by challenging the propriety of an already-conducted hearing; and (2) contains a remarkable number of misrepresentations that counsel feels obliged to correct, lest sentence potentially be based on inaccurate representations.

and understaffing projects, which harmed quality but saved money for Montage. *Second*, because of Moayedi's choices, Montage repeatedly did inadequate work, including in seven large projects for the Department of State ("DOS") worth $103 million in total. *Third*, Moayedi was aware that Montage did inadequate work, yet he made no real changes in response. The defense does not appear to contest the vast majority of these points, including each of the following 23 points:

1. Control: Moayedi controlled Montage. He was "the boss." (Gov. Br. 2; *Fatico* Hearing Tr. ("Tr."), 357). Moayedi decided (1) which projects to bid; (2) how much to bid; (3) which individuals to list as Key Personnel in bids; (4) which purported qualifications (*i.e.*, lies) were listed on resumes; (5) which subcontractor to use; and (6) which numerical figures to list in bids. (Gov. Br. 8; Tr. 357-59, 404; GX 102, 103).

2. Tiny Workforce: Montage had extremely few employees. (Gov. Br. 2; Dkt. 42 ("Def. Sent."), 12-13 (noting that Montage had only 5-10 employees)).

3. Montage Could Not Provide Required Key Personnel: Montage lacked the workforce to do large DOS projects itself. And by 2017 (if not earlier), Montage was incapable of even providing the contractually required five Key Personnel per project. (Gov. Br. 2).

4. Key Personnel are Critical: Key Personnel are the point people, on site, for quality, safety, construction security, and project management. (Gov. Br. 2-3). They are "key to getting the job done well," as DOS Project Director ("PD") Kevin Mizell put it. (Tr. 45).

5. Unqualified Employees: Moayedi hired unqualified employees. He hired in ways unlikely to secure talent, such as hiring through Craigslist (Nathan Marshall) or hiring a nanny/schoolteacher with no construction experience (Analiza Lleses). (Gov. Br. 3; Tr. 167, 187, 348-49).

6. Failure to Train: Moayedi did not train his unqualified personnel. There was no formal training at Montage. Moayedi even used YouTube to provide "training" to Analiza Lleses, including a YouTube video containing "Construction Tips" for "Pouring a Concrete Foundation." (Gov. Br. 3-4; Tr. 169, 339-40; GX 125, 125A, 126, 126A).

7. Low Pay: Montage did not pay "enough to attract key personnel." (Gov. Br. 4; GX 1362)

8. Fake Employees: In his bids, Moayedi touted individuals who did not work for Montage, such as Aaron Cropp and Sarah Powers. (Gov. Br. 5; GX 708).

9. Fake Engineering Degrees: Moayedi falsely claimed that four of his employees had engineering degrees (Quarles, Ahmed, Gutierrez, Garcia). (*Id.*; Sent. Tr. 43; PSR ¶ 57).

10. Moayedi Refused the Obvious Solution: At any point, Moayedi could have hired a critical mass of qualified employees, but he chose not to do so. (Gov. Br. 6; Tr. 83-84).

2

11. <u>Moayedi's Wealth</u>: Moayedi's 2009 Will and Testament confirmed that he owned 13 real properties, including in Washington, D.C., Virginia, Iran, the Bahamas, the Philippines, and Palau. (Gov. Br. 6). (His 2017 Will listed 10 properties. Dkt. 43, p. 26.)

12. <u>"Insufficient Manpower"</u>: Moayedi did not provide required Key Personnel. DOS PDs repeatedly noted insufficient staffing, as did Moayedi's employee, Marshall. (*See* Gov. Br. 18-19, GX 1132 (**Bermuda**); Gov. Br. 22, GX 984 (Montage "has not provided the five, full-time, on-site key managment staff required by the contract.") (**Guayaquil**); Gov. Br. 9, GX 1416 ("insufficient manpower on the job" contributed to Montage's failure to complete the project on schedule) (**Burkina Faso**); (Tr. 183-84) (Marshall "didn't have any of the key personnel that were required for the project," which was "a major issue") (**Madrid**); Gov. Br. 23, GX 809 (**Lagos**) (inadequate supervision on site)).

13. <u>Lies About Profit</u>: Moayedi misrepresented Montage's intended profits. (Gov. Br. 6-7).

14. <u>Lack of Knowledge</u>: Montage employees were not knowledgeable. Moayedi knew that. He hired a nanny/schoolteacher with zero experience (Lleses), and he acknowledged that she might not be accepted by DOS. (Gov. Br. 3-4). Moayedi also described his own employee as follows: "Hamadou is a very nice guy and caring but doesn't have enough knowledge or experience to know what to look for . . . . I was not able to disagree with [DOS's] assessment that we don't know what we are doing." (Gov. Br. 10; GX 109). DOS PD Lowther testified that Montage's Project Managers "lacked knowledge of basic construction methods." (Tr. 256). For instance, Alex Gutierrez was "incompetent"; "misread" drawings; "misordered materials"; and "never once had a schedule that was accurate." (Tr. 257-59). Likewise, Montage's Quality Control ("QC") Managers "did not understand basic construction practices. They didn't know how to read plans or drawings." (Tr. 262). Montage's QC Manager and Safety Manager, Yash Davoodi, "did not have a basic knowledge of construction," "didn't know how to read rebar shop drawings," and "didn't know most of the things that we were doing." (Tr. 263-64). DOS PD Mizell testified similarly. (*See*, *e.g.*, Tr. 45 (majority of Montage's personnel did not understand basics of embassy construction); Tr. 63 (Thad Quarles' "basic understanding of the engineering needed for construction was limited"; Quarles would give "blank stares" in response to Mizell's questions about concrete work); Tr. 51 (Montage Safety Program was unsatisfactory due to, *inter alia*, "lack of expertise")).

