```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       -v-<br><br>SINA MOAYEDI,<br><br>            Defendant. | 22-cr-188 (JSR)<br><br>OPINION |

JED S. RAKOFF, U.S.D.J.:

On April 19, 2023, Sina Moayedi pleaded guilty to charges of conspiracy to commit wire and bank fraud, conspiracy to commit bribery, and aggravated identity theft. The charges, and Moayedi's guilty plea, all related to Moayedi's conduct in procuring government contracts to perform construction work on U.S. embassies abroad. At Moayedi's initial sentencing hearing on August 11, 2023, the parties expressed conflicting views about a matter that is relevant and material to the Court's sentencing decision, specifically, whether Moayedi "intentionally provided substandard and shoddy workmanship in order to further line his pocket." ECF No. 45 ("Initial Sentencing Tr."), at 29-30. That dispute arose because a central facet of Moayedi's request for a lenient sentence is that his company "Montage did the work under the contracts and always intended to do so." ECF No. 42 ("Sentencing Submission of Moayedi"), at 33; see also Initial

1

Sentencing Tr. at 16 (Moayedi's counsel stating, "Moayedi . . . and his companies did the work.").

Because the Government maintained its opposition to Moayedi's assertion, the Court set a hearing under United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979), to resolve whether Moayedi "provided inadequate construction for the projects he was in charge of, and if so, whether he did so intentionally or at least with reckless disregard." Minute Entry of 8/14/2023; see ECF No. 49. The Court held the Fatico hearing over two days, on October 11 and October 13, 2023, hearing live testimony from seven witnesses and receiving voluminous documentary and photographic evidence. Following the hearing, the parties also submitted briefing. The Government filed its initial submission on November 7, 2023, see ECF No. 51 ("Mem."), Moayedi filed responsive papers on November 22, 2023, see ECF No. 52 ("Opp."), and the Government filed reply papers on December 1, 2023, see ECF No. 53 ("Reply").[1] After considering the evidence heard and received at the Fatico hearing -- including the Court's assessment of the demeanor and credibility of the witnesses -- and the parties' post-hearing submissions, the Court finds by a preponderance of the evidence that in numerous respects, Moayedi

---

[1] The Court hereby grants the Government's request to file under seal Exhibit 2 to the Government's reply, see ECF No. 53-4, which contains confidential bidding information about a Montage competitor.

provided inadequate construction for the projects at issue and did so intentionally.

Before addressing the facts, the Court first responds to a legal argument Moayedi makes for the first time in his post-hearing submission. Moayedi now contends that the very subject of the <u>Fatico</u> hearing -- whether Moayedi provided inadequate construction and his attendant mental state -- is improper for the Court's consideration at sentencing because shoddy construction is not criminal conduct. <u>See</u> Opp. at 6-15. But, even putting aside that it was Moayedi who first raised the issue at sentencing by asserting that Moayedi's properly doing the work on the projects he illegally obtained was a mitigating factor, the law makes plain that conduct need not be criminal to be relevant at sentencing. Indeed, "[t]here is a long and durable tradition that sentencing judges enjoy discretion in the sort of information they may consider at an initial sentencing proceeding." <u>Concepcion v. United States</u>, 597 U.S. 481, 491 (2022).[2] A federal judge's "broad discretion to consider all relevant information . . . is bounded only when Congress or the Constitution expressly limits the type of information a district court may consider." <u>Id.</u> at 491. And Congress has proclaimed that "[n]o limitation shall be placed on the information concerning the background, character, and conduct

---

[2] Here and elsewhere, internal alterations, citations, and quotation marks are omitted unless otherwise indicated.

of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. "Accordingly, a federal judge in deciding to impose a sentence may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." Concepcion, 597 U.S. at 492.[3]

Furthermore, as already noted, there is a pointed irony to Moayedi's argument that the Fatico hearing was improper or irrelevant. The hearing was a direct response to Moayedi's own assertions -- in his counsel's initial sentencing submission, in his own letter to the Court, and in his counsel's arguments at the initial sentencing hearing -- that he "did the work under the contracts and always intended to do so." Sentencing Submission of Moayedi at 33. Because Moayedi thereby put the nature of his work at issue and because, in any case, the Court continues to agree that the manner in which that work was carried out and that defendant's intention with respect thereto are relevant considerations for the Court to consider in imposing a sentence, the Court rejects Moayedi's newly introduced objections.