15. <u>Concrete</u>: Montage struggled with even the basics, like pouring concrete. In fact, DOS PD Lowther had to "teach" Montage personnel "the fundamentals of concrete," including the need to use shop drawings, how to read shop drawings, and how to set rebar; Lowther also had to "correct" Montage's rebar placement "every" time, as Montage never got it right without his help. (Gov. Br. 19; Tr. 284-85).

16. <u>CPARs</u>: Moayedi responded to CPARs and thus was aware of the litany of problems specified therein (*e.g.*, poor quality work, safety issues, insufficient manpower, forged architectural drawings, design inadequacies, delays and schedule failures, organizational failures, and regulatory failures). (Gov. Br. 8-25). As to quality of work, Montage's failures related to, *inter alia*, fire protection, structural steel, HVAC, roofing, concrete, welding, drywall, electrical, irrigation, cladding, perimeter wall, etc. (*Id.*).

3

17. <u>Recurring QC Failures</u>: "The number of construction deficiencies and the frequency with which they occur show a lack of effective Quality Control (QC) program." (Gov. Br. 12; GX 1222) (**Prague**). "Montage has never appeared to be on board with the concept of a Quality Control Program." (Gov. Br. 19; GX 1131) (**Bermuda**). Montage's QC Program "lacks critical expertise such as National Electrical Code and FEBR installations." (Gov. Br. 16; GX 1369) (**Madrid**). In fact, in Madrid, Montage did not even have a QC Manager on site until more than halfway through the project. (*Id.*).

18. <u>Recurring Safety Failures</u>: Montage had serious safety violations in Madrid, Prague, Burkina Faso, and Bermuda. These violations included inadequate fall protection; a lack of personal protective equipment; insufficient safety barricades; and scaffolding violations. (Gov. Br. 8-24). In Madrid, a DOS health-and-safety field audit found deficiencies in 10 of 11 areas. In Prague, there were two fires. In Burkina Faso, there was a scaffolding death. (Gov. Br. 17, 15, 10). In Bermuda, Montage sought to carry a 1,200-pound door up 100 year old, rickety, wooden steps; fortunately, Lowther devised an alternative, as such "weight on those stairs would probably collapse them." (Tr. 283).

19. <u>Fraud In the Execution</u>: Moayedi repeatedly committed fraud during the execution phase of contracts, including: (i) submitting falsified resumes for several employees, such as Analiza Lleses, Spencer Voges, and Samantha Garcia (Gov. Br. 17; Tr. 57-58); (ii) lying in CPAR responses (Gov. Br. 10, 19-20; GX 1133, 1416); and (iii) submitting to DOS at least 37 forged architectural drawings, which related to safety and structural issues and critical building systems, including roofing, fire protection, structural steel, concrete, water treatment, and communications cabling (Gov. Br. 21; GX 984).

20. <u>Failure to Pay Subcontractors</u>: Montage failed to pay certain subcontractors. (Gov. Br. 15; GX 1234; Tr. 185).

21. <u>"Shabby" Work</u>: Moayedi recognized that Montage's work was poor. In Burkina Faso, he admitted that the work was "shabby"; "the duct bank the concrete and general upkeep of sites would flunk"; and he could not dispute DOS's view that "we don't know what we're doing." (Gov. Br. 10; GX 109). In Lagos, he admitted that there was "extremely poor workmanship on the roof," "large areas of ponding," and "If a real inspector inspects the roof, it would not pass inspection." (Gov. Br. 23; GX 119). In Prague, he admitted that Montage had not "*purposefully* installed deficient work." (Gov. Br. 13; GX 1222). In Madrid, Moayedi told the DOS PD, "Sorry to see things not as hoped…it is frustrating. Through time you will see a different face." (Gov. Br. 17; GX 1361 at 60).

22. <u>Terminations</u>: Montage was terminated for default twice (Madrid and Prague), and also received several "Cure Notices regarding their lack of performance," including three in one year, for Bermuda. (Gov. Br. 11, 15, 20; GX 1234, 1366, 1131). In Madrid, for instance, Montage completed no security upgrades whatsoever and did less than 10% of the work during the full period of performance (28 months). (Gov. Br. 16; Tr. 21).

23. <u>Mold and Termites</u>: Only a few years after Montage's work on the Guayaquil Project, that facility has been plagued by, *inter alia*, HVAC issues, humidity, condensation, mold, termites, and a cracked roof and ceiling. (Gov. Br. 22; GX 987).

4

The defense brief does not contest any of these facts. Instead, the defense raises procedural arguments (which are discussed next) and then, on the merits, they "tinker around the edges" to try to avoid the obvious conclusions that flow from these undisputed facts.