---

[3] Moayedi cites cases discussing the meaning of "relevant conduct" as a term of art in the Federal Sentencing Guidelines. See, e.g., United States v. Catchings, 708 F.3d 710, 720 (6th Cir. 2013); U.S.S.G. § 1B1.3. Those cases are entirely inapposite to the dispute here, which has no bearing on Moayedi's Guidelines range.

4

Turning to the evidence presented at the Fatico hearing, the Court concludes that the Government has demonstrated to the Court by a preponderance of the evidence that Moayedi provided inadequate construction in numerous respects in the contracts at issue and that he did so intentionally. See United States v. Gaskin, 364 F.3d 438, 461 (2d Cir. 2004) (burden of proof for facts considered at sentencing is "by a preponderance of the evidence").

I.   Inadequate Construction

Moayedi's company, Montage, was terminated by the Department of State for default -- not one time, but in two such contracts. See GX 1234 (explaining, for an embassy project in Prague, that "Montage has failed to prosecute the work with diligence," "has not yet achieved substantial completion and is . . . 862 days late without excuse"); GX 1366 (noting, for a different embassy project in Madrid, "Montage's failure to complete the project in accordance with the contract schedule, Montage's failure to progress the work, Montage's unsatisfactory planning, scheduling, and reporting of the work, Montage's failure to meet limitations on subcontracting, Montage's failure to properly manage the project, Montage's failure to maintain quality control, and Montage's failure to meet safety and health requirements"). Kevin Mizell, the Project Director for the Department of State on the Madrid project, credibly testified that "Montage and their performance in Madrid was the worst I had seen in all nine years [at the Department of

5

State] and in all my career." Tr. 164.[4] Another fully credible witness, Charles Lowther, the Project Director for the Department of State on a similar project in Bermuda, described "Montage's overall performance" as "unsatisfactory" and stated that Montage was "the worst contractor I've dealt with in my 30 years in the construction industry." Tr. 251-52.

Further still, at the time Montage was terminated for default in Madrid -- the point at which the project was due to have been substantially completed -- Montage had performed "less than 10 percent of the work." Tr. 21. Project Director Mizell contemporaneously discussed Montage's work product unfavorably with others at the State Department. In a September 5, 2018 email to three others at the State Department, with subject line "Hamilton, Madrid and Prague Montage [P]erformance Issues," Mizell wrote, "The long and short of it is that they are clearly overwhelmed by this $16M project [in Madrid] and have no real technical competence to perform at or near [the] minimum level of marginal performance. We're supplementing and bolstering them through many performance metrics (quality, security, local legal compliance, management). They're [sic] 'hands off' approach

---

[4] Citations to "GX" refer to exhibits introduced by the Government and received at the Fatico hearing. Citations to "DX" refer to those introduced by the defense. Citations to "Tr." refer to the transcript of the Fatico hearing.

(subcontracting the entirety of the work . . .) is proving quite ineffective." DX KM-21.

Montage's written evaluations by federal agencies in the Contractor Performance Assessment Reporting (CPAR) system tell a similar story. Montage's final CPAR evaluation for work at the U.S. embassy in Burkina Faso states that "the quality of the work on site was routinely marginal to unacceptable." GX 1416. "[T]he contractor's" -- Montage's -- "position on quality, as with almost everything else, was it was someone else that was at fault and things [were] beyond their control even though they chose the method of execution, the resources to devote to the project, the sub-contractors, the workforce, . . . etc." Id. The evaluation lists several examples of inadequate performance. For instance, "[d]uring construction, the contractor toiled for months and couldn't find a core drill that was proper to drill through the perimeter wall for the electrical conduits to go through." Id. "Although the government kept reminding the contractor of these and other critical decisions that needed to be taken . . . they simply weren't done and the government had to step in." Id.