## II. THE DEFENSE'S PROCEDURAL ARGUMENTS ARE WRONG IN EVERY WAY

The defense's procedural arguments reveal remarkable chutzpah: After requesting a *Fatico* hearing, the defense now claims, for the first time, that the hearing was pointless because the issue in dispute cannot be held against a defendant at sentencing. (Def. Br. 6-10). That is clearly wrong, legally and factually. But it is telling that, after hearing testimony and reading the Government's brief, the defense now seeks to undo the hearing—essentially a concession that the Government has prevailed. Notably, the defense cites no change in the law between August and November. Instead, they simply have buyer's remorse—enough so to contravene the Court's Order that post-hearing briefing should be "limited" to the "question that I posed in my order," and should focus on "the transcript," "exhibits," and "inferences" to draw therefrom, "in lieu of oral summations." (Tr. 466-67; 385-86). The defense has clearly waived (or forfeited) its procedural arguments, but given these arguments' prominence in their brief, the Government addresses them nonetheless.

The crux of the defense's argument is that only criminal conduct can be used as the basis for an enhancement under the U.S. Sentencing Guidelines; and according to the defense, providing inadequate construction is not criminal. (Def. Br. 6). There are numerous flaws with this argument.

1. <u>The Law</u>: As to the defense's claim that only criminal conduct can be considered, that is wrong. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Indeed, the Supreme Court has held that sentencing courts may consider *acquitted* conduct, *United States v. Watts*, 519 U.S. 148, 152 (1997), and the Second Circuit has held that sentencing courts may consider (i) criminal aspirations, *United States v. Hammie*, 205 F.3d 1325 (2d Cir. 2000) (unpublished), and even (ii) "a defendant's beliefs or associational activity," so long as they are "relevant to the issues involved" in the sentencing proceeding, such as future dangerousness, *United States v. Kane*, 452 F.3d 140, 142–43 (2d Cir. 2006). Thus, the Court had it exactly right when

5

it stated, at the August sentencing proceeding in this case: "My view is that anything that can give the Court a full appreciation of every aspect of a person's character and history is relevant to sentence." (Sent. Tr. 32).

2. The Facts: In any event, the execution phase *was* part of Moayedi's criminal conduct. For instance, during the execution phase, he lied about his employees' qualifications (*e.g.*, three falsified resumes during the Madrid Project), and he forged architectural drawings during the Guayaquil Project and then lied to DOS about it. Further, to perpetuate his fraud, Moayedi lied in his CPAR responses to try to evade the consequences of Montage's poor work. More fundamentally, **Montage did not morph overnight** once Moayedi won projects; it did not miraculously transform from a tiny, unqualified company to a robust, impressive one. Moayedi lied, in his bids, because Montage lacked the quality and quantity of personnel needed to do largescale, complex, overseas work. He touted fake projects, fake references, fake employees, fake degrees, a fake recruitment plan, a bogus emphasis on training, a fake profit estimate, fake financials, fake ownership, etc. In short, Moayedi couldn't do the projects adequately at the time he bid them (which he knew—that's why he lied in bids); and he couldn't do the projects adequately once they were awarded to him (because he took no steps to make Montage more like the company he had fraudulently touted in his bids, which existed only on paper). *I.e.*, this has always been one overarching fraud conspiracy.

3. The Plea: Contrary to Moayedi's claim, his plea agreement implicates the execution phase in several respects, including his admissions that: (1) the Designer of Record for Guayaquil was one of ten or more victims of the crime; (2) Moayedi defrauded his bank in order to fund Montage's operations; (3) Moayedi defrauded his bonding company throughout the life of construction projects; and (4) restitution is due to both DOS and a bonding company for losses sustained due to Montage's performance.

4. The Dispute: The defense strains to import case law from the Guideline enhancement context (Def. Br. 6-7), but there is no Guidelines dispute here; as part of the Plea Agreement, the parties stipulated to the applicable range. Rather, this is a *factual* dispute about the nature, extent, details, and consequences of Moayedi's mega-fraud on DOS. This information is obviously relevant to sentencing under § 3553(a), as it bears on the nature, circumstances, and seriousness of the offense, as well as on Moayedi's history and characteristics. Indeed, there is nothing surprising about a *Fatico* hearing regarding a purely factual dispute with no Guidelines implications.[2]

5. The Order: The Court already determined that it is material to sentence whether Moayedi provided inadequate construction in various instances. (Sent. Tr. 41, 47). Contrary to the defense's claim, the Government has only one burden: to prove, by a preponderance, the questions at issue in the Court's August 14, 2023 Order.

---

[2] *See*, *e.g.*, *United States v. Bellamy*, 16 Cr. 303 (VEC) (Dkt. 33) (defendant pled guilty to bank fraud; *Fatico* hearing to address whether he possessed firearm days after guilty plea); *United States v. Figueras*, 17 Cr. 379 (JPO) (Dkt. 67) (defendant pled guilty to (b)(1)(C) narcotics distribution; *Fatico* hearing to address (1) whether he had sold cocaine or fentanyl-laced-heroin, and (2) if the latter drugs, whether those drugs contributed to some extent to his customer's overdose death).