The CPAR evaluations for the Prague project, from which Montage was eventually terminated for default, list several categories of installation that were performed improperly, such as roofing and a perimeter wall, that Montage had to redo after prompting by the Department of State's Quality Assurance team. GX

1222. The CPAR explained that "[t]he number of construction deficiencies and the frequency with which they occur show a lack of effective Quality Control (QC) program." Id. "QC activities do not appear to be closely coordinated with the project schedule and deficient work continuously affects the project schedule by causing delays in the completion of construction activities." Id. Similarly, a CPAR evaluation for Montage's work at a project in Lagos listed the quality of the work as "marginal" in every category, including those related to QC, and the "identification/correction of deficient work" as "unsatisfactory." GX 809.

Montage's lack of adequate quality control and project management was a recurring issue across projects. See GX 1131 ("Montage has never appeared to be on board with the concept of a Quality Control program."). For instance, Montage had no quality control manager on site for much of the work performed on the Madrid project until Montage was terminated for cause. Tr. 48 (Mizell's testimony that "[t]he first we saw quality control manager was 16 months after we told them to proceed"); see GX 1369. Regarding Montage's work in Bermuda, Project Director Lowther testified that the three project managers Montage cycled through "lacked knowledge of basic construction means or methods." Tr. 256. Montage's project managers in Bermuda "were repeatedly shown to be deficient in their understanding of reading plans or

specifications." Id. "They ignored a lot of basic industry standards . . . for safety and for quality control." Id. One such Montage project manager in Bermuda "never once had a schedule that was accurate." Tr. 259. To boot, Lowther "never once got an update for the project schedule that was even remotely on time." Id. A different person, whom Montage had simultaneously designated as both the safety manager and quality control manager, "did not have a basic knowledge of construction." Tr. 263. That person "didn't know how to read rebar shop drawings" and "didn't know most of the things that we were doing." Tr. 263-64. Lowther even "had to teach" Montage's employees himself "about the fundamentals of concrete" because "they were incapable of reading the shop drawings." Tr. 284.

   The above examples reflect only some of the evidence presented to the Court demonstrating that Moayedi and his company provided grossly inadequate construction for several of the contracts of which he was in charge. Moayedi argues that even if the Court concludes that he in some cases provided inadequate construction, he did not do so for every project he and his company was awarded or for every aspect of those projects. See, e.g., Opp. at 17-19. But this pales beside the evidence that in some of his (wrongfully obtained) construction projects, the work of Moayedi's company was so grossly defective.

II.  Moayedi's State of Mind

The Government has further proved that these numerous defects were intentional on Moayedi's part.

Moayedi personally decided which projects Montage would bid on, which individuals to list as key personnel for those bids, and which purported qualifications of those key personnel he would highlight. See Tr. 357-59. Repeatedly, Moayedi falsely inflated the credentials of key personnel -- and in some cases, submitted names of people who never even worked for Montage -- that he touted to the State Department to win bids, only to send in their stead people that he knew were patently unqualified for their roles once he secured the contract in question. One such unqualified employee, for example, was Analiza Lleses, a teacher's aide at a private school, whom Moayedi sent to work on the Prague project as a construction superintendent. Moayedi wrote to Lleses that he would "teach [her] all about being a super." GX 125. Moayedi sent Lleses short YouTube videos with titles such as, "A Day in the Life: Construction Superintendent." Id. He instructed Lleses to "look at the way the super walks in the video," "how he holds the role [sic] of drawings under his arm," "his mannerisms," and his "jumping on scaffolding." Id. It blinks reality to believe that someone could be an effective construction superintendent of a $20 million compound security upgrade project at a U.S. embassy merely by

imitating the "mannerisms" from a sub-five-minute YouTube video. See GX 125A.