6. <u>The Irony</u>: There is a tremendous irony to the defense's argument. The defense's primary mitigating argument, in August, was that Moayedi was different from other fraud defendants *because of his approach to the execution phase of contracts*: "Unlike the defendants . . . whose entire operations were fraud factories, Sina Moayedi's crimes were motivated by **a desire to actually do the hard work**." (Def. Sent. 2). Clearly, that is not true. And in his letter to Your Honor, Moayedi himself made similar claims, asserting that: he was "meticulous" and "self absorbed with the quality"; "I would have never neglected the safety and security of our service men and women for project profits, and that is perhaps one the many reasons why our profits were usually minimal"; and "I have never been driven by greed." (*Id.* Ex. J). These are lies. Thus, when the defense sought a reduced sentence based on Moayedi's purported desire to do the hard work, the execution phase was highly relevant to sentencing, from their perspective. But once the Government proved that the defense's primary argument is simply untrue, the defense pivoted and now says that this entire issue should not be part of sentencing. This is "*Heads I Win, Tails It's Irrelevant*." These are bad arguments.

Finally, the defense seeks to rewrite the Court's Order by changing the applicable *mens rea*. By sitting on its hands for months until after the hearing, the defense has waived (or forfeited) this argument, too. In any event, the Order is plainly correct. Both states of mind (in the Order) contemplate intentional action, with an awareness of the likely outcome. Moayedi was keenly aware of recurring, serious problems—including Montage's unskilled personnel, insufficient manpower, non-existent QC, deficient safety practices and serious safety incidents, lengthy delays, and inadequate physical construction. Nonetheless, Moayedi made no changes. He had the knowledge (*e.g.*, a Master's Degree in Architecture), the experience (*e.g.*, he founded Montage in 1986), and the financial wherewithal (*e.g.*, he owned 13 properties across five countries) to get the job done well; he just needed to hire a critical mass of decently qualified employees. He never did.

## III. <u>THE DEFENSE'S MERITS ARGUMENTS ARE MISLEADING OR WRONG</u>

The defense next makes certain limited arguments about the quality of Montage's work and Moayedi's state of mind. As noted, the most important facts are the many that they do *not* challenge. The arguments they do make are misleading, wrong, and/or unpersuasive, to wit:

1. <u>Numerical Argument</u>: The defense seeks to defend Montage's record by asserting that, from 1993 to 2020, Montage was awarded 387 government contracts worth $195 million. (Def. Br. 3). These numbers are revealing. The 7 projects highlighted by the

7

Government in connection with this hearing are worth more than **$103 million** in total. (Ex. 1). The remaining 380 projects are worth about $92 million, or an average value of **less than $250,000 per project**. The prior 300+ projects are not especially relevant to the limited question at issue here: whether Montage did inadequate work once it pivoted from a contractor that did fairly small-scale projects (averaging less than $250,000) to a contractor averaging nearly $15 million per overseas Embassy project.

The best evidence that Montage's prior work is irrelevant is the defense's admission that Montage was ineligible to bid largescale projects. In its sentencing memo, the defense admits that "Moayedi inflated or fabricated certain prior experience to include with Montage's bids," because Montage's actual experience "**would not have permitted Montage to bid on the larger contracts at issue**." (Def. Sent. 52).

Put another way, Montage may well have been capable of performing small-scale, uncomplicated work, like paving a parking lot. But Embassy projects are dramatically different. They involve life-safety systems, structural design, FEBR material, roofing, HVAC, electrical systems, water systems, communications systems, security requirements, overseas shipping, and much more. Moayedi knew this. He wanted the profits of largescale Embassy projects, but he neither developed the experience nor hired the personnel needed for such work; instead, he lied and bribed his way to winning projects, and then brought his junior varsity team to play in the big leagues.

Nonetheless, the defense claims that Montage was awarded 400 contracts, and that "at the conclusion of each such project, the agency project director and contracting officer were required to prepare detailed evaluation forms that any agency considering Montage's record of past performance could review. Through 2016, then, Montage had enjoyed, at a minimum, a satisfactory reputation as a government contractor." (Def. Br. 1). This is not true. CPARs are required only for projects of $750,000 or more (and previously, $500,000 or more) and for terminations for cause. FAR 42.1502. Montage's average project was not even $250,000; there are no CPARs for the overwhelming majority. The defense should not assert that projects went well when there is no evidence of such; nor should they assert that CPARs were "required" to be filed for "each" of 400 projects when that is false. In sum, the defense's numerical argument reveals how grossly unqualified Montage was to do largescale Embassy work.

2. "50/50": The defense claims that Montage received the same number of favorable and unfavorable recommendations in CPARs—to wit, 6 of each. (Def. Br. 18-19). According to the defense, "For six of those contracts, the review is positive. Thus, even if the Court concludes that Montage did inadequate work on six contracts, *it unquestionably did adequate work* on the other six." (*Id.* at 19) (emphasis added). This claim is severely misleading. An examination of the 6 relied on by the defense reveals that in only 2 instances (not 6) did Montage potentially do adequate work. The other 4 do not withstand scrutiny: Two involved no actual work; a third was, in fact, an *unfavorable* rating in the final CPAR; and a fourth involved a highly critical CPAR that, many years after the project's completion, was suspiciously changed, without explanation, by someone at DOS with no involvement in the project.