To give another example, when the Department of State sent Montage a letter requesting a plan of recovery for inadequate work in Prague, Montage's project manager at the time wrote to Moayedi stating, "You can not teach welders via You tube and expect it to come out correctly." GX 107. Rather than respond with concern or a desire to improve, Moayedi replied, "[W]ho's side are you on, I understand that the welders have their certs? Your job is to defend us on site." Id.

Further still, Moayedi's internal emails show that he was aware of Montage's inability to adequately perform the construction contracts awarded, even as he continued to engage in fraud to obtain additional contracts. In a June 7, 2018 email from Moayedi to others at Montage discussing the Burkina Faso project, Moayedi wrote that his own employee "doesn't have enough knowledge or expertise to know what to look for." GX 109. Moayedi referred to Montage's "work" as "shabby." Id. He continued that he "was not able to disagree with post assessment that we don't know what we are doing." Id. In a July 2017 email about the Prague project, Moayedi pushed back on an email from an employee about a need for better quality control; Moayedi sought to avoid hiring a quality control manager who would be onsite performing inspections at least half the time. GX 100. And when the Department of State sent a

11

letter from its contracting officer to Moayedi about Montage's subpar work on the Madrid project, Moayedi "breathed out immediate threatenings in response" but took "no substantive action." DX KM-21.

Particularly telling is a November 2017 email chain between Moayedi and a Montage senior project manager about the possibility of termination for default in the Bermuda project. The project manager posed to Moayedi that "the best way to protect ourselves might be to start digging up the site maybe for duct banks and perimeter walls and such." GX 105. "This way it will be that much more difficult to terminate us because they will have a bunch of open excavations around site sitting for a year until they get another contractor in there." Id. Rather than respond in an aghast manner, Moayedi replied with a list of what he believed, "legally speaking," was "very important in order to have [a] basis to overturn a termination for default." Id. That list included finding ways to demonstrate that "resources are committed" and showing that Montage was "faced with unforeseen site conditions." Id.

Moayedi was also well aware that he, time and again, was not providing sufficient personnel to complete Department of State projects that Montage was awarded. Indeed, the Department of State and his own employees told him as much. A CPAR evaluation of Montage's work on a project in Ecuador stated that "the contractor has not provided the five, full-time, on-site key management staff

required by the contract." GX 984. A CPAR evaluation for Montage's work on the Burkina Faso project, which rated Montage's quality as marginal and schedule as unsatisfactory, stated that Montage provided "insufficient manpower on the job to get it done in the timeframe of the schedule." GX 1416. A former Montage employee, who was hired on Craigslist and had no overseas, consulate, or embassy construction experience but was sent to the Madrid project as Montage's project manager, testified that he "arrived there by [him]self and essentially the entire time [he] didn't have any of the key personnel that were required for the project." Tr. 183-84.

In defense counsel's view, the evidence may show that Moayedi was overwhelmed or that Montage was spread too thinly, but not that Moayedi more likely than not acted intentionally or recklessly in providing inadequate construction. The Court disagrees. If Moayedi had been overwhelmed but was otherwise acting in good faith, nothing required him to continue bidding for multimillion dollar overseas construction projects at U.S. embassies, let alone to secure such contracts by providing false information about his personnel and their qualifications. Moayedi admits that he "inflated or fabricated certain prior experience to include with Montage's bids" because "the timing and size of these contracts would not have permitted Montage to bid on the larger contracts at issue." Sentencing Submission of Moayedi at 52. Yet having thereby

13

fraudulently obtained the contracts, Moayedi repeatedly provided grossly inadequate personnel to carry out the contracts and did so again and again. From all of the evidence the Court has received and considered, the only conclusion that the Court can draw is that Moayedi not only knew that Montage was unqualified even to bid on the contracts at issue, but also was in many instances unqualified to perform the work that those contracts would require.

The Court will sentence Moayedi this Friday, December 8, 2023, at 4:00 PM, taking account of all the factors specified in 18 U.S.C. § 3553(a). The findings from the Fatico hearing will bear on that assessment, though it will be only one of the many facts and factors the Court will consider.

New York, NY  
December 7, 2023

JED S. RAKOFF, U.S.D.J