8

- FBI IDIQs: Two of the six cited by the defense were IDIQ contracts ("IDIQs") with FBI that involved no actual work. The defense knows this; they accurately described IDIQs in their sentencing memo, noting that IDIQs do not involve a specific project; instead, an IDIQ merely places a contractor on a list of companies that is *eligible* to bid for future work.[3] Consistent with the defense's accurate definition of an IDIQ, the FBI has confirmed that the CPARs cited by the defense do not correspond to any actual construction work, and further, that the language in these CPARs is standard placeholder language for IDIQs. (Even where no work was contracted, a CPAR is required to be filed because the amount of the IDIQ exceeds $750,000.) Indeed, these FBI CPARs explicitly state, "**This evaluation is provided for administrative purposes only**" and further, that any specific task-order will receive a separate, "standalone evaluation." Notably, these FBI CPARs include an amount obligated of "**$0.00**", and a description of "**N/A**" for Quality, because there is no work to assess. (DX SG-13, DX SG-14 (attached hereto)).

- Khartoum: In the final CPAR for Khartoum, DOS's Contracting Officer noted that he "would **not**" recommend Montage for similar contracts in the future. (Gov. Br. 25; GX 1517). This is not in dispute. Nonetheless, the defense seeks to take credit for an *interim* CPAR, which—at that earlier stage in the project—had a different (tentative) recommendation. It is severely misleading to seek to take credit for a tentative view, based on partial performance, without even *mentioning* that DOS's final recommendation was precisely the opposite. (Ironically, the defense previously told the Court that the final CPAR is "the one that's relevant." (Tr. 383)).

- Lagos: In our post-hearing brief, the Government described this project in detail (Gov. Br. 22-25) and noted, in summary, that: Montage finished this project nearly four years late; the quality of Montage's work was problematic in virtually every respect, including untimely procurement of materials, inadequate supervision, and issues with engineering, concrete, electrical, and security; and Montage was rated "Unsatisfactory" in its "Identification/Correction of Deficient Work." Moayedi's emails also revealed the "extremely poor workmanship on the roof." And per the CPAR, there was a direct link between Montage's inadequate staffing and its delayed, problematic performance.

  Back in 2012, the CPAR format apparently did *not* ask the Contracting Officer to state whether or not they would recommend this contractor in the future. But the 99% CPAR, from November 2012, was stinging in its wide-ranging criticisms of Montage's work. (GX 808). And this 99% CPAR evaluated four years' worth of work (2008-2012). Two months after this 99% CPAR was written, the Lagos Project finally ended in January 2013. Yet in 2016, another CPAR was mysteriously issued (*id.*), despite the absence of any work for over three years. This 2016 CPAR is highly irregular, suspicious, and should be accorded no weight. The

---

[3] *See* Def. Sent. 46-47 ("Prospective contractors bid to be a qualified vendor within the IDIQ project. The agency selects the IDIQ contractors but they are not given any specific projects at that point. When the agency has a specific need, it asks pre-qualified vendors to bid on a 'task order' for the work. Only the pre-qualified vendors may bid on these task orders.") (emphasis added).

2016 CPAR changed certain of the "bottom-line" ratings (and did indeed contain a purported "would recommend" recommendation), but the 2016 CPAR provided no narrative or new facts—nor did it, in any way, call into question the detailed criticisms from the 99% stage. And the DOS employee who issued the 2016 CPAR was not involved in any way in the Lagos Project. By contrast, the DOS employee who had participated in, and knew, the project issued the 99% CPAR. The person with a factual basis to evaluate Montage's work issued a highly critical 99% CPAR.

In sum, the defense has identified two projects for which Montage potentially performed adequately, while the Government has identified seven for which it did not.

3. <u>"Overwhelmed"</u>: The defense asserts that Montage was "overwhelmed," and "any small business" would encounter "tremendous challenge when winning five projects in a single calendar year." (Def. Br. 1). This certainly sounds like an acknowledgement about the quality of Montage's work. Nonetheless, it appears to be an argument that Moayedi did not intend poor quality work, but instead, was caught off-guard by unexpected bidding success. There are several flaws with this argument. *First*, if Moayedi was overwhelmed by the fact that he won four projects in September 2016, then why did he seek more work a year later by bidding a $16 million project in Khartoum in August 2017? *Second*, Moayedi could not have been surprised that he had various projects simultaneously, because he bribed a State Department insider (May Salehi) to win at least three projects (Guayaquil, Bermuda, Madrid).[4] Having procured contracts by bribing a government insider, it is audacious for Moayedi to now complain that his bribery scheme worked. *Third*, if he was overwhelmed, there was an easy, ever-present solution to his self-created problem: hire a critical mass of qualified employees. *Finally*, the defense has harped on the word "overwhelmed," but DOS PD Mizell appears to have meant something different than the defense suggests. Mizell wrote, "given Montage's demonstrated ineptitude to date, I am very hesitant to introduce more

---

[4] Indeed, as to Guayaquil, Moayedi initially told DOS that he was *not* going to bid the project (GX 908), but then he paid Salehi to exfiltrate a competitor's bid. She did so, and Moayedi submitted a bid and was awarded Guayaquil. The second-place bidder, a company named EMR, was the company whose bid Moayedi illegally obtained during the bidding process. (Ex. 2 (exfiltrated bid, recovered during search of Montage office); GX 900 (EMR was second-place bidder)).

Notably, in their sentencing memo, the defense misrepresented this exfiltrated bid. (Def. Sent. 60 ("Moayedi acknowledges that on an earlier occasion, Salehi had provided him with a copy of the technical portion of another larger and well-established company's bid **on a job that had already been awarded (and completed)** so that Montage might present future bids to the State Department in a far more 'professional' and organized fashion than it had been doing.") (emphasis added). *I.e.*, the defense represented that the exfiltrated bid related to a *historical project* that "had already been awarded" to another company and indeed "completed"—but in reality, the exfiltrated bid was that of a direct competitor on a project (the Guayaquil Project) that was ultimately awarded to Montage.

This instance of bribery also exposes the fallacy of another defense position: to wit, "Moayedi denies any allegations that Salehi ever provided him with confidential bidding information with respect to any job that Montage bid on, other than the Bermuda project." (Def. Sent. 61).

variables into their already evidently overwhelmed state." (DX KM-25). Mizell also wrote, "The long and short of it is that they are clearly overwhelmed by this $16M project and have no real technical competence to perform at or near OBO's minimum level of marginal performance." (DX KM-21). Mizell's point is that Montage was inept and was overwhelmed by the magnitude or complexity of "this" project.

4. Inspections/Acceptance: The defense next argues that "DOS's contemporaneous and repeated approval of Montage's monthly requests for payment" establishes that "Montage's work met the quality standards of the contract." (Def. Br. 31). This argument is deeply flawed, principally because the entire course of the projects was permeated with fraud. Moayedi's bids were completely divorced from reality; the company he touted was completely different from the one that actually existed. He touted fake projects, fake references, fake employees, fake degrees, a fake recruitment model,[5] a bogus emphasis on training, a fake profit estimate, fake financials, and fake ownership. He bribed and lied his way to over $100 million worth of projects for which his company was completely unqualified—and indeed, ineligible.

Moayedi claimed that his employees were "highly qualified" and "highly trained," with "extensive Construction-Design experience" and "technical expertise." GX 1302, pp. 114-18. And he lied about his employees' qualifications during both the procurement and execution phases, including lying that several employees had engineering degrees. In reality, Moayedi's employees could not even do the basics, like pouring concrete, reading architectural plans, making a viable schedule, ordering the correct materials, or installing a fire extinguisher. Indeed, the defense has *admitted* that Montage was ineligible to bid larger DOS projects. (Def. Sent. 52). That admission is conclusive. Had DOS known the truth, it would have not contracted with, or paid, Montage. 48 C.F.R. § 52.246-12(i) (the Government's acceptance of work "shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud," etc.).

*Second*, the fact that some work may have ultimately been deemed acceptable does not mean that *Montage* did adequate work. In Bermuda, for instance, DOS PD Lowther is clearly the reason that project eventually got done, albeit belatedly. Lowther literally had to teach Montage personnel the basics of construction, including how to read architectural plans, pour concrete, maintain safety, move heavy objects, coordinate shipments of materials, etc. And even after his teaching lessons, Montage *still* couldn't get the job done right without his help. Montage essentially seeks to take credit for Lowther's willingness to do aspects of their work for them. Similarly, in Madrid, DOS PD Mizell wrote that Montage has "no real technical competence to perform at or near OBO's minimum level of marginal performance. *We're supplementing and bolstering them through many performance metrics (quality, security, local legal compliance, management)*," yet their "'hands off' approach (subcontracting the entirety of the work

---

[5] Montage bids contained a bogus five-page "Recruitment Plan," which claimed that Montage has "4 dedicated recruiters"; Montage recruits "highly qualified" personnel; Montage has "some of the best-trained employees in the industry"; and Montage offers "competitive salaries and personal development through training." GX 1302 at 114-18 (**Madrid**); *see also* GX 902 at 100-05 (**Guayaquil**); GX 1502 at 112-16 (**Khartoum**); GX 1207 at 72-76 (**Prague**). These are lies.

11

. . . and supplying some FEBR products) is proving quite ineffective." (DX KM-21).[6]

5. Subcontracting: The defense next claims that the contracts all permitted Montage to subcontract 85% of the work. That is wrong. Before explaining why, it is important to highlight that, while the parties disagree about the limitations on subcontracting, the parties appear to agree on two even more fundamental facts: (i) Moayedi farmed out most of the work to subcontractors, and (ii) Moayedi misrepresented the extent of Montage's anticipated profits, based in part on subcontracting.

Several sources make clear that Montage was generally required to self-perform the majority of the work. *First*, as an example, the Madrid Project contract explicitly states: "**Limits on Subcontracting**. This project is subject to subcontracting limits of no more than 50% of the total value of the contract, as identified in 22 U.S. Code Section 4852." (DX NM-9, p. 125). The contract further explains: "With respect to a diplomatic construction project, a prime contractor may not subcontract more than 50 percent of the total value of the **Construction** work. Any amount included in the contract price for Design is excluded from the calculation to determine the value of the Construction project." (*Id.* at 47) (underlining added).

*Second*, Montage clearly (and correctly) understood this language. In at least four bids, Moayedi highlighted that, in prior projects, Montage had "**self-performed more than 50% of the work**." These bids include Guayaquil, Madrid, Prague, and Khartoum. For instance, in his Khartoum bid (GX 1502, p. 5), Moayedi specifically identified that self-performance "above 50%" (on prior projects) was a relevant factor:

Relevant factors between enumerated past projects and this solicitation are as follows:
- Design Build
- Complexity of Construction
- Renovation
- Self-Performed above 50%
- Residential Use
- Security Upgrade
- $ Value
- Overseas Construction

In his bids for the Madrid and Prague Projects, Moayedi touted that Montage had "acted as a general contractor in all the project examples and [had] self-performed more than 50% of the work." (GX 1302, p. 5; GX 1207, p. 5). Moayedi then provided specific examples. He cited Montage's purported projects for the Franciscan Monastery, highlighting that Montage had "self-performed more than 50% of the work." (GX 1302, pp. 7, 9 (**Madrid**); GX 1207, pp. 7, 9 (**Prague**); GX 903, p. 6 (**Guayaquil**)). To be clear, Moayedi invented these projects for the Monastery; he could have chosen any percentage of self-performance, yet he picked "more than 50%." At bottom, there is no question that DOS and Moayedi were in accord about the self-performance requirement. Moayedi's employee understood the requirement the same way. (Tr. 370 ("[T]he general contractor should self-perform a greater portion, but -- yes, a greater portion than the subcontractor.")). So did an arbitral panel when Montage and its subcontractor went to arbitration over a dispute in Prague. (*See* Gov. Br. 6, n.1; Dkt. 44, Ex. 2).

---

[6] As noted above, there were also latent defects, such as those that led to HVAC issues, humidity, condensation, mold, termites, and a cracked roof in Guayaquil. (Gov. Br. 22; GX 987).

12

*Third*, despite the clarity of its bids, Montage was evasive during the execution phase. For instance, during the Madrid Project, DOS issued an eight-page Show Cause Letter to Moayedi, setting forth Montage's various serious failings. (GX 1369). A full page focused on how Montage had "misrepresent[ed] the percentage of self-performed work," including that it had "omitted several known subcontracts." (*Id.* at 5). Further, Montage's "requests for progress payment omit the required listing of the amount included for work performed by each subcontractor." DOS noted that "A prime contractor may not subcontract more than 50 percent of the total value of the construction work," yet "Montage's subcontracting plan heavily outweighs its self-performance of work. Montage has reserved a few key [] personnel positions and administrative functions but has contracted with Veyka and a few specialty contractors to perform the majority of actual construction work *contrary to* Section H.5 'Limitation of Subcontracting' *and Montage correspondence on the subject*." (*Id.*) (emphasis added). Two former Montage employees testified that the plan was for Veyka to perform the majority of the work in Madrid. (Tr. 184; 400-03).

Moayedi's subcontracting practices matter because they are another lie by Moayedi that implicates both the procurement and execution phases. His bids generally listed a projected profit of about 10%, which conveyed that he was devoting the vast majority of the contract price to the actual work. He was not. As previously demonstrated, Moayedi envisioned up to 50% profit (not 10%), given the cost at which he "turnkeyed" several projects.[7] In other words, the Government paid millions of dollars to get an experienced, qualified, domestic company that would put the vast majority of the contract price into the work. The Government received nothing of the sort. Moayedi's subcontracting practices are also problematic because Moayedi complained that some subcontractors "don't know what they're doing or" were "doing unsatisfactory work." (Tr. 370). This is unsurprising given the price that his subcontractors agreed to be paid.

*Finally*, there are numerous flaws with the defense's reasoning, but the most fundamental is its reliance on a provision that, by its own admission, generally does not apply here. The defense argues that each contract at issue includes a provision that "Montage needed to perform only 15% of the work." (Def. Br. 20). That is not so. In making this argument, the defense cites FAR 52.219-14. (*Id.* n.14). But by its own terms, that provision applies only to *set-aside contracts for small businesses*. *See* FAR 52.219-14(c) ("*Applicability*. This clause applies only to . . . Contracts that have been set aside for any of the small business concerns identified in 19.000(a)(3)"). As the defense has admitted, only 2 of the 28 contracts at issue in this case were set-asides for small businesses. (Def. Sent. 51 ("Two of the 28 contracts were set asides for women owned small businesses.")). And of the seven projects highlighted by the Government

---

[7] On that score, the defense criticizes the Government for asserting that, in several instances, Montage subcontracted 100% (or nearly 100%) of the work. The defense claims that the language in the subcontracts is "imprecise." (Def. Br. 22). The Government is unaware how to write a contract any clearer than the phrases, "all of the work" and "all work," which appear in the subcontracts for Prague and Khartoum. (Gov. Br. 6). And as to Madrid, Montage *admitted* that its construction costs were less than $6 million (GX 1369, p. 5); and Montage's revised subcontract with Veyka was for $5.74 million (GX 1350), which appears to exceed 95%.

13

in this hearing, only one was a set-aside for a small business (Burkina Faso). Thus, as to 6 of 7 projects highlighted by the Government, the provision cited by the defense is completely irrelevant. *I.e.*, the Government has correctly highlighted Montage's deceptive, improper subcontracting in Madrid, Prague, and Khartoum.

6. <u>Financial Incentives</u>: The defense argues that Moayedi was financially incentivized to do work on time, because delays could trigger liquidated damages. (Def. Br. 26). But even if liquidated damages were assessed, Montage's subcontracts enabled Montage to pass on such damages to its subcontractors.[8] More fundamentally, if one is saving millions of dollars through (i) prohibited subcontracting practices, (ii) paying a tiny number of low salaries, and (iii) failing to provide required Key Personnel, then liquidated damages are worth the cost. If such damages reduced one's profit from, say, 50% to 40%, that would still far outstrip the 10% profit Moayedi claimed in his bid. When the defense asked DOS PD Mizell whether he'd want to be charged liquidated damages, he testified that it depends on the math: "if I have to spend $6 million to avoid $2,000 of liquidated damages, I think I'll take the $2,000 in LDs." (Tr. 140).

The defense next argues that Moayedi would not have wanted Montage to receive negative CPARs. (Def. Br. 33). This has surface appeal, but it assumes a law-abiding actor committed to a company, rather than himself. As Moayedi acknowledged through his guilty plea, his fraud involved *three* corporate entities (not just Montage). He deployed each entity to abuse government programs over 25 years:

<u>1995-2004</u>:  Montage 8(a) fraud
<u>2003-2012</u>:  Viking 8(a) fraud
<u>2014-2020</u>:  Montage fraud, woman-owned small business fraud, and bribery
<u>2016</u>:  Moayedi enters into criminal agreement regarding Ponce Contractors
<u>2017</u>:  Ponce Contractors ("Ponce") fraudulently applies for 8(a) status
<u>2020</u>:  Ponce fraudulently attains 8(a) status

After abusing the 8(a) Program through Montage and Viking, Moayedi started laying the groundwork in 2016 for the next iteration of his 8(a) fraud through Ponce. As the Court may recall, in 2016, Moayedi and an African American woman ("W-1") entered into a criminal agreement whereby W-1 agreed to serve as the putative president of Ponce in exchange for monthly payments and a commission for signing documents and attending meetings; she was also to be paid a commission for any contracts awarded to Ponce. In or around June 2017, Ponce fraudulently applied for 8(a) status—based on misrepresentations about prior work, financials, and ownership—and it received 8(a) status in May 2020. (*See* Dkt. 43 (Govt. Sent.), pp. 3-4). Thus, in the same period that Moayedi knowingly chose *not* to invest in Montage and *not* to fix any of Montage's many failings, he invested in Ponce and its fraudulent future. The most logical inference

---

[8] *See* Dkt. 44, Ex. 1 (Montage-BRC Prague Subcontract ("If the Owner recovers liquidated or other damages against MONTAGE, then MONTAGE may assess against the Subcontractor the portion of the Owner's damages that represent the Subcontractor's share of the responsibility")); *see also* Dkt. 44, Ex. 3 (Montage-Veyka Khartoum Subcontract (same)). Given that these subcontractors were doing nearly "all" of the work, their "share" of responsibility was likely most, if not all.

14

is that Moayedi milked Montage for all he could, but at a certain point, he was content to let it fail because he already knew what his next move was—a pivot to Ponce.

## CONCLUSION

In conclusion, the parties appear to agree that:

- Sina Moayedi is highly intelligent, experienced, and knowledgeable;
- Moayedi was in charge of Montage and the projects at issue;
- Montage was a tiny company with approximately 5-10 employees;
- Before Montage pivoted to seeking largescale DOS projects, the average value of its projects was less than approximately $250,000;
- Montage was ineligible to bid these largescale DOS projects;
- Moayedi repeatedly bid such projects anyway—by lying in numerous respects;
- Moayedi defrauded DOS by: bribing a public official; stealing numerous identities; and lying about (among many other things) his company's construction experience and his employees' identities, education, and qualifications;
- In his bids, Moayedi relied most frequently on Aaron Cropp—a man who never worked for Montage—for the positions of QC Manager, Safety Manager, and Security Manager;
- Moayedi's lies about his employees' purported qualifications occurred during both the procurement and execution phases of DOS contracts;
- A company with approximately ten employees cannot provide approximately five Key Personnel for seven simultaneous projects;
- Montage encountered "tremendous challenge[s]" on large DOS projects (Def. Br. 1);
- Moayedi responded to CPARs and thus was aware of the numerous problems noted therein;
- Montage was terminated for default twice; and
- Despite his awareness of endemic problems with Montage's performance, Moayedi never changed how he ran Montage—and he never hired a critical mass of qualified employees.

In sum, the evidence establishes by (much more than) a preponderance that: (1) Moayedi was in charge of Montage and its projects, (2) Montage repeatedly performed inadequate construction, and (3) Moayedi intended that result or at least acted with reckless disregard.

Dated: New York, New York
December 1, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Michael D. Neff
Assistant United States Attorney
(212) 637-2107

Cc: Counsel of Record (by ECF and email)

